UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,

**Index No: 08-CV-0823**
**(NPM/ATB)**

Plaintiff,

v.

GENERAL INTERIOR SYSTEMS, INC., a
Corporation, JEFFREY T. MENTO, Individually
And as President, and RICHARD MABBETT,
Individually and as Vice President,

Defendant's.

## DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

### INTRODUCTION

Pursuant to Federal Rule Civil Procedure 56 and Local Rule 7.1, defendants General Interior Systems, Inc. ("GIS") and Jeffrey T. Mento submit the following opposition and objections to plaintiff's statement of undisputed material facts. Each heading and numbered paragraph corresponds to plaintiff's headings and numbered paragraphs; defendants' use of plaintiff's headings is only for reference purposes and is not meant to infer that defendants agree with the headings.

Where a fact is denied, defendants have cited to the evidence where the factual issues arise. The evidence cited was either previously submitted with plaintiff's motion for partial summary judgment, previously submitted with defendants' motion for

1

summary judgment, which is incorporated herein by reference, or is being submitted herewith.

Pursuant to Federal Rule Civil Procedure 56(c)(2), defendants have asserted certain objections to the admissibility of some of plaintiff's cited evidence. Defendants request that the Court rule on each of defendants' objections. The Statute of Limitations in this case, 29 U.S.C.§255a, is two (2) years from the date of filing, unless there is a willful violation in which case the limitations period is three (3) years. Plaintiff's Complaint was filed on July 28, 2008, see plaintiff's Exhibit 1. The overwhelming majority of plaintiff's undisputed material facts do not reference any timeframe and the supporting deposition testimony cited by plaintiff also does not reference a timeframe or it is unclear as to the timeframe. Many of the relationships and testimony predate July 28, 2005, and therefore plaintiff is utilizing inadmissible testimony as part of its motion for partial summary judgment. Defendants object to the use of testimony where no timeframe is specified as a result.

Plaintiff segregates its statement of fact under certain headings. Paragraphs 1-10 are set forth under the heading "General Interior Systems, Inc." Paragraphs 11-25 are set forth under the heading "Bona Fide Subcontractor Businesses." Paragraphs 26 and 27 are set forth under the heading "Individual Drywall Installers." Paragraphs 28-64 are set forth under the heading "Drywall Installers Who GIS Hired Directly." Lastly, paragraphs 65-132 are set forth under the heading "Drywall Installers Referred to GIS From Labor Brokers." Due to plaintiff's headings, defendants presume that it should respond to paragraphs 28-64 of plaintiff's statement as if the purported facts are alleged to apply to only the drywall installers who GIS allegedly hired directly. Similarly, defendants

paragraphs 65-132 as if the purported facts are alleged against only the drywall installers referred to GIS from labor brokers.

Defendants also set forth herein, in separately numbered paragraphs, additional material facts that are in dispute.

## GENERAL INTERIOR SYSTEMS, INC.

1.       Admitted.

2.       Denied to the extent that plaintiff implies that GIS is exclusively a commercial drywall installation subcontractor.  GIS is in the commercial construction business; it installs metal stud framing, drywall, and acoustical ceilings, and it performs carpentry work such as installation of doors, hardware, closures, and hinges.  Plaintiff's Exhibit 3, Mento, at pages 9:19-10:22, 11:24-12:24 and 14:5-16:15.

3.       Admitted.

4.       Admitted.

5.       Denied as follows.  Plaintiff's Exhibit 3, Mento, at pages 35:18-36:15, lacks foundation and is vague as no particular time period is specified for GIS' operation of the construction sites in the various States.

Plaintiff's Exhibit 4, Crim, at pages 17:22-18:2, 40:14-16 and 57:18-58:13, lacks foundation and is vague as no particular time period is specified for GIS' operation of the construction sites in the various states.  Plaintiff's Exhibit 5, Landman, at pages 15:20-16:3, lacks foundation and is vague as no particular time period is specified for GIS' operation of the construction sites in the various states.  Plaintiff's Exhibit 6, Davis II, at pages 77:22-24, lacks foundation and is vague as no particular time period is specified for GIS' operation of the construction sites in the various states.   Plaintiff's

Exhibit 7, Crouse, at pages 43:2-6, lacks foundation and is vague as no particular time period is specified for GIS' operation of the construction sites in the various states.

6.      While plaintiff's statement might be true, the evidence cited by plaintiff does not support the statement and defendants must therefore deny it for purposes of defendants' opposition.  Plaintiff's Exhibit 3, Mento, at pages 40:3-10, is irrelevant and does not support the purported fact as the purported fact misstates the testimony.  The cited testimony only says that GIS "work[s] under somebody" and says nothing about general contractors' responsibilities in the commercial construction industry.

Plaintiff's Exhibit 7, Crouse, at pages 26:7-27:4, is irrelevant, lacks foundation, and does not support the purported fact.  The cited testimony only references how a company called "Anthony" operated in some unspecified time period.

7.      Denied as follows.  Plaintiff's Exhibit 8, Mabbett, at pages 11:3-15, 14:17-20 and 79:23-80:18, lacks foundation and is vague as no particular time period is specified for GIS' submission of bids to general contractors.  In addition, GIS also works for owners and architects.  Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6.

8.      Denied as follows.  Plaintiff's Exhibit 8, Mabbett, at pages 11:3-15, 14:17-20 and 79:23-80:18, lacks foundation, is vague, irrelevant, and does not support the purported fact as no particular time period is specified for GIS' submission of bids to general contractors and there is no mention of drywall installation.  In addition, GIS also works for owners and architects.  Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6.

9.      Denied as follows.  Plaintiff's Exhibit 8, Mabbett, at pages 11:3-15, 14:17-20 and 79:23-80:18, lacks foundation, is vague, irrelevant, and does not support the purported fact as the purported fact misstates the testimony insofar as no particular time

4

period is specified for GIS' submission of bids to general contractors and there is no mention of bids being based on a fixed hourly wage rate or a fixed price per job. In addition, GIS estimated jobs by square foot. Plaintiff's Exhibit 8, Mabbett, at pages 79:23-80:18.

10.     Denied as follows. GIS has performed drywall installation work using subcontractors retained directly by GIS, GIS' own employees, and workers employed and provided by labor supply companies. Plaintiff's Exhibit 3, Mento, at pages 24:7-27:18, 51:8-53:24, 57:10-19 and 58:13-20; plaintiff's Exhibit 6, Davis II, at pages 44:7-21; Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011 and Exhibit T to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 1-:9-20:13.

### *BONA FIDE* SUBCONTRACTOR BUSINESSES

11.     Plaintiff's Exhibit 9, Smith, at pages 19:17-20:6 is irrelevant and does not support the purported fact as the purported fact misstates the testimony. The cited evidence says nothing about a subcontractor having, or not having, a contractual relationship with GIS or with general contractors; the cited evidence says nothing at all about contractual relationships. The cited evidence simply says that Steven Smith used to have a business called Steve Smith Drywall Corp. Moreover, the evidence is in reference to a time period in 2010, which is irrelevant. The evidence also lacks foundation as there is no evidence that Steven Smith – who was a GIS subcontractor and then a GIS employee in 2010 and he only did drywall finishing – has the knowledge or expertise to speak on behalf of the GIS company about GIS' general practice in subcontracting out work. And as this purported fact is under plaintiff's heading "Bona Fide Subcontractor Businesses," defendants object to the use of the description "bona fide;" as plaintiff

admits at Exhibit 9, Smith, at pages 23:20-24:6, plaintiff's counsel created this description on his own. Furthermore, subcontractors whom plaintiff describes as "bona fide" did not necessarily have contracts with GIS; for instance, Steven Smith, a so-called "bona fide" subcontractor, never had a contract with GIS or anybody else. Plaintiff's Exhibit 9, Smith, at pages 17:21-18:4 and 25:14-25.

12.     Admitted in part and denied in part.   Plaintiff's Exhibit 6, Davis II, at pages 29:16-17, lacks foundation and refers to a time period in 2011, which is irrelevant. The entirety of the evidence that plaintiff cites to support its purported facts is, "When I need employees, we run an ad through Monster.  I do not hire subcontractors to be employees."  Admitted that none of GIS' subcontractors were employees, but denied to the extent that plaintiff has created the description "bona fide" and unilaterally applies it to only a select number of subcontractors.

13.     Denied as follows.  Plaintiff's Exhibit 9, Smith, at pages 19:22-20:3 is vague as no particular time frame is specified, and it lacks foundation as there is no evidence that Steven Smith – who was a GIS subcontractor and then a GIS employee in 2010 and he only did drywall finishing – has the knowledge or experience necessary to speak on behalf of the GIS company about the extent to which GIS subcontracted with different types of business entities.

In addition, subcontractors whom plaintiff describes as "bona fide" were not necessarily just corporations, partnerships, LLCs, or sole proprietorships.  On the contrary, the so-called "bona fide" subcontractors included individual people; for instance, Steven Smith, a so-called "bona fide" subcontractor, was an S corporation for a time (with no employees) but dissolved that and then just worked as a subcontractor for

GIS as himself, the individual. Plaintiff's Exhibit 9, Smith, at pages 19:11-20:19 and 29:4-21. Also denied to the extent plaintiff is incorrectly implying that those who it unilaterally deems not to be "bona fide" subcontractors worked exclusively on an hourly basis. Ted Davis II, although deemed by plaintiff not to be a "bona fide" subcontractor, was a "dba" and although he worked at times on an hourly basis, he also worked on a square footage basis. Plaintiff's Exhibit 6, Davis II, at pages 9:9-12:4, 32:24-33:11, 34:20-35:13, 60:10-20, 89:5-11, 90:4-9, 111:20-112:2 and 122:22-123:13; plaintiff's Exhibit 9, Smith, at pages 20:9-22 and 29:4-21.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, was a "dba" and he worked on both an hourly and square footage basis. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 17:2-10, 21:3-23:6, 24:13-24, 71:15-74:17, 93:15-94:2 and 103:20-24.

14. Denied as follows. Plaintiff's Exhibit 6, Davis II, at pages 29:25 lacks foundation and is irrelevant because it is referring to a time period in 2011. In addition, the so-called "bona fide" subcontractors were often just a single person with no employees; for instance, Steven Smith, a so-called "bona fide" subcontractor, never had any employees for any of the subcontracting work that he did. Plaintiff's Exhibit 9, Smith, at pages 20:9-22. On the other hand, Clinton Bleskoski, an independent contractor plaintiff has deemed not "bona fide," had his brother working for him for several years on GIS projects and other projects. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 24:6-25:7, 103:9-105:17 and 106:17-108:10. Lastly, Meaghan Doran was a receptionist and then an administrative assistant at GIS for approximately two (2) years. Plaintiff's Exhibit 10, Doran, at pages

9:24-10:7.  Defendants deny that she has the knowledge and experience needed to speak regarding how subcontractors complete work for general contractors or other subcontractors.  Plaintiff's Exhibit 10, Doran, at page 124:4-17.

15.     Denied as follows.  Plaintiff's Exhibit 9, Smith, at pages 21:4-22:4 is vague as no particular time frame is specified, and it lacks foundation as there is no evidence that Steven Smith – who was a GIS subcontractor and then a GIS employee in 2010 and he only did drywall finishing – is capable of speaking on behalf of all "bona fide" subcontractors about the extent to which they may work simultaneously for more than one contractor on more than one jobsite.  Plaintiff misleadingly implies that the only subcontractors who worked for more than one contractor at a time were the ones plaintiff has decided to call "bona fide" subcontractors.  On the contrary, other subcontractors who plaintiff has decided are not "bona fide" subcontractors also worked for more than one contractor at a time, including working for GIS' competitors.  Plaintiff's Exhibit 3, Mento, at pages 86:7-19; plaintiff's Exhibit 17, P. Davis, at pages 14:15-15:23.  Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 23:7-24:5, 25:20:27:12, 29:10-19, 101:21-102:18 and 104:12-106:16.  Lastly defendants object to this statement of undisputed material fact on the grounds that plaintiff is mischaracterizing the testimony by unilaterally interjecting a descriptive term, "bona fide," not used by the witnesses.

16.     Denied as follows.  Plaintiff's Exhibit 9, Smith, at pages 21:4-22:4, and 29:22-30:11, is vague as no particular time frame is specified, and it lacks foundation as there is no evidence that Steven Smith – who was a GIS subcontractor and then a GIS employee in 2010 and he only did drywall finishing – is capable of speaking on behalf of

all "bona fide" subcontractors about the extent to which they may alternate between jobsites. Additionally, the cited testimony does not support the purported fact as the purported fact misstates the testimony: Mr. Smith, never having any employees of his own on any subcontracting work that he ever did, cannot speak at all about the extent to which any subcontractor employed several crews. Plaintiff's Exhibit 9, Smith, at page 20:15-22. Plaintiff puts the word "crews" in quotes, as if quoting Mr. Smith's testimony, but Mr. Smith did not use the word "crews" in the cited evidence so plaintiff is misrepresenting his testimony. Admitted that it is possible subcontractors, whether those plaintiff decides to call "bona fide" or not, could have worked and did work for more than one contractor at a time, but defendants deny the cited testimony supports the proposition. Plaintiff's Exhibit 3, Mento, at page 86:7-19; plaintiff's Exhibit 17, P. Davis, at pages 14:15-15:23; Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 23:7-24:5, 25:20:27:12, 29:10-19, 101:21:102:18 and 104:12-106:16. In addition, defendants object to this purported fact to the extent that plaintiff has unilaterally created the description "bona fide" and applies it to only a select number of subcontractors.

17.  Defendants object to this statement on the grounds that plaintiff is mischaracterizing the cited testimony by use of the term "bona fide." Denied as follows. Plaintiff's Exhibit 22, Butler, at page 83:3-13, lacks foundation and is speculative as there is no evidence that Ryan Butler – a subcontractor who did framing work for GIS but who plaintiff unilaterally deems not "bona fide" – is capable of speaking on behalf of "bona fide" subcontractors about the extent to which those subcontractors (whoever they may be) may determine their own daily work schedules or hours or pay their workers. In the

cited evidence, Mr. Butler was asked only about the hours of one company, called Perkins, and his response included "I guess" and "[p]retty much." Mr. Butler did not even work for Perkins. Work schedules can be determined by the general contractors, whether permits and inspections are timely, material deliveries and other contractors can hold up the work. See the Affidavit of Jeffrey T. Mento in opposition to plaintiff's motion for partial summary judgment (hereinafter referred to as "Mento Affidavit in Opposition") and plaintiff's Exhibit 25, Carver, at pages 90:8-20 and 168:17-169:5.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, determined his own work schedule and paid his own worker. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 14:7-17:10, 24:6-25:7, 27:24-28:19, 103:9-105:17 and 106:17-108:10.

18.     Admitted in part and denied in part. Plaintiff's Exhibit 10, Doran, at page 62:1-13 is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee. The witness' opinion cannot properly be couched as fact. Admitted that some subcontractors do remit an invoice, but denied to the extent that plaintiff has created the description "bona fide" and applies it to only a select number of subcontractors.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, has worked on a square footage basis and would send GIS a bill for that work. And since 2007, he has been submitting bills to GIS for all work, regardless of whether it is hourly or by the foot, and he has not submitted any timesheets. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 22:15-18 and 123:20-125:9.

19.     Admitted in part and denied in part.  Plaintiff's Exhibit 9, Smith, at pages 22:14-23:19 is vague as no particular time frame is specified, and it lacks foundation as there is no evidence that Steven Smith – who was a GIS subcontractor and then a GIS employee in 2010 and he only did drywall finishing – is capable of speaking on behalf of all "bona fide" subcontractors about their invoicing practices.

Plaintiff's Exhibit 11, eight invoices, lacks foundation as they are not authenticated.  Without waiving said objections, admitted that invoices can contain the number of hours worked or the square footage of work.

20.     Denied as follows.  Plaintiff's Exhibit 11, eight invoices, lacks foundation as they are not authenticated.  In addition, Exhibit 11, the Nu Contracting invoice, does in fact identify the Nu Contracting employees (Nate and Nick) who performed the work.

21.     Denied on the grounds that plaintiff's Exhibit 11, eight invoices, lacks foundation as they are not authenticated.   In addition, what the subcontractors pay their employees is up to them.

22.     Defendants object to the term "bona fide."  Defendants do not know who plaintiff considers a "bona fide" subcontractor, or what its criteria are.  Denied to the extent that plaintiff is ignoring the fact that GIS virtually never paid any of the labor supply companies' employees directly.  GIS paid the labor supply companies, not the individual employees of those companies.   Plaintiff's Exhibit 3, Mento, at pages 25:14-28:5, 45:13-46:9, 59:2-13 and 63:2-66:6; Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011.

23.     Defendants object to the use of the term "bona fide."  Defendants are not sure why plaintiff deems Mr. Smith "bona fide."  Admitted that Steven Smith worked for

a time on a per project basis for GIS.  Denied to the extent plaintiff is incorrectly implying that those who it deems not to be "bona fide" subcontractors worked exclusively on an hourly basis. Ted Davis II, although deemed by plaintiff not to be a "bona fide" subcontractor, was a "dba" and although he worked at times on an hourly basis, he also worked on a square footage basis.  Plaintiff's Exhibit 6, Davis II, at pages 9:9-12:4, 34:20-35:13, 60:10-20, 90:4-9, 111:20-112:2 and 122:22-123:13.  Also denied that Steven Smith always "owned and operated" a "drywall subcontractor business" while he was a so-called "bona fide" subcontractor for GIS.  Mr. Smith was an S corporation for a time (with no employees) but dissolved that and then just worked as a subcontractor for GIS as himself, the individual.  Plaintiff's Exhibit 9, Smith, at pages 20:9-22 and 29:4-21.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, was a "dba" and he worked on both an hourly and square footage basis. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 17:2-10, 21:3-23:6, 24:13-24, 71:15-74:17, 93:15-94:2 and 103:20-24.

24.     Admitted that Mr. Smith had Steve Smith Drywall Corp. for a time, which was an S corporation (with no employees), but he dissolved the company, dropped the company name, and then just worked as a subcontractor for GIS as himself, Steven Smith the individual.  Plaintiff's Exhibit 9, Smith, at pages 20:9-22 and 29:4-21.

25.     Admitted in part and denied in part.  Denied on the grounds that plaintiff's Exhibit 9, Smith, at pages 20:23-25:7 is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee.  The witness' opinion cannot properly be couched as fact.  Admitted that in response to the

question of why he considered himself a subcontractor, among Steven Smith's reasons were that he set his own hours, worked with his own tools, and was not working "for one guy." Denied to the extent that plaintiff failed to list the other reasons that Mr. Smith gave, which were that he had to have his own insurance and he did not have tax withholdings taken out. Plaintiff's Exhibit 9, Smith, at page 24:3-10. Also denied to the extent that plaintiff incorrectly implies that subcontractors who plaintiff has decided are not "bona fide" did not work with their own tools, did not work exclusively for GIS, worked simultaneously for GIS competitors, had to have their own insurance, and did not have tax withholdings taken out. Plaintiff's Exhibit 3, Mento, at pages 48:2-50:7, 84:5-7 and 86:7-19; plaintiff's Exhibit 12, Chase, at pages 13:12-23, 20:17-21:18 and 37:12-21; plaintiff's Exhibit 16, Sanders, at pages 15:20-16:19 and 24:4; plaintiff's Exhibit 17, P. Davis, at pages 14:15-15:20; plaintiff's Exhibit 18, Carr, at pages 21:15-19. Further, Mr. Smith stopped working for GIS as a subcontractor and became a GIS employee, at which point GIS provided Mr. Smith with insurance. Plaintiff's Exhibit 9, Smith, at page 17:5-15.

**INDIVIDUAL DRYWALL INSTALLERS**

26. Defendant objects to the use of the term "individual drywall installers" on the grounds that it is vague. Plaintiff's Exhibit 6, Davis II at pages 32:24-33:9 lacks foundation and is vague as no particular time period is specified for when the "[i]ndividual drywall installers also installed drywall for GIS." Without waiving said objection, denied. GIS has performed drywall installation work using subcontractors retained directly by GIS, GIS' own employees, and subcontractors employed and provided by labor supply companies. Plaintiff's Exhibit 3, Mento, at pages 24:7-27:18,

13

51:8-53:24, 57:10-19 and 58:13-20; plaintiff's Exhibit 6, Davis II, at page 44:7-21;

Affidavit of Jeffrey T. Mento sworn to on June 27, 2011 and Exhibit T to the Affidavit of

David E. Leach sworn to on September 23, 2011 at pages 19:9-20:13.

27.   Denied as follows.  Plaintiff's Exhibit 7, Crouse, at page 31:5-13 lacks

foundation and is vague as no particular time period is specified for GIS' "hiring" of

drywall installers.   In addition, GIS has performed drywall installation work using

subcontractors retained directly by GIS, GIS' own employees, and subcontractors

employed and provided by labor supply companies.  Plaintiff's Exhibit 3, Mento, at pages

24:7-27:18, 51:8-53:24, 57:10-19 and 58:13-20; plaintiff's Exhibit 6, Davis II, at page

44:7-21; Affidavit of Jeffrey T. Mento sworn to on June 27, 2011 and Exhibit T to the

Affidavit of David E. Leach sworn to on September 23, 2011 at pages 1-:9-20:13.

**DRYWALL INSTALLERS WHO GIS HIRED DIRECTLY**

28.   Admitted in part and denied in part.  Plaintiff's Exhibit 3, Mento, at page

24:7-10; plaintiff's Exhibit 7, Crouse, at page 45:20-21; plaintiff's Exhibit 13, Huerta, at

pages 19:24-20:6; plaintiff's Exhibit 14, J. Anguiano, at page 14:14-22 and plaintiff's

Exhibit 15, L. Anguiano, at page 10:9-19, lack foundation and are vague as no particular

time period is specified for GIS' "recruiting" of drywall installers.   Admitted that GIS

retained some subcontractors through newspaper advertisements, the internet, and

referrals from other employees.

29.   Admitted in part and denied in part.  Plaintiff's Exhibit 16, Sanders, at

pages 14:22-15:2, 8-16 and plaintiff's Exhibit 21, Kelly, at page 16:3-17:9, are irrelevant

as Mr. Sanders and Mr. Kelly are not GIS workers listed on Exhibit A to plaintiff's

Complaint.  Their testimony also lacks foundation and is vague as no particular time

period is specified for GIS' "hiring" of independent contractors or subcontractors. Plaintiff's Exhibit 7, Crouse, at page 31:23-4 and 33:3-8 and plaintiff's Exhibit 18, Carr, at page 21:15-22:13, lack foundation and are vague as no particular time period is specified for GIS' "hiring" of independent contractors or subcontractors. Admitted that among those who performed drywall work for GIS were independent contractors or subcontractors.

30.     Denied as follows. Plaintiff's Exhibit 5, Landman, at page 99:6-14, lacks foundation and is vague as no particular time period is specified and there is no evidence that Robert Landman, who plaintiff has unilaterally decided was not a "bona fide" subcontractor, is capable of speaking on behalf of the GIS company about the extent to which GIS accepted bids from subcontractors.

Plaintiff's Exhibit 20, Hamilton, at page 24:15-22, lacks foundation and is vague as no particular time period is specified and there is no evidence that Jeffery Hamilton, who is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint, is capable of speaking on behalf of the GIS company about the extent to which GIS accepted bids from subcontractors. Mr. Hamilton's testimony is irrelevant as he was a subcontractor for GIS prior to the dates relevant to this litigation. Plaintiff's Exhibit 20, Hamilton, at pages 67:19-68:10 and 76:7-77:22.

Plaintiff's Exhibit 21, Kelly, at page 47:15-24, is irrelevant, lacks foundation, and is vague as no particular time period is specified and there is no evidence that John Kelly, who is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint, is capable of speaking on behalf of the GIS company about the extent to which GIS accepted bids from subcontractors.

15

31.     Denied as follows.   Exhibit 5, Landman, at pages 15:20-16:3, lacks foundation and is vague as no particular time period is specified and there is no evidence that Robert Landman, who plaintiff has decided was not a "bona fide" subcontractor, has the knowledge, expertise or authority to speak on behalf of the GIS company about the extent to which GIS received invoices from subcontractors.  Mr. Landman's testimony is irrelevant and does not support the purported fact as the purported fact misstates the testimony insofar as the cited testimony does not mention invoices.

Plaintiff's Exhibit 12, Chase, at pages 72:17-73:6, lacks foundation and is vague as no particular time period is specified and there is no evidence that Matthew Chase, who plaintiff has decided was not a "bona fide" subcontractor, is capable of speaking on behalf of the GIS company about the extent to which GIS received invoices from subcontractors.   Mr. Chase's testimony is irrelevant and does not support the purported fact as the purported fact misstates the testimony insofar as the cited testimony does not mention invoices.

Plaintiff's Exhibit 20, Hamilton, at pages 24:15-22, lacks foundation and is vague as no particular time period is specified and there is no evidence that Jeffery Hamilton, who is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint, is capable of speaking on behalf of the GIS company about the extent to which GIS received invoices from subcontractors.  Mr. Hamilton's testimony is irrelevant as he was a subcontractor for GIS prior to the dates relevant to this litigation and he is not listed on Exhibit A to plaintiff's Complaint.  Plaintiff's Exhibit 20, Hamilton, at pages 67:19-68:10 and 76:7-77:22.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, has worked on a square footage basis and would send GIS a bill for that work. And since 2007, he has been submitting bills to GIS for all work, regardless of whether it is hourly or by the foot, and he has not submitted any timesheets. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 22:15-17 and 123:20-125:9.

32.    Denied as follows. Plaintiff's Exhibit 5, Landman, at page 86:9-17, lacks foundation and is vague as no particular time period is specified and there is no evidence that Robert Landman, who plaintiff has decided was not a "bona fide" subcontractor, is capable of speaking on behalf of the GIS company about the extent to which GIS supplied timesheets to workers or directed workers to record hours on timesheets. Mr. Landman's testimony is irrelevant and does not support the purported fact as the purported fact misstates the testimony insofar as the cited testimony does not mention GIS giving directions to workers or GIS supplying timesheets. Instead the cited testimony pertains only to one particular occasion where Mr. Landman wanted to get his timesheet verified.

Plaintiff's Exhibit 12, Chase, at page 59:10-23, lacks foundation and is vague as no particular time period is specified and there is no evidence that Matthew Chase, who plaintiff has decided was not a "bona fide" subcontractor, is capable of speaking on behalf of the GIS company about the extent to which GIS supplied timesheets to workers or directed workers to record hours on timesheets. Mr. Chase's testimony is irrelevant and does not support the purported fact as the purported fact misstates the testimony insofar as the cited testimony does not mention GIS giving

directions to workers or supplying timesheets.  Instead the cited testimony pertains only to Mr. Chase initialing timesheets.

Plaintiff's Exhibit 18, Carr, at page 62:15-24 and plaintiff's Exhibit 19, Snyder, at pages 48:17-24 and 49:18-25, lack foundation and are vague as no particular time period is specified.

Plaintiff's Exhibit 20, Hamilton, at page 42:12-24, lacks foundation and is vague as no particular time period is specified and there is no evidence that Jeffery Hamilton, who is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint, is capable of speaking on behalf of the GIS company about the extent to which GIS supplied timesheets to workers or directed workers to record hours on timesheets.  Mr. Hamilton's testimony is irrelevant as he was a subcontractor for GIS prior to the dates relevant to this litigation.  Plaintiff's Exhibit 20, Hamilton, at pages 67:19-68:10 and 76:7-77:22.

Plaintiff's Exhibit 21, Kelly, at pages 35:20-36:11, is irrelevant, lacks foundation, and is vague as no particular time period is specified and there is no evidence that John Kelly, who is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint, is capable of speaking on behalf of the GIS company about the extent to which GIS supplied timesheets to workers or directed workers to record hours on timesheets.   Subcontractors, even those plaintiff deems not "bona fide," sometimes worked on a square footage basis and submitted invoices.  Plaintiff's Exhibit 6, Davis II, at pages 9:9-12:4, 34:20-35:13, 60:10-20, 89:5-11, 90:4-9, 111:20-112:2, and 122:22-123:13.

Clinton Bleskoski, although deemed by plaintiff not to be a "bona fide" subcontractor, has worked on a square footage basis and would send GIS a bill for that work. And since 2007, he has been submitting bills to GIS for all work, regardless of whether it is hourly or by the foot, and he has not submitted any timesheets Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 22:15-17 and 123:20-125:9.

33.     Denied as follows. Plaintiff's Exhibit 16, Sanders, at page 36:17-23 and plaintiff's Exhibit 21, Kelly, at page 30:14-15, are irrelevant as they are not GIS workers listed on Exhibit A to plaintiff's Complaint. Their testimony also lacks foundation and is vague as no particular time period is specified.

Plaintiff's Exhibit 5, Landman, at pages 32:12-33:25; plaintiff's Exhibit 7, Crouse, at page 32:20-23; plaintiff's Exhibit 12, Chase, at page 37:3-11; plaintiff's Exhibit 22, Butler, at pages 33:22-34:16, lack foundation and are vague as no particular time period is specified.

Sometimes subcontractors, even those plaintiff has unilaterally deemed not "bona fide," would request an hourly billing rate and GIS would accept the requested rate. Plaintiff's Exhibit 17, P. Davis, at pages 13:21-14:14; plaintiff's Exhibit 18, Carr, at page 21:11-14; plaintiff's Exhibit 19, Snyder, at page 11:12-20. Sometimes subcontractors, even those plaintiff has unilaterally deemed not "bona fide," worked either hourly or on a square footage basis, depending on the job. Plaintiff's Exhibit 6, Davis II, at pages 9:9-12:4, 34:20-35:13, 60:10-20, 89:5-11, 90:4-9, 111:20-112:2, and 122:22-123:13 and Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 17:2-10, 21:3-23:6, 71:15-74:17, 93:15-94:2 and 103:20-24.

19

34.     Admitted in part.  The labor broker/labor supply companies also require that the subcontractors they provide have their own hand tools.  See the Affidavit of Jeffrey T. Mento sworn to on June 27, 2011; Exhibits I, J and M to the Affidavit of David E. Leach sworn to on September 23, 2011.

35.     Denied as follows.  Plaintiff's Exhibit 4, Crim, at page 164:11-15, lacks foundation and is vague as there is no time period specified and the cited testimony contains neither a full question nor a full answer.  The entirety of the cited testimony is: "Q.  Okay.  Was that a common thing for General Interior Systems, to put up -- .  A.  If these guys did not have the money to pay and we had to, you know, put it on a credit card or something down there to give them a room -- ."  There is no reference to a time period or to who "these guys" were or to whether Ms. Crim was referring to a job outside of New York.

Defendants also object to plaintiff's purported fact on the grounds that plaintiff is inaccurately and misleadingly reciting deposition testimony.  In support of the purported fact, plaintiff cites five lines of testimony from one witness, and in those five lines, both the question and the answer were interrupted.  Furthermore, defendants submit that one witness, Ms. Crim, cannot properly represent all of the persons listed on Exhibit A to plaintiff's Complaint.  Defendants deny this purported fact on this basis as well.

General contractors, not GIS, sometimes paid for GIS subcontractors' hotels.  Plaintiff's Exhibit 16, Sanders, at pages 41:19-43:19.  Additionally, ASR paid for the hotels its workers stayed in.  Plaintiff's Exhibit 26, Casterillo, at pages 146:25-148:9 and 149:15-17.  Further, some of GIS' subcontractors paid for their own hotels.

Plaintiff's Exhibit 13, Huerta, at pages 37:19-38:10 and Exhibit T to the Affidavit of David E. Leach sworn to on September 23, 2011 at page 92:15-18.

36.      Denied as follows.  Plaintiff's Exhibit 21, Kelly, at page 50:13-21, is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.  It also lacks foundation and is vague as no particular time period is specified for the work.

Plaintiff's Exhibit 5, Landman, at pages 36:14-37:3; plaintiff's Exhibit 7, Crouse, at page 42:13-16; plaintiff's Exhibit 12, Chase, at page 55:14-20; plaintiff's Exhibit 17, P. Davis, at page 60:12-19; plaintiff's Exhibit 18, Carr, at page 70:4-7; plaintiff's Exhibit 19, Snyder, at page 45:17-24; and plaintiff's Exhibit 22, Butler, at page 39:10-15, lack foundation and are vague as no particular time period is specified for the work.

Plaintiff's Exhibit 6, Davis II, at pages 34:25-35:3, lacks foundation and is vague as no particular time period is specified for the work.  The purported fact also misstates the testimony as plaintiff neglects to acknowledge that Mr. Davis, II was paid not just hourly but also by the square foot, in which case the number of hours worked was irrelevant to how much GIS paid him.

Plaintiff's Exhibit 8, Mabbett, at page 42:19-24, lacks foundation and is vague as no particular time period is specified for the work.  The cited testimony is also irrelevant as this purported fact is under plaintiff's heading "Drywall Installers Who GIS Hired Directly" but the testimony pertains to the labor supply company's employees. Plaintiff has not cited admissible evidence in support of the purported fact.

37.     Admitted in part and denied in part.  Denied that Ms. Doran was an office manager.  She was initially a receptionist and then an administrative assistant.  Plaintiff's Exhibit 10, Doran, at page 124:4-14.  Defendants admit the remainder of this statement.

38.   Denied as follows.  Plaintiff's Exhibit 21, Kelly, at pages 13:20-23, 40:14-19, 47:12-14, and 65:8-20, is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.  Subcontractors who plaintiff has decided are not "bona fide" did not work exclusively for GIS, and even worked for GIS' competitors. Plaintiff's Exhibit 3, Mento, at pages 86:7-19; plaintiff's Exhibit 17, P. Davis, at pages 14:15-15:2 and Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 23:7-24:5, 25:20-27:12, 29:10-19 and 101:21-102:18.  The subcontractors did not work continuously; for those who worked on a per project basis, they were unemployed or worked elsewhere when a particular project stopped. Plaintiff's Exhibit 16, Sanders, at pages 8:2-11:5; plaintiff's Exhibit 21, Kelly, at page 44:14-22 and Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 23:7-24:5, 25:20:27:12, 29:10-19, 101:21:102:18 and 104:12-106:16.

39.   . Denied as follows.  Plaintiff's Exhibit 3, Mento, at pages 40:12-41:16 does not support the purported fact as the purported fact misstates the testimony.  Plaintiff neglects to acknowledge that part of the cited testimony where Mr. Mento explains how the general contractors were the ones who supervised the work and pointed out if the work was not appropriate.

Plaintiff's Exhibit 5, Landman, at pages 53:6-14, 85:2-9, and 99:6-14 contains hearsay regarding what Ted Davis, II said and regarding what GIS workers were

told by unidentified people; in addition, lacks foundation and is vague as there is no time period specified for the direction and supervision.

Plaintiff's Exhibit 6, Davis II, at page 50:5-19 does not support the purported fact as the purported fact misstates the testimony.   Plaintiff neglects to acknowledge the part of the cited testimony that includes Mr. Davis' explanation that the owner and the general contractor also review the workers' work product.

Plaintiff's Exhibit 12, Chase, at pages 63:3-64:23, contains hearsay regarding what "Ted" said, and it lacks foundation and is vague as there is no time period specified for the direction and supervision.

Plaintiff's Exhibit 18, Carr, at pages 29:18-20, 30:7-16, and 31:3-13 contains hearsay regarding what "Teddy" said, and it lacks foundation and is vague as there is no time period specified for the direction and supervision.

Plaintiff's Exhibit 21, Kelly, at pages 33:17-34:8 is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.   It also contains hearsay regarding what "he" said and what the carpenter and foreman said.   In addition, it lacks foundation and is vague as there is no time period specified for the direction and supervision.

Plaintiff's Exhibit 22, Butler, at pages 26:20-23, 61:9-10, and 74:23-75:3 lacks foundation and is vague as there is no time period specified for the direction and supervision, and it is utterly unclear who Mr. Butler is talking about in the cited testimony.   GIS did not direct or supervise the work of subcontractors, including subcontractors plaintiff has deemed not "bona fide."   Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 17:20-19:9 and

84:5-86:15. The general contractors would affect the hours worked for all workers; Mr. Carver would say what the maximum hours his subcontractors could work. Plaintiff's Exhibit 6, Davis II, at pages 6:10-7:6, 34:20-37:9, 48:7-15, and 121:20-122:7. Paul Davis and Clinton Bleskoski would set their own hours, decide when to take breaks, and no one at GIS directed or controlled their work. Plaintiff's Exhibit 17, P. Davis, at pages 9:20-13:7.

40.     Denied as follows. Plaintiff's Exhibit 5, Landman, at pages 85:2-7 and 99:6-14; plaintiff's Exhibit 22, Butler, at pages 32:9-11, 15-17, 45:24-46:8 and 63:12-13, lack foundation and are vague as there is no time period specified for the setting of daily work schedules.

Plaintiff's Exhibit 6, Davis II, at page 117:21-24 lacks foundation and is vague as there is no time period specified for the setting of daily work schedules. The testimony also does not support the purported fact as the purported fact misstates the testimony. Mr. Davis, II went on to explain that he set GIS employee work schedules but not GIS subcontractor work schedules. Plaintiff's Exhibit 6, Davis II, at pages 118:21-120:3. He also explained the general contractor can get the hours worked. Plaintiff's Exhibit 6, Davis II, at pages 121:20-122:7.

Plaintiff's Exhibit 7, Crouse, at page 38:18-25, does not support the purported fact as the purported fact misstates the testimony. The cited testimony only says that Mr. Crouse's job was to "coordinate, schedule daily logs, quality control." It does not reference setting individual drywall installers' daily work schedules.

Plaintiff's Exhibit 21, Kelly, at pages 54:23-55:5, is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint. It also

contains hearsay regarding what Davis, the foreman, or the carpenter said, and it lacks foundation and is vague as there is no time period specified for the setting of daily work schedules.   GIS did not set daily work schedules for subcontractors, including subcontractors plaintiff has deemed not "bona fide."   Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 14:7-17:10 and 27:24-28:19 and plaintiff's Exhibit 6, Davis II, at pages 34:20-37:9, 118:21-120:3 and 121:20-122:7.   In addition, work schedules can be set by the general contractor, or be affected by things outside of GIS' control, such as permits not being obtained and inspections not being performed timely, which slows down the work; other contractors can also slow GIS down because GIS cannot do its work until others work is complete; and delays in material deliveries affect work schedules.  Plaintiff's Exhibit 6, Davis II, at pages 24:20-37:9 and 121:20-122:7; Mento Affidavit in Opposition.

41.      Admitted in part and denied in part.  Plaintiff's Exhibit 5, Landman, at pages 53:12-16, 85:2-7 and 100:4-14 lacks foundation and is vague as there is no time period specified for the instructions on what work to perform and where to perform it.

Plaintiff's Exhibit 6, Davis II, at page 77:3-7 does not support the purported fact as the purported fact misstates the testimony.  The cited testimony only says that Mr. Davis, II has done "quality control."

Plaintiff's Exhibit 12, Chase, at pages 63:3-64:23, contains hearsay regarding what Ted said, and it lacks foundation and is vague as there is no time period specified for the instructions on what work to perform and where to perform it.

Plaintiff's Exhibit 17, P. Davis, at pages 56:23-57:5, does not support the purported fact as the purported fact misstates the testimony.  The cited testimony only

says that Mr. Davis has shown "someone how to cut something or where to screw something or whatever the case may be." It is unclear who "someone" is or what "something" may be, and there is no reference to instructing individual drywall installers on what work to perform and where to perform the work. The cited testimony also lacks foundation and is vague as there is no time period specified for the instructions on what work to perform and where to perform it.

Plaintiff's Exhibit 18, Carr, at pages 30:7-17 and 31:3-13, contains hearsay regarding what Teddy said, and it lacks foundation and is vague as there is no time period specified for the instructions on what work to perform and where to perform it.

Plaintiff's Exhibit 22, Butler, at pages 61:9-10, 63:12-13 and 74:23-75:3, lacks foundation and is vague as there is no time period specified for the instructions on what work to perform and where to perform it, and it is utterly unclear who Mr. Butler is talking about in the cited testimony.

GIS did not instruct Clinton Bleskoski or control his work, yet plaintiff has deemed him to be not a "bona fide" subcontractor. Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 17:20-19:9. In addition, the plans or blueprints for the projects depict what work needs to be performed and where it needs to be done. GIS would share the plans with or make them available to the drywall installers. Mento Affidavit in Opposition. Admitted that GIS, like any contractor, would at times relay information from the plans to the subcontractors regarding what work to perform and where to perform it.

42.    Admitted in part and denied in part. Plaintiff's Exhibit 21, Kelly, at page

51:8-11 is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint. The testimony also lacks foundation and is vague as there is no time period specified for the review of the workmanship.

Plaintiff's Exhibit 5, Landman, at page 53:12-16; plaintiff's Exhibit 6, Davis II, at pages 50:14-17 and 77:3-7; plaintiff's Exhibit 18, Carr, at page 30:7-17 lack foundation and are vague as there is no time period specified for the review of the workmanship.

Plaintiff's Exhibit 12, Chase, at pages 63:3-64:23 contains hearsay regarding what Ted said, and it lacks foundation and is vague as there is no time period specified for the review of the workmanship. The purported fact also misstates the testimony as Mr. Chase stated that it was the general contractor who "really ran the job, the whole job, everybody." Also, the general contractors and the project owners reviewed the workmanship. Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6; plaintiff's Exhibit 6, Davis II, at page 50:5-13.

GIS did not review all subcontractors' workmanship, including subcontractors plaintiff has deemed not "bona fide." Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6; plaintiff's Exhibit 17, P. Davis, at page 12:12-20; plaintiff's Exhibit 21, Kelly, at pages 33:17-34:10.

43. Denied as follows. Plaintiff's Exhibit 6, Davis II, at page 50:14-17 lacks foundation and is vague as there is no time period specified for the instructions to re-do work.

Plaintiff's Exhibit 17, P. Davis, at pages 56:23-57:5 does not support the purported fact as the purported fact misstates the testimony. The cited testimony only

says that Mr. Davis has shown "someone how to cut something or where to screw something or whatever the case may be." It is unclear who "someone" is or what "something" may be, and there is no reference to instructing drywall installers to re-do their work. The cited testimony also lacks foundation and is vague as there is no time period specified. GIS did not review all subcontractors' work, including subcontractors plaintiff has deemed not "bona fide." Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6; plaintiff's Exhibit 17, P. Davis, at page 12:12-20; plaintiff's Exhibit 21, Kelly, at pages 33:17-34:10. Also, the general contractors and the project owners reviewed the work, and told GIS if the work was not appropriate or acceptable. Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6; plaintiff's Exhibit 6, Davis II, at page 50:5-13.

44.    Denied as follows. Plaintiff's Exhibit 17 P. Davis, at pages 56:23-57:15, lacks foundation and is vague as there is no time period specified for the training.

Plaintiff's Exhibit 18, Carr, at page 53:12-18, is hearsay regarding what Bob said. It also lacks foundation and is vague as there is no time period specified.

GIS did not train its subcontractors, including subcontractors plaintiff has deemed not "bona fide." Plaintiff's Exhibit 3, Mento, at pages 5:8-6:22 and 43:24-25:2; plaintiff's Exhibit 17, P. Davis, at pages at 9:20-13:7; plaintiff's Exhibit 21, Kelly, at page 33:17-34:10 and Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at page 17:23-25.

45.    Denied as follows. Plaintiff's Exhibit 3, Mento, at page 15:7-25, does not support the purported fact as the purported fact misstates the testimony. The cited testimony only says that GIS owned trucks and automobiles, and that pursuant to its contracts with general contractors, GIS typically had to supply metal studs for wall

framing jobs and the grid, tiles, and wires for ceiling jobs.  The cited testimony does not reference supplying vehicles to anyone, nor does it reference tools, hydraulic lifts, scaffolds, sheetrock, or bolts.

Plaintiff's Exhibit 6, Davis II, at page 69:12-17 and plaintiff's Exhibit 21, Kelly, at page 49:12-15 lack foundation and are vague as there is no time period specified for the supplying.  In addition, Mr. Kelly is not noted on Exhibit A to plaintiff's Complaint and therefore his testimony is irrelevant.  Plaintiff has not submitted any admissible evidence supporting the purported fact.  Further, none of the cited evidence even refers to supplying workers with vehicles, powder-actuated tools, scaffolds, sheetrock, or bolts.

46.     Admitted.

47.     Denied as follows.  Plaintiff's Exhibit 5, Landman, at page 86:9-17; plaintiff's Exhibit 6, Davis II, at pages 63:11-14 and 82:10-12; plaintiff's Exhibit 7, Crouse, at pages 40:21-41:15; plaintiff's Exhibit 12, Chase, at page 59:10-23 and plaintiff's Exhibit 22, Butler, at pages 45:24-46:8, lack foundation and are vague as there is no time period specified for the verification of time sheets.

Plaintiff's Exhibit 18, Carr, at pages 62:15-63:10 is speculative as Mr. Carr testified that he "assumed" someone verified timesheets but he did not know if anyone initialed them and he never saw anyone looking them over.  The testimony also lacks foundation and is vague as there is no time period specified for the verification of time sheets.  GIS did not verify all subcontractors' hours, including subcontractors plaintiff has deemed not "bona fide," as some subcontractors could work whatever hours they wanted.  Plaintiff's Exhibit 17, P. Davis, at pages 9:20-13:7.

48.     Denied as follows. Plaintiff's Exhibit 5, Landman, at pages 100:20-101:10, plaintiff's Exhibit 18, Carr, at pages 58:21-59:12, and plaintiff's Exhibit 6, Davis II, at page 22:22-25 lack foundation and are vague as there is no time period specified for the hiring and firing. In addition, defendants deny that the deposition testimony of these three individuals is sufficient to establish that GIS maintained and exercised the power to hire and fire all individual drywall installers.

49.     Admitted that Jeffrey Mento did so on behalf of GIS as its President.

50.     Denied as follows. Plaintiff's Exhibit 5, Landman, at pages 99:6-14 and 100:8-14 does not support the purported fact as the purported fact misstates the testimony. The cited testimony refers to how Mr. Landman "felt" he was an employee; there is no reference to whether or not he previously worked as a subcontractor. The testimony is also inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee; the witness' opinion cannot properly be couched as fact. The cited testimony also lacks foundation and is vague as no time period is specified.

Plaintiff's Exhibit 21, Kelly, at page 50:6-12 is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint and the cited testimony does not support the purported fact as the purported fact misstates the testimony. The cited testimony refers to Mr. Kelly's opinion of the difference between an employee and a subcontractor; there is no reference to whether or not he previously worked as a subcontractor. This is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee; the

witness' opinion cannot properly be couched as fact.  The cited testimony also lacks foundation and is vague as no time period is specified.

Plaintiff's Exhibit 16, Sanders, at page 15:14-17 lacks foundation and is vague as there is no time period specified.

Subcontractors, including subcontractors plaintiff has deemed not "bona fide," do hold themselves out as subcontractors and have previously worked as subcontractors.  Plaintiff's Exhibit 17, P. Davis, at pages 6:15-12:20, 13:16-14:23, 15:9-16:5 and 26:9-19.  Exhibit T, Bleskoski, to the Affidavit of David E. Leach sworn to on September 23, 2011 at pages 14:7-17:10, 24:6-25:7, 27:24-28:19, 103:9-105:17 and 106:17-108:10.  Lastly, plaintiff's statement implies that it is applicable to all individual drywall installers.  Defendants deny that the cited testimony, to the extent any is admissible, is sufficient to establish that all individual drywall installers do not hold themselves out as and have not previously worked as subcontractors.

51.  Defendants object to this purported statement of fact.  Plaintiff's Exhibit 21, Kelly, at pages 13:21-33, 17:7-9 and 40:8-19 is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.  Without waiving the objection, defendants admit that Mr. Kelly worked for GIS but deny that Mr. Kelly worked full time; he only worked intermittently for GIS.  Plaintiff's Exhibit 21, Kelly at page 44:14-22.  There is nothing in the cited testimony that indicates he worked exclusively for GIS.

52.  Defendants object to this purported statement of fact.  Plaintiff's Exhibit 21, Kelly, at pages 13:21-33, 17:7-9 and 40:8-19 is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.  In addition, the descriptive

term "bona fide subcontractor" is not in the cited testimony, and plaintiff is therefore mischaracterizing the testimony.

53.     Defendants object to this purported statement of fact. Plaintiff's Exhibit 21, Kelly, at page 50:6-12, is irrelevant as Mr. Kelly is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint and therefore plaintiff's statement is denied. It is also inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee. The witness' opinion cannot properly be couched as fact. Defendants object to the use of the term "bona fide" as set forth above. Without waiving the objection, defendants admit Mr. Kelly testified as quoted.

54.     Denied that the cited testimony, plaintiff's Exhibit 18, Carr, at pages 21:15-22 and 96:8-20, supports the plaintiff's statement. It does not indicate Mr. Carr was hired as an independent contractor or that he worked full-time.

55.     Although Mr. Carr may have testified as set forth by plaintiff, defendants deny this statement of "fact" on the grounds that plaintiff's Exhibit 18, Carr, at page 40:8-13 is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee. The witness' opinion cannot properly be couched as fact and therefore the statement is denied.

56.     Denied. Construct Corp, a labor supply company, hired and paid Mr. Landman for about a year and a half. Plaintiff's Exhibit 5, Landman, at pages 11:8-14, 13:21-15:23 and 27:10-28:15.

57.     Denied as follows. Plaintiff's Exhibit 5, Landman, at pages 92:17-14 and

99:6-7 is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee. The witness' opinion cannot properly be couched as fact. His opinion is irrelevant.

58.     Although Mr. Landman may have testified as set forth by plaintiff, defendants deny this purported statement of "fact" on the grounds that plaintiff's Exhibit 5, Landman, at page 99:6-14 is inadmissible lay opinion testimony about the legal question concerning the difference between a subcontractor and an employee. The witness' opinion cannot properly be couched as fact.

59.     Denied. The evidence cited only contains an admission that "[i]ndividuals who performed drywall services for GIS as independent contractors or subcontractors have, at other time(s), been employees of GIS." There is no admission that GIS "alternatively classified" workers. Thus the cited evidence does not support the purported fact.

60.     Denied as follows. Plaintiff's Exhibit 6, Davis II, at pages 30:11-33:18 does not support the purported fact as the purported fact misstates the testimony. The cited testimony says that presently GIS no longer has individual subcontractors, that GIS mainly does government projects, that GIS does government projects either with its employees or with subcontractor companies, and that in the 1998-2006 time period, GIS had "dba" subcontractors and single subcontractors. Mr. Davis II does not reference "classifying" workers as subcontractors for certain projects and then "re-classifying" those same workers for other projects. Defendants deny that Mr. Davis is an Operations Manager; he is a supervisor that runs projects. Plaintiff's Exhibit 10, Doran, at page 19:6-23.

61.   Denied as follows.  Plaintiff's Exhibit 6, Davis II, at pages 6:22-7:5 and 32:5-12 does not support the purported fact as the purported fact misstates the testimony.  Plaintiff implies that GIS "re-classified" Mr. Davis II as an employee in 2006 because of the Fort Drum project.  But plaintiff took Mr. Davis, II's testimony out of context and neglected to cite the part where he explains that the Fort Drum project began in 2006 and he went to work for GIS as an employee in 2006, but he had nothing to do with the Fort Drum project.  Mr. Davis II did not work on the Fort Drum project until "recently" (his deposition was in February 2011, *five years* after the Fort Drum project began).  Plaintiff's Exhibit 6, Davis II, at page 32:3-20.

62.   Denied.  GIS did not "re-classify" Mr. Davis from independent contractor to employee; plaintiff's use of the word "re-classify" misleadingly and incorrectly implies that nothing about Mr. Davis' job changed except the title.  From about 2005-2009, Mr. Davis worked as an independent contractor for GIS, and then GIS did hire him on as an employee.  However, the nature of his job as an independent contractor was different from his job as an employee.  Typical hours that employees worked were 7:00 a.m. to 3:30 p.m.  But when Mr. Davis was an independent contractor, he did not work those hours.  He set his own hours, working whatever hours he could, whenever he wanted.  No one at GIS told him how many hours to work.  He took whatever breaks he wanted and he was paid for breaks.  He dictated the jobs himself.  No one at GIS trained him, nor did anyone at GIS direct or control his work; on most jobs, he did not even see anyone from GIS.  He purchased his own liability insurance and he had his own dba.  He billed GIS for the work he did, and he received 1099's.  He contracted with GIS but he was also free to contract with any other company he wanted.  He used his own tools.  He

considered himself an independent contractor and not an employee.  Then when GIS hired him as an employee, Mr. Davis was put on the GIS payroll and has been working regular 40 hour weeks.  He receives W2's.  He has no choice in what hours he works.  He takes the required breaks and does not get paid for lunch breaks.  He uses GIS' tools instead of his own.  GIS pays for his liability insurance.  Plaintiff's Exhibit 17, P. Davis, at pages 9:4-12:20, 13:22-14:23, 15:21-16:5, 17:5-18:11, 33:4-6, 47:9-20, 49:5-50:5, 53:20-54:23 and 69:19-70:24.

63.    Denied as follows.  Plaintiff's Exhibit 16, Sanders, at pages 11:6-12:5, 14:22-15:16 and 38:12-20 is irrelevant as Mr. Sanders is not one of the GIS workers listed on Exhibit A to plaintiff's Complaint.  Denied that GIS "re-classified" Mr. Sanders from independent contractor to employee.  The cited testimony does not use such a term.

64.    Objection to the evidence.  Plaintiff's Exhibit 10, Doran, 109:19-110:6 lacks foundation and is speculative as there is no evidence that Ms. Doran has any grounds for making this statement.  The cited testimony is irrelevant to the issues in this case.  Lastly, Ms. Doran was a receptionist and/or administrative assistant at GIS, and does not have the authority or knowledge to bind GIS to such a statement.  Plaintiff's Exhibit 10, Doran, at page 124:4-17.

**DRYWALL INSTALLERS REFERRED FROM LABOR BROKERS**

65.    Defendants deny that they "recruited" individual laborers through labor brokers.  Rather the workers were "sent" by the labor brokers.  Plaintiff's Exhibit 3, Mento, at page 24:11-13; plaintiff's Exhibit 6, Davis II, at pages 44:25-45:5.  Sometimes the labor brokers solicited GIS' business.  Defendants' Exhibit E, Tashkin, at page 19:3-17; plaintiff's Exhibit 25, Carver, at pages 11:7-13:2.

35

66.     Defendants deny so much of this paragraph as states that labor brokers "refer laborers" to general contractors and subcontractors.  The labor brokers "provide," "supply," "staff out" or "procure" "skilled workers" or "employees."   Defendants' Exhibit E, Tashkin, at pages 6:15-7:8, 15:7-21, 18:18-19:2; plaintiff's Exhibit 25, Carver, at pages 11:17-24, 12:19-23; plaintiff's Exhibit 26, Castillero, at pages 11:11-12:25, 15:7-12.

67.     Denied with respect to the use of the word "primarily."   GIS used other labor brokers including Construct Corps.  See Affidavit of Jeffrey T. Mento at paragraphs 3 and 4 sworn to on June 27, 2011; defendants' Exhibit E, Tashkin, at page 47:10-12. See also response to paragraph 66 regarding "skilled workers" or "employees."

68.     Admitted.

69.     Denied that the referenced deposition testimony uses the phrase "supplied individual laborers."  Plaintiff's Exhibit 25, Carver, at pages 34:20-35:20, 39:9-18.

70.     Denied that referenced deposition testimony supports plaintiff's purported "fact."  The referenced testimony indicates that Mr. Carver was a sales person whose role was to drive to Syracuse, meet Mr. Mento in a bar, have a few beers, hang out, be likable and try and get someone to address any problems (if they had any).  Plaintiff's Exhibit 25, Carver, at page 41:15-21.

71.     Admitted.

72.     Admitted.

73.     Admitted in part and denied in part.  Admitted that ASR provided skilled subcontractors during the referenced time period.  Plaintiff's Exhibit 26, Castillero, at pages 11:11-15:12.

74.     Denied that the referenced deposition testimony indicates that the three individuals "operated" ASR or "managed" ASR's business dealings with GIS.  Such language is simply not on the pages.  See plaintiff's Exhibit 26, Castillero, at pages 10:8-11:10.    According to Rodrigo Merida, Cesar Castillero has no business partners at ASR. Plaintiff's Exhibit 27, Merida, at pages 10:17-11:7.

75.     Denied that Corey Tashkin testified that Construct Corps referred approximately seven (7) laborers to GIS from July of 2004 until March of 2007.  In fact, Mr. Tashkin testified that he did not know whether the invoices which contained the seven names (Exhibit 2 at his deposition) accurately reflected the complete relationship between Construct Corps and General Interior Systems.  See defendants' Exhibit E, Tashkin, at pages 69:2-70:5.  So, there could be more workers and/or a larger timeframe.

76.     Defendants object to this statement on the grounds that the phrase "refer to them" is not used in the referenced deposition testimony.  The labor brokers "provide," "supply," "staff out" or "procure" "skilled workers" or "employees."   Defendants' Exhibit E, Tashkin, at pages 6:15-7:8, 15:7-21, 18:18-19:2; plaintiff's Exhibit 25, Carver, at pages 11:17-24, 12:19-23; plaintiff's Exhibit 26, Castillero, at pages 11:11-12:25, 15:7-12.    Without waiving the aforementioned objections, defendants admit the remaining facts set forth.

77.     Denied.    Plaintiff is mischaracterizing the testimony referenced. Specifically, the testimony never mentions anything about workers who "typically resided in North Carolina," or that ads were placed in "local North Carolina newspapers," or that the networking was done in the "North Carolina construction industry."  Plaintiff's Exhibit 25, Carver, at pages 84:23-85:17, 32:6-15; plaintiff's Exhibit 26, Castillero, at

page 102:11-19.  In addition, plaintiff did not indicate where Construct Corps searched for the workers it provided or how it went about locating such workers.

78.     Defendants deny this statement on the grounds that plaintiff is mischaracterizing the deposition testimony.  Specifically, the referenced deposition testimony (Exhibit 25 the deposition of Hobart Carver at pages 86:3-87:22, and Exhibit 26, the deposition of Cesar Castillero at pages 102:20-103:10) does not indicate that the meeting with the candidates is about placing them "with GIS" specifically, rather the testimony talks about placing the workers with clients in general.  In addition, the labor brokers separately maintained a database with workers' contact information and would contact the workers after being contacted by a client.  Plaintiff's Exhibit 26, Castillero, at page 104:2-18; plaintiff's Exhibit 27, Merida, at pages 42:7-18, 44:4-19, and 140:13-15.

79.     Denied as Construct Corps hired drywall installers as its own employees and brokered out its employees.  Defendants' Exhibit E, Tashkin, at pages 15:3-21, 25:4-26:3, 27:7-28:17, 30:4-23, 32:19-25, 34:15-35:1, 38:2-22, and 42:1-43:2.

80.     Denied.  The referenced deposition testimony simply does not say what plaintiff purports it says.  The referenced testimony (plaintiff's Exhibit 25, Carver, at pages 46:6-47:2 and page 146:15-21) does not say anything about GIS specifying dates and times.  See also plaintiff's Exhibit 26, Castillero, at page 110:2-15.

81.     Denied on the grounds that plaintiff has mischaracterized the referenced deposition testimony.  Mr. Mento was not asked if GIS treated the drywall installers as individual "independent contractors," "subcontractors" or as "employees."  The questions posed to Jeffrey T. Mento presupposed that the people were subcontractors.  In addition, none of the cited testimony uses the word "treated."

82.     Defendants admit that the three (3) workers whose deposition testimony is marked as Exhibits 13, Huerta, 15, L. Anguiano and 30, Lara did not own or operate independent businesses, but deny that they speak for the other 233 drywall workers provided by the labor brokers.  See the Affidavit of John Sangster sworn to on June 24, 2011 for evidence that a total of 236 workers were provided by the labor brokers.  See defendants Memorandum of Law regarding their discussion of representative evidence at Point IV.  While these three (3) workers may not have owned or operated independent businesses, it is possible that the other 233 did.  In addition, the three (3) workers were employees of their labor broker, so they would not need to own or operate an independent business.

83.     Denied on the grounds that the plaintiff has mischaracterized the deposition testimony.  First, plaintiff references one (1) drywall installer, Luis Anguiano, for the proposition that "the drywall installers referred to GIS by the labor brokers did not submit bids or invoices to GIS or to the labor brokers."  It is respectfully submitted that one person cannot bind the other 235 workers provided to GIS by the labor brokers.  See defendants' Memorandum of Law at Point IV.  This is especially true when you consider he was "only associated with GIS" for two and a half (2.5) to three (3) months.  Plaintiff's Exhibit 15, L. Anguiano, at pages 8:21-9:2.  In addition, Mr. Anguiano merely testified that he never "said" to GIS that he would "like to bid" on a job.  He did not testify that he never actually submitted a bid or invoice to GIS or to the labor brokers.  Plaintiff's Exhibit 15, L. Anguiano, at pages 30:22-31:6

84.     Admitted.  The labor brokers paid them hourly.  Plaintiff's Exhibit 25, Carver, at pages 55:23-56:4, 105:22-106:2 and 162:18-164:12; plaintiff's Exhibit 26,

Castillero, at pages 19:12-20 and 127:21-22 and plaintiff's Exhibit 27 at pages 76:12-14 and 77:6-15.

85.     Denied.  Generally, the workers were hired to do a specific [job] and when the job was done, they would go home.  Plaintiff's Exhibit 25, Carver, at pages 151:13-152:2.  In addition, plaintiff is not accurately reciting the deposition testimony.  None of the deposition testimony cited by the plaintiff in Exhibits 13, Huerta, 14, J. Anguiano, 15, L. Anguiano or 25, Carver, discusses whether the installers worked on a part-time, full-time or per project basis.  See plaintiff's Exhibit 13, Huerta, at page 6:3-5; plaintiff's Exhibit 14, J. Anguiano, at page 11:10-17; plaintiff's Exhibit 15, L. Anguiano, at pages 8:25-9:2; plaintiff's Exhibit 25, Carver, at pages 46:23-47:2.

86.     Denied as plaintiff is mischaracterizing deposition testimony and not reciting testimony accurately.  According to the referenced testimony of Jose Huerta, plaintiff's Exhibit 13 at page 6:3-5, he worked for GIS for approximately one (1) year. The referenced testimony did not state anything about full-time, exclusively or continuously.

The referenced testimony for Javier Anguiano, plaintiff's Exhibit 14 at page 11:10-12, indicates he worked for GIS for five (5) months but does not say if it was full-time or continuously.

The referenced testimony of Luis Anguiano, plaintiff's Exhibit 15, at pages 8:25-9:2, indicates that he was associated with GIS for two and a half  (2.5) to three (3) months, but does not state that he worked full-time, exclusively or continuously.

The referenced testimony for Eduardo Lara, plaintiff's Exhibit 30 at page 30:11-13, merely indicates that he worked for GIS for seven (7) months.  It does not

indicate that he worked full-time, exclusively or continuously for that seven (7) months. Notably, none of the referenced testimony indicates that the four (4) workers worked for GIS during the timeframe at issue, July 25, 2005-July 25, 2008, and therefore the testimony is irrelevant.  In addition, plaintiff's statement indicates that drywall installers worked for GIS for a period of a time that ranged from months to "years."  None of the cited testimony stands for the proposition that a worker worked for GIS for more than one (1) year.

   87. Admitted in part and denied in part.  Plaintiff is misstating and mischaracterizing the cited deposition testimony.  With respect to Jose Huerta's testimony, plaintiff's Exhibit 13 at page 24:4-5, he merely indicates that someone reviewed his work product.  This person and his employer were unidentified.  Similarly, the location and time of the review were unidentified.

   Javier Anguiano's testimony, plaintiff's Exhibit 14 at pages 34:19-24, 54:9-11, merely indicates that they would go to an unspecified office in an unspecified location at an unspecified time and get sent to a different place, such as Cazenovia.  His testimony, at page 54:9-11, merely indicates that an unspecified individual was looking over unspecified workers' work product at an unspecified location at an unspecified time.

   None of the other referenced testimony states that GIS "exclusively controlled all aspects of the work" performed by the drywall installers who were supplied by the labor brokers.  See plaintiff's Exhibit 3, Mento, at page 29:18-25; plaintiff's Exhibit 6, Davis II, at pages 55:2-4 and 77:3-7; plaintiff's Exhibit 25, Carver, at pages 46:6-47:2 and 146:24-147:4; plaintiff's Exhibit 26, Castillero, at pages 40:24-25, 120:15-19 and 158:11-14; plaintiff's Exhibit 27, Merida, at page 58:19-25; plaintiff's Exhibit 30,

Lara, at pages 31:5-7, 60:2-11 and 62:1-7; plaintiff's Exhibit 31, Nicita, at pages 26:18-27:5, 95:4-7, 95:23-96:2.  Defendants admit that Mr. Nicita testified that the workers are under the control of GIS at the jobsite, but he did not say such control was exclusive or over all aspects of the work.  The labor supply companies send someone with the crews to supervise their work.  Plaintiff's Exhibit 3, Mento, at page 28:18-21.

88.    Denied to the extent that plaintiff is mischaracterizing the cited deposition testimony.  Jeffrey Mento's testimony, plaintiff's Exhibit 3, Mento, at page 29:18-25, does not indicate that GIS supervised drywall workers.  He indicated that when they show up on the jobsite, GIS tells them what work has to be done.  Ted Davis, II's testimony, plaintiff's Exhibit 6, at pages 55:2-4 and 77:3-7, does not indicate GIS "supervised" the drywall installers.  He checked the quality of work.  Jose Huerta's testimony, plaintiff's Exhibit 13 at page 24:4-5, merely indicates that an unidentified person at an unidentified time at an unidentified location reviewed his work product.

Javier Anguiano's, plaintiff's Exhibit 14 at pages 34:19-24, states that they went to an unspecified office and were told to go to a different place, Cazenovia.  No timeframe is specified and he does not say who told him to go to Cazenovia.  Javier Anguiano's, plaintiff's Exhibit 14 at page 54:9-11, merely indicates that an unidentified person was looking over unidentified worker's work product at an unidentified time at an unidentified location.

Hobart Carver's testimony, plaintiff's Exhibit 25 at pages 46:6-22 and 146:24-147:4, does not specify a timeframe and is therefore irrelevant.  He has been doing business with GIS since 2000 or 2001.  Plaintiff's Exhibit 25, Carver, at page 35:10-20.

Rodrigo Merida's testimony, plaintiff's Exhibit 27 at page 58:19-25, does not mention supervision. Eduardo Lara's testimony, plaintiff's Exhibit 30 at pages 31:5-7, indicates that someone from GIS directed him to a different site but does not provide a timeframe and this testimony does not mention supervision. Similarly, there is no mention of supervision at page 62:1-7. Mr. Lara at page 60:2-11 indicates that an unidentified person supervised his work at an unidentified location.

Santo Nicita's testimony, plaintiff's Exhibit 31, assumes ASR's workers are being supervised by GIS but he has never been to a GIS site. Thus his testimony is speculative. Plaintiff's Exhibit 31, Nicita, at pages 94:23-96:9. The labor supply companies sent someone with the crews to supervise them. Plaintiff's Exhibit 3, Mento, at page 28:18-21.

89.     Admitted in part and denied in part. Denied that Mr. Davis, plaintiff's Exhibit 6, Davis II, at pages 55:2-4, 77:3-7, testified that GIS, and not the labor brokers, directed drywall installers as to what work to do and where to work. This cited testimony does not stand for the alleged facts set forth by the plaintiff.

Jose Huerta, plaintiff's Exhibit 13 at page 24:4-5, merely indicates that an unidentified person at an unidentified time at an unidentified location reviewed his work product.

Javier Anguiano, plaintiff's Exhibit 14 at page 34:19-24, states that he and some unidentified others went to an unspecified office and were told by an unidentified individual to go to a different place, Cazenovia. Also, Javier Anguiano, plaintiff's Exhibit 14 at page 54:9-11, merely indicates that an unidentified person was looking over unidentified worker's work product at an unidentified time at an unidentified location.

Rodrigo Merida, plaintiff's Exhibit 27 at page 58:19-25, talks about workers having to show up at certain times and certain dates; he does not discuss GIS giving directions to drywall installers regarding what work to do and where to work.

With respect to Eduardo Lara's testimony, plaintiff's Exhibit 30 at page 31:5-7, there is no timeframe specified. Mr. Lara had no personal knowledge that the supervisor he referenced on page 60:2-11 was a supervisor for GIS; he was told it was a GIS supervisor, which is hearsay. Plaintiff's Exhibit 30, Lara, at pages 59:12-60:5.

With respect to Santo Nicita's testimony, plaintiff's Exhibit 31, he has never been on a GIS jobsite and is assuming the workers are following directions from a GIS supervisor because ASR does not have a supervisor there. Thus his testimony is speculative. Plaintiff's Exhibit 31, Nicita, at pages 94:23-95:23. Admitted that Mr. Mento, plaintiff's Exhibit 3 at page 29:18-25, testified that GIS told the installers "what kind of work to do." Also, admitted that Mr. Carver's companies did not tell the workers what work to do and where to work. When GIS would tell someone what work had to be done and where, it was relying on information from the plans and specifications prepared by the project's architect or engineer. Mento Affidavit in Opposition.

90.    Admitted that Hobart Carver did not regularly communicate with the drywall installers that his companies provided to GIS, but denies the remaining portion of this statement. The referenced testimony does not use the term "referred" or phrase "worked for GIS." With respect to the deposition testimony of Santo Nicita, plaintiff's Exhibit 31, he testified that he probably spoke with the subcontractors before they were sent off to a jobsite for GIS but his conversation was probably limited to "good morning" or something like that because he did not speak Spanish. Plaintiff's Exhibit 31, Nicita, at

pages 29:24-30:6.  With respect to his testimony on page 76:4-8, he merely indicated that he personally did not stay in regular contact with the subs.  This does not mean that someone else at ASR was not communicating with the drywall installers.  None of the testimony cited in paragraph number 90 indicates that the drywall installers "worked for GIS."

91.     Denied.  Work schedules can be set by the general contractor, and can be affected by whether permits have been pulled, building code inspections have been completed, how far other contractors have gotten with their work, whether materials are delivered timely, how much someone can work during the week, and it is up to the worker to decide whether or not to work the hours.  Plaintiff's Exhibit 25, Carver, at pages 89:9-21, 90:3-20, 104:15-105:9 and 168:17-169:20; plaintiff's Exhibit 26, Castillero, at pages 101:23-102:7 and 117:6-13; plaintiff's Exhibit 6, Davis II, at pages 121:20-122:7 and Mento Affidavit in Opposition.  Further, the contract between ASR and its workers requires the workers to notify ASR if they are going to be late to work.  Plaintiff's Exhibit 26, Castillero, page 114:6-10 and Exhibit J, the Rules of the Company, attached to the Affidavit of David E. Leach sworn to on September 23, 2011.  ASR had to develop the Rules of the Company, because if ASR had no penalties for its workers, the subcontractors would come and go as they please.  Plaintiff's Exhibit 26, Castillero, pages 117:6-22 and 161:4-162:19; plaintiff's Exhibit 27, Merida, at pages 56:20-57:17, 59:15-61:2 and 61:8-62:24.

In addition, the deposition testimony cited by the plaintiff does not support the alleged undisputed material fact.  Plaintiff's Exhibit 3, Mento, at page 92:18-25, does not mention GIS, as opposed to and not the labor brokers, setting daily work schedules.

Ted Davis, II, plaintiff's Exhibit 6, Davis II, at 117:21-24, indicates he has played a role in determining the number of hours a worker for GIS would work but there is nothing in the question or answer that indicates this was true for the drywall installers sent by the labor brokers.  In addition, there was no timeframe in the questions, therefore, Mr. Davis' answer is vague and lacks foundation.

Jose Huerta, plaintiff's Exhibit 13 at pages 38:14-39:10, is questioned regarding how long the breaks that he took lasted and he indicated that Bob, last name unknown, was in charge of him.  There is no evidence that Bob worked for GIS and there is no timeframe referenced with any of these questions.  Therefore this testimony is vague and lacks foundation.  Further, Mr. Carver's companies worked with GIS beginning in 2000 or 2001 and there is no timeframe referenced in his cited deposition testimony, plaintiff's Exhibit 25, Carver, at pages 46:23-47:2, 89:22-90:2, 90:21-24, so the testimony is vague and lacks foundation.  Plaintiff Exhibit 25, Carver, at pages 34:20-35:20.

Cesar Castillero's testimony, plaintiff's Exhibit 26 at page 120:15-19, does not mention anyone setting the drywall installers' daily work schedules.  Rodrigo Merida's testimony, plaintiff's Exhibit 27 at page 56:2-8, merely indicates that Mr. Merida is not aware of anyone at ASR discussing the amount of hours a worker/subcontractor was going to work and therefore this testimony does not support plaintiff's "fact."

92.   Denied as follows.  Jose Huerta, plaintiff's Exhibit 13 at page 24:4-5, indicates that someone reviewed his work product.  The cited testimony does not say that it was someone from GIS and/or not the labor brokers.  Javier Anguiano, plaintiff's

Exhibit 14 at page 54:9-11, merely indicates that someone looked over the workers/subcontractors work product. The cited testimony does not indicate that this was someone from GIS.

Hobart Carver, plaintiff's Exhibit 25, Carver, at pages 46:6-22, 47:2, does not mention a review of work product. Mr. Carver's testimony at pages 146:24-147:4 indicates that he "assumed" that GIS reviewed the workers/subcontractors work product, which is speculative.

Cesar Castillero, plaintiff's Exhibit 26, at page 40:24-25, discusses supervision, not a review of workmanship. Mr. Castillero, plaintiff's Exhibit 26 at 120:15-19, discusses how the day to day dealings of the workers are not of his concern. This too does not mention a review of workmanship. Mr. Castillero, plaintiff's Exhibit 26 at pages 40:24-25, 120:15-19 and 158:11-14, does not mention whether or not ASR reviewed the drywall installers' workmanship.

Rodrigo Merida, plaintiff's Exhibit 27 at page 58:19-25, does not discuss a review of the drywall installers' workmanship. Eduardo Lara, plaintiff's Exhibit 30 at pages 31:5-24, 59:21-65 and 62:1-7, does not discuss a review of the drywall installers workmanship by GIS and not the labor brokers. Instead, he talks about sending people to other jobsites and supervision of work.

Santo Nicita, plaintiff's Exhibit 31 at pages 26:18-27:5, 95:4-7 and 95:23-96:2, does not mention a review of drywall installers' workmanship. The general contractors and owners on the various projects also reviewed the workmanship on the projects. Plaintiff's Exhibit 3, Mento, at pages 40:24-41:6. Admitted that Mr. Davis

provided quality control, but deny the question and answer specified a timeframe or whose work he reviewed. Admitted that Hobart Carver did not supervise workers.

93.     Denied as follows. Jeffrey Mento, plaintiff's Exhibit 3, Mento, at page 15:7-25, testified that his contract with the owner or general contractor requires him to provide metal studs, acoustical ceiling tiles and grid.

With respect to Robert Landman, plaintiff's Exhibit 5, Landman, at page 48:14-25, there is no timeframe for the testimony and therefore it is vague and lacks foundation.

Ted Davis, plaintiff's Exhibit 6 at pages 68:22-26, indicates that GIS would provide tools to people who did not have them. Mr. Davis' testimony at 69:12-17 did not indicate a timeframe or that the tools were provided to labor supply personnel and therefore this testimony is vague and lacks foundation.

Jose Huerta, plaintiff's Exhibit 13 at page 40:3-24, indicated that he used a GIS scaffold, but did not testify that GIS provided the other tools listed. Joe Carr, plaintiff's Exhibit 18, merely indicates at page 82:4-13 that a number of different tools were kept in a shed by an office. There is no testimony that GIS owned the shed and there is no mention of GIS owning these tools. There certainly is no mention of GIS providing these tools to workers from labor supply companies. In fact, there is no cited evidence that Mr. Carr was a worker from a labor supply company. Therefore, his cited testimony does not support plaintiff's purported fact as it is under the heading of "Drywall Installers Referred from Labor Brokers."

94.     Denied as follows. GIS could kick a worker supplied by a labor broker off a jobsite, but it would be up to the labor broker to determine whether or not it "fired" the

worker.  Mento Affidavit in Opposition.  Mr. Carver would generally tend to place the workers somewhere else.  Plaintiff's Exhibit 25, Carver, at pages 147:9-148:23 and 154:22-155:13.  Cesar Castillero testified that where a superintendent tells a worker to leave a jobsite, the relationship between the worker is not necessarily over if ASR knows he is a good worker; ASR could re-staff that worker on another job unrelated to GIS.  Plaintiff's Exhibit 26, Castillero, at pages 99:24-101:3.

Mr. Tashkin, defendants' Exhibit E, testified that depending upon what happened at the jobsite, Construct Corps relationship with its employee may continue or may end (if there was a theft, anything breaking the law or fighting).  Defendant's Exhibit E, Tashkin, at pages 52:22-54:12, 101:1-13.

With respect to Robert Landman, plaintiff's Exhibit 5, neither the question nor the answer specified a timeframe for when he was terminated, therefore his testimony is vague and lacks foundation.  Plaintiff's Exhibit 5, Landman, at pages 100:20-101:10.

Ted Davis, plaintiff's Exhibit 6 at pages 22:22-25, merely indicates that part of his job is to hire and fire people.  Notably, there is no timeframe for this question and answer.  In point of fact, Mr. Davis was an independent contractor with respect to GIS from 1998 to 2006, and then was hired as an employee in 2006.  Plaintiff's Exhibit 6, Davis II, at pages 6:12-7:3, 19:6-8.

With respect to Joe Carr, plaintiff's Exhibit 18, Mr. Carr found GIS by responding to an ad in the newspaper; he was not placed with GIS by a labor broker and therefore his testimony should not be submitted as part of plaintiff's argument that GIS fired the workers provided by the labor brokers.  Plaintiff's Exhibit 18, Carr, at pages 18:4-21:10.

95.     Denied.   The timekeeping and payroll process for the workers was set forth in the contracts between the labor broker companies and GIS.   See Exhibits A and B to the Affidavit if Jeffrey T. Mento sworn to on June 27, 2011.  Notably, the labor broker companies prepared these contracts. Plaintiff's Exhibit 27, Merida, at page 21:4-17; Mento Affidavit in Opposition; and plaintiff's Exhibit 25, Carver, at pages 58:16-60:13 and 60:23-61:2.

The All Seasons and Hobart Carver company contracts provided as follows: The Contractor [GIS] will be responsible for tracking time and will have the Superintendent sign the Subcontractors weekly time sheet.  The Contractor [GIS] will then fax the signed, legible time sheet to Subcontractor by [the] following [Monday or Tuesday depending on the contract].  The Subcontractor's [All Seasons/Hobert Carver's companies] invoice will be faxed by 5:00 pm Wednesday.  The Subcontractor's [All Seasons/Hobart Carver's companies] payment is due next day overnight mail; unless other arrangements are agreed to before work begins.  If any invoices unpaid are due, Contractor [GIS] shall pay all cost[s] of collection, including and without limitation, reasonable attorneys fees.

Also, the labor broker companies provided time sheets to GIS and the workers.   Plaintiff's Exhibit 25, Carver, at page 92:10-21; plaintiff's Exhibit 26, Castillero, at pages 62:14-64:15, 65:19-65:13 and 67:8-69:18; plaintiff's Exhibit 27, Merida, at pages 27:15-28:5; plaintiff's Exhibit 31, Nicita, at pages 15:19-16:9.

96.     Denied as misleading.  See response to paragraph 95.

97.     Denied as misleading.  See response to paragraph 95.

98.   Admitted in part.   The workers would also send their hours to Hobart Carver/Construction Personnel on a fairly often basis.  Plaintiff's Exhibit 25, Carver, at page 154:9-15.

99.   Denied that the deponents testified that the GIS office managers "culled the information" from the time sheets and denied that GIS office managers "calculate[d] each drywall installer's weekly pay."  See plaintiff's Exhibit 4, Crim, at pages 52:7-16 and 119:2-18; plaintiff's Exhibit 10, Doran, at pages 55:14-56:10 and 90:1-4.   ASR processed payroll.   Plaintiff's Exhibit 27, Merida, at page 63:14-18.  In addition, the labor brokers or labor supply companies paid the drywall installers.  Plaintiff's Exhibit 25, Carver, at pages 31:10-20, 55:23-56:13, 94:3-8, 105:22-106:2 and 107:5-7; plaintiff's Exhibit 26, Castillero, at pages 67:22-69:18 and 127:21-22; plaintiff's Exhibit 27, Merida, at page 75:19-22; defendant's Exhibit E, Tashkin, at pages 18:18-24, 32:19-21 and 88:20-89:1.  Hobart Carver's workers would send their hours directly to him on a fairly often basis.  Plaintiff's Exhibit 25, Carver, at page 154:9-21.

100.   Denied that GIS created and forwarded a "weekly master time sheet" "derived" from the information on the drywall installers' individual time sheets.  Denied that the cited testimony uses such terms.  In addition, the drywall installers sent their own time sheets in on a fairly often basis.  Plaintiff's Exhibit 25, Carver, at page 154:9-21.

101.   Denied that the cited deposition testimony speaks in terms of "weekly master time sheets" and denied on the grounds that it implies that GIS determined the total amount of pay each individual drywall installer should receive for the week.  As indicated in response to paragraph 99, the labor supply companies paid each worker. Plaintiff's Exhibit 25, Carver, at pages 31:10-20, 55:23-56:13, 94:3-8, 105:22-106:2,

107:5-7 and 154:9-21; plaintiff's Exhibit 26, Castillero, at pages 67:22-69:18 and 127:21-22; plaintiff's Exhibit 27, Merida, at page 75:19-22; defendant's Exhibit E, Tashkin, at pages 18:18-24, 32:19-21 and 88:20-89:1. The labor brokers had their own agreements with the workers regarding what the workers would be paid by the labor brokers. See plaintiff's Exhibit 25, Carver, at pages 162:18-164:12; plaintiff's Exhibit 26, Castillero, at pages 37:21-38:14.

102.    Denied for numerous reasons.    First, plaintiff is misstating and mischaracterizing the deposition testimony.   Meaghan Doran, plaintiff's Exhibit 10, Doran, at pages 80:20-81:2, merely indicates that she would send forms with "guy's names and the hours they worked each day and the total dollar amount," and then an unidentified female would "double check it and send us [GIS] an invoice for that dollar amount."

Cesar Castillero, plaintiff's Exhibit 26 at pages 131:8-132:2, indicates that a corporation by the name of GIS Southern (not the defendant GIS) had a supervisor who was telling ASR to pay a guy more money because the worker was threatening to leave and Southern could not afford to lose him.  Plaintiff's Exhibit 26, Castillero, at pages 131:4-132:2. See Exhibit R to the Affidavit of David E. Leach sworn to on September 23, 2011 and Mento Affidavit in Opposition.  Southern is a separate legal entity from the defendant in this case, GIS.  It should also be pointed out that Mr. Castillero testified that he could not recall if a worker was given a raise on a GIS project because the GIS supervisor made a recommendation.  Plaintiff's Exhibit 26, Castillero, at pages 153:19-154:20.  Notably, Mr. Castillero's testimony on page 131:8-132:2 never indicated if the worker actually received the increase and he did not ever say the alleged increase was at

anyone's "sole discretion." Lastly, GIS did not ever dictate what a worker's wage would be. Plaintiff's Exhibit 25, Carver, at page 107:5-16.

103.    Denied that the cited testimony speaks in terms of "weekly master time sheets" and denied that GIS always recorded the drywall installers' individual time sheets. Plaintiff's Exhibit 25, Carver, at page 154:9-15. Generally speaking, the time sheets that GIS maintained accurately reflected the number of hours the workers worked. Plaintiff's Exhibit 25, Carver, at page 105:11-20; plaintiff's Exhibit 27, Merida, at pages 66:4-9 and 75:19-22. To the extent that there was a discrepancy between the hours that a worker claimed to have worked for a given week and what was shown on the actual time sheet, it would be reconciled in the following week's check. Plaintiff's Exhibit 25, Carver, at pages 95:5-12 and 102:14-103:17. Admitted than on one occasion, hours were deducted from ASR because GIS tools were missing. However, just because hours were deducted for the missing tools does not mean that it affected what ASR paid its workers. Plaintiff's Exhibit 27, Merida, at pages 118:116-119 and 75:19-22; plaintiff's Exhibit 25, Carver, at page 66:4-17; plaintiff's Exhibit 31, Nicita, at pages 90:6-91:14 and Mento Affidavit in Opposition.

104.    Denied as written. Tools from a jobsite and certain labor broker supply workers were missing and time was deducted from ASR on one occasion; but it did not affect what ASR paid its workers. Plaintiff's Exhibit 26, Castillero, at pages 132:9-133:18; plaintiff's Exhibit 27, Merida, at pages 63:6-7, 66:4-17, 75:19-22 and 118:16-119:25; plaintiff's Exhibit 31, Nicita, at pages 90:6-91:14 and Mento Affidavit in Opposition.

105.    Denied on the grounds that this statement is misleading.  GIS admits that it paid the labor broker companies an hourly sum based upon the number of hours that the workers/employees/subcontractors of the labor broker companies supplied to GIS worked.  GIS further admits that the amount it paid the labor supply companies was higher    than    the    amount    the    labor    broker    companies    paid    their workers/employees/subcontractors.  Plaintiff's Exhibit 25, Carver, at pages 31:10-20, 55:23-56:13; plaintiff's Exhibit 26, Castillero, at pages 19:12-20, 37:21-38:14 and 135:10-25.

106.    Denied that the referenced testimony speaks in terms of "reliance," "weekly," "master time sheets" and "proceeds."  GIS admits that it paid the labor broker companies an hourly sum based upon the number of hours that the workers/employees/ subcontractors of the labor broker companies supplied to GIS worked.  GIS further admits that the amount it paid the labor supply companies was higher than the amount the labor broker companies paid their workers/employees/subcontractors.  Plaintiff's Exhibit 25, Carver, at pages 31:10-20 and 55:23-56:13; plaintiff's Exhibit 26, Castillero, at pages 19:12-20, 37:21-38:14 and 135:10-25.

107.    Denied.  The statement is misleading and irrelevant to the issues in this case.  The labor brokers pay the drywall installers directly because the labor brokers hired the drywall installers and have a contract with them whereby they are required to pay the drywall installers.  Plaintiff's Exhibit 26, Castillero, at pages 19:12-20, 32:2-17, 37:21-38:14 and 79:11-81:10; Exhibit Q, Affidavit of David E. Leach sworn to on September 23, 2011.

In addition, Mr. Carver was asked, in essence, why a contractor such as

GIS would not start paying the workers directly once they have been provided by the labor brokers.  Mr. Carver stated that there are many reasons why a contractor such as GIS would call a labor broker in order to obtain workers.  These reasons included the fact that the workers are not GIS employees; GIS would not have to have a reason to let them go, and if the job ended, the workers or subcontractors could just be sent home.  Plaintiff's Exhibit 25, Carver, at pages 53:4-54:7.  He went on to testify that GIS would not want to pay the workers and avoid the premium because the labor market was such that GIS could not find enough workers to hire to do the work.  Plaintiff's Exhibit 25, Carver, at pages 56:17-57:9.  Contractors such as GIS would get into a situation where they have a job that their normal sources of labor in the area cannot handle.  Plaintiff's Exhibit 25, Carver, at pages 78:24-79:2.  The contractors cannot just put an advertisement in the paper and get 10-12 additional guys that are qualified within so short of a timeframe.  Plaintiff's Exhibit 25, Carver, at pages 57:20-58:5 and 79:2-4.  The contractors generally opt to pay extra for their workers in comparison to the market.  Plaintiff's Exhibit 25, Carver, at page 79:4-6.  It is easier for them to call someone and get their workers rather than trying to hire an employee to do the work.  Plaintiff's Exhibit 25, Carver, at page 79:6-8.

Mr. Castillero testified, plaintiff's Exhibit 26 at page 135:10-25, that ASR controlled the payroll in order to make sure that they will get paid by GIS because they do not know how long the worker is going to stick around.  In order for ASR to get paid, the worker has to perform.  GIS pays ASR and ASR pays the workers so there has to be a degree of trust that this is going to work out that way.  Plaintiff's Exhibit 26,

Castillero, at page 135:10-25.  Lastly, what the labor brokers "believe" is irrelevant to any issue in this case.

108.    Admitted in part and denied in part.  Admitted that the cited deposition testimony indicates that GIS faxed time sheets and its invoices to ASR, but denied that it mentions payroll, Liverpool, New York or North Carolina.  Plaintiff did not cite any deposition testimony from a representative of Construct Corps or Hobart Carver so defendant denies that the alleged undisputed fact applies to those other labor brokers.

109.    Denied.  GIS paid the labor brokers a particular rate that they negotiated and then the labor brokers paid the workers a lower rate.  Plaintiff's Exhibit 25, Carver, at pages 55:23-56:13 and 58:16-63:2; plaintiff's Exhibit 26, Castillero, at pages 19:12-20, 24:15-21 and 37:21-38:14.   At least one labor broker, Construct Corps, paid its employees at a time and a half rate for instances in which the employees worked more than forty (40) hours in a week and then charged its clients a premium on time and a half pay.  Defendants Exhibit E, Tashkin, at pages 32:19-25, 34:12-36:2 and 71:15-23.   In addition, the cited testimony of Jeffrey T. Mento, plaintiff's Exhibit 3, at page 88:2-4, pertains to workers not provided by the labor supply companies.  See the question and answer immediately preceding the testimony cited by plaintiff.  Plaintiff's Exhibit 3, Mento, at page 87:21-25.  Therefore, his testimony does not support plaintiff's alleged facts.

The only thing GIS was ever supposed to pay Mr. Carver's companies was the hourly rate set forth in their contract.  Plaintiff's Exhibit 25, Carver, at pages 159:24-162:17.  Mr. Carver's companies had a contract agreement with their workers by which

they paid their workers a certain amount of money per hour, which the workers agreed to. Plaintiff's Exhibit 25, Carver, at pages 162:18-164:12.

110. Denied. Construct Corps charged a premium for time and a half pay. Defendant's Exhibit E, Tashkin, at pages 35:2-36:2 and 71:15-23. In addition, the testimony of Jeffrey Mento cited by the plaintiff, plaintiff's Exhibit 3, Mento, at page 88:2-4, has nothing to do with and/or does not mention paying labor brokers overtime premium. Mr. Mento's testimony as seen from the question immediately preceding the one cited by plaintiff clearly is talking about workers not supplied by labor supply companies. As such, the statement is not supported by the cited testimony. Plaintiff's Exhibit 3, Mento, at page 87:21-25.

111. Defendants can either admit or deny this statement because certain labor brokers contradicted themselves on the statement set forth. The purported fact is therefore necessarily in dispute. Mr. Castillero testified that there were discrepancies at times, but then also says ASR always pays its guys. Plaintiff's Exhibit 26, Castillero, at pages 65:19-69:18; plaintiff's Exhibit 27, Merida, at pages 75:19-22. Regardless, plaintiff's statement is irrelevant to the issues in this case.

112. Denied to the extent this statement mischaracterizes the testimony. The cited testimony indicates that at some unidentified date ASR did not have the actual funds to pay the workers and/or was shorting the workers, so GIS paid the workers directly. The cited deposition testimony also indicates that at some point Hobart Carver was not available so GIS paid the workers directly. The cited testimony does not, however, indicate that GIS paid Mr. Carver's company a "premium." Plaintiff's Exhibit 10, Doran, at pages 81:3-84:8 and 134:23-135:9. Notably, Ms. Doran testified at page 81:3-17 of

plaintiff's Exhibit 10, Doran, that she did not know when GIS paid the workers directly, so her testimony is vague and lacks foundation.

113.   Denied to the extent plaintiff is mischaracterizing the testimony. Admitted that GIS told Construction Personnel that it should hire Erick Solis, and that he could do work for GIS.  Plaintiff's Exhibit 10, Doran, at pages 78:16-80:13; plaintiff's Exhibit 33, fax cover sheet dated November 30, 2005.  Erick Solis may have been working for All Seasons or he may have been a relative of one the workers that had been working for GIS.  Plaintiff's Exhibit 10, Doran, at pages 78:16-80:3; plaintiff's Exhibit 33, fax cover sheet dated November 30, 2005.

114.   Denied on the grounds that the statement mischaracterizes the testimony. Meaghan Doran indicates that GIS told Construction Personnel to hire one (1) worker, Erick Solis, because ASR was behind.  Plaintiff's Exhibit 10, Doran, at pages 78:16-84:8. Mr. Carver, plaintiff's Exhibit 25, Carver, at pages 50:24-52:24, testified that he added workers from All Seasons to his payroll when All Seasons cut off Jeff financially. Notably, Mr. Carver did not know whose idea it was to do that; it was either his or Jeff Mento's; Mr. Carver may have volunteered to do it.  Plaintiff's Exhibit 25, Carver, at pages 50:24-52:24.

Mr. Merida, plaintiff's Exhibit 27 at pages 85:3-12, indicates that certain workers were not happy with Construction Personnel for their own reasons so they were switched over to ASR.  He did not testify that GIS directed this.

115.   Admitted that Meaghan Doran testified as plaintiff quoted, but denied anything in the citation indicates she was a GIS office manager responsible for

processing the payroll.  In fact, Meaghan Doran was initially a receptionist and then her title changed to administrative assistant.  Plaintiff's Exhibit 10, Doran, at page 124:4-9.

116.    Denied on the grounds that this statement mischaracterizes the testimony. GIS told Construction Personnel that they should hire one (1) worker, Erick Solis, and that he would work for GIS.  Plaintiff's Exhibit 10, Doran, at pages 78:16-80:8.   In addition, Ms. Doran testified that she was not sure who Erick Solis was but he may have been working for All Seasons, another labor broker.  Plaintiff's Exhibit 10, Doran, at page 79:20-24.

Eduardo Lara, at pages 93:17-95:1 of plaintiff's Exhibit 30, does not say anything about GIS directing Construction Personnel to pay wages to drywall installers who have been referred to GIS through friends or relatives, and who did not have any association with the labor brokers.

117.    Admitted in part and denied in part.  Admit so much of this paragraph as states that Eduardo Lara traveled from Denver, Colorado to Liverpool, New York after being referred to GIS by his uncle and cousin, but denied that they were GIS employees. Plaintiff's Exhibit 30, Lara, at pages 11:10-12:16 and 15:18-21; See Exhibit G to David E. Leach's affidavit sworn to on September 23, 2011.   Mr. Lara claimed that he was an employee of GIS but received a W-2 from Construction Personnel.  Plaintiff's Exhibit 30, Lara, at pages 21:2-5, 93:17-94:10, 105:17-106:16; see also a check made payable to Mr. Lara from Construction Personnel, which is Exhibit O to David E. Leach's affidavit sworn to on September 23, 2011.

118.    Denied.  This statement mischaracterizes the testimony.  Mr. Lara claimed that he was an employee of GIS but received a W-2 from Construction Personnel.

Plaintiff's Exhibit 30, Lara, at pages 21:2-5, 93:17-94:10 and 105:17-106:16.  See also a check made payable to Mr. Lara from Construction Personnel, Exhibit O to David E. Leach's affidavit sworn to on September 23, 2011.  In addition, the cited testimony does not indicate that he was hired by GIS directly or that he worked for GIS exclusively.

119.   Admitted, but Mr. Lara testified that he received a W-2 from Construction Personnel.  Plaintiff's Exhibit 30, Lara, at pages 93:17-94:10 and 105:17-106:16.  See also a check made payable to Mr. Lara from Construction Personnel, Exhibit O to David E. Leach's affidavit sworn to on September 23, 2011.

120.   Admitted in part and denied in part.  Admitted that the cited testimony indicates that Javier Anguiano traveled from Kansas to Liverpool because his friend Jose (last name unspecified) said there was work there.  Denied that Mr. Anguiano and Jose (last name unspecified) are "former GIS drywall installers."  Defendants object to the characterization of Mr. Anguiano and Mr. Huerta (assuming he is the Jose referenced) as "former GIS drywall installers."  Mr. Anguiano, at least, was placed by Construction Personnel.  See a check made payable to Mr. Anguiano from Construction Personnel, Exhibit S to David E. Leach's affidavit sworn to on September 23, 2011.  Mr. Anguiano worked for Construction Personnel for approximately three (3) months when in New York.  Plaintiff's Exhibit 14, J. Anguiano, at pages 82:8-83:19, 87:11-14 and 88:9-18. Defendants maintain that Mr. Huerta (assuming he is the referenced "Jose") and Mr. Anguiano are not their employees.  Defendants' Answer to Plaintiff's Complaint, plaintiff's Exhibit 2.

121.   Denied.   Mr. Anguiano testified that he was in New York for approximately five (5) months and believes that he worked for Construction Personnel

for approximately three (3) months. Plaintiff's Exhibit 14, J. Anguiano, at pages 87:11-14, 88:6-18 and 101:13-19. Defendants deny that they hired Mr. Anguiano as an employee. Defendants' Answer to Plaintiff's Complaint, plaintiff's Exhibit 2.

122. Defendants object to this statement on the grounds that there is no timeframe specified. Without waiving the aforementioned objection, admitted. See also defendants' responses to paragraphs 120 and 121.

123. Admitted in part and denied in part. Denied that the referenced testimony indicates that Mr. Anguiano never worked in North Carolina at all. The testimony cited does not state that. Denied that he never met anyone who worked for Construction Personnel Services. His relatives worked for them. Defendants admit the remainder of this statement. Plaintiff's Exhibit 14, J. Anguiano, at pages 82:22-24, 83:20-25 and 84:2-5.

124. Defendants object to the use of the term "treated." Denied as follows. Denied that Exhibit 5, Landman, at page 85:2-9 supports plaintiff's statement. That testimony talks about hours being worked.

Plaintiff's citation to Exhibit 16, Sanders, at pages 39:19-25 and 40:2-3, is irrelevant because there is no timeframe specified in that testimony and there is no indication that the work he was doing was for GIS. Notably, Mr. Sanders (plaintiff's Exhibit 16) was deposed on August 24, 2010 and he has been on and off the Fort Drum job for four (4) years. Therefore, his answer does not necessarily cover the time period at issue, July 25, 2005 through July 25, 2008. Plaintiff's Exhibit 16, Sanders, at page 11:19-22.

The testimony set forth at plaintiff's Exhibit 19, at page 80:12-23, the deposition of Jason Snyder, indicates that he did not know that he would be working harder and that his responsibilities would change, once he became an employee. He also indicated that it did not matter to him if he was a contractor as opposed to an employee. This testimony does not support plaintiff's purported undisputed fact. In addition, there is no timeframe specified and the testimony is therefore vague.

Plaintiff's Exhibit 21 at page 33:17-22, the deposition testimony of John Kelly, indicates that the "work standard" for the way he performed on a Wal-Mart job as a subcontractor did not differ from other jobs when he was an employee. This testimony does not support plaintiff's statement because there is no timeframe specified and it does not say he was a subcontractor or employee of GIS. In addition, Mr. Kelly was not placed with GIS by a labor supply company or a labor broker and therefore his testimony should not be relevant to this portion of plaintiff's motion, which focuses on workers provided by labor brokers. Lastly, Mr. Kelly is not listed on Exhibit A to plaintiff's Complaint and therefore his testimony is irrelevant.

125. Denied as follows. Denied that plaintiff's Exhibit 5, Landman, deposition at page 85:2-9 supports plaintiff's purported undisputed fact because there is no timeframe specified. Notably, Mr. Landman was deposed on August 25, 2010.

Joseph Sanders, plaintiff's Exhibit 16 at page 40:6-12, indicates that his rate of pay as a subcontractor was the same rate he received as an employee, but does not indicate when he changed from a subcontractor to an employee; notably, Mr. Sanders was deposed on August 24, 2010 and he may have become an employee outside of the

timeframe at issue, July 25, 2005 through July 25, 2008. Therefore his testimony is vague and without foundation.

Jeffrey Hamilton, plaintiff's Exhibit 20, at page 24:17-22, talks about a number of things, including how he was treated as an employee. Notably, the cited testimony does not say who treated him like an hourly employee or when he was treated that way. Therefore, Mr. Hamilton's testimony does not support plaintiff's purported undisputed fact. Also, Mr. Hamilton is not listed on Exhibit A to plaintiff's Complaint, thus his testimony is irrelevant.

Mr. Kelly's testimony, plaintiff's Exhibit 21 at page 33:17-22, indicates that his work standard is the same, but no timeframe is specified. Notably, Mr. Kelly was deposed on August 23, 2010. His testimony at plaintiff's Exhibit 21, Kelly, at page 77:16-18 indicates he was given an employee handbook and told he was a subcontractor. There was no timeframe set forth in the question or answer and he does not indicate who gave him the employee handbook or who told him he was a subcontractor. Lastly, Mr. Kelly is not listed on Exhibit A to plaintiff's Complaint and therefore his testimony is irrelevant.

126. Denied as follows. Neither of the deponents whose testimony is cited, Ted Davis, II or Meaghan Doran, were GIS management. Mr. Davis has been a supervisor with GIS since 2006 and he runs construction projects, makes sure the guys have safety equipment, and makes sure material is at the job but does not bid on projects. Plaintiff's Exhibit 6, Davis II, at pages 6:12-14 and 19:6-20:7. The testimony cited by plaintiff (plaintiff's Exhibit 6, Davis II, at page 29:16-25) merely indicates that Mr. Davis runs an "ad through Monster" when he needs employees, that he does not hire subcontractors to

be employees and that the subcontractors GIS uses have employees. Plaintiff's statement mischaracterizes this testimony.

With respect to Meaghan Doran, plaintiff's Exhibit 10, Ms. Doran worked for GIS from January 2005 through approximately April 30, 2007. Plaintiff's Exhibit 10, Doran, at pages 9:21-10:4. In the beginning she worked three (3) days per week and her responsibilities were to answer the phones, run errands and other support functions. Plaintiff's Exhibit 10, Doran, at pages 17:6-18:16. The job eventually became full time. See defendants' response to paragraph 115. Plaintiff's Exhibit 10, Doran, at page 19:13-19. When Ms. Doran was first hired at GIS her job title was receptionist; it stayed that title until she changed it to administrative assistant. Plaintiff's Exhibit 10, Doran, at page 124:4-9. Her job duties did not change when her title changed. Plaintiff's Exhibit 10, Doran, at pages 124:14-17. Therefore, Ms. Doran was never "management" at GIS. Defendants object to the use of the term "legitimate" and "classified" as those terms are not specified in the testimony. In addition, no timeframe is set forth in plaintiff's statement.

127.   Admit that Meaghan Doran testified as set forth by plaintiff, but denies that she is a former GIS office manager. Initially, she was a receptionist and then her title changed to administrative assistant. Plaintiff's Exhibit 10, Doran, at page 124:4-17.

128.   Admitted in part and denied in part. Defendants admit that Ted Davis II testified at his deposition that "I do not hire subcontractors to be employees....The subcontractors we have, have employees." Plaintiff's Exhibit 6, Davis II, at page 29:16-25. Defendants deny that Mr. Davis is a GIS operations manager, rather he is a

supervisor running projects.  Plaintiff's Exhibit 6, Davis II, at page 19:6-23.  Denied to the extent plaintiff's statement does not mirror Mr. Davis' testimony.

129.    Defendants object to this statement on the grounds that it is vague and no timeframe is specified.  Plaintiff does not identify whether the workers referenced in the statement are the drywall installers at issue in this case and does not indicate when Mento allegedly hired and fired them.    Without waiving the aforementioned objections, defendants admit so much of paragraph 129 as alleges that Jeffrey Mento hired and/or fired (as the case may be) the workers whose testimony is cited, i.e., Richard Mabbett (plaintiff's Exhibit 8) and Donna Crim (plaintiff's Exhibit 4), Ted Davis, II (plaintiff's Exhibit 6), Robert Crouse (plaintiff's Exhibit 7), and Meaghan Doran (plaintiff's Exhibit 10).   Defendants deny the rest of paragraph 129 as the cited testimony does not support plaintiff's broad statement.

130.    Denied on the grounds that this statement is vague and no timeframe is specified.  Plaintiff does not indicate whether the drywall installers referenced are any of the workers at issue in this litigation and does not indicate when Jeffrey Mento allegedly assigned the "work responsibilities."  Plaintiff cites the testimony of Ted Davis, II and Meaghan Doran as evidence of what Jeff Mento's purported responsibilities are. Strangely, plaintiff does not cite Jeff Mento's testimony regarding his own responsibilities and this statement lacks foundation.  Regardless, Mr. Davis' testimony, plaintiff's Exhibit 6, Davis II, at pages 18:23-25 and 19:2, merely indicates that "Jeff would get a few of us together and we would go lay it out, frame it, rock it and put the ceilings in."  There is no explanation as to who the "us" or "we" is and therefore this testimony does not support plaintiff's claim that Jeff Mento purportedly assigned work

responsibilities to the drywall installers.  Quite frankly, the cited testimony does not even say if "Jeff" is Jeffrey Mento.

Ms. Doran's testimony, Exhibit 10, Doran, at page 22:14-22, indicates that Jeff Mento and two (2) others trained her on certain additional tasks and additional responsibilities.   Again, Ms. Doran went from a receptionist to an administrative assistant.  Plaintiff's Exhibit 10, Doran, at page 124:4-17.  The cited testimony has nothing to do with Jeff Mento's purportedly assigning work responsibilities to drywall installers.

131.   Denied.  The statement is vague and no timeframe is specified.  What drywall installers is plaintiff referring to?  The ones GIS contracted with directly?  The ones provided by the labor brokers?  The ones who ASR did not pay for a while because it lacked funds?  Regardless, in this paragraph, plaintiff cites the deposition testimony of Donna Crim, Ted Davis, II and Meaghan Doran for the purported undisputed fact.  Again, the plaintiff does not cite Jeffrey Mento's testimony and lacks foundation.

In addition, Jeffrey Mento negotiated a contract with the labor brokers whereby GIS paid the labor brokers.  Plaintiff's Exhibit 25, Carver, at pages 58:14-63:2.  GIS did not pay their workers, rather the workers were paid by the labor brokers themselves. Plaintiff's Exhibit 25, Carver, at pages 55:23-56:4, 105:22-106:2 and 162:18-164:12; plaintiff's Exhibit 26, Castillero, at pages 19:12-20 and 127:21-22 and plaintiff's Exhibit 27 at pages 76:12-14 and 77:6-15.

In addition, Mr. Davis' testimony, plaintiff's Exhibit 6, Davis II, at page 17:18-22, discusses how in 1998, 1999 and 2000 he would go to the office on Friday morning, turn in his footage or hours and Jeff Mento would write him a check.  That

timeframe is not at issue. His testimony at plaintiff's Exhibit 6, Davis II, at page 70:2-6 indicates that in "the past couple of years" he would help Jeff (no last name specified) determine a worker's wage rate. Notably, Mr. Davis was deposed on February 24, 2011 and we do not know what timeframe his testimony covers exactly. Mr. Davis' testimony is therefore vague. In addition, Mr. Davis' testimony does not indicate who the workers are. They may be the ones at issue in this case and then again they may not.

Ms. Doran's testimony, plaintiff's Exhibit 10, Doran, at pages 85:6-25 and 86:1-13, merely indicates that Jeff Mento told Ms. Doran how to handle the pay of one (1) particular worker provided by Construction Personnel. Not only does this not support plaintiff's purported undisputed material fact, but there is no timeframe set forth in the question or answer. Lastly, plaintiff does not indicate if they are claiming Jeff Mento set the wages of and wrote paychecks to "all" drywall installers.

132. Denied on the grounds that the statement is vague and no timeframe is specified. This paragraph is included in the portion of plaintiff's motion dealing with "Drywall Installers Referred to GIS From Labor Brokers." See page 14 of plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment. The purported material fact in this paragraph speaks in terms of "drywall installers" and there is no indication as to whether plaintiff is talking about all drywall installers or certain drywall installers, such as those provided by the labor brokers. Regardless, defendants admit so much of paragraph 132 as states that Jeffrey Mento filled out time sheets but deny the cited testimony speaks in terms of reviewing and verifying the time sheets. In addition, the testimony does not specify a timeframe and there is no indication as to what people we are talking about. Mr. Davis was deposed on

February 24, 2011 and we do not know if he is talking about the time period of July 25, 2005 through July 28, 2008.

## ADDITIONAL MATERIAL FACTS THAT ARE IN DISPUTE

### A.    DEPOSITION TESTIMONY OF HOBART CARVER

133.    Hobart Carver began working for a company by the name of Drywall Personnel in 1999.  See Exhibit 25 to the plaintiff's motion papers at page 10:5-15.

134.    Drywall Personnel was owned by Mr. Carver's father, Charlie Carver, and another gentleman named David Davis.  See Exhibit 25 to the plaintiff's motion papers at page 11:3-9.

135.    Over the years, the ownership of the company changed and every time ownership changed, the name of the company changed.  See Exhibit 25 to the plaintiff's motion papers at pages14:4-16:19.

The company had four (4) names: Drywall Personnel, Construction Personnel, Construction Labor Source and Drywall Labor Source.  See Exhibit 25 to the plaintiff's motion papers at pages 15:18-16:10, 22:3-17.

136.    These companies supplied workers to subcontractors such as drywall and paint contractors.  See Exhibit 25 to the plaintiff's motion papers at page 9:16-20.

137.    Drywall Personnel's clients are basically drywall or paint companies who have more business than they can take care of with their personnel that is readily available in the area; so they would get extra help from Drywall Personnel on certain jobs.  See Exhibit 25 to the plaintiff's motion papers at page 11:17-24.

138.    Mr. Carver, as sales representative for Drywall Personnel, would look at

[advertisements] in various newspapers and phone [companies] to try and get them to use Drywall Personnel's workers, rather than hiring someone directly.  See Exhibit 25 to the plaintiff's motion papers at page 12:9-18.

139.    Mr. Carver would look for drywall companies and paint companies who are looking for workers and would say "I can broker workers so you do not have to go through the process." See Exhibit 25 to the plaintiff's motion papers at pages 12:19-13:2.

140.    Mr. Carver was the president of the company after they let Mr. Davis go. See Exhibit 25 to the plaintiff's motion papers at page 19:7-14.

141.    Cesar Castillero, Rodrigo Merida and Vidar Morfin worked for one of Mr. Carver's companies at one point.  See Exhibit 25 to the plaintiff's motion papers at pages 21:24-22:2, 25:6-16, 27:2-3 and 173:18-174:2.

142.    Mr. Castillero and Mr. Merida left Mr. Carver's companies to form a different company that was a competitor.  See Exhibit 25 to the plaintiff's motion papers at pages 25:19-26:2, 27: 2-8.

143.    Mr. Carver fired Vidar Morfin because it appeared that Mr. Morfin was passing along workers' contact information from Mr. Carver's company to competitors. See Exhibit 25 to the plaintiff's motion papers at page 173:2-174:2.

144.    Mr. Carver's companies made money when they supplied workers directly to contractors based upon the difference between what the contractors paid Mr. Carver's companies and what Mr. Carver agreed to pay the workers.   See Exhibit 25 to the plaintiff's motion papers at page 31:10-20.

145.    Mr. Carver would receive an order from a client saying they need X

number of laborers in a specialized field and somebody from his companies would try to locate workers to staff up the client. See Exhibit 25 to the plaintiff's motion papers at pages 32:25-33:7.

146. If some of the workers provided by Mr. Carver's companies did not work out, did not have enough skill or whatever, he would try and replace them. See Exhibit 25 to the plaintiff's motion papers at page 42:2-5.

147. All Seasons would not supply Jeff new people anymore at one point because he was getting behind financially so All Seasons cut him off. See Exhibit 25 to the plaintiff's motion papers at pages 50:23-51:4.

148. Mr. Carver thought he was a genius and picked up all of All Seasons workers and put them on Mr. Carver's payroll. See Exhibit 25 to the plaintiff's motion papers at pages 51:4-52:15.

149. So, there could be some overlap of workers supplied by All Seasons and Mr. Carver's companies. See Exhibit 25 to the plaintiff's motion papers at page 51:8-9.

150. According to Mr. Carver, there are a lot of good reasons why General Interior Systems would not hire these workers directly, including the fact that they are just not their employees, GIS would not have to have a reason to let them go, and if the job ended, the workers or subcontractors could just be sent home. See Exhibit 25 to the plaintiff's motion papers at pages 53:4-54:7.

151. In addition, most of the people Mr. Carver sent were not looking for a full-time job somewhere. See Exhibit 25 to the plaintiff's motion papers at page 54:8-16.

152.    The workers would agree to go [to New York] on a temporary basis and go work for some temporary amount of time and then come home.  See Exhibit 25 to the plaintiff's motion papers at page 54:16-19.

153.    It was not completely odd for some worker to have worked for one of Mr. Carver's companies and then work for someone else such as ASR.  See Exhibit 25 to the plaintiff's motion papers at pages 54:20-55:5.

154.    Sometimes Mr. Carver would have a customer that had a lot of work and somebody else might not; they could find work for their worker for a while then the worker could just go work for whomever.  See Exhibit 25 to the plaintiff's motion papers at page 55:5-11.

155.    Mr. Carver's companies pay the workers directly.  See Exhibit 25 to the plaintiff's motion papers at pages 55:23-56:4.

156.    GIS pays Mr. Carver's companies for that same worker and the amount that GIS pays Mr. Carver's company for that worker is larger than the amount of money that one of his companies pays to the worker.  See Exhibit 25 to the plaintiff's motion papers at page 56:5-13.

157.    GIS would not want to pay the workers directly and avoid the premium because the labor market was such that GIS could not find enough workers to hire to do the work.  See Exhibit 25 to the plaintiff's motion papers at pages 56:17-57:9.

158.    So, GIS had to look elsewhere to find workers and, therefore, had to pay a premium to get them to travel to come and do the work.  See Exhibit 25 to the plaintiff's motion papers at page 57:9-11.

159.    Mr. Carver believes most of his customers, such as GIS, would have

preferred to hire workers directly if that were a possibility, but they just could not; on a job to job basis, Mr. Carver's clients would not be able to change their labor force around enough to do certain jobs.  See Exhibit 25 to the plaintiff's motion papers at page 57:13-23.

160.   There were lots of times that Jeff [Mento] had more [work] than he was able to locally get the personnel for, and he would try to obtain them from wherever he could get them.  See Exhibit 25 to the plaintiff's motion papers at pages 57:20-58:5.

161.   Contractors such as GIS tried to even out their labor force by hiring Mr. Carver's companies to provide workers.  See Exhibit 25 to the plaintiff's motion papers at page 78:3-24.

162.   Contractors such as GIS get into a situation where they have a job that their normal sources of labor in the area cannot handle.  See Exhibit 25 to the plaintiff's motion papers at pages 78:24-79:2.

163.   The contractors can not just put an advertisement in the paper and get 10 or 12 additional guys that are qualified within so short of a timeframe.  See Exhibit 25 to the plaintiff's motion papers at page 79:2-4.

164.   The contractors generally opt to pay extra for [the workers] in comparison to the market.  See Exhibit 25 to the plaintiff's motion papers at page 79:4-6.

165.   It is easier sometimes for them to call someone and get [the workers], rather than trying to hire an employee to do [the work].  See Exhibit 25 to the plaintiff's motion papers at page 79:6-8.

166.   Mr. Mento got a lot of workers from Mr. Carver's companies and he got a

lot of workers from other people too.  See Exhibit 25 to the plaintiff's motion papers at page 58:5-7.

167.    Mr. Carver does not know if GIS ever hired any of his workers directly. See Exhibit 25 to the plaintiff's motion papers at pages 58:9-13 and 68:8-11.

168.    Pursuant to the contract between Mr. Carver's companies and GIS, GIS would pay Mr. Carver's companies a particular hourly rate for each hour worked by the workers; the contract was originated by the accountant for Mr. Carver's companies, Jerry Blunt.  See Exhibit 25 to the plaintiff's motion papers at pages 58:16-60:13, 60:23-61:2.

169.    The wage that Mr. Carver's companies such as Construction Labor Source paid to the laborer or worker varied depending on the laborer's skill level and his experience.  See Exhibit 25 to the plaintiff's motion papers at page 61:3-10.

170.    The contracts between GIS and Mr. Carver's companies required Mr. Carver's companies to provide Worker's Compensation insurance and general liability insurance.  See Exhibit 25 to the plaintiff's motion papers at pages 58:16-59:5, 63:7-14, 64:18-65:16.

171.    The rate GIS paid one of Mr. Carver's companies was negotiated by Jeff [Mento] and typically Mr. Carver.  See Exhibit 25 to the plaintiff's motion papers at pages 62:12-63:2.

172.    Under the contract between GIS and Mr. Carver's companies, should GIS want to hire a worker furnished by Mr. Carver's companies, than GIS would have to pay Mr. Carver's companies a $2,500.00 transfer fee per worker.  See Exhibit 25 to the plaintiff's motion papers at page 67:10-16.

173.    Mr. Carver's companies would staff laborers to multiple GIS work sites

during the course of a week because either business slowed down or just started.  See Exhibit 25 to the plaintiff's motion papers at pages 74:18-75:8.

174.    Mr. Carver consulted with both attorneys and his accountant and determined that the workers they were providing were subcontractors.  See Exhibit 25 to the plaintiff's motion papers at page 79:10-23;

175.    The first lawyer Mr. Carver consulted with provided them with a letter that discussed a breakdown of the 20 question test that the IRS uses to determine whether someone is an employee or not an employee.  See Exhibit 25 to the plaintiff's motion papers at page 81:4-14.

176.    Mr. Carver wanted to make sure that they were handling subcontractors correctly in terms of complying with the IRS rules and the Department of Labor.  See Exhibit 25 to the plaintiff's motion papers at pages 81:15-84:22.

177.    Mr. Carver's companies interviewed the workers before they sent them out to clients in order to ascertain their skill and experience level.   See Exhibit 25 to the plaintiff's motion papers at page 86:3-7.

178.    The commercial drywall work is pretty complicated with metal framing but it is not too hard to ask them certain questions in order to figure out whether or not they are capable of going to work on a job.  See Exhibit 25 to the plaintiff's motion papers at page 86:11-19.

179.    Once his [company] identified a laborer to be sent, his company is Supposed to have the laborer fill out forms such as a subcontractor agreement and tax forms such as a W-9 for the 1099.  See Exhibit 25 to the plaintiff's motion papers at pages 87:23-88:14.

180.    The number of hours the workers would work varied wildly depending upon the job, whether permits had been obtained or how much someone could work during the week.  See Exhibit 25 to the plaintiff's motion papers at page 89:9-17.

181.    To the best of his knowledge, there was not a standard amount of hours per day that one of these workers would work.  See Exhibit 25 to the plaintiff's motion papers at page 89:18-21.

182.    Mr. Carver assumes that GIS is responsible for determining the number of hours laborers he sent to the worksites work, but a lot of times GIS was not in charge of it either.  See Exhibit 25 to the plaintiff's motion papers at page 90:3-13.

183.    If the general contractor on the project does not have a certain permit, GIS and the other subcontractors would only be allowed to go so far and that would be outside of GIS' hands.  See Exhibit 25 to the plaintiff's motion papers at page 90:8-20.

184.    GIS could also be held up by how far the other subcontractors got with different aspects of their work.  See Exhibit 25 to the plaintiff's motion papers at page 90:8-12.

185.    The number of hours worked by a specific worker on a GIS project varied wildly.  There was definitely never any standard or specific hours because you could get caught up with one of the other trades when the plumber was not done enough, where there was an inspection that had not been handled.  See Exhibit 25 to the plaintiff's motion papers at pages 104:15-105:9 and 151:13-19.

186.    When asked to describe the different factors that could explain why the hours the workers worked changed week by week, Mr. Carver indicated a job would end and their might not be work for a couple of days, or they would do the drywall part

quickly, catch up to one of the other trades, like plumbers and have to wait a day or two

for them, or if there was not an inspection that was done on a timely basis they might

have to sit and wait.  See Exhibit 25 to the plaintiff's motion papers at pages 168:17-

169:5.

187.    Also, entities such as the general contractor, the plumber, or the

electrician may not have obtained the building permits timely and the job can get backed

up.  See Exhibit 25 to the plaintiff's motion papers at page 169:7-20.

188.    Mr. Carver's companies provided blank time sheets to the workers

for the workers to verify with the supervisor at the end of the day that this is my time

sheet, these are the amount of hours I worked and then have them sign off on it.  See

Exhibit 25 to the plaintiff's motion papers at pages 91:14-92:9.

189.    They supplied time sheets to General Interior Systems because they

could not always take the word of the workers for how many hours they worked; it was a

lot better to have the supervisors of GIS turn the worksheets in.  See Exhibit 25 to the

plaintiff's motion papers at page 92:10-22.

190.    They would send them a blank time sheet and they would probably make

copies of it and send one to each jobsite.  See Exhibit 25 to the plaintiff's motion papers

at page 93:3-10.

191.    Once they got the time sheets to GIS, GIS handled the reporting and the

certifying or verifying of the time.    See Exhibit 25 to the plaintiff's motion papers at

page 93:11-15.

192.    GIS faxes the time sheet to Mr. Carver's office; then Mr. Carver's

office creates an invoice and sends it to GIS; Mr. Carver's companies create a check and mail a check to the employees.  See Exhibit 25 to the plaintiff's motion papers at page 94:3-8.

193.    So that time sheet has dual purposes, one to create the invoice that Mr. Carver sends back to GIS for the amount of money they owe Mr. Carver per worker, and also so that Mr. Carver's companies can pay the worker for the amount of time they work for that previous week.  See Exhibit 25 to the plaintiff's motion papers at page 94:9-15.

194.    Mr. Carver was not aware of any instances in which a workers time was not recorded purposely.  See Exhibit 25 to the plaintiff's motion papers at pages 94:20-95:4.

195.    To the extent that there was, a discrepancy between the hours that a worker claimed to have worked for a given week and what was shown on the actual time sheet, it would be reconciled in the following week's check.  See Exhibit 25 to the plaintiff's motion papers at page 95:5-12.

196.    There were not a lot of problems with arguments over how many hours somebody was paid as they tried to take care of that up front by having the supervisor and the worker both acknowledge how much they worked during the week.  See Exhibit 25 to the plaintiff's motion papers at pages 95:19-96:9.

197.    It was somewhat common for Mr. Carver's companies to have a small discrepancy in hours at the end of the week, but the discrepancy was normally handled. See Exhibit 25 to the plaintiff's motion papers at pages 102:14-103:17.

198.    Generally speaking the time sheets maintained by GIS accurately reflected the number of hours the workers worked.  See Exhibit 25 to the plaintiff's motion papers at page 105:11-20.

199.    Mr. Carver's companies always directly paid the workers for the time they worked on GIS jobsites.  See Exhibit 25 to the plaintiff's motion papers at pages 105:22-106:2.

200.    There were two (2) times that Mr. Carver's companies quit working with GIS and did so abruptly, so he does not know if GIS may have paid those workers directly.  See Exhibit 25 to the plaintiff's motion papers at page 106:3-9.

201.    Mr. Carver always paid his guys, even when he did not get paid.  See Exhibit 25 to the plaintiff's motion papers at page 106:12-15.

202.    Prior to sending a worker to a GIS jobsite, they would discuss the wage that his companies would pay the worker.  See Exhibit 25 to the plaintiff's motion papers at page 106:16-20.

203.    The wage that his companies paid the workers was negotiated between his company and the worker.  See Exhibit 25 to the plaintiff's motion papers at page 106:22-24.

204.    GIS never dictated what a worker's wage would be.  See Exhibit 25 to the plaintiff's motion papers at page 107:5-7.

205.    Mr. Carver's companies would loan or advance the workers or subcontractors money to pay for their expenses through the first week, such as for their hotel. See Exhibit 25 to the plaintiff's motion papers at pages 109:6-18 and 134:2-8.

206.    Sometimes Mr. Carver's companies would pay the crew leader of the workers or the work such that one (1) person would be receiving a check on behalf of the 10-12 guys and then the crew leader would pay the workers himself.  See Exhibit 25 to the plaintiff's motion papers at pages 127:7-129:13.

207.    This relationship where Mr. Carver's company had a team leader and a bunch of workers underneath the leader did not in any way effect the way GIS paid Mr. Carver's companies.  See Exhibit 25 to the plaintiff's motion papers at page 129:21-25.

208.    Mr. Carver's companies did not provide tools to the workers but they may have loaned money to the workers to buy some tools on a personal basis.  See Exhibit 25 to the plaintiff's motion papers at pages 138:22-139:5.

209.    He has never heard of GIS providing training to the workers.  See Exhibit 25 to the plaintiff's motion papers at page 143:18-20.

210.    Mr. Carver assumes that GIS's supervisor on the job reviewed the workers' work product.  See Exhibit 25 to the plaintiff's motion papers at page 146:10-13.

211.    When a worker supplied by Mr. Carver's companies to GIS was cut loose or terminated from a particular worksite by GIS, Mr. Carver's companies would generally tend to place them somewhere else.  See Exhibit 25 to the plaintiff's motion papers at pages 147:9-148:23.

212.    If a particular worker was cut loose from a GIS jobsite or some other contractor's jobsite, Mr. Carver's companies would replace the worker or send them home.  See Exhibit 25 to the plaintiff's motion papers at pages 154:22-155:13.

213.   When the workers would come back to his company he would try to place them with another contractor sometimes but a lot of the times they would go get work elsewhere.  See Exhibit 25 to the plaintiff's motion papers at pages 155:18-156:4.

214.   If someone had been turned away from two (2) or three (3) jobs for not having the skills, Mr. Carver's companies may not try to send the worker out anymore. See Exhibit 25 to the plaintiff's motion papers at page 148:16-18.

215.   But if there was a personality conflict and he had been a good worker, he might be ok working someplace else.  See Exhibit 25 to the plaintiff's motion papers at page 148:18-23.

216.   Mr. Carver's companies did not really ever field any complaints from the workers about anything regarding the jobsite or GIS other than about the language some of the supervisor's used.  See Exhibit 25 to the plaintiff's motion papers at page 150:7-18.

217.   Generally, the workers were hired to do a specific [job], and when the job was done they would go home.  See Exhibit 25 to the plaintiff's motion papers at page 151:13-22.

218.   Mr. Carver was not sure what the longest period of time was that one of his workers that was sent up to GIS stayed with GIS.  See Exhibit 25 to the plaintiff's motion papers at page 152:9-12.

219.   The workers that he provided to various contractors would send their hours directly to him on a fairly often basis as a back up to whatever was turned in by the company just to verify they were all on the same pages.  See Exhibit 25 to the plaintiff's motion papers at page 154:9-15.

220.    Mr. Carver's company would compare what his client sent him in terms of hours verses what men sent him in terms of hours and try to reconcile it although when push came to shove they took the contractor's word for it.   See Exhibit 25 to the plaintiff's motion papers at page 154:16-21.

221.    Exhibit 25 to Mr. Carver's deposition was a contract agreement between General Interior Systems and Drywell Personnel dated June 22, 2001.  See Exhibit 25 to the plaintiff's motion papers at pages 159:24-160:21.

222.    Mr. Carver had several different contracts with General Interior Systems. See Exhibit 25 to the plaintiff's motion papers at page 161:3-9.

223.    The only thing GIS was ever supposed to pay Mr. Carver's companies was the hourly rate set forth in the contract.  See Exhibit 25 to the plaintiff's motion papers at page 162:13-17.

224.    Mr. Carver's companies had a contract agreement with the workers whereby they paid the workers a certain amount of money per hour which the workers agreed to, and then there would be a conversation regarding per diems for hotels, meals and travel.  See Exhibit 25 to the plaintiff's motion papers at pages 162:18-164:12.

225.    His companies were trying to set up as best as they could legally a situation where they maximized the amount of per diem they were paying to the workers while minimizing their taxes and Worker's Compensation payment.  See Exhibit 25 to the plaintiff's motion papers at pages 163:13-164:12.

226.    GIS did not have anything to do with the per diems as this was a system Mr. Carver's accountant, Jerry Blunt, set up.  See Exhibit 25 to the plaintiff's motion papers at pages 163:20-165:24.

227.    Mr. Carver's companies had a safety policy that his supervisors were supposed to go over with the workers before they left for the job.  See Exhibit 25 to the plaintiff's motion papers at page 175:8-13.

**B.    DEPOSITION TESTIMONY OF CESAR CASTILLERO**

228.    Cesar Castillero is the president of ASR Construction.  See Exhibit 26 to the plaintiff's motion papers at page 7:10-8:4.

229.    ASR has also been known as All Seasons Restoration and ASR Construction Solutions, LLC.  See Exhibit 26 to the plaintiff's motion papers at pages 7:13-21, 171:22-172:6.

230.    ASR incorporated in about 2005 but began operations approximately one year before that.  See Exhibit 26 to the plaintiff's motion papers at page 8:7-16.

231.    Santo Nicita is Vice President of Operations.  See Exhibit 26 to the plaintiff's motion papers at page 10:8-24.

232.    Rodrigo Merida is also a Vice President, and he handles accounting.  See Exhibit 26 to the plaintiff's motion papers at pages 10:25-11:5.

233.    ASR is a labor broker that provides or procures skilled workers to specialty contractors in the fields of drywall, wood framing, some masonry, stucco and EIFS, and painting.  Exhibit 26 to the plaintiff's motion papers at pages 11:11-13:19, 15:7-9, 154:21-155:3.

234.    The specialty contractors are ASR clients and the workers performing the painting, drywall installation, carpentry or masonry are the subcontractors.  See Exhibit 26 to the plaintiff's motion papers at page 14:7-22.

235.    ASR's clients, the specialty contractors, typically request subcontractors

on a per project basis or for a specific job.  See Exhibit 26 to the plaintiff's motion papers at pages 15:13-17:3.

236.    The subcontractors' [workers] may not be available for another job; they may go to a job, finish that job and then disappear.  ASR may never see them again.  In fact, sometimes they do not even show up.  See Exhibit 26 to the plaintiff's motion papers at pages 17:7-18:25.

237.    ASR derives a profit from its relationship with the specialty contractor clients because the client pays ASR and ASR pays the workers.  See Exhibit 26 to the plaintiff's motion papers at pages 19:12-20.

238.    Cesar Castillero worked for Construction Personnel in 2004.  See Exhibit 26 to the plaintiff's motion papers at pages 22:5-22:13.

239.    Hobart Carver, the President of Construction Personnel, was Mr. Castillero's boss.  See Exhibit 26 to the plaintiff's motion papers at page 23:10-19.

240.    ASR and Construction Personnel have essentially the same or similar business models; as the specialty contractors are the clients of both companies.  See Exhibit 26 to the plaintiff's motion papers at page 24:15-21.

241.    ASR would pay the workers/subcontractors the going rate for what a skilled worker makes after negotiating with the worker what the rate would be.  See Exhibit 26 to the plaintiff's motion papers at pages 37:21-38:14.

242.    GIS Southern is a different business than GIS as there is a principal other than Jeff [Mento].  See Exhibit 26 to plaintiff's motion papers at page 43:9-12.

243.    The contract between GIS and ASR was marked as deposition Exhibit No.

2 and he copied this contract from what Construction Personnel had. See Exhibit 26 to the plaintiff's motion papers at pages 55:9-21, 56:11-14, 57:16-18.

244. ASR's contract provides as follows: "the Contractor [GIS] will be responsible for tracking the time and will have the Superintendent sign the Subcontractor's [worker's] weekly time sheet. The Contractor [GIS] will then fax the signed, legible time sheet to Subcontractor [ASR] by [the] following Monday." See contract between GIS and ASR attached to Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011 as Exhibit B.

245. The contract between ASR and GIS also provides that the "mechanics" [workers] are to provide all of their own hand tools necessary to complete the work.... See contract between GIS and ASR attached to Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011 as Exhibit B.

246. ASR's contract indicates that ASR is going to provide journeyman rate mechanics to GIS. See contract between GIS and ASR attached to Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011, as Exhibit B.

247. Mechanics are experienced drywallers. See Exhibit 26 to the plaintiff's motion papers at page 37:3-4.

248. ASR's contract provides that it "will provide original certificates of insurance to contractor [GIS] as required. Both General Liability Insurance and Worker's Compensation Insurance will have at least a $1,000,000.00 limit. Insurance will remain in effect throughout this contract." See contract between GIS and ASR attached to Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011, as Exhibit B; Exhibit 26 to the plaintiff's motion papers at pages 89:23-90:3.

249.    ASR's contract also provides that should Contractor [GIS] hire any of Subcontractor's [ASR's] mechanics that are assigned to Contractor [GIS], Contractor [GIS] will pay the Subcontractor [ASR] a $2,500.00 transfer fee per mechanic.   See contract between GIS and ASR attached to Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011, as Exhibit B.

250.    ASR provides the subcontractors/workers with a time sheet and GIS provided their own time sheets.  See Exhibit 26 to the plaintiff's motion papers at page 62:14-18.

251.    There were two (2) different time sheets because sometimes the subs lost their time sheets and sometimes there were conflicts regarding the number of hours recorded.  See Exhibit 26 to the plaintiff's motion papers at pages 62:23-64:15, 65:19-66:13

252.    Lots of times the workers forgot about going on a break and not coming back, came in late or not coming back from lunch so the supervisor and whoever was in charge of the crew of workers would track the workers time and normally the supervisors time is right.  See Exhibit 26 to the plaintiff's motion papers at pages 67:8-68:13.

253.    Normally the ASR workers have a lead person on their crew and if the lead person says no this worker is right and that superintendent is wrong, then ASR will pay their workers.  See Exhibit 26 to the plaintiff's motion papers at pages 67:22-69:18.

254.    ASR always paid its guys.  See Exhibit 26 to plaintiff's motion papers at pages 69:17-18 and 115:19-25.

255.    ASR maintained Worker's Compensation and General Liability Insurance for its workers.  See Exhibit 26 to the plaintiff's motion papers at pages 71:13-73:2, 89:23-90:3.

256.    Plaintiff's counsel introduced as deposition Exhibit 3, to Mr. Castillero's deposition, a packet of materials for new hires at ASR that was partially written in Spanish, and he asked Mr. Castillero to translate on the record the contract between ASR and one of its workers, Francisco Medina.  See Exhibit 26 to the plaintiff's motion papers at pages 79:11-81:10.

257.    The document which Mr. Casterillo was translating was marked as Exhibit 3 and is always provided to all of the workers prior to going on a jobsite as far as he knows.  See Exhibit 26 to the plaintiff's motion papers at page 108:3-9.

258.    All Seasons Restoration is referred to as the contractor under the agreement between it and Francisco Medina.  See Exhibit 26 to the plaintiff's motion papers at page 81:7-10.

259.    ASR's contract with Mr. Medina indicates that the contractor [Medina] is responsible for the quality of its work and if any of the contractor's [Medina's] work is inferior or unacceptable by the contractor or general contractor or inspectors of the construction, than the contractor is in agreement to fix the performance of his work with no additional charge with no responsibility of All Seasons Restoration.  See Exhibit 26 to the plaintiff's motion papers at page 92:7-25.

260.    Mr. Castillero did not know the longest amount of time that a worker that ASR furnished to GIS worked at a GIS worksite, but did not think it could be more than a year.  See Exhibit 26 to the plaintiff's motion papers at pages 85:19-86:4.

261.     When a worker of ASR is capable but may have made a mistake or screwed up something, the superintendent may call Santos Nicita and tell ASR that the person needs to pick up the pace.  ASR will then call the lead guy on that person's crew and tell him that the worker needs to straighten up.  If [he] does not, he's gone.  See Exhibit 26 to the plaintiff's motion papers at pages 95:13-96:3.

262.     The lead guy of the ASR crew is picked by either knowledge and experience.  It could also be the person that has a car.  That person is in control because they dictate the hours people work.  They would say "if you want to ride with me, were going to work; otherwise you're staying home.  See Exhibit 26 to the plaintiff's motion papers at pages 96:5-98:3.

263.     Where a superintendent tells a worker to leave a jobsite, the relationship between ASR and the worker is not necessarily over if ASR knows he's a good worker.  ASR could re-staff that worker on another job unrelated to GIS.  See Exhibit 26 to the plaintiff's motion papers at pages 99:24-101:3.

264.     The contract between All Seasons Restoration and workers such as Francisco Medina, deposition Exhibit 3, indicates that the general contractor could ask the contractor [worker] to work any certain number of hours but it is the decision of the worker whether or not they will work them.  See Exhibit 3 to the deposition of Cesar Castillero; Exhibit 26 to the plaintiff's motion papers at pages 101:23-102:7, 116:7-18 and 117:6-13.

265.     When a worker presents to ASR for a job, ASR interviews the worker, asks for references, speak with those references, speaks with some of their co-workers and checks their tools.  Exhibit 26 to the plaintiff's motion papers at pages 102:20-

103:10, 104:2-11, 105:3-106:3, 155:5-24.  ASR already has a roster of workers before getting a call from GIS because they advertise and people respond.  ASR would contact that roster to see if they were available.  See Exhibit 26 to plaintiff's motion papers at page 104:2-18.

266.   If everything checks out, ASR has them fill out W-9, W-4, a job application and the document marked as Exhibit 3.  See Exhibit 26 to the plaintiff's motion papers at pages 106:4-108:9.

267.   Once a worker is on ASR's roster and is appropriate for a particular GIS job, ASR will tell the crew where the job is going to be, when they need to be there, who they report to, what time they've got to be there, and what they are going to be building. ASR will get the workers a map and put them on their way.  See Exhibit 26 to the plaintiff's motion papers at page 110:2-19.

268.   ASR requires its workers to sign a document whereby they agree to carry their own tools to the job otherwise they will be penalized $50.00.  See Exhibit 4 to the deposition of Cesar Castillero; Exhibit 26 to the plaintiff's motion papers at pages 112:14-113:10.  It is called the Rules of the Company.  Exhibit 26 to plaintiff's motion papers at pages 161:4-162:19.  ("ASR's Rules")

269.   Paragraph number 2 of ASR's Rules requires the worker to notify someone at ASR if they are going to be late to work.  See Exhibit 4 to the deposition of Cesar Castillero; Exhibit 26 to the plaintiff's motion papers at pages 114:6-10 and 161:13-162:19.

270.   Paragraph number 3 of ASR's Rules indicates that the worker understands that if he leaves the job before the job ends he will not get paid for the day.  See Exhibit 4

to the deposition of Cesar Castillero; Exhibit 26 to the plaintiff's motion papers at page 114:11-13 and 161:13-162:19.

271.   Paragraph number 4 of ASR's Rules provides that if the worker leaves the area for any reason without notifying ASR Construction Solutions, he will be penalized $100.00.  See Exhibit 4 to the deposition of Cesar Castillero; Exhibit 26 to the plaintiff's motion papers at page 114:14-18 and 161:13-162:19.

272.   ASR had to develop something like what's in paragraphs 3, 4 and 5 of ASR's Rules because if ASR had no penalties to the subcontractors, they would come and go as they please.  See Exhibit 26 to the plaintiff's motion papers at page 117:14-22.

273.   Mr. Castillero did not know of any instances where a worker supplied by ASR to GIS was paid directly by GIS as opposed to being paid by ASR.  See Exhibit 26 to the plaintiff's motion papers at pages 123:25-124:5.

274.   ASR paid the workers by check.  See Exhibit 26 to the plaintiff's motion papers at page 127:21-22.

275.   GIS and other clients of ASR have docked ASR money.  GIS did it when workers left the job and tools were missing.  See Exhibit 26 to the plaintiff's motion papers at pages 132:9-133:18.

276.   ASR controls the payroll in order to make sure that they will get paid by GIS because they do not know how long the worker is going to stick around for.  In order for ASR to get paid, the worker has to perform.  GIS pays us and we pay the worker so you have to have a degree of trust that this is going to work out that way.  See Exhibit 26 to the plaintiff's motion papers at page 135:10-25.

277.    Deposition Exhibit 9 to Cesar Castillero's deposition, ASR Construction Required Tools Contract, states that "ASR Construction Solutions enforces all safety rules and regulations required by OSHA laws."  See Exhibit 26 to the plaintiff's motion papers at pages 3:24-25, 142:17-144:21.

278.    ASR tells its workers that they have to follow the OSHA laws that are required for particular jobs.  See Exhibit 26 to the plaintiff's motion papers at pages 145:7-18, 149:18-150:14.

279.    ASR paid for the hotel that its workers stayed in during the time that they were working on GIS worksites.  See Exhibit 26 to the plaintiff's motion papers at pages 146:25-147:24.

280.    GIS never had anything to do with the transactions related to paying for hotels.  See Exhibit 26 to the plaintiff's motion papers at pages 147:25-148:9, 149:15-17.

281.    Mr. Castillero could not remember if a superintendent on a GIS project ever told ASR that someone needed to be paid more money.  See Exhibit 26 to the plaintiff's motion papers at pages 153:19-154:20.

282.    If a worker was not performing right on the jobsite, a GIS supervisor or some other contractor would call ASR, and probably speak with either Santo [Nicita] or Rodrigo [Merida], and report the problem; either Santo or Rodrigo will call and talk to the worker and talk to the person in charge.  See Exhibit 26 to the plaintiff's motion papers at pages 156:19-158:6.

283.    ASR maintains certain records for their workers including the packet marked as deposition Exhibit 3 in Cesar Castillero's deposition, a copy of the job

application, a copy of their drivers license and social security card.  See Exhibit 26 to the plaintiff's motion papers at pages 164:23-165:19.

284.    The GIS supervisor would sign off on the time sheets that are faxed to ASR in order to eliminate any discrepancy between the worker and ASR.  The worker is supposed to go to the supervisor who says "Ok, you have X amount of hours," the worker agrees, the supervisor signs off on it and gives it to ASR.  Then ASR can say "this is what your supervisor signed off on."  See Exhibit 26 to the plaintiff's motion papers at pages 172:7-173:4, 173:17-25.

285.    ASR's workers would work in crews of two (2), four (4) or it could be eight (8).  See Exhibit 26 to the plaintiff's motion papers at page 174:3-22.

286.    When a worker who ASR supplied to GIS left GIS's worksite or may have been, typically the worker would return to ASR in North Carolina to be staffed up on another job, but in most cases they take a break.  See Exhibit 26 to the plaintiff's motion papers at pages 176:22-177:13.

## C.    DEPOSITION TESTIMONY OF RODRIGO MERIDA

287.    Rodrigo Merida has been employed by ASR Construction Solutions since 2005.  See Exhibit 27 to the plaintiff's motion papers at page 6:21-7:4.

288.  He is the Secretary of ASR; he handles the finances and recruits workers. See Exhibit 27 to the plaintiff's motion papers at page 7:5-10.

289.    Mr. Merida worked for Construction Personnel Services for a few months, June through August of 2005.  See Exhibit 27 to the plaintiff's motion papers at page 8:10-18.

290.    Cesar Castillero has no business partners, whether they be silent or active, at ASR.  See Exhibit 27 to the plaintiff's motion papers at pages 10:12-11:7.

291.    ASR is a labor broker and its clients are contracting companies such as GIS.  See Exhibit 27 to the plaintiff's motion papers at pages 11:23-12:11.

292.    ASR acts as a middle man to furnish laborers who were drywall specialists/skilled drywall workers to their clients.   See Exhibit 27 to the plaintiff's motion papers at page 12:12-23.

293.    ASR did business with GIS for approximately 8 months, and provided between 50 and 60 subcontractors to GIS. See Exhibit 27 to the plaintiff's motion papers at pages 17:25-18:7, 19:23-25, 36:2-6.

294.    The contract between ASR and GIS was prepared by Mr. Merida and is dated October 31, 2005.  See Exhibit 27 to the plaintiff's motion papers at pages 21:4-22:3.

295.    The only type of drywall laborer that ASR supplied to GIS was of the journeyman-grade mechanic class. See Exhibit 27 to the plaintiff's motion papers at page 22:19-22.

296.    Under the contract, the contractor [GIS] agreed to pay the subcontractor [ASR] a rate of $22.00 per hour for journeyman-grade.  See Exhibit 27 to the plaintiff's motion papers at page 24:5-10.

297.    There were two (2) different time sheets, one set of time sheets were provided by ASR to the subcontractor's [workers] to maintain on their own, and then another set of time sheets which GIS maintained on behalf of the subcontractor's

[workers] which ultimately were sent to Mr. Merida's attention.  See Exhibit 27 to the plaintiff's motion papers at page 27:15-22.

298.    When asked what happened to the time sheets that ASR provided to the workers, Mr. Merida testified that in most cases the workers would not use them; they would just go by GIS's time sheets.  See Exhibit 27 to the plaintiff's motion papers at pages 27:15-28:5.

299.    ASR provided the workers with time sheets as a way for them to track hours in case there was a discrepancy.  See Exhibit 27 to the plaintiff's motion papers at page 28:6-10.

300.    There were occasions where there were discrepancies between the times reported on one time sheet verses what a worker said he actually worked for that same time and these occasions were reconciled by contacting GIS; one time the discrepancy was because a few workers did not turn in their time sheets to GIS.  See Exhibit 27 to the plaintiff's motion papers at pages 28:20-29:23.

301.    The longest amount of time that any worker supplied by ASR to GIS worked was for 3-4 months.  See Exhibit 27 to the plaintiff's motion papers at pages 34:23-36:6.

302.    Exhibit 3 to Mr. Castillero's deposition is the Subcontractor Agreement between ASR and a Subcontractor.  See Exhibit 27 to the plaintiff's motion papers at pages 37:24-38:18.

303.    GIS did not have any input into the contract marked as Exhibit 3 to Mr. Castillero's deposition nor did they ever review or otherwise edit the contract.  See Exhibit 27 to the plaintiff's motion papers at page 39:8-13.

304.   ASR would put out advertisements and candidates would respond to those ads; those candidates names would be entered into a database and then when a client of ASR's requested workers, ASR would then consult its database, conduct the appropriate number of interviews, bring those workers on and then ship them out to the client.  See Exhibit 27 to the plaintiff's motion papers at pages 42:7-18, 44:4-19, 140:13-15.

305.   Mr. Merida personally interviewed the workers and he asked them how many years experience they had, what kind of jobs they had done, what nature, residential or commercial; and then he would find out their references, or projects they had done and what kind of tools they had.  Someone from ASR would actually examine the tools to gauge their level of experience.  See Exhibit 27 to the plaintiff's motion papers at pages 43:5-19, 141:8-12, 142:4-9, 142:23-143:3.

306.   The way ASR conducted its business with GIS is that GIS would contact someone from ASR and express a need for a specific number of workers that were needed for a jobsite or multiple jobsites; then ASR would consult its database and find the appropriate number and the appropriate type of worker that would be sufficient for GIS's purposes.  See Exhibit 27 to the plaintiff's motion papers at page 51:9-20.

307.   ASR unilaterally decided which workers they thought would be sufficient for GIS.  See Exhibit 27 to the plaintiff's motion papers at page 52:10-13.

308.   The Subcontract Agreement between ASR and the subcontractor/workers are the rules maintained by ASR.  These rules are almost disciplinary measures.  See Exhibit 27 to the plaintiff's motion papers at pages 56:20-57:17, 59:15-61:2, 61:24-62:24.

309.   If a worker supplied by ASR to GIS actually left the worksite before the end of the day, GIS would contact ASR and then ASR would try and find out the reason

for them not coming back so they could tell GIS what happened.  GIS would then let ASR know if they wanted the worker or crew replaced.  See Exhibit 27 to the plaintiff's motion papers at page 61:8-23.

310.    All the time sheets went to the home office and the home office will send ASR a general time sheet from all the jobs.  See Exhibit 27 to the plaintiff's motion papers at pages 64:20-65:3.

311.    When a subcontractor/workers time was not recorded for the time they worked for GIS, ASR would contact the office of GIS and tell them a guy was missing such day or so many hours, and then GIS would check it out and say sorry we missed him.  See Exhibit 27 to the plaintiff's motion papers at pages 65:8-66:3.

312.    Mr. Merida testified that the time sheets that GIS maintained and ultimately sent to ASR accurately captured the time that the workers worked because the subcontractor/worker never complained.  See Exhibit 27 to the plaintiff's motion papers at page 66:4-17.

313.    ASR always paid the workers they supplied to GIS the proper amount of wages.  Exhibit 27 to the plaintiff's motion papers at page 75:19-22.

314.    ASR always paid its workers on an hourly rate and a few of the workers successfully negotiated their wages with ASR.  See Exhibit 27 to the plaintiff's motion papers at page 76:12-14, 77:6-15.

315.    There were some Construction Personnel workers who were not happy with Construction Personnel for their own reasons, so they were switched over to ASR.  See Exhibit 27 to the plaintiff's motion papers at page 85:3-12.

316.    GIS and ASR had an arrangement whereby GIS paid ASR on a per worker basis hourly and that was the premium on top of what the hourly rate was for the worker, meaning just to use an example, worker X is staffed thru ASR, ASR pays worker X $17.00 per hour, but ASR is receiving $22.00 per hour from GIS.  See Exhibit 27 to the plaintiff's motion papers at page 86:6-17.

317.    ASR gave its workers $70.00 every week to help cover their hotel cost; this hotel cost had nothing to do with the transaction between ASR and GIS; it was specific to the transaction between the worker and ASR.  See Exhibit 27 to the plaintiff's motion papers at pages 97:21-98:16 and 108:24-109:8.

318.    With respect to the missing tools, and the occurrence on February 2, 2006, Mr. Merida was not aware of GIS making any other deductions.  See Exhibit 27 to the plaintiff's motion papers at pages 107:24-108:4.

319.    In some instances there were workers who were staffed on a GIS project by Construction Personnel, and then at some point the relationship between the workers and Construction Personnel went awry and the worker stopped working with Construction Personnel, but remained on the GIS jobsite because in certain instances ASR would then come in and sort of pick up the payroll for those workers.  See Exhibit 27 to the plaintiff's motion papers at pages 112:24-113:12.

320.    This happened on one jobsite in Connecticut and it involved four (4) guys; the workers approached GIS and said they wanted to be on ASR's payroll.  See Exhibit 27 to the plaintiff's motion papers at pages 114:4-115:18.

321.     GIS deducted probably between two (2) and four (4) hours from what it was paying ASR for the missing tools.  See Exhibit 27 to the plaintiff's motion papers at pages 118:25-119:16.

322.     Mr. Merida testified that ASR workers always got paid and when discussing the fax marked as Exhibit 7 he did not mean that it affected what the workers got paid.  See Exhibit 27 to the plaintiff's motion papers at pages 118:16-119:25, 66:4-17.

323.     ASR gave the workers a time sheet so they could keep track of their hours in case of a discrepancy with the hours kept by the supervisor or superintendent of GIS.  See Exhibit 27 to the plaintiff's motion papers at page 131:16-24.

324.     Mr. Merida did not know if the time sheets filled out by GIS were based upon GIS' review of the time sheets submitted by the workers.  See Exhibit 27 to the plaintiff's motion papers at pages 132:17-133:5

325.     The workers that ASR would send out to various contractors would be covered by the Worker's Compensation and general liability insurance policies that ASR carried regardless of which contractor or client ASR's workers were sent to.  See Exhibit 27 to the plaintiff's motion papers at pages 137:15-138:19.

326.     Once the business relationship between ASR and GIS ended in August of 2006, 10-20 of the guys stayed on and kept working.  See Exhibit 27 to the plaintiff's motion papers at page 139:8-21.

327.     Exhibit 1 to Mr. Nicita's deposition is the Subcontractor Balance Detail.  This 26 page document encompasses every worker that ASR ever sent up to GIS for the

entirety of GIS's business relationship with ASR.  See Exhibit 27 to the plaintiff's motion papers at page 145:7-18.

**D.      DEPOSITION TESTIMONY OF SANTO NICITA**

331.    Santo Nicita has been employed by ASR Construction Solutions since the end of 2005, and his current title is Vice President in charge of operations.  See Exhibit 31 to the plaintiff's motion papers at pages 5:5-6, 6:21-23, 7:4-7.

332.    ASR is a broker; its clients are the contractors, and the worker whose services they are brokering to the client is called a subcontractor.  See Exhibit 31 to the plaintiff's motion papers at pages 8:18-9:13.

333.    ASR's contractor clients will sometimes call ASR and ask for drywall laborers to start on a particular date and end on a particular date, but they do not always give an end date; they are not sure usually.   See Exhibit 31 to the plaintiff's motion papers at pages 10:13-11:5.

334.    There are two (2) sets of time sheets being obtained; one set of time sheets was given to the workers by ASR to keep for themselves to make sure that it was accurate; then there was a second set of time sheets that GIS's superintendents at times verified and which were transmitted to ASR for payment.   See Exhibit 31 to the plaintiff's motion papers at pages 15:19-16:9.

335.    Mr. Nicita does not know who filled out the time sheets in the field.  See Exhibit 31 to the plaintiff's motion papers at pages 16:20-17:5.

336.    ASR    entered    into    an    agreement    or    a    contract    with    its subcontractors/workers.  See Exhibit 31 to the plaintiff's motion papers at page 20:16-21.

337. Exhibit 10 to Cesar Castillero's deposition is a packet of information that ASR provides to the subcontractors and they fill out the forms provided and a W-9. See Exhibit 31 to the plaintiff's motion papers at pages 27:6-28:4.

338. ASR carries its own general liability and Worker's Compensation insurance. See Exhibit 31 to the plaintiff's motion papers at page 28:13-18.

339. ASR will provide the workers that it staffs to its clients with insurance if the workers do not have it themselves, and then ASR will deduct a small portion of the insurance from the worker. See Exhibit 31 to the plaintiff's motion papers at pages 28:19-29:7.

340. According to the ASR Rules, Exhibit 4 to Cesar Castillero's deposition, ASR requires the worker, the subcontractor, to be on time and if they are going to be late they must advise ASR a full half hour beforehand. Mr. Nicita is sure that a worker, who is expecting to be late, will call ASR to say that they are going to be late for work. See Exhibit 31 to the plaintiff's motion papers at pages 35:6-10 and 37:13-25.

341. ASR's Rules seem almost like they are disciplinary measures or penalties that ASR would enact upon the workers if the worker was late to work or left early or did not have tools or otherwise did not comply with what the understanding of work-site demeanor was. See Exhibit 31 to the plaintiff's motion papers at pages 35:6-10, 41:6-14.

342. ASR always paid subcontractors that it sent to GIS. See Exhibit 31 to the plaintiff's motion papers at page 42:18-21.

343. The workers were paid by ASR on an hourly basis. See Exhibit 31 to the plaintiff's motion papers at page 43:23-25.

344.    ASR paid its workers by check.  See Exhibit 31 to the plaintiff's motion papers at page 46:17-23.

345.    Mr. Nicita has never seen the Subcontractor Balance Detail marked as Exhibit 1 to his deposition.  See Exhibit 31 to the plaintiff's motion papers at page 48:10-19.

346.    Counsel to the plaintiff represented to Mr. Nicita that the workers listed on this document (Subcontractor Balance Detail) are for GIS starting on page (1) because there was a post it note that indicates General Interior Systems, Inc. He asked Mr. Nicita to assume that the subcontractors listed on this document were assigned to work at GIS. See Exhibit 31 to the plaintiff's motion papers at pages 48:10-49:23.

347.    Mr. Nicita was then asked by counsel to the plaintiff about the significance of certain dollar figures and certain entries but Mr. Nicita had no idea what the amounts were for, could not answer why there were two (2) entries for each date and why there was a $70.00 charge.  See Exhibit 31 to the plaintiff's motion papers at pages 49:24-51:5.

348.    To the best of Mr. Nicita's knowledge, GIS never paid any of the subs directly.  See Exhibit 31 to the plaintiff's motion papers at pages 51:25-52:3.

349.    The practice of GIS deducting hours because tools were missing was not a normal practice and it usually never happened; it is very out of the ordinary.  See Exhibit 31 to the plaintiff's motion papers at pages 69:18-70:24.

350.    He believes that there would have been a conversation with GIS about the deductions and the situation would have been hashed out.  Mr. Nicita did not recall the final outcome.  See Exhibit 31 to the plaintiff's motion papers at page 71:2-16.

351.   Whatever deductions were made from the rate that GIS paid to ASR, that did not change the money that ASR paid to the subs.  See Exhibit 31 to the plaintiff's motion papers at page 72:6-19.

352.   ASR paid for the hotels that its workers stayed in and would send their paychecks to them at the hotels.  See Exhibit 31 to the plaintiff's motion papers at page 73:11-25.

353.   Mr. Nicita would occasionally speak with superintendents at the GIS worksite with regards to the quality of the workers/subcontractors work.   Mr. Nicita would ask how the job was going and whether GIS was having any problems with any of the ASR workers.  GIS would respond with either a yes or no, and indicate that things were going fine or that ASR needs to tell the workers to kick it up a notch or they'll be replaced.  See Exhibit 31 to the plaintiff's motion papers at page 75:8-23.

354.   Exhibit 9 to Cesar Castillero's deposition is a list of equipment and tools required for specific jobs for different kinds of workers.  It also indicates that ASR will enforce all safety rules and regulations, including OSHA laws.  ASR is responsible for OSHA compliance on GIS sites.  Exhibit 31 to the plaintiff's motion papers at pages 76:22-78:2.

355.   ASR will go over the OSHA rules and regulations of the jobs with the workers in Spanish so they understand.  See Exhibit 31 to the plaintiff's motion papers at page 78:9-19.

356.   He does not recall whether any sub that ASR sent over to GIS was ever dismissed, terminated or sent away prematurely from a GIS worksite.  See Exhibit 31 to the plaintiff's motion papers at page 79:8-21.

357.    When ASR hires a worker to broker them out, ASR checks the background and skill level of the workers, looks at the guys' tools to make sure that when they go to a jobsite that they are fully equipped with the tools to do the job and ASR would look to be sure they have proper personal protection equipment also.  See Exhibit 31 to the plaintiff's motion papers at pages 82:8-83:11.

358.    Under the contract between All Seasons and the workers, Exhibit 3 to Mr. Castillero's deposition, the worker is referred to as the contractor.  See Exhibit 31 to the plaintiff's motion papers at pages 85:17-86:4.

359.    According to Exhibit 9 of Mr. Castillero's deposition, ASR required that the employees and/or subcontractors of ASR have the necessary tools to perform their tasks as assigned.  See Exhibit 31 to the plaintiff's motion papers at page 86:13-25.

360.    This document, Exhibit 9, was prepared by ASR.  See Exhibit 31 to the plaintiff's motion papers at page 87:8-9.

361.    Mr. Nicita has never seen the document marked as Exhibit 3 to his deposition; he does not recall it.  Just because Donna Crim said certain workers are going to be paid a particular hourly rate that does not mean ASR ever agreed to it; according to Mr. Nicita, there would be a discussion regarding this issue.  See Exhibit 31 to the plaintiff's motion papers at pages 87:10-89:3.

362.    With respect to Castillero Exhibit 7,  the February 2, 2006 fax from Meaghan Doran, just because GIS would deduct something from ASR does not mean ASR is going to deduct something from the workers; the way ASR handles the workers and what they get paid is up to ASR and its not dictated by GIS.  See Exhibit 31 to the plaintiff's motion papers at pages 90:6-91:14.

363.     ASR has control over the worker because they pay them, if the workers want to keep working they have to do a good job, they have to be productive, follow ASR rules and do what their supposed to do.  See Exhibit 31 to the plaintiff's motion papers at pages 91:24-93:8.

364.     ASR has rules whereby they can fine the workers for failure to notify ASR if they are going to be late, or for leaving the job early or for not having tools; these rules are communicated to the workers.  See Exhibit 31 to the plaintiff's motion papers at pages 93:12-94:3.

E.     **DEPOSITION TESTIMONY OF COREY TASHKIN**

365.     Construct Corps application packet includes an employment application form, contact information, work history, I-9's, W-4's, the employment agreement, and some tax credit forms that the worker may be eligible for.  See Exhibit E to defendant's motion papers at pages 38:23-39:8.

366.     Construct Corps requires that the worker they staff out to have their own tools.  See Exhibit E to defendant's motion papers at pages 44:20-45:15.

367.     Mr. Tashkin did not know how many workers or employees Construct Corps provided to GIS during the course of their relationship.  See Exhibit E to defendant's motion papers at page 49:11-15.

368.     When a worker that is provided to a client is dismissed from the jobsite, Construct Corp may continue the relationship with the employee depending on what happened; however, if [the reason for dismissal] involved a theft, breaking the law or fighting, the worker could be terminated.  See Exhibit E to defendant's motion papers at pages 53:23-54:12.

369.     Construct Corps typically staff its employees to contractors for days, but it can be month, many months.  See Exhibit E to defendants' motion papers at page 57:11-17.

370.     Paragraph 6 of the contract between Construct Corps and GIS, entitled "TIMECARDS," states that "[t]here are two ways of reporting time for employees of Construct Corps (1) Construct Corps employees carry his/her time card to be signed and verified by your foreman/supervisor each Friday. (2) Customer receives time sheet each week to list Construct Corps employees and their hours worked.   Customer foreman/supervisor keeps time and faxes to Construct Corps.  It is the customer or their designated representatives responsibility to collect your copy of the employees signed timecard each Friday for your records.  Construct Corps will not be held responsible to furnish copies of original time sheets as reason for non-payment or any other dispute...."  See Exhibit A to Affidavit of Jeffrey T. Mento sworn to on June 27, 2011.

371.     Sometimes Construct Corps enforces the provision in its contract regarding standard permanent placement fees when a client of Construct Corps hires one of its employees, and sometimes they do not.  See Exhibit E to defendant's motion papers at pages 60:16-61:13; Exhibit A to the Affidavit of Jeffrey T. Mento sworn to on June 27, 2011 at paragraph seven (7).

372.     Mr. Tashkin did not know if the invoices marked as Exhibit 2 at his deposition accurately reflect the complete relationship between Construct Corps and GIS.  See Exhibit E to defendant's motion paper at pages 69:13-70:5.

373.     Once the relationship between the client and the Construct Corps employee is formed, the benefit to the client for continuing to pay Construct Corps is that

the client would not be responsible for Worker's Compensation premiums and/or cost of injuries, payroll taxes, general liability insurance and payroll.   See Exhibit E to defendant's motion papers at pages 81:11-82:4.

374.   The contract between Construct Corp and GIS, Exhibit 1 to Mr. Tashkin's deposition, is a Construct Corps document and was drafted on behalf of Construct Corps and is on Construct Corps letterhead.   See Exhibit E to defendant's motion papers at pages 90:8-91:16.

375.   Construct Corps had the authority to send a field worker/employee from one particular construction project to another, but they typically would not do that especially if the contractor was satisfied with the employee. See Exhibit E to defendant's motion papers at page 96:7-18.

376.   Prior to 2007, Construct Corps had a Professional Employer Organization that provided Worker's Compensation and managed/administered the Worker's Compensation claims.  See Exhibit E to defendant's motion papers at pages 96:19-97:25.

377.   Hand tools are required by Construct Corps for employees to be sent out as a trade person.  See Exhibit E to defendant's motion papers at page 98:1-4.

**F.    DEPOSITION TRANSCRIPT OF JEFFREY MENTO**

378.   GIS provided more than merely drywall installation.  GIS also performed metal stud framing and the installation of acoustical ceilings.  Exhibit 3 to plaintiff's motion papers, at pages 9:19-10:22 and 11:24-12:24.

379.   GIS does not work solely for general contractors.  GIS also works for owners and architects. See Exhibit 3 to plaintiff's motion papers at pages 40:24-41:6.

380.    GIS has utilized the labor of several groups of workers, including its own employees, its own subcontractors, and subcontractors supplied from labor companies. See Exhibit 3 to plaintiff's motion papers at pages 24:7-27:18, 51:8-53:24, 57:10-19 and 58:13-20.

381.    Some of the individual drywall installers negotiated their salaries with GIS. Exhibit 3 to plaintiff's motion papers at page 96:3-10.

382.    Some of the subcontractors worked on a square footage basis or submitted invoices. Exhibit 3 to plaintiff's motion papers at pages 33:13-34:4.

383.    Some of the subcontractors were also brought in on a per project basis. Exhibit 3 to plaintiff's motion papers at pages 77:23-78:8.

384.    With respect to the labor companies, Mento negotiated the rate of pay for workers with the management of those companies. Exhibit 3 to plaintiff's motion papers at page 28:3-5.

385.    With respect to workers provided by the labor companies, GIS virtually always paid the labor companies directly. See Exhibit 3 to plaintiff's motion papers at 25:14-28:5.    Mento was only aware of one exception which occurred when a labor supply was having financial issues. See Exhibit 3 to plaintiff's motion papers at pages 64:4-65:15.

386.    The labor supply companies send someone to supervise the work. Plaintiff's Exhibit 3 to plaintiff's motion papers at page 28:18-24

387.    Subcontractors were required to use their own tools, worked for competitors, and carried their own liability insurance. See Exhibit 3 to plaintiff's motion papers at pages 48:2-50:7, 83:24-84:7, 84:5-7 and 86:7-19.

388.   Additionally, some of the subcontractor companies provided "more expensive" tools.  Exhibit 3 to plaintiff's motion papers at page 69:12-24.

389.   With respect to its subcontractors, Mento testified that GIS merely informed them of what "kind of work" needed to be done on a particular site.  See Exhibit 3 to plaintiff's motion papers at page 29:18-25.  GIS was not solely responsible for reviewing its subcontractors' work, inasmuch as general contractors, architects, and owners also informed GIS if work was not appropriately completed.  See Exhibit 3 to plaintiff's motion papers at pages 40:12-41:16.

390.   Similarly, workers from labor supply companies were supervised by employees of the labor supply companies.  Exhibit 3 to plaintiff's motion papers at page 28:18-24.

391.   GIS did not train its subcontractors.  See Exhibit 3 to plaintiff's motion papers at pages 43:24-44:2.

392.   Mento testified that the time sheets that GIS retained were "mainly for [its] record to keep track of job costing on the job."  Exhibit 3 to plaintiff's motion papers at page 89:11-16.

393.   Subcontractors to GIS would also work in projects for other companies or competitors.  See Exhibit 3 to plaintiff's motion papers at page 86:7-19.

394.   Finally, if GIS liked a particular laborer's work, that worker could be hired as an employee of GIS.  Exhibit 3 to plaintiff's motion papers at pages 53:19-24 and 57:10-19.

### G.    DEPOSITION TRANSCRIPT OF DONNA CRIM

395.    Donna Crim testified that sometimes, some of the subcontractors were paid on a square footage basis. Exhibit 4 to plaintiff's motion papers at page 42:11-22.

396.    Donna Crim is the president of General Interior Systems Southern, Inc., which is incorporated in Florida and is unrelated to defendant GIS.   Exhibit 4 to plaintiff's motion papers at pages 8:5-9:16, 54:8-55:9 and 63:24-64:2.

397.    From 2001 to October 2005, however, she was employed by defendant GIS.   Her position was office manager.   Exhibit 4 to plaintiff's motion papers at pages 12:4-13:10 and 14:22-15:5.

398.    In October 2005 she opened General Interior Systems Southern, Inc. Exhibit 4 to plaintiff's motion papers at pages 15:20-16:4.

399.    Ms. Crim does not know why some who performed work for GIS were employees and some were independent contractors. Exhibit 4 to plaintiff's motion papers at pages 41:16-21.

400.    Unlike independent contractors for GIS, the GIS employees were either salaried or paid hourly but they were never paid by the square foot.   Exhibit 4 to plaintiff's motion papers at pages 43:23-44:6.

401.    GIS did business with labor supply companies, which sent their employees to perform work for GIS.   The workers were not GIS employees and GIS did not pay the workers.   GIS paid the labor supply companies, and the labor supply companies paid the workers.   Exhibit 4 to plaintiff's motion papers at pages 50:6-53:3.

### H.    DEPOSITION TRANSCRIPT OF ROBERT LANDMAN

401.    Although Robert Landman testified that he was "put up at GIS's

expense" at a hotel, he admitted that he was merely making an assumption and had no actual knowledge of that fact.  Exhibit 5 to plaintiff's motion papers at page 29:18-21.

402.    Landman did not receive any training from GIS.  Exhibit 5 to plaintiff's motion papers at page 116:20-23.

## I.    DEPOSITION TRANSCRIPT OF TED DAVIS, II

403.    Ted Davis, II is not an "operations manager," but a supervisor who runs projects.  See Exhibit 6 to plaintiff's motion papers at page 19:6-23.

404.    The class of subcontractors at issue has included individual people, not just corporations, partnerships, or sole proprietorships.  Additionally, Mr. Davis, has worked on either an hourly or a square footage basis.  See Exhibit 6 to plaintiff's motion papers at pages 9:9-12:4, 32:24-33:11, 34:20-35:13, 60:10-20, 90:4-9, 111:20-112:2 and 122:22-123:13.

405.    As a subcontractor of GIS, Mr. Davis would negotiate his rate of compensation with Mento.  See Exhibit 6 to plaintiff's motion papers at pages 9:9-12:14 and 122:22-123:13.

406.    As an subcontractor, Mr. Davis did sign a contract with GIS to perform work.  Exhibit 6 to plaintiff's motion papers at pages 115:21-116:16.

407.    GIS employees were required to have their own tools.  Exhibit 6 to plaintiff's motion papers at page 69:3-7.

408.    GIS subcontractors would submit either time sheets or invoices regarding their payment.  See Exhibit 6 to plaintiff's motion papers at page 123:10-13.

409.    When asked how he would oversee the day-to-day activities as a supervisor, Mr. Davis indicated that he would "make sure there was enough material,

lifts, [and] men." Mr. Davis, the general contractor, and the owner all reviewed the individual workers' product. See Exhibit 6 to plaintiff's motion papers at pages 49:24-50:13. Mr. Davis essentially performed "[q]uality control." See Exhibit 6 to plaintiff's motion papers at page 77:3-13.

410. Mr. Davis did not set the work schedules of all GIS subcontractors, a general contractor can set the hours. See Exhibit 6 to plaintiff's motion papers at pages 118:21-120:3, 121:20-122:7.

411. Workers from labor supply companies were supervised by employees from those labor supply companies. Exhibit 6 to plaintiff's motion papers at pages 44:25-45:17, 49:8-14, 55:5-19, 56:5-9.

412. Workers from labor supply companies like Carver's were also paid directly by the labor supply companies. Exhibit 6 to plaintiff's motion papers at page 54:15-21.

**J.      DEPOSITION TRANSCRIPT OF ROBERT CROUSE**

413. Crouse testified that he negotiated his rate of compensation with Mento. Exhibit 7 to plaintiff's motion papers at pages 31:16-32:21.

414. Crouse was also required to carry his own insurance policy. Exhibit 7 to plaintiff's motion papers at page 34:19-23.

**K.      DEPOSITION TRANSCRIPT OF RICHARD MABBETT**

415. Subcontractors were free to contract with whomever they wanted and could possibly be sent to other jobs during a given workweek. Exhibit 8 to plaintiff's motion papers at page 78:5-25.

416.    Mabbett also testified that the skills that laborers provided by the companies had varied.  Exhibit 8 to plaintiff's motion papers at page18:20-25.

**L.    DEPOSITION TRANSCRIPT OF STEVEN SMITH**

417.    As an individual subcontractor, Steven Smith could have performed work for other companies and determined the hours at which he would start and end his workday.  Additionally, he only reported to a supervisor to find out where material was or be pointed towards where his work was.  Exhibit 9 to plaintiff's motion papers at pages 21:4-7 and 30:4-7.

418.    Smith testified that some workers only stayed on GIS projects for a few days before departing.  Exhibit 9 to plaintiff's motion papers at pages 39:19-40:8.

**M.    DEPOSITION TRANSCRIPT OF MATTHEW CHASE**

419.    Matthew Chase testified that some workers were paid by the "All Seasons Company" instead of GIS.  Exhibit 12 to plaintiff's motion papers at page 82:7-20.

420.    Chase submitted a 1099 when he was working for GIS.  Exhibit 12 to plaintiff's motion papers at pages 37:17-39-7.

421.    Chase was not provided with any training when he began to work with GIS.  Exhibit 12 to plaintiff's motion papers at page 96:12-14.

422.    Chase was required to carry his own liability insurance policy.  Exhibit 12 to plaintiff's motion papers at page 39:10-14.

**N.    DEPOSITION TRANSCRIPT OF JOSE HUERTA**

423.    Jose Huerta was sent to Florida by Construction Personnel at some point during the seven projects he worked for GIS.  Exhibit 13 to plaintiff's motion papers at page 99:5-13.

424.    GIS did not pay for a hotel at which Mr. Huerta stayed.  Exhibit 13 to plaintiff's motion papers at pages 37:19-38:10.

**O.    DEPOSITION TRANSCRIPT OF JAVIER ANGUIANO**

425.    Mr. Anguiano worked in New York for about five (5) months.  Exhibit 14 to plaintiff's motion papers at page 87:11-14.

426.    He started working for Construction Personnel Services and he estimates that he worked for the company for approximately three (3) months.  Exhibit 14 to plaintiff's motion papers at page 88:6-18.

427.    He later worked at GIS and believes he was an employee of GIS.  Exhibit 14 to plaintiff's motion papers at page 101:4-6.

428.    When he worked for Construction Personnel for those three (3) months he thought he was one of its employees.  Exhibit 14 to plaintiff's motion papers at page 101:13-19.

**P.    DEPOSITION TRANSCRIPT OF LUIS ANGUIANO**

429.    Luis Anguiano he did not recall bring provided tools by GIS.  Exhibit 15 to plaintiff's motion papers at page 42:11-15.

430.    Luis Anguiano also testified that GIS did not provide him with training, but "just told [him] to go ahead and start."  Exhibit 15 to plaintiff's motion papers at page 42:16-20.

431.    Luis Anguiano worked for GIS for only 2.5 to 3 months.  Exhibit 15 to plaintiff's motion papers at page 8:21-9:7.

**Q.    DEPOSITION TRANSCRIPT OF JOSEPH SANDERS**

432.     Joseph Sanders testified that he filled out a 1099 when working with GIS. Exhibit 16 to plaintiff's motion papers at pages 16:23-17:9.

433.     Some of the tools Sanders used when working for GIS were larger than those that would fit on a toolbelt, including a "Sawzall, jigsaw, a router, a screw gun, [and] a Skilsaw." Exhibit 16 to plaintiff's motion papers at pages 33:21-34:16.

434.     Sanders testified that while he was working for GIS, there was at least one occasion where he remained at a hotel, but another company paid for his stay. Exhibit 16 to plaintiff's motion papers at page 43:4-17.

435.     While working for GIS, Sanders was required to carry his own liability insurance. Exhibit 16 to plaintiff's motion papers at page 16:16-22.

**R.      DEPOSITION TRANSCRIPT OF PAUL DAVIS**

436.     As a subcontractor, Paul Davis was free to contract with any other company and performed projects for individuals. See Exhibit 17 to plaintiff's motion papers at pages 11:5-7 and 14:15-15:20.

437.     Additionally, as an independent contractor, Mr. Davis set his own hours, received "1099s," carried his own insurance, worked as a d/b/a, and billed Mento for the hours he worked. See Exhibit 17 to plaintiff's motion papers at pages 9:20-10:20, 11:2-18 and 16:18-17:19.

438.     Mr. Davis denied that anyone directed or controlled his work while he was an independent contractor. In fact, "most jobs [he] did not see anybody on." See Exhibit 17 to plaintiff's motion papers at page 12:16-20.

439.     Mr. Davis negotiated his compensation with Mento prior to working with GIS. See Exhibit 17 to plaintiff's motion papers at pages 13:21-14:14.

440.    GIS did not provide Mr. Davis with any training nor did it instruct him how to perform his work.  See Exhibit 17 to plaintiff's motion papers at pages 11:25-12:6.

441.    Mr. Davis testified that, as an independent contractor, he was not paid for his travel time.  Exhibit 17 to plaintiff's motion papers at page 64:23-25.

442.    Mr. Davis also testified that he did not know for sure that GIS paid for a motel on one occasion, but only assumed that fact based on the fact that GIS told him where to go for the motel.  Exhibit 17 to plaintiff's motion papers at pages 66:23-67:6.

443.    As an individual, Mr. Davis did hold himself out as, and worked as, a subcontractor.  See Exhibit 17 to plaintiff's motion papers at pages 9:20-11:21, 14:15-23, 15:17-25 and 26:9-19.

444.    When Mr. Davis' employment status with GIS changed from independent contractor to employee, many aspects of his work changed.  Since being hired as an employee, he no longer works longer than 40 hours, receives a W-2, uses GIS' tools more often, and does not get paid for lunch breaks.  See Exhibit 17 to plaintiff's motion papers at pages 10:7-12, 17:20-24, 41:15-20, 47:9-14, 49:5-50:5 and 54:18-23.

445.    Mr. Davis also testified that many of the drywall companies did "footage work."  Exhibit 17 to plaintiff's motion papers at page 60:8-11.

**S.    DEPOSITION TRANSCRIPT OF JOSEPH CARR**

446.    Benjamin Carr testified that when he was working for GIS, he was required to pay his own taxes.  Exhibit 18 to plaintiff's motion papers at page 21:17-19.

447. Carr was told by Mento that he would be required to carry his own liability insurance. Exhibit 18 to plaintiff's motion papers at pages 21:17-19 and 22:18-21.

## T.   DEPOSITION TRANSCRIPT OF JASON SNYDER

448. Jason Snyder, an individual subcontractor, negotiated his compensation prior to working for GIS. See Exhibit 19 to plaintiff's motion papers at page 11:12-23.

449. As an independent contractor, Snyder worked the hours that he chose to work and was not instructed by GIS which hours to work. Exhibit 19 to plaintiff's motion papers at pages 12:16-13:17 and 46:8-9.

450. Snyder was also required to pay his own taxes and received 1099 forms. Exhibit 19 to plaintiff's motion papers at page 15:13-19.

451. Although Snyder had insurance when he started working with GIS, he cancelled it when he became a full employee. Exhibit 19 to plaintiff's motion papers at pages 28:2-29:10.

452. When asked if anyone ever directed, controlled, or told him the manner and method of how to do his job, he responded "no" to each question. See Exhibit 19 to plaintiff's motion papers at page 14:6-12.

## U.   DEPOSITION TRANSCRIPT OF JEFFERY HAMILTON

453. With respect to GIS' lack of supervision or control of his work, Jeffrey Hamilton testified that "[y]ou do not hear anything unless you're doing something wrong or bad." Exhibit 20 to plaintiff's motion papers at page 41:13-19.

454. Hamilton testified that he used his own tools while working for GIS, including a screw gun that he had to buy without reimbursement because it was "[n]ot the type they wanted [him] to use." Exhibit 20 to plaintiff's motion papers at page 55:14-21.

455. Also, when Hamilton began to work for GIS, he was required to procure his own liability insurance. Exhibit 20 to plaintiff's motion papers at page 18:6-19.

## V.   DEPOSITION TRANSCRIPT OF JOHN KELLY

456. John Kelly testified that when he worked as a subcontractor for GIS, he would be legally permitted to work for other companies. In fact, he testified that quite a few of the subcontractors did that sort of thing. Exhibit 21 to plaintiff's motion papers at page 48:4-23.

457. With respect to GIS' supervision or control over its subcontractors' work, Kelly testified that he was simply "pointed . . . in the right direction" and "just started working." Workers did not need to seek GIS' approval. Exhibit 21 to Plaintiff's Motion papers at pages 32:22-33:6 and 73:10-15.

## W.   DEPOSITION TRANSCRIPT OF RYAN BUTLER

458. Ryan Butler testified that he heard on job sites that some of the subcontractor companies were working on a square footage basis. Exhibit 22 to plaintiff's motion papers at pages 91:23-92:5.

## X.   DEPOSITION OF MEAGHAN DORAN

456. Ms. Doran worked for General Interior Systems from January 2005 through approximately April 3, 2007. Exhibit 10 to plaintiff's motion papers at pages 9:21-10:4.

457.    Initially she was the receptionist and worked on a part-time basis, three (3) days per week.  Exhibit 10 to plaintiff's motion papers at pages 124:4-6 and 18:11-16.

458.    She changed her title to administrative assistant because she thought receptionist was outdated.  Exhibit 10 to plaintiff's motion papers at page 124:7-13.

459.    Her job duties did not change when her title changed and her job duties included answering the phones, running errands and support stuff.  Exhibit 10 to plaintiff's motion papers at pages 124:15-17 and 18:1-3.

460.    Although she could not recall the date of this occurrence, Meaghan Doran testified that on one occasion, GIS paid Carver's workers when GIS could not get in touch with Carver.  Exhibit 10 to plaintiff's motion papers at page 81:3-8:20; *see also* Exhibit 10 to plaintiff's motion papers at pages 134:23-135:2.

461.    There may have also been one occasion where workers from ASR were directly paid by GIS when ASR lacked the funds to pay its workers or was "shorting" them.  Exhibit 10 to plaintiff's motion papers at pages 83:10-84:2-8.

**Y    DEPOSITION TESTIMONY OF CLINTON BLESKOSKI**

462.    Mr. Bleskoski is a carpenter who has worked on and off as an independent contractor for GIS since 2004.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 8:7-10:6, 19:9-21:11, 57:10-58:24 and 118:3-9.

463.    He filed a dba for and has been doing business as Dunrite Interiors.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 24:18-25:7, 101:21-102:15, 103:20-104:11, 105:10-12, 113:9-24 and 143:10-18.

464.    As an independent contractor for GIS, Mr. Bleskoski has always been the one who decides what hours he wants to work.   Nobody from GIS has told him what

hours he has to work.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 14:7-17:10 and 27:24-28:19.

465.   GIS has not controlled his work, instructed him, or trained him.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 17:20-19:9.

466.   Mr. Bleskoski has uniquely excellent skills and experience in ceiling installation, so much so that GIS has not been able to find anyone else to replace him.  He also did college coursework in architecture, so he is able to read and understand blueprints.  Most carpenters are not skilled enough to read and understand blueprints, so this special skill sets him apart from others.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 17:11-14, 37:15-39:13 and147:13-148:16.

467.   As an independent contractor for GIS, Mr. Bleskoski has worked not just hourly but also on a square footage basis.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 17:2-10, 21:3-23:6, 71:15-74:17, 93:15-94:2 and 103:20-24.

468.   When Mr. Bleskoski has worked on a square footage basis, he has always sent GIS a bill and then GIS has sent him a check.  And since 2007, he has been billing GIS for all work, regardless of whether it is hourly or by the foot, and he has not submitted any timesheets.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 22:15-17 and 123:20-125:9.

469.   Mr. Bleskoski's billing rates are set after a negotiation between GIS and him.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at page 130:6-24.

470.     Since first starting his independent contractor work for GIS in 2006, Mr. Bleskoski has not worked exclusively for GIS.  He has done independent contractor work on numerous projects for various other competitor contractors, including LeMoyne Interiors, Associated Contractors, and DL Morse. See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 23:7-24:5, 25:20:27:12, 29:10-19, 101:21:102:18 and 104:12-106:16.

471.     Mr. Bleskoski's brother Joseph worked for him from 2007 until around the time of Mr. Bleskoski's deposition in 2010.  He paid Joseph directly.  GIS never paid Joseph, nor did Mr. Bleskoski ever have to seek GIS' permission to have Joseph work on GIS projects.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 24:6-25:7, 103:9-105:17 and 106:17-108:10.

472.     Mr. Bleskoski has always received a 1099 from GIS and paid for his own liability insurance and workers' compensation insurance.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 27:13-28:13, 88:20-90:22, and 92:7-14.

473.     GIS did not reimburse him for lodging during out of town projects.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at page 92:15-18.

474.     In addition to his own tools, he has used his own scaffolding on projects for GIS.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at page 64:2-11.

475.    The general contractors supervise and have the ultimate authority on projects.  See Exhibit T to David E. Leach's affidavit sworn to on September 23, 2011 at pages 84:5-86:15.

Dated: September 23, 2011

GOLDBERG SEGALLA LLP
*Attorneys for Defendant's*

By: David E. Leach, Esq.
(Bar Roll No.: 507434)
5786 Widewaters Parkway
Syracuse, New York 13214
(315) 413-5400

To:     Evan R. Barouh, Esq.
        Jeffrey Ruzal, Esq.
        U.S. Department of Labor
        *Attorneys for Plaintiff's*
        Office of the Solicitor, Reg. II
        201 Varick Street, Room 983
        New York, NY 10014
        Tel. (646) 264-3668