UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

HILDA L. SOLIS, Secretary of Labor,
United States Department of Labor,

                                        **Index No: 08-CV-0823**
                                              **(NPM/ATB)**

                Plaintiff,

         v.

GENERAL INTERIOR SYSTEMS, INC., a
Corporation, JEFFREY T. MENTO, Individually
And as President, and RICHARD MABBETT,
Individually and as Vice President,

                Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

                        **GOLDBERG SEGALLA, LLP**
                        David E. Leach, Esq.
                        *Attorneys for Defendants*
                        General Interior Systems, Inc.,
                        Jeffery T. Mento and Richard Mabbett
                        5786 Widewaters Parkway
                        Syracuse, New York 13214
                        (315) 413-5400

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………………………… ii

INTRODUCTION…………………………………………………………….. ...1

SUMMARY OF ARGUMENT…………………………………………….........1

STATEMENT OF FACTS ……………………………………………………… 1

STANDARD OF REVIEW……………………………………………………..6

ARGUMENTS

    POINT I……………………………………………………………....7

        **UNDER THE ECONOMIC REALITIES TEST, THE WORKERS ARE INDEPENDENT CONTRACTORS AND NOT EMPLOYEES FOR THE PURPOSES OF THE FLSA**

    POINT II…………………………………………………………..20

        **PLAINTIFF HAS NOT SUFFICIENTLY DEMONSTRATED ENTITLEMENT TO SUMMARY JUDGMENT**

    POINT III…………………………………………………………..21

        **THE WORKERS' OPINIONS WITH RESPECT TO WHETHER THEY WERE "EMPLOYEES" ARE NOT ENTITLED TO ANY EVIDENTIARY WEIGHT**

    POINT IV…………………………………………………………..21

        **PLAINTIFF'S REPRESENTATIVE EVIDENCE IS INSUFFICIENT TO MEET PLAINTIFF'S BURDEN WITH RESPECT TO THE ENTIRE POOL OF EMPLOYEES**

    CONCLUSION……………………………………………………...24

**TABLE OF AUTHORITIES**

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009)…………………………...21

*Baker v. Flint Eng'g & Constr. Co.,* 137 F.3d 1436, 1441 (10th Cir. 1998)…………….11, 17

*Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F. 3d 132, 141-143 (2d Cir. 2008)……..7, 8

*Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973)……………….23

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988)………………….7, 8, 11, 19

*Carter v Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984)…………………………8, 13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)……………………….6, 7

*Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 281 (E.D.N.Y. 2005)……………..17

*Clarke v. JPMorgan Chase Bank, N.A.*, 159 Lab. Cas. (CCH) P35,732, 2010 U.S. Dist. LEXIS

33264 (S.D.N.Y. Mar. 26, 2010)……………………………………………………………….7

*Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113 (4th Cir. 1985)…………………………….22

*Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982)……………………..22

*Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983)………………………….7

*Donovan v. Williams Oil Co.*, 717 F.2d 503 (10th Cir. 1983)……………………………….22

*Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003)………………………..23

*Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1136 (N.D. Cal. 2009), *lv. denied* 2009

U.S. Dist. LEXIS 113208 (N.D. Cal. Nov. 20, 2009) ……………………………………..…8

*Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1998)………………………………8

*Herr v. Heiman*, 75 F.3d 1509, 1513 (10th Cir. 1996)……………………………………….8

*Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 689-690 (D. Md. 2010)…………..9, 15, 16

*Lawrence v. Adderley Indus.*, 2011 U.S. Dist. LEXIS 14386 at *18-31 (E.D.N.Y. Feb.

11, 2011)………………………………………………………………………………8, 9, 15

*Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 457 (S.D.N.Y. 2002)........................20

*Magnoni v. Smith & Laquercia, LLP*, 661 F.Supp.2d 412, 415-416 (S.D.N.Y. 2009)...........7

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348(1986)............................................................................................7

*McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 812, 825-826 (D.N.J. 1989)......22

*McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988), *cert denied*, 488 U.S. 1040, 109 S. Ct. 864 (1989).....................................................................................22, 23

*Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 701-702 (S.D.N.Y. 2005).....................18

*Solis v. Sec. Credit Sys.*, 2011 U.S. Dist. LEXIS 27613 at *10 (W.D.N.Y. Mar. 15, 2011)....22

*Reich v. Gateway Press* 13 F.3d 685, (3d Cir. 1994)..................................................23

*Reich v. Southern New Eng. Telcoms. Corp.*, 121 F.3d 58, 66-67 (2d Cir. 1997)............21, 22

*Thibault v. Bellsouth Telcoms., Inc.*, 2008 U.S. Dist. LEXIS 109656 (E.D. La. Nov. 10,2008)..............................................................................................17

*United States v. Bonanno Organized Crime Family*, 879 F.2d 20, 27 (2d Cir. 1989)............21

*West v. Border Foods, Inc.*, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006)...........23

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61 (2d Cir. 2003).......................................7, 8

**Statutes**

Fed. R. Civ. P. 56 (c).................................................................................6

## INTRODUCTION

This Memorandum of Law is submitted on behalf of defendants General Interior Services, Inc. ("GIS") and Jeffrey T. Mento ("Mento") in opposition to plaintiff's motion for partial summary judgment and in further support of defendants' motion for summary judgment.

## SUMMARY OF ARGUMENT

It is respectfully submitted that the workers at issue are independent contractors and not employees for the purposes of the Fair Labor Standards Act (FLSA); that plaintiff has not sufficiently demonstrated entitlement to summary judgment because it has used inadmissible evidence and mischaracterized deposition testimony; that the workers' opinions as to whether they were "employees" are not entitled to evidentiary weight; and plaintiff's representative evidence is insufficient to meet its burden with respect to the entire pool of workers.

## STATEMENT OF FACTS

In addition to drywalling, defendant GIS also performs metal stud framing, wire hanging, the installation of acoustical ceilings, and the installation of doors and hardware. Pl. Ex. 3, at 9:19:10-22; 11:24-12:24, 14:5-16:15. As Carver testified, commercial drywalling itself is a "pretty complicated" process. *See* Pl. Ex. 25, at 86:13-19.

Within the group of non "bona fide" subcontractors at issue, there are several distinguishing characteristics dividing the workers. Chief among those distinctions is that some of the workers were hired directly by GIS and a large majority of others were provided by labor brokers. The workers provided by the labor brokers would be interviewed by those companies and some would even check their tools during the hiring process. *See* Pl. Ex. 25, at 86:3-7; Pl. Ex. 26, at 102:20-103:10, 104:2-11, 105:3-106:3, 155:5-24; Pl. Ex. 27, at pages 43:5-19, 141:8-12, 142:4-9, 142:23-143:3. Carver testified that he at one point met with attorneys and an accountant to ensure that his workers were subcontractors for tax and Labor Law purposes. Pl.

1

Ex. 25, at 79:10-23, 81:6-84:22. ASR would only send skilled or experienced workers. Pl. Ex. 26, at 32:2-14 and 37:21-24.

The labor brokers would require their workers to fill out employment documents and would retain some of those records, including job applications, subcontractor agreements, tax forms, and copies of drivers' licenses or social security cards. *See* Pl. Ex. 26, at 164:23-165:19; Pl. Ex. 31, at 15:19-16:9; *see also* Ex. I to Leach Affidavit; Ex. E to Defendant's Motion, at 38:23-39:8; Pl. Ex. 25, at 87:23-88:14. GIS has none of these documents other than some time sheets which were used primarily to keep track of the cost of a project. *See* Pl. Ex. 3, at 89:11-16; Affidavit in Opposition of Jeffrey T. Mento.

Some of these workers did not seek permanent employment and served as temporary workers where the companies' clients did not have enough help at a job site. Pl. Ex. 25, at 53:4-54:19, 57:4-17. The labor brokers negotiated pay rates with their workers and GIS would pay the labor broker directly instead of the worker. *See* Pl. Ex. 3, at 25:14-28:5, 45:13-46:9, 59:2-12, 63:2-66:6; Pl. Ex. 6, at 54:15-21; Pl. Ex. 25, at 56:5-13, 58:16-60:13, 62:6-22, 60:23-61:2, 94:3-8, 106:16-24, 107:5-7, 162:13-17; Pl. Ex. 26, at 37:21-38:14, 76:12-14, 77:6-15; Affidavit of Mento, dated June 27, 2011, at ¶¶ 3-4. Although Mento and Doran indicated that GIS may have paid labor broker workers directly on rare occasions, their testimony does not indicate when those incidents occurred. *See* Pl. Ex. 3, at 64:4-65:15; Pl. Ex. 10, at 81:3-20, 83:10-84:2-8, 134:23-135:2, 141:15-18.

Some of these workers would also sign a contract with the labor brokers. *See* Pl. Ex. 25, at 87:23-88:14; Pl. Ex. 26, at 117:6-13, 161:4-162:19; Pl. Ex. 27, at 56:20-57:17. The contract a worker had with ASR, for instance, contained clauses penalizing workers for leaving the job site early or for failing to provide their own tools. *See* Ex. J to Leach Affidavit; Pl. Ex. 26, at 112:14-113:10, 114:6-10, 114:14-18, 117:14-22 135:10-25, 161:13-162:19; Pl. Ex. 27, at 59:15-

61:2, 61:24-62:24; Pl. Ex. 31, at 91:24-93:8; 93:12-94:3.  These workers were also supervised by crew leaders supplied by those companies.  *See* Pl. Ex. 3, at 28:18-24; Pl. Ex. 6, at 6:10-7:6, 44:25-45:17, 49:8-14, 55:5-19, 56:5-9; Pl. Ex. 26, at 67:22-69:18, 96:5-98:3, 110:2-19.  These workers were also covered by insurance policies provided by the labor brokers.  *See* Contracts between GIS and ASR, attached to Mento Affdavit, sworn to on June 27, 2011 as Ex. B; Pl. Ex. 25, at 58:16-59-5, 63:7-14, 64:18-67:7; Pl. Ex. 26, at 71:13-73:2, 89:23-90:3; Pl. Ex. 27, at 29:24-30:12, 137:15-138:19; Pl. Ex. 31, at 28:13-29:11.  Both ASR and Carver's companies also had policies in place where they would instruct their workers with respect to safety and OSHA. *See* Pl. Ex. 25, at 173:174-2; Pl. Ex. 31, at 76:22-78:2, 78:9-19, 82:8-83:11; *see also* Ex. M to Leach Affidavit; Pl. Ex. 26, 149:18-150:14.  ASR checked to make sure its subcontractors had proper personal protective equipment and enforced OSHA compliance on GIS job sites.  Pl. Ex. 26 at 102:20-103:10, 104:2-11, 105:3-106:3, 155:5-24; Pl. Ex. 31 at pages 82:8-83:11.  Notably, if GIS were to directly hire a labor brokers' employee, they would be charged a "transfer fee." *See* Pl. Ex. 25, at 67:10-16; Pl. Ex. 27 at 31:20-32:19; Ex. E to Defendant's Motion at 60:16-61:13; *see also* Mento Affidavit, dated June 27, 2011, ¶ 3.

GIS had no control over the hiring and firing of these employees.  The labor brokers determined which employees would be sent to GIS and GIS' power to "fire" them was limited only to removing them from GIS' work site and seeking a replacement, inasmuch the labor brokers were free to continue to employ those workers at other job sites.  *See* Pl. Ex. 25, at 147:9-148:23, 155:18-156:4; Pl. Ex., 26, at 99:24-101:3, 117:14-22; 135:10-25; Pl. Ex. 27, at 44:4-19, 52:10-13; *see also* Ex. E to Defendant's Motion at 53:23-54:12.  Notably, these workers filled out 1099's or W-9's.  Pl. Ex. 25, at 88:9-14; Pl. Ex. 26, at 106:4-108:9; Pl. Ex. 27, at 49:14-25.  These workers would be provided with timesheets from their own companies and sometimes sent them directly to those companies.  *See* Pl. Ex. 25, at 91:16-92:2, 154:9-15; Pl.

Ex. 26, at 62:14-18; Pl. Ex. 27, at 27:15-22.  GIS was required to review those time sheets and

fax them to the labor brokers; however, their failure to do so would not necessarily result in the

workers not being paid.  *See* the Contracts attached as Ex. B to the Affidavit of Jeffrey T. Mento

sworn to on June 27, 2011; Pl. Ex. 31, at 15:19-16:9, 90:6-91:14.  Notably, many of the practices

of these labor brokers mirror those of Tashkin's company, discussed in defendant's motion,

which admits that its workers were employees.

       With respect to all of the subcontractors at issue, it is clear that some workers did not

work exclusively for GIS, i.e., they worked for GIS' competitors. Pl. Ex. 3, at 86:7-19; Pl. Ex. 8,

at 78:5-25; Pl. Ex. 9, at 21:4-11, 30:4-7; Pl. Ex. 13, at 99:5-13; Pl. Ex. 16, at 8:2-11:5; Pl. Ex. 17,

at 14:15-15:20; Pl. Ex. 21, at 44:14-22, 48:4-22; Ex. T to Leach affidavit sworn to on September

23, 2011, at 23:7-24:5, 25:20-27:12, 29:10-19, 101:21-102:18, 104:12-106:16.  Some workers

also held themselves out to be independent contractors and set their own hours. Pl. Ex. 17, at

6:15-12:20, 13:16-14:23, 15:9-16:5, 26:9-19; *See* Ex. T to Leach affidavit sworn to on

September 23, 2011, at 8:7-10:6, 14:7-17:10, 19:9-21:11, 24:18-25:7, 27:24-28:19, 57:10-58:24,

101:21-102:15, 103:20-104:11, 105:10-12, 113:9-24, 118:3-9, 143:10-18.  One of those

subcontractors has unique experience especially valuable to GIS and had his brother working

with him on GIS projects without GIS' permission.  Ex. T to Leach affidavit sworn to on

September 23, 2011, at 17:11-14, 24:6-25:7, 37:15-39:13, 103:9-105:17, 106:17-108:10 147:13-

148:16.  Additionally, some individual drywall installers negotiated their compensation with

GIS.  *See* Pl. Ex. 3 at 96:3-10; Pl. Ex. 7, at 31:16-32:21; Pl. Ex. 17, at 13:21-14:14; Ex. T to

Leach affidavit sworn to on September 23, 2011, at 130:6-24.  These workers could be paid

either by the hour or by square footage.  Pl. Ex. 3, at 33:13-34:4; Pl. Ex. 6, at 9:9-12:4, 34:20-

35:13, 60:10-20, 89:5-11, 90:4-9, 122:22-123:13; *see also* Pl. Ex. 4, at 42:11-22; Pl. Ex. 17, at

60:8-11; Pl. Ex. 22. at 91:23-92:5; Ex. T to Leach affidavit sworn to on September 23, 2011, at

17:2-10, 21:3-23:6, 71:15-74:17, 93:15-94:2, 103:20-24, 123:20-125:9.   Additionally, GIS'
workers filled out 1099's instead of W-2's. *See* Ex. 12, at 37:17-39:7; Pl. Ex. 16, at 16:23-17:4;
Pl. Ex. 17, at 16:18-17:3; Pl. Ex. 19, at 15:13-19; Ex. T to Leach affidavit sworn to on September
23, 2011, at 27:13-28:13, 88:20-90:22, 92:7-14.

Individual workers were often told only where they should begin working and performed
their work without being told how to accomplish their tasks. *See* Pl. Ex. 6, at 12, 7:20, 118:21-
120:3, 121:20-122:7; Pl. Ex. 17, at 9:20-13:7, 11:25-12:6, 12:16-20; Pl. Ex. 19, at 14:6-12; *see
also* Pl. Ex. 20, at 41:13-19; Pl. Ex. 21, at 32:22-33:6, 73:7-15.   Many workers, including those
of the labor brokers, could set their hours with GIS. *See* Pl. Ex. 6, at 119:16-120:3, 121:20-
122:7; Pl. Ex. 9, at 30:12-16; Pl. Ex. 17, at 9:20-11:21; Pl. Ex. 19, at 12:16-13:17, 46:8-9; Pl. Ex.
26, at 101:23-102:7, 117:6-13; Pl. Ex. 27, at 56:20-57:17; Ex. I to Leach Affidavit; Ex. T to
Leach affidavit sworn to on September 23, 2011, at 14:7-17:10, 27:24-28:19.   All workers' hours
were subject to forces outside of GIS' control, such as the general contractor's schedule,
availability of work and permits for construction, inspections, and the speed at which other
subcontractors worked.   Pl. Ex. 25, at 90:8-20, 168:17-169:5, Mento Affidavit in Opposition.
Further, the workers' product was reviewed by project owners and general contractors.   Pl. Ex. 3,
at 40:24-41:6; Pl. Ex. 6, at 50:5-13; Ex. T to Leach affidavit sworn to on September 23, 2011, at
84:5-86:15.   GIS did not provide any of these workers with liability insurance. *See* Pl. Ex. 3 at
48:15-49:5; Pl. Ex. 16, at 16:16-22; Pl. Ex. 17, at 17:5-19, 69:19-70:8; Pl. Ex. 18, at 21:17-19;
Pl. Ex. 19, at 14:19-24; Pl. Ex. 20, at 18:6-19; Ex. T to Leach affidavit sworn to on September
23, 2011, at 27:13-28:13, 88:20-90:22, 92:7-14.   GIS would only provide insurance when an
individual worker became its employee.   Pl. Ex. 19, at 29:6-10.

There is no evidence that GIS trained any subcontractors.   Pl. Ex. 3 at 5:8-6:22, 43:24-
44:2; Pl. Ex. 17, at 9:20-13:7; *see also* Pl. Ex. 5 at 116:20-23; Pl. Ex. 12, at 96:12-14; Pl. Ex. 15,

44:2; Pl. Ex. 17, at 9:20-13:7; *see also* Pl. Ex. 5 at 116:20-23; Pl. Ex. 12, at 96:12-14; Pl. Ex. 15,

at 42:16-20; Pl. Ex. 25, at 143:18-20; Ex. T to Leach affidavit sworn to on September 23, 2011,

at 17:20-19:9.   Subcontractors were required to carry their own tools and, on occasion, GIS

would deduct the cost of missing tools from money owed to the broker.  *See* Contracts attached

as Ex. B to the Affidavit of Jeffrey T. Mento sworn to on June 27, 2011; Pl. Ex. 3, at 83:24-84:7;

Pl. Ex. 6, at 69:3-11; Pl. Ex. 15, at 42:6-15; Pl. Ex. 16, at 3:19-34:16; Pl. Ex. 20, at 55:8-21; Pl.

Ex. 26, at 171:6-13; Pl. Ex. 27, at 63:6-7; Pl. Ex. 31, at 82:8-83:11, 86:13-25; Ex. T to Leach

affidavit sworn to on September 23, 2011, at 64:2-11.

Further, it is not certain that GIS paid for all subcontractors' travel or hotel costs.  *See* Pl.

Ex. 13, at 37:19-38:10; Pl. Ex. 16, at 43:4-17; Pl. Ex. 26, 146:25-148:9, 149:15-17; Pl. Ex. 27 at

109:4-8; Pl. Ex. 31, at 73:11-25; Ex. T to Leach affidavit sworn to on September 23, 2011, at

92:15-18.  On this point, Mento's testimony did not clarify whether subcontractors provided by

the labor brokers had their hotels paid for by GIS, and the testimony of others was speculative.

*See* Pl. Ex. 3, at 83:8-23; Pl. Ex. 5, at 29:18-21.  In fact, ASR paid for the hotels that its workers

stayed in.  Pl. Ex. 26, at 146:25-148:9. 149:15-17; Pl. Ex. 31, 73:11-25.  Carver also testified that

GIS had nothing to do with its workers' per diems.  Pl. Ex. 25, at 163:20-164:20, 165:3-11.

Finally, it is notable that the time a given worker might remain with GIS varied wildly,

and workers sometimes worked on a per project basis.  *See* Pl. Ex. 9, at 39:19-40:8; Pl. Ex. 14, at

11:10-12, 88:6-18, 100:25-101:19; Pl. Ex. 15, at 8:21-9:7; Pl. Ex. 25 at 89:9-21, 104:15-105:9,

151:13-19; Pl. Ex. 26, at 15:13-17:3, 17:7-18:25, 85:19-86:4, 176:22-177:13; Pl. Ex. 27 at 34:23-

36:6.  In fact, ASR and GIS only did business for eight (8) months.  Pl. Ex. 27, at 34:23-36:6.

## STANDARD OF REVIEW

Summary judgment is proper only if the moving party shows that "there is no genuine

issue as to any material fact."  *See* Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S.

317, 322, 106 S. Ct. 2548 (1986).  On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986).  Generally, whether "a party is an employer or joint employer for purposes of the FLSA is essentially a "question of fact."  *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 194 (5th Cir. 1983); *see also Clarke v. JPMorgan Chase Bank, N.A.*, 159 Lab. Cas. (CCH) P35,732, 2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26, 2010).

## POINT I

## UNDER THE ECONOMIC REALITIES TEST, THE WORKERS ARE INDEPENDENT CONTRACTORS AND NOT EMPLOYEES FOR THE PURPOSES OF THE FLSA

Independent contractors are exempt from the overtime provisions of the FLSA.  *See Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988); *Magnoni v. Smith & Laquercia, LLP*, 661 F.Supp.2d 412, 415-416 (S.D.N.Y. 2009).  To determine whether a worker is an employee or an independent contractor, the court will apply the "economic realities" test.  *See Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F. 3d 132, 141-143 (2d Cir. 2008).

Numerous factors are applicable to the analysis of whether there is an employment relationship under the FLSA.  *See Barfield*, 537 F. 3d at 141-143.  Depending on the circumstances of the case, those factors may include: (1) whether the employer had the power to hire and fire; (2) whether the employer supervised and controlled employee work schedules and work conditions; (3) whether the employer determined the method and rate of payment; (4) whether the employer maintained employment records; (5) whether the employees had opportunity for profit or loss based on investment in the business; (6) the skill and independent initiative required to perform the work; (7) the duration of the working relationship; and (8) the necessity of the work to the employer's business.  *Id.* at 141-143, discussing *Zheng v. Liberty*

*Apparel Co.*, 355 F.3d 61 (2d Cir. 2003); *Brock*, 840 F.2d 1054; and *Carter v Dutchess Community College*, 735 F.2d 8 (2d Cir. 1984); *see also Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1998) ("any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition").

"Under federal law . . . '[t]he existence and degree of each factor [regarding the status of a person as an independent contractor or employee] is a question of fact while the legal conclusion to be drawn from those facts -- whether workers are employees or independent contractors -- is a question of law.'" *Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1136 (N.D. Cal. 2009), *lv. denied* 2009 U.S. Dist. LEXIS 113208 (N.D. Cal. Nov. 20, 2009), quoting, inter alia, *Herr v. Heiman*, 75 F.3d 1509, 1513 (10th Cir. 1996). Due to the "fact-intensive character of a determination of joint employment," *Barfield* noted that the courts' opportunity to review awards of summary judgment are "rare[]." *Barfield*, 537 F.3d at 143-144; *see also Lawrence v. Adderley Indus.*, 2011 U.S. Dist. LEXIS 14386 at *18-31 (E.D.N.Y. Feb. 11, 2011).

(1)     The Power to Hire and Fire

Initially, it is clear that GIS did not have the power to hire and fire all workers at issue. Although some subcontractors may have been hired directly by GIS, plaintiff has failed to sufficiently differentiate those workers from those hired through labor brokers, demonstrate when the hiring of these workers actually occurred, or establish the timeframe in which those workers were working.

Many of the subcontractors did not work exclusively for GIS or also worked for GIS' competitors at the same time. Pl. Ex. 3, at 86:7-19; Pl. Ex. 8, at 78:5-25; Pl. Ex. 13, at 99:5-13; Pl. Ex. 17, at 14:15-15:20; Pl. Ex. 21, at 48:4-23; Ex. T to Leach Affidavit sworn to on September 23, 2011, at 23:7-24:5, 25:20-27:12, 29:10-19, 101:21-102:18, 104:12-106:16. The labor brokers, and not GIS, would interview the workers, check their references, and check their

tools. *See* Pl. Ex. 25, at 86:3-7; Pl. Ex. 26, at 102:20-103:10, 104:2-11, 105:3-106:3, 155:5-24;

Pl. Ex. 27, at pages 43:5-19, 141:8-12, 142:4-9, 142:23-143:3.  In some cases, GIS had no say

over which workers would be sent from the labor brokers.  For instance, ASR unilaterally

decided which workers they believed would be sufficient for GIS' purposes after reviewing their

worker database. *See* Pl. Ex. 27, at 44:4-19, 52:10-13.  GIS would be charged a "transfer fee" if

it was to hire these workers as employees. *See* Pl. Ex. 25, at 67:10-16; Pl. Ex 27 at 31:20-32:19;

Ex. E to Defendant's Motion at 60:16-61:13; *see also* Affidavit of Mento, dated June 27, 2011, ¶

3.

The limitation of GIS' power to "fire" these workers extended only to whether they were

permitted to work at a particular job site.  For example, if GIS removed one of Carver's workers

from a particular job site, Carver would not necessarily fire that person, but would simply move

them to another place.  Pl. Ex. 25, at 147:9-148:23; *see also* Ex. E to Defendant's Motion at

53:23-54:12.  Sometimes, those workers would simply work elsewhere.  Pl. Ex. 25, at 155:18-

156:4.  The same was true of ASR's workers.  Pl. Ex., 26, at 99:24-101:3.

The situation of Carver's and ASR's employees mirrors that of Construct Corps.  *See*

Affidavit of Mento, dated June 27, 2011, ¶ 3; Ex. E to Defendant's Motion at 25:4-12, 52:22-

54:3.  Construction Corps paid payroll taxes for its workers, loaned workers on a temporary

basis, paid its employees benefits, gave vacation and holiday pay, provided insurance, and

provided OSHA training. *See* Ex. E to Defendant's Motion at 15:17-21, 19:3-20:13, 25:7-25,

34:20-35:1, 43:22-44:4.  Notably, Construct Corps admits that it is the employer of its workers

and that it paid them overtime. *See* Ex. E to Defendant's Motion at 15:16-21.

Clearly, this is not a typical situation where all of the workers could be hired and fired at

GIS' command, and this is especially true with respect to the employees of the labor brokers.

*See Lawrence*, 2011 U.S. Dist. LEXIS 14386 at *24-29, discussing *Jacobson v. Comcast Corp.*,

740 F. Supp. 2d 683, 689-690 (D. Md. 2010). Additionally, plaintiff has relied upon inadmissible evidence in attempting to establish GIS' power to hire and fire. Specifically, plaintiff cited testimony that was irrelevant to those issues, mischaracterized the cited testimony, or relied on testimony which lacked foundation or was vague as to a particular time period. *See* Defendants' Response to Plaintiff's Statement of Undisputed Facts, at ¶¶ 29, 113, 114, 116-123. Therefore, it is respectfully submitted that triable issues of fact remain concerning this factor.

(2)     Supervision and Control of Work Schedules and Work Conditions

Next, GIS did not exclusively direct or supervise the work of all of its subcontractors. Pl. Ex. 6, at 118:21-120:3, 121:20-122:7; Pl. Ex. 17, at 9:20-13:7; Pl. Ex. 19, at 14:6-12. While GIS might specify when and where the work was to be completed and/or relay information from the plans, plaintiff has provided no evidence as to exactly when GIS exercised any supervision and control over any subcontractor's activities. For example, John Kelly testified that on his first day, he was simply "pointed . . . in the right direction" as to where he was to perform work and "just started working." *See* Pl. Ex. 21, at 32:22-33:6. The workers "pretty much knew what [they] were doing" and did not need "approval." Pl. Ex. 21, at 73:10-15. Similarly, Jeffery Hamilton testified that one would not "hear anything unless [one was] doing something wrong or bad" from GIS' supervisors. Pl. Ex. 20, at 41:13-19. Paul Davis also denied that anyone directed or controlled his work while he was an independent contractor. *See* Pl. Ex. 17, at 11:25-12:6; 12:16-20. Similarly, GIS did not control or instruct Bleskoski, who has unique experience in ceiling installation and the ability to read blueprints. Ex. T to Leach affidavit sworn to on September 23, 2011, at 17:11-14, 17:20-19:19, 37:15-39:13, 147:13-148:16. Bleskoski set his own hours and even had his brother work with him on GIS projects without obtaining GIS' permission. Ex. T to Leach affidavit sworn to on September 23, 2011, at 14:7-17:10, 24:6-25:7, 27:24-28:19, 103:9-105:17, 106:17-108:10.

10

Rather, individual subcontractors largely either set their own hours or their hours were affected by factors outside of the control of GIS. Workers' hours could be set by the general contractor and were influenced by the availability of work and permits for construction, the timing of inspections, and the speed at which the other subcontractors worked. Mento Affidavit in Opposition; Pl. Ex. 25, at 90:8-20, 168:17-169:5. Further, the contract between ASR and the 50-60 workers it provided indicated that although someone could ask them to work a certain number of hours, it was up to the worker to agree to those hours. *See* Pl. Ex. 6, at 119:16-120:3, 121:20-122:7; Pl. Ex. 9, at 30:12-16; Pl. Ex. 17, at 9:20-11:21; Pl. Ex. 19, at 12:16-13:17, 46:8-9; Pl. Ex. 26, at 101:23-102:7; Ex. I to Leach Affidavit. These facts distinguish *Baker v. Flint Eng'g & Constr. Co.,* where the workers were instructed when to work, take breaks, and leave, were unable to set their own schedules, and the workers did not offer their services on other projects while a project was ongoing. *See* 137 F.3d 1436, 1441 (10th Cir. 1998). Also distinguishable on this basis is *Brock,* in which it was noted that defendant "unilaterally dictated the nurses' hourly wage." *Brock,* 840 F.2d at 1060.

With respect to ASR's workers, they were required to call ASR, not GIS, if they were going to be late to work, and had to inform ASR if they were going to leave the worksite under penalty of $100. *See* Ex. J. to Leach Affidavit; Pl. Ex. 26, at 114:6-10, 114:14-18; Pl. Ex. 27, at 59:15-61:2, 61:24-62:24. Penalties such as these were drafted to prevent workers from coming and going as they pleased. Pl. Ex. 26, at 117:14-22; 135:10-25. If a worker did leave, GIS would contact ASR and let ASR know if it wanted a replacement. Pl. Ex. 27, at 61:8-23. As indicated above, the contract between ASR and its workers specified that although the general contractor could ask the worker to work any amount of hours, that decision was entirely up to the subcontractor. Pl. Ex. 26, at 117:6-13; Pl. Ex. 27, at 56:20-57:17. GIS had no input concerning this contract and did not review or edit it. Pl. Ex. 27, at 39:8-13. As Nicita testified, ASR had

11

control over its workers inasmuch as it paid them and required them to follow ASR's rules, which included fines for workers who left early or failed to bring their own tools. Pl. Ex. 31, at 91:24-93:8; 93:12-94:3; *see also* Ex. J to Leach Affidavit; Pl. Ex. 26, at pages 112:14-113:10, 114:14-18, 161:13-162:19.

It should be noted that the general contractors and the project owners also reviewed the laborers' workmanship. Pl. Ex. 3, at 40:24-41:6; Pl. Ex. 6, at 50:5-13; Ex. T to Leach affidavit sworn to on September 23, 2011, at 84:5-86:15. Further, when workers did make a mistake, a labor supply company such as ASR would call the worker's supervisor and instruct him to "straighten up." *See* Pl. Ex. 26, at 95:13-96:3.

The workers provided by Carver or ASR also had their own agreements with the labor brokers. *See* Pl. Ex. 25, at 87:23-88:14; *see also* Pl. Ex. 26, at 24:15-21, 161:4-162:19; Pl. Ex. 27 at 56:20-57:17, 59:15-61:2, 61:24-62:24. Additionally, subcontractors from the labor brokers were supervised by a crew leader from their own companies, including those of Carver and ASR. *See* Pl. Ex. 3, at 28:18-24; Pl. Ex. 6, at 6:10-7:6, 44:25-45:17, 49:8-14, 55:5-19, 56:5-9; Pl. Ex. 26, at 67:22-69:18, 96:5-98:3, 110:2-19. Further, the labor brokers provided the workers they supplied to GIS with Worker's Compensation and general liability insurance. *See* Contracts between GIS and ASR, attached to the Affidavit of Jeffrey T. Mento, sworn to on June 27, 2011 as Ex. B; Pl. Ex. 26, at 71:13-73:2, 89:23-90:3; Pl. Ex. 27, at 29:24-30:12, 137:15-138:19; Pl. Ex. 31, at 28:13-22.

ASR was also responsible for instructing its employees with regard to OSHA, enforcing OSHA compliance on GIS sites, and ensuring that workers had the proper personal protection equipment. Pl. Ex. 31, at 76:22-78:2, 78:9-19, 82:8-83:11; *see also* Ex. M to Leach Affidavit in Opposition; Pl. Ex. 26, 149:18-150:14. Carver's company also required his supervisors to go over a safety policy with the workers. Pl. Ex. 25, at 173:174-2. Similarly, Construct Corps

initially had a Professional Employee Organization which managed and administrated its

Worker's Compensation claims and then its Risk Manager handled the claims.   Ex. E to

Defendant's Motion at 96:19-97:25.

Further, GIS did not train any of its subcontractors.  Pl. Ex. 3 at 5:8-6:22, 43:24-44:2; Pl.

Ex. 17, at 9:20-13:7; Pl. Ex. 5 at 116:20-23; Pl. Ex. 12, at 96:12-14; Pl. Ex. 15, at 42:16-20; Pl.

Ex. 25, at 143:18-20.  GIS also did not pay for the subcontractors' insurance.  *See* Pl. Ex. 3 at

48:15-49:5; Pl. Ex. 16, at 16:16-22; Pl. Ex. 17, at 17:5-19, 69:19-70:8; Pl. Ex. 18, at 21:17-19;

Pl. Ex. 19, at 14:19-24; Pl. Ex. 20, at 18:6-19; Ex. T to Leach Affidavit in Opposition, at 27:13-

28:13, 88:20-90:22, 92:7-14.  As Snyder testified, he actually cancelled his liability insurance

policy when he became an employee of GIS.  Pl. Ex. 19, at 29:6-10.

In sum, it is respectfully submitted that there are triable issues of fact with respect to

whether defendant had the requisite control over all of the subcontractors at issue.

(3)    The Power to Determine the Method and Rate of Payment

As *Carter* noted, the factor of whether one controls the rate of pay is "very material" to

the economic realities test.  *Carter*, 735 F.2d at 15.  The record reflects that GIS had no power to

determine the method and rate of payment with respect to many workers.  As discussed, the 236

workers supplied by the labor brokers negotiated their rate of pay with, and were paid directly

by, the labor brokers.  *See* Pl. Ex. 25, at 58:16-60:13, 60:23-61:2, 106:16-24; Pl. Ex. 26, at

37:21-38:14, 76:12-14, 77:6-15.  GIS did not pay those workers.  GIS paid the labor supply

company directly instead of the individuals who were working on site.  *See* Pl. Ex. 3, at 25:14-

28:5, 45:13-46:9, 59:2-12, 63:2-66:6; Pl. Ex. 6, at 54:15-21; Pl. Ex. 25, at 56:5-13, 107:5-7;

Affidavit of Mento, dated June 27, 2011, at ¶¶ 3-4.

Carver testified that GIS would have several good reasons for not paying workers

directly, including the fact that some of the workers he sent to GIS simply were not looking for

permanent positions. Pl. Ex. 25, at 53:4-54-19. Further, some of his customers merely could not find enough workers or could not hire the workers directly. Pl. Ex. 25, at 57:4-17. Carver also stated that he had to negotiate the hourly rate of payment with GIS and his own workers, and that GIS did not dictate his workers' wages. *See* Pl. Ex. 25, at 62:6-22, 106:16-107:16, 162:13-17.

Contrary to plaintiff's suggestion, subcontractors such as Paul Davis have actually held themselves out as subcontractors and have previously worked as subcontractors. *See* Pl. Ex. 17, at 6:15-12:20, 13:16-14:23, 15:9-16:5, 26:9-19. Further, the testimony of Clinton Bleskoski, conspicuously not cited by plaintiff, also establishes that GIS had workers who held themselves out as independent contractors. Bleskoski has worked on and off as for GIS as an independent contractor for GIS since 2004 using the d/b/a of Dunrite Interiors. *See* Exh. T to Leach affidavit sworn to on September 23, 2011, at 8:7-10:6, 19:9-21:11, 24:18-25:7, 57:10-58:24, 101:21-102:15, 103:20-104:11, 105:10-12, 113:9-24, 118:3-9, 143:10-18.

Additionally, some of the individual subcontractors negotiated rates of compensation with GIS. *See* Pl. Ex. 3 at 96:3-10; Pl. Ex. 7, at 31:16-32:21; Pl. Ex. 17, at 13:21-14:14; Ex. T to Leach Affidavit in Opposition, at 130:6-24. Some of the subcontractors worked on either an hourly or square footage basis and submitted invoices. Pl. Ex. 3, at 33:13-34:4; Pl. Ex. 6, at 9:9-12:4, 34:20-35:13, 60:10-20, 89:5-11, 90:4-9, 122:22-123:13; *see also* Pl. Ex. 4, at 42:11-22; Pl. Ex. 17, at 60:8-11; Pl. Ex. 22, at 91:23-92:5; Ex. T to Leach affidavit sworn to on September 23, 2011, at 17:2-10, 21:3-23:6, 71:15-74:17, 93:15-94:2, 103:20-24, 123:20-125:9. With respect to ASR, some of its employees negotiated their wages with ASR. Pl. Ex. 27, at 76:12-14; 77:6-15. In fact, Mento was only aware of one time where GIS paid labor broker worker directly, when a labor supply company was undergoing financial problems. Pl. Ex. 3, at 64:4-65:15. Although Meaghan Doran testified that there may have been occasions where broker workers were directly paid by GIS when it could not get in touch with Carver or ASR was not properly paying its

workers, she did not clarify when those occasions occurred. *See* Pl. Ex. 10, at 81:3-20, 83:10-84:2-8, 134:23-135:2, 141:15-18.

Notably, all of GIS's subcontractors were required to fill out form 1099's instead of W-2s. *See* Ex. 12, at 37:17-39:7; Pl. Ex. 16, at 16:23-17:4; Pl. Ex. 17, at 16:18-17:3; Pl. Ex. 19, at 15:13-19; Ex. T to Leach affidavit sworn to on September 23, 2011, at 27:13-28:13, 88:20-90:22, 92:7-14. This is similarly true with respect to Carver's workers. Pl. Ex. 25, at 88:9-14. ASR required its workers to fill out a W-9, W-4, a job application, and the documents attached as Ex. J to the Leach Affidavit in Opposition. *See* Pl. Exh 26, at 106:4-108:9; Pl. Ex. 27, at 49:14-25.

Workers supplied by labor brokers were provided with timesheets by the labor brokers. *See* Pl. Ex. 25, at 91:16-92:2; Pl. Ex. 26, at 62:14-18; Pl. Ex. 27, at 27:15-22. Generally, workers' timesheets were forwarded to GIS for review. Pl. Ex. 8, at 43:6-44:21. Some timesheets were also sent directly to the labor brokers. *See* Pl. Ex. 25 at page 154:9-15. With respect to Carver's company, GIS would fax the timesheets to Carver, who would create an invoice for GIS to pay to Carver, and then he would pay the employees directly. Pl. Ex. 25, at 94:3-8. Alternatively, Carver's offices would pay its crew leaders a lump sum and the crew leader would pay the workers from that sum. Pl. Ex. 25, at 127:7-129:13. Notably, the contract between the labor brokers and GIS required GIS to verify the time and fax the timesheets to the labor brokers. *See* Ex. B to the Affidavit of Jeffrey T. Mento sworn to on June 27, 2011; Pl. Ex. 31, at 15:19-16:9. In the event that GIS did deduct something from ASR, it did not mean that ASR's workers would subsequently be docked, inasmuch as the rate of the worker's pay was determined by ASR, not GIS; the way ASR handles its workers and what they get paid is not dictated by GIS. Pl. Ex. 31, at 90:6-91:14

Clearly, there are at least questions of fact with respect to GIS' ability to determine the method and rate of payment. *See Lawrence*, 2011 U.S. Dist. LEXIS 14386 at *30-31, discussing

*Jacobson v. Comcast Corp.*, 740 F. Supp. 2d 683, 2010 U.S. Dist. LEXIS 102834 (D. Md. 2010).

(4)     The Maintenance of Employment Records

      Initially, plaintiff has failed to demonstrate what employment records were maintained by GIS. As the testimony indicates, subcontractors' labor brokers generally kept the records, such as their job applications, copies of their driver's license, social security cards, tax forms, and subcontractor agreement. *See* Pl. Ex. 26, at 164:23-165:19; Ex. 31, at 15:19-16:9; *see also* Ex. 3 to Castillero's Deposition; Ex. E to Defendant's Motion, at 38:23-39:8; Pl. Ex. 25, at 87:23-88:14. GIS has none of these documents for the workers supplied by the labor brokers and only 1099s for the others. *See* Mento Affidavit in Opposition. The time sheets that were kept by GIS were "mainly for [its] record to keep track of job costing on the job." Pl. Ex. 3, at 89:11-16. Therefore, it is submitted that there are triable issues of fact concerning this factor. *See Jacobsen*, 740 F. Supp. 2d at 692.

(5)     Worker's Opportunity for Profit or Loss based on Investment in the Business

      From this record, it is clear that the subcontractors were responsible for providing their own hand tools. Pl. Ex. 3, at 83:24-84:7; Pl. Ex. 6, at 69:3-11; Pl. Ex. 15, at 42:6-15; Pl. Ex. 20, at 55:8-21; Pl. Ex. 31, at 82:8-83:11, 86:13-25; Ex. T to Leach affidavit sworn to on September 23, 2011, at 64:2-11. Carver's companies did not provide tools to the workers, but would occasionally loan them money to buy some tools. Pl. Ex. 25, at 138:22-139:5. Similarly, the contracts between the labor brokers and GIS provided that the workers were to provide their own hand tools. *See* Ex. B to the Affidavit of Jeffrey T. Mento sworn to on June 27, 2011; Pl. Ex. 26, at 171:6-13. With respect to ASR, workers could even be fined for failing to bring their own tools. *See* Exs. I, J, & M to Leach Affidavit in Opposition; Pl. Ex. 26, at 112:14-113:10, 171:6-13. On occasion, where tools went missing, GIS would deduct the cost of the tools from the money owed to the labor supply company. *See* Pl. Ex. 27, at 63:6-7. Some of the tools brought

by some subcontractors were larger than those that could fit on a tool belt, suggesting a substantial investment in GIS' business. *See* Ex. 16, at 3:19-34:16 (ladders, Sawzall, jigsaw, a router, a screw gun, and a Skilsaw); Ex. T to Leach affidavit sworn to on September 23, 2011, at 64:2-11 (scaffolding). Additionally, some of the "companies" GIS worked with provided more expensive tools than hand tools. Pl. Ex. 6, at 69:18-25.

The fact that the workers provided their own tools is a factor weighing in favor of independent contractor status. *See Thibault v. Bellsouth Telcoms., Inc.*, 2008 U.S. Dist. LEXIS 109656 (E.D. La. Nov. 10, 2008); *Chen v. St. Beat Sportswear, Inc.*, 364 F. Supp. 2d 269, 281 (E.D.N.Y. 2005). Also important is the fact that some subcontractors worked on a square footage basis or set their own hours with GIS, providing them with opportunities for profit or loss. Pl. Ex. 6, 9:9-12:4, 32:24-33:11, 34:20-35:13, 60:10-20, 89:5-11, 90:4-9, 111:20-112:2, 122:22-123:13; Ex. T to Leach affidavit sworn to on September 23, 2011, at 8:7-10:6, 14:7-17:10, 19:9-21:11, 24:18-25:7, 27:24-28:19, 57:10-58:24, 101:21-102:15, 103:20-104:11, 105:10-12, 113:9-24, 118:3-9, 143:10-18; *see also Baker*, 137 F.3d at 1441.

(6)     The Skill and Independent Initiative Required to Perform the Work

As Carver testified, the installation of "commercial drywall is pretty complicated." Pl. Ex. 25, at 86:13-19; *see also* Ex. E to Defendant's Motion, at 6:18-7:2. Further, the record reflects that workers were not closely observed by GIS. As Kelly testified, he was "pointed . . . in the right direction" as to where he was to work and "just started working." *See* Pl. Ex. 21, at 32:22-33:6. Workers did not need GIS' approval to perform their tasks (Pl. Ex. 21, at 73:7-15) and generally would not hear from GIS "unless [one was] doing something wrong or bad." Pl. Ex. 20, at 41:13-19. The workers were experienced in their field and no one at GIS directed or controlled them in their work. Pl. Exh, 17, at 12:7-20. Additionally, ASR would only send skilled or experienced workers. Pl. Ex. 26, at 32:2-14, 37:21-24. While a degree of a skill is not,

by itself, indicative of independent contractor status, it is respectfully submitted that when viewed in conjunction with the other factors, this factor does weigh in favor of a finding of independent contractor status. *See Schwind v. EW & Assocs.*, 357 F. Supp. 2d 691, 701-702 (S.D.N.Y. 2005).

(7)     Duration of the Working Relationship

As previously discussed, some of the subcontractors did not work exclusively for GIS, some worked for GIS' competitors, and for other subcontractors, they were unemployed when a particular project ended. *See* Pl. Ex. 16, at 8:2-11:5; Pl. Ex. 21, at 44:14-22, 48:4-22; *see also* Pl. Ex. 9, at 21:4-11, 30:4-7; Pl. Ex. 17, at 11:5-7, 14:15-23. In addition, Castillero indicated that although he was not sure of the longest period of time which an ASR worker stayed with GIS, he believed it could have not been longer than one year. *See* Pl. Ex. 26, at 85:19-86:4; *see also* Pl. Ex. 9, at 39:19-40:8; Pl. Ex. 14, at 11:10-12, 88:6-18, 100:25-101:19 (two months); Pl. Ex. 15, at 8:21-9:7 (2.5 to 3 months); Pl. Ex. 27 at 34:23-36:6 (three to four months). Actually, ASR and GIS did business for eight (8) months. Pl. Ex. 27, at 34:23-36:6. ASR and Carver's companies typically and/or generally handled requests for subcontractors on a per project basis. Pl. Ex. 25 at 151:13-22; Pl. Ex. 26, at 15:13-17:3. Sometimes the employees would perform one job only and then disappear or, in other cases, they would not even show up at all. Pl. Ex. 26, at 17:7-18:25; 176:22-177:13. Carver also indicated that many workers he sent were only looking for temporary employment before returning home and that contractors like GIS would require workers for projects where their usual sources of labor were insufficient and qualified workers were needed for short periods of time. Pl. Ex. 25, at 54:8-19; 78:24-79:8. Carver was also unable to indicate the longest period of time for which one of his workers performed services for GIS. Pl. Ex. 25, at 152:9-12.

(8)     Necessity of the Work to the Employer's Business

GIS performed more than merely drywall installation.  In addition, GIS performed metal stud framing, wire hanging, the installation of acoustical ceilings, doors, and hardware.  Pl. Ex. 3, at 9:19:10-22; 11:24-12:24, 14:5-16:15.  As such, it is respectfully submitted that there are triable issues of fact concerning the necessity of the work to GIS' overall business.

(9)     Additional Considerations

As case law makes clear, the court may also take into consideration additional factors not previously identified in case law.  *See Brock*, 840, F.2d at 1059.

Contrary to plaintiff's contentions, GIS did not always pay for hotels that workers sometimes stayed in when working on a job site.  *See* Pl. Ex. 13, at 37:19-38:10; Pl. Ex. 16, at 43:4-17; Pl. Ex. 26, 146:25-148:9, 149:15-17; Pl. Ex. 27 at 109:4-8; Pl. Ex. 31, at 73:11-25; Ex. T to Leach Affidavit in Opposition, at 92:15-18.  Mento's testimony on this topic failed to clarify whether subcontractors provided by the labor brokers had their hotels paid for by GIS.  *See* Plaintiff Ex. 3, at 83:8-23.  In addition, Landman was only "assuming" that it was GIS paying for his hotel costs.  Pl. Ex. 5, at 29:18-21.  It is also undisputed that ASR paid for the hotels that its workers stayed in, not GIS.  Pl. Ex. 26, at 146:25-148:9. 149:15-17; Pl. Ex. 31, 73:11-25.

As discussed above, ASR would provide its workers with insurance if they did not have insurance already, and would deduct a portion of that cost from the worker.  Pl. Ex. 31, at 28:19-29:11.  Carver's companies also provided worker's compensation insurance for its employees and aided their employees with finding liability insurance without being reimbursed by GIS.  Pl. Ex. 25, at 58:16-59-5, 63:7-14, 64:18-67:7.  Carver also testified that GIS had nothing to do with its workers per diems.  Pl. Ex. 25, at 163:20-164:20, 165:3-11.

Significantly, Carver testified that he at one point sat down with attorneys and an accountant to ensure that his workers were subcontractors for tax and Labor Law purposes.  Pl. Ex. 25, at 79:10-23, 81:6-84:22.  Notably, IRS Publication 15-A states that, under common law

principles, "a corporation furnishing workers to various professional people and firms is the employer of those workers for employment tax purposes" and that it is the service corporation who is the employer for employment tax purposes based on its right to control and direct the worker's services, hire, and fire the worker, determine their wages, and its provision of insurance *See* Ex. U to Leach Affidavit in Opposition.

As a final note, the relationship that the purported non- "bona fide" workers have with GIS share many similar characteristics to those of a "bona fide" subcontractor. *See* Affidavit of Mento, dated June 27, 2011 at ¶ 4. A review of Tashkin's testimony indicates that his company hired workers in a similar manner to ASR and Construction Personnel (Ex. E to Defendant's Motion at, 18:22-24); negotiated and contracted with GIS (Ex. E to Defendant's Motion at 19:7-17); provided its workers with timesheets (Ex. E to Defendant's Motion at 19:15-17); received faxes from GIS concerning the worker's hours (Ex. E to Defendant's Motion at 20:22-21:4); provided liability and Worker's Compensation insurance (Ex. E to Defendant's Motion at 27:10-15); provided OSHA training (Ex. E to Defendant's Motion at 43:22-44:4); and paid its workers after receiving money from GIS (Ex. E to Defendant's Motion at 89:2:6). Despite these similarities, Construct Corp. paid its own workers overtime. Ex. E to Defendant's Motion at 65:7-11. This understandably led to Mento's expectation that ASR and Carver's companies would have done the same. *See* Affidavit of Mento, dated June 27, 2011 at ¶ 6.

In sum, it is respectfully submitted that, at a minimum, there are triable issues of fact with respect to whether the workers at issue were independent contractors and/or employees of GIS. *See Lee v. ABC Carpet & Home*, 186 F. Supp. 2d 447, 457 (S.D.N.Y. 2002).

## POINT II

## PLAINTIFF HAS NOT SUFFICIENTLY DEMONSTRATED ENTITLEMENT TO SUMMARY JUDGMENT

In this case, it is respectfully submitted that plaintiff has failed to establish its entitlement to summary judgment because it is using inadmissible testimony. Throughout many of the depositions, the time period at issue was only occasionally referenced, and given the overlap and variance with which workers came and went from GIS' job sites, it is not at all clear which employees were allegedly underpaid during the time period at issue. In addition, plaintiff has mischaracterized deposition testimony and cited to testimony that doe not support its statements. *See* Defendant's Response to Plaintiff's Statement of Undisputed Material Facts. Therefore, plaintiff has not demonstrated "as a matter of just and reasonable inference" that all of the listed employees have been underpaid for the purposes of the FLSA. *See Reich v. Southern New Eng. Telcoms. Corp.,* 121 F.3d 58, 66-67 (2d Cir. 1997).

## POINT III

### THE WORKERS' OPINIONS WITH RESPECT TO WHETHER THEY WERE "EMPLOYEES" ARE NOT ENTITLED TO ANY EVIDENTIARY WEIGHT

To the extent that plaintiff relies on the statements of any subcontractors where they allege that they were employees of GIS, those opinions are not entitled to any weight with respect to the court's determination as to whether they are employees or independent contractors for the purposes of the FLSA. "Legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *United States v. Bonanno Organized Crime Family*, 879 F.2d 20, 27 (2d Cir. 1989); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

## POINT IV

### PLAINTIFF'S REPRESENTATIVE EVIDENCE IS INSUFFICIENT TO MEET PLAINTIFF'S BURDEN WITH RESPECT TO THE ENTIRE POOL OF EMPLOYEES

While it is true that not every worker needs to testify, a sufficient number of employees must testify to establish the commonality of claims with respect to all plaintiffs and to permit the

court to draw reasonable inferences from their testimony. *See McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 812, 825-826 (D.N.J. 1989); *Solis v. Sec. Credit Sys.*, 2011 U.S. Dist. LEXIS 27613 at *10 (W.D.N.Y. Mar. 15, 2011). Although there is no "magic formula" for determining what number of plaintiffs must testify, the court may consider the "the nature of the work involved, the working conditions and relationships, and the detail and credibility of the testimony." *Reich*, 121 F.3d at 67-68 (quotation omitted).

In this case, 13 workers/employees testified out of the 340 (approximate) listed on Ex. A to plaintiff's Complaint. These workers were Landman, Davis II, Crouse, Smith, Chase, Huerta, J. Anguiano, L. Anguiano, P. Davis, Carr, Snyder, Butler and Lara. Notably, deponents Carl, Hamilton, Kelly, and Sanders are not on Ex. A to plaintiff's Complaint. Some of the 340 were provided by the labor brokers and some contracted directly with GIS. Of the 236 workers supplied by the labor brokers (*see* the Affidavit of John Sangster) only four (4) workers/subcontractors were deposed (Landman, Huerta, Javier and Luis Anguiano). Plaintiff attempts to piece portions of their testimony together with that of the owners of ASR and Carver's companies to establish their entitlement to summary judgment. However, much of their testimony is inadmissible and the case law is clear that it is the workers' testimony that is needed. Based on the small percentage of workers testifying (4% overall and only 2% of the labor broker supplied workers/employees) and the questionable ability of those workers to represent the entire pool, it is respectfully submitted that this is not a sufficient amount of evidence to establish that all of the workers at issue are entitled to summary judgment. *See e.g. McLaughlin v. Ho Fat Seto*, 850 F.2d 586 (9th Cir. 1988), *cert denied*, 488 U.S. 1040, 109 S. Ct. 864 (1989) (5 employees testified out of 28); *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113 (4th Cir. 1985) (testimony of 22 employees supported award of backpay to group of 98

22

employees); *Donovan v. Williams Oil Co.*, 717 F.2d 503 (10th Cir. 1983) (testimony of 19 supported award to group of 34); *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11th Cir. 1982) (23 employees testified, 207 employees received an award, and an award was denied to 56 non-testifying employees); *Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5th Cir. 1973) (testimony of 16 supported award to 26); *McLaughlin v. DialAmerica Marketing, Inc.*, 716 F. Supp. 812 (D.N.J. 1989) (43 out of 393 employees testified).

It is submitted that this case falls more in line with those cases which have held that testimony was taken from an insufficient number of employees or that the testimony that was taken was not sufficiently demonstrative of the claims of the entire group of plaintiffs. *See West v. Border Foods, Inc.*, 2006 U.S. Dist. LEXIS 96963 (D. Minn. June 12, 2006) (plaintiffs' showing that 6 out of 240 employees were required to work off of the clock did not support plaintiffs' claim of "widespread violations resulting from a common policy or plan"); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042 (N.D. Ill. 2003) (demonstration of payment practice of 2 out of 50 employees did not establish a 'modest factual showing' of a common policy or plan for purposes of order authorizing notice to similarly situated plaintiffs); *Reich v. Gateway Press*, 13 F.3d 685 (3d Cir. 1994) (remanding and questioning whether Secretary met burden of proof where 22 out of 70 employees testified).

As can be readily seen from the evidence, there are many different subdivisions within the class of non- "bona fide" workers, including employees hired directly by GIS and those which came to GIS by referral through labor brokers. *See* Pl. Ex. 3, at 21:5-7, 24:7-17; *see also* Pl. Ex. 8, at 61:5-62:8; Pl. Ex. 10, at 82:25-83:3.  There was also significant overlap concerning the workers at issue, who sometimes worked for multiple entities while working on GIS projects. *See* Pl. Ex. 25, at 50:25-51:11; Pl. Ex. 27, at 85:3-12, 112:24-113:12, 114:4-115:18.

Additionally, as previously discussed, the length of time which workers worked varied wildly. *See* Ex. 9, at 39:19-40:8; Pl. Ex. 25, at 89:9-21, 104:15-105:9, 151:13-19; Pl. Ex. 26, at 85:19-86:4; *see also* Pl. Ex. 14, at 11:10-12; Pl. Ex. 15, at 8:21-9:7; Pl. Ex. 27 at 34:23-36:6. Even the level of skill amongst employees hired from the labor brokers varied. *See* Pl. Ex. 8, at 20-25.

Throughout the depositions, including, but not limited to, those of Mento, Paul Davis, Davis II, Smith, Snyder, and Chase, the time period at issue was often only occasionally referenced, leaving one to question whether there was sufficient representation of GIS' pay practices during the period of July 2005 to July 2008. Other testimony, such as that of Carver, Crim, Doran, and Butler also concerned GIS' practices from partially or entirely outside of the time period at issue on this motion. Still others, such as Jose Huerta and Luis Anguiano, could not even recall without being refreshed exactly what time periods they worked for GIS.

Therefore, it is respectfully submitted that plaintiff has not tendered sufficient evidence to demonstrate that the entire class of workers was properly represented.

## **CONCLUSION**

Based on the foregoing reasons, it is respectfully submitted that plaintiff's motion for partial summary judgment should be denied in all respects.


Dated:      Syracuse, New York
            September 23, 2011


                        GOLDBERG SEGALLA LLP
                        *Attorneys for Defendants*


                        By: David E. Leach, Esq.
                        (Bar Roll No.: 507434)
                        5786 Widewaters Parkway
                        Syracuse, New York 13214
                        (315) 413-5400

To:    Evan R. Barouh, Esq.
        Jeffrey Ruzal, Esq.
        U.S. Department of Labor
        *Attorneys for Plaintiff*
        Office of the Solicitor, Reg. II
        201 Varick Street, Room 983
        New York, NY 10014
        Tel. (646) 264-3668

Get a Document - by Citation - 2010 U.S. Dist. LEXIS 33264
Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 31 of 102
Page 1 of 28

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's*® | More | | History | Alerts |

**FOCUS™** Terms        Advanced...   **Get a Document**        View Tutorial

Service: **Get by LEXSEE®**
Citation: **2010 U.S. Dist. LEXIS 33264**

*2010 U.S. Dist. LEXIS 33264, \*; 159 Lab. Cas. (CCH) P35,732*

ANDREW CLARKE and TAPAS SARKAR, Individually and on Behalf of Others Similarly Situated, Plaintiffs, -against- JPMORGAN CHASE BANK, N.A., Defendant.

08 Civ. 2400 (CM)(DCF)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2010 U.S. Dist. LEXIS 33264; 159 Lab. Cas. (CCH) P35,732

March 26, 2010, Decided
March 26, 2010, Filed

**PRIOR HISTORY:** Clarke v. J.P. Morgan Chase & Co., 2009 U.S. Dist. LEXIS 54061 (S.D.N.Y., June 19, 2009)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant employer filed a motion for summary judgment in the putative collection action brought by plaintiffs, current and former employees of defendant who were allegedly misclassified as exempt from the overtime requirements of the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq. The court addressed the claims of the two named plaintiffs only.

**OVERVIEW:** Plaintiff 1 worked in defendant's IT department until his employment ended in 2007. In 2005, he was among many of defendant's employees who were reclassified as nonexempt. Plaintiff 1 remained overtime eligible from that date until he voluntarily left defendant's employment. Plaintiff 2 worked as a computer specialist for defendant and in 2008, his job, among hundreds of others, was reclassified as overtime eligible. The court held that Plaintiff 1's claim under the FLSA was time-barred. The court found that Plaintiff 1 failed to make a factual showing here that there was any genuine issue about whether defendant willfully violated the FLSA's overtime provisions. Thus, the two-year statute of limitations governed Plaintiff 1's FLSA claim and was time barred. Likewise, Plaintiff 2's claim was time-barred but it also failed because he was exempt from the FLSA and New York state overtime law requirements under the FLSA's computer employee exemption, 29 U.S.C.S. § 213(a)(17).

**OUTCOME:** The court granted defendant's motion for summary judgment.

**CORE TERMS:** overtime, exemption, summary judgment, server, exempt, team, user, job duties, reclassification, network, statute of limitations, willful, certification, remediation, discovery, undisputed, software, frame, deposition, eligible, collective action, willfulness,

opinion letters, primary duty, reclassified, technology, training, desktop, spent, space

**LEXISNEXIS® HEADNOTES**                                                    ⊟ **Hide**

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔍

Civil Procedure > Summary Judgment > Supporting Materials > Affidavits 🔍

*HN1* ⬇ It is well-settled that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment. Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiffs affidavit opposing summary judgment and that affidavit contradicts his own prior deposition testimony.  More Like This Headnote | *Shepardize*: Restrict By Headnote

Civil Procedure > Summary Judgment > Standards > Genuine Disputes 🔍

Civil Procedure > Summary Judgment > Standards > Legal Entitlement 🔍

Evidence > Inferences & Presumptions > Inferences 🔍

*HN2* ⬇ A party is entitled to summary judgment when there is no genuine issue as to any material fact and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor.  More Like This Headnote |
*Shepardize*: Restrict By Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants 🔍

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔍

Civil Procedure > Summary Judgment > Standards > Materiality 🔍

*HN3* ⬇ The moving party on a motion for summary judgment has the initial burden of demonstrating the absence of a disputed issue of material fact. Once such a showing has been made, the nonmoving party must present specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The party opposing summary judgment may not rely on conclusory allegations or unsubstantiated speculation. Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment.  More Like This Headnote | *Shepardize*: Restrict By Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔍

Civil Procedure > Summary Judgment > Standards > Appropriateness 🔍

*HN4* ⬇ To withstand a motion for summary judgment, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict.  More Like This Headnote |
*Shepardize*: Restrict By Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations 🔍

Labor & Employment Law > Wage & Hour Laws > Wage Payments 🔍

*HN5* ⬇ The statute of limitations for a Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq.,
overtime claim is two years, except that the limitations period is three years for a
claim arising out of a willful violation. 29 U.S.C.S. § 255(a). The statute of
limitations for an overtime claim under the New Jersey Wage and Hour Law,
N.J.S.A. § 34:11-56a25.1, is also two years, with no exception for willful violations.
A cause of action accrues at each payday following an allegedly unlawful pay
period.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Procedural Considerations > Burdens of Proof > Allocation 🔍

Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations 🔍

Labor & Employment Law > Wage & Hour Laws > Wage Payments 🔍

*HN6* ⬇ An employer willfully violates the Fair Labor Standards Act (FLSA), 29 U.S.C.S. §
201 et seq., only if it either knew or showed reckless disregard for the matter of
whether its conduct was prohibited by the statute. Reckless disregard involves
actual knowledge of a legal requirement, and deliberate disregard of the risk that
one is in violation. A willful violation requires more than mere negligence. The
plaintiffs must prove more than that the defendant should have known it was
violating the law. Willfulness cannot be found where the employer acted negligently
or assumed in good faith, but incorrectly, that its conduct complied with the FLSA.
Further, an employer does not willfully violate the FLSA even if it acted
unreasonably, but not recklessly, in determining its legal obligation. The employee
bears the burden of proving willfulness.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔍

Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations 🔍

Labor & Employment Law > Wage & Hour Laws > Wage Payments 🔍

*HN7* ⬇ The fact that the United States Congress did not simply extend the limitations
period to three years, but instead adopted a two-tiered statute of limitations, makes
it obvious that Congress intended to draw a significant distinction between ordinary
violations and willful violations under the Fair Labor Standards Act (FLSA), 29
U.S.C.S. § 201 et seq. Proof of willfulness requires a factual showing of an
employer's knowing or reckless violation of the FLSA. An FLSA plaintiff seeking to
invoke the three-year limitations period cannot survive a motion for summary
judgment unless he makes a competent demonstration that there is a trial worthy
issue as to whether the employer either knew or showed reckless disregard for the
matter of whether its conduct was prohibited by the statute.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Labor & Employment Law > Wage & Hour Laws > Remedies > Private Suits 🔍

Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations 🔍

Labor & Employment Law > Wage & Hour Laws > Wage Payments 🔍

**HN8** A Fair Labor Standards Act (FSLA), 29 U.S.C.S. § 201 et seq., collective action overtime suits are often prompted by a reclassification; if the mere fact of a reclassification were enough to trigger the exceptional three-year limitations period, it would cease to be an exception. That is clearly not what the United States Congress intended when it passed the two-tiered statute of limitations in 1966. In a decision from the Eastern District of Louisiana, the court held that the defendant's reclassification of a plaintiff as an hourly employee and its payment of back overtime pay after a United States Department of Labor audit is not evidence that defendant willfully violated the FLSA.  More Like This Headnote |
*Shepardize: Restrict By Headnote*

Civil Procedure > Summary Judgment > Standards > Appropriateness

Labor & Employment Law > Wage & Hour Laws > Statutes of Limitations

Labor & Employment Law > Wage & Hour Laws > Wage Payments

**HN9** The question of willfulness under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., absent genuinely disputed issues of fact, is properly decided on summary judgment.  More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Evidence > Documentary Evidence > Affidavits

**HN10** A party cannot contradict its own pleading with affidavits. The allegations in the complaint are judicial admissions by which a plaintiff is bound throughout the course of the proceeding. Judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants

Civil Procedure > Summary Judgment > Opposition > General Overview

**HN11** Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in the United States District Court for the Southern District of New York have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees

**HN12** Under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., employees must be compensated for every hour worked over 40 per week at a rate not less than one and one-half times the regular rate at which he is employed. 29 U.S.C.S. § 207(a)(1). However, the FLSA provides that certain categories of employees are exempt from its overtime requirements. Some exemptions are: the administrative

employee exemption, pursuant to 29 U.S.C.S. § 213(a)(1); the computer employee exemption under § 213(a)(17); the combination exemption under 29 C.F.R. § 541.708; the highly compensated employee exemption under 29 C.F.R. § 541.601.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees 🔍

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
   Executives & Professional Employees 🔍

*HN13* ⬇ N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 expressly provides that New York's overtime requirement is subject to the exemptions of the Fair Labor Standards Act, 29 U.S.C.S. §§ 207 and 213. There is general support for giving FLSA and the New York Labor Law consistent interpretations.  More Like This Headnote

Evidence > Procedural Considerations > Burdens of Proof > Allocation 🔍

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
   Executives & Professional Employees 🔍

*HN14* ⬇ Because the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., is a remedial law, courts must narrowly construe its exemptions. The employer has the burden of proving that the employee clearly falls within the terms of the overtime exemption under 29 U.S.C.S. § 213.  More Like This Headnote

Civil Procedure > Trials > Jury Trials > Province of Court & Jury 🔍

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
   Executives & Professional Employees 🔍

*HN15* ⬇ Whether an employee is exempt from the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213, overtime coverage is a mixed question of law and fact. The question of how the employee spent his working time is a question of fact. The question whether his particular activities excluded him from the overtime benefits of the FLSA is a question of law. Thus, the ultimate question of a particular worker's exemption, based on factual findings as to his actual work activities, requires a conclusion of law.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
   Executives & Professional Employees 🔍

*HN16* ⬇ Under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), the FLSA exempts from its overtime requirements any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is: (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications; (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs,

including prototypes, based on and related to user or system design specifications; (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $ 27.63 an hour.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees

**HN17** The term primary duty set forth in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), means the employee's principal, main, major or most important duty. 29 C.F.R. § 541.700 defines primary duty for purposes of executive, administrative, professional, computer and outside sales employee exemptions. In determining an employee's primary duty, courts look to all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. 29 C.F.R. § 541.700. The amount of time an employee spends performing exempt work can be a useful guide in determining whether his primary duty consists of exempt work. Employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees

**HN18** The computer employee exemption to overtime payments set forth in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), applies to a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker. Thus, an employee's job duties, not his job title, determine whether the exemption applies. 29 C.F.R. § 541.400. Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of the computer employee exemption. Where the prescribed duties tests are met, the computer exemption may be applied regardless of the job title given to the particular position.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions > Executives & Professional Employees

**HN19** The exemption in the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 213(a)(17), broadens the coverage of computer services personnel from that included in the prior § 213(a)(1) computer professional exemption and the 1991 United States Department of Labor regulations in three significant ways. Most notably, it eliminates the requirement that the employee's work require the exercise of independent judgment and discretion. It also eliminates any reference to educational requirements, and dispenses with the requirement that the employee must have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Employees

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
    Executives & Professional Employees 🔍

*HN20* The exempt status of a given employee from overtime depends upon an analysis of
    the employee's job duties. 29 C.F.R. § 541.2 The exempt or nonexempt status of
    any particular employee must be determined on the basis of whether the
    employee's salary and duties meet the requirements of the
    exemption.  More Like This Headnote

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants 🔍

Civil Procedure > Summary Judgment > Opposition > Supporting Materials 🔍

*HN21* Under Fed. R. Civ. P. 56(f), if a party opposing the summary judgment motion
    shows by affidavit that, for specified reasons, it cannot present facts essential to
    justify its opposition, the court may: (1) deny the motion; (2) order a continuance
    to enable affidavits to be obtained, depositions to be taken, or other discovery to
    be undertaken; or (3) issue any other just order. However, it is well established
    that Rule 56(f) applies to summary judgment motions made before discovery is
    concluded.  More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🔍

Labor & Employment Law > Wage & Hour Laws > Defenses & Exemptions >
    Executives & Professional Employees 🔍

*HN22* The computer employee exemption set forth in the Fair Labor Standards Act
    (FLSA), 29 U.S.C.S. § 213(a)(17), does not require the exercise of discretion and
    independent judgment.  More Like This Headnote


**COUNSEL:  [*1]** For Andrew Clarke, individually and on behalf of all others similarly situated,
Tapas Sarkar, individually and on behalf of all others similarly situated, Plaintiffs:
Adam T Klein ▾, Jack A. Raisner ▾, LEAD ATTORNEYS, Outten & Golden, LLP (NYC), New York,
NY; Eve H. Cervantez ▾, LEAD ATTORNEY, James M. Finberg ▾, PRO HAC VICE, Altshuler
Berzon, L.L.P., San Francisco, CA; Jahan C. Sagafi ▾, LEAD ATTORNEY, Kelly Dermody, Lieff
Cabraser Heimann & Bernstein, LLP(SF), San Francisco, CA; Peter E. Leckman ▾, LEAD
ATTORNEY, Altshuler Berzon LLP, San Francisco, CA; Rachel Geman ▾ Lieff Cabraser Heimann &
Bernstein, LLP, New York, NY.

For J.P. Morgan Chase & Co., Defendant: Debra S. Morway, Morgan, Lewis and Bockius LLP
(NY), New York, NY; Sam Scott Shaulson ▾ Morgan, Lewis & Bockius LLP (New York), New York,
NY; Sarah E. Bouchard ▾, PRO HAC VICE, Morgan, Lewis & Boukius, LLP, Philadelphia, Pa.

**JUDGES:** Colleen McMahon ▾, U.S.D.J.

**OPINION BY:** Colleen McMahon ▾


**OPINION**


DECISION AND ORDER GRANTING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT AND
DENYING AS MOOT PLAINTIFFS' MOTION FOR CONDITIONAL COLLECTIVE ACTION

## CERTIFICATION

McMahon ▾, J.:

## INTRODUCTION

Plaintiffs Andrew Clarke ("Clarke") and Tapas Sarkar ("Sarkar") bring this putative collective action  **[*2]** against defendant JPMorgan Chase ▾Bank, N.A. ("JPM" or "Defendant"), asserting claims individually and on behalf of hundreds of similarly situated current and former JPM information technology ("IT") employees, under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"), Article 19 of the New York Labor Law ("NYLL") and the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a et seq. ("NJWHL"). Plaintiffs allege that JPM violated the overtime pay requirements of the FLSA, NYLL and NJWHL by failing to compensate them for hours worked in excess of forty per week.

Three motions are pending before the Court: (1) JPM's motion for summary judgment on the claims of Plaintiff Clarke (the "Clarke Summary Judgment Motion"); (2) JPM's motion for summary judgment on the claims of Plaintiff Sarkar (the "Sarkar Summary Judgment Motion"); and (3) Plaintiffs' motion for conditional collective action certification. For the reasons set forth below, the Court grants JPM's summary judgment motions. Plaintiffs' collective action certification motion is therefore denied as moot.

## BACKGROUND

### I. The Claims Asserted and the Putative Classes

Plaintiffs filed their complaint (the "Complaint") on March 7, 2008.  **[*3]** The Complaint asserts three causes of action.

Count I is the FLSA claim, brought by both Plaintiffs individually, and as a putative collective action pursuant to 29 U.S.C. § 216(b) on behalf of current and former JPM IT employees who were allegedly misclassified by JPM as exempt from the FLSA's overtime requirements, and later reclassified as nonexempt--i.e., overtime eligible. (See Compl. PP 23-25, 39-46.) Count II is the NJWHL claim, brought by Plaintiff Clarke individually and as a putative class action pursuant to Federal Rule of Civil Procedure 23 on behalf of similarly situated current and former IT employees who worked in New Jersey (the "New Jersey Class"). (See id. PP 27-28, 47-53.) Count III is the NYLL claim, brought by Plaintiff Sarkar individually and as a putative Rule 23 class action on behalf of similarly situated current and former IT employees who worked in New York (the "New York Class"). (See id. PP 29-30, 54-60.)

Plaintiffs seek, inter alia, damages in the amount of their unpaid overtime wages, an award of liquidated damages pursuant to § 216(b), attorneys' fees and expenses.

### II. The Pending Motions

JPM argues that it is entitled to summary judgment on Clarke's claims  **[*4]** because they are time-barred, and that even if his claims are timely, Clarke was exempt from FLSA overtime coverage. (Def.'s Mem. in Supp. of Summ. J. Mot. to Dismiss Claims of Pl. Clarke, Apr. 14, 2009, at 1-2.) JPM argues that it is entitled to summary judgment on Sarkar's claims because he was exempt from FLSA and NYLL overtime provisions under several different exemptions, including the computer employee exemption. (Def.'s Mem. in Supp. of Summ. J. Mot. to Dismiss Claims of Pl. Sarkar, Apr. 14, 2009 ("Def.'s Sarkar Mem."), at 1-2.) Sarkar opposes JPM's summary judgment motion on the merits, but also submits a Rule 56(f) affidavit, asking the Court to deny JPM's motion on Rule 56(f) grounds or, alternatively, to stay its decision and order additional discovery. (See Decl. of Adam T. Klein in Supp. of Pls.' Opp. to Def.'s Sarkar Summ. J. Mot., Pursuant to Fed. R. Civ. P. 56(0, May 14, 2009 ("Klein 56(f) Decl."), P 27.)

For the reasons stated herein, the Court finds that Clarke's claims are time-barred and that Sarkar was exempt as a computer employee, and rejects Sarkar's Rule 56(f) application. Accordingly, the Court grants summary judgment to JPM on both Plaintiffs' claims, mooting **[\*5]** Plaintiffs' certification motion.

### III. Facts

The undisputed facts relevant to JPM's summary judgment motions are taken from the parties' Rule 56.1 statements, and from certain deposition testimony, declarations and documents.

### A. JPM

JPM is a global financial services firm that provides a variety of products and services, including investment banking, mortgages, loans, retail banking, private banking and wealth management. (Def.'s Rule 56.1 Stmt. in Supp. of Sarkar Summ. J. Mot., Apr. 14, 2009 ("Def.'s Sarkar 56.1 Stmt."), P 3.) [1] Each of these various business units is referred to as a "line of business" or "LOB." (Id.) As a normal practice, JPM periodically reviews the exempt status of its jobs to ensure that they are classified consistent with FLSA overtime requirements. (Pls.' Resp. to Def.'s Clarke 56.1 Stmt. & Pls.' Stmt. of Add'l Material Facts, June 30, 2009 ("Clarke 56.1 Cntrstmt."), P 98.)

#### FOOTNOTES

[1] When the Court cites only Defendant's Rule 56.1 statement, that means the cited paragraph is expressly admitted in the corresponding paragraph in Plaintiffs' Rule 56.1 counterstatement; otherwise, when taking undisputed facts from the parties' Rule 56.1 statements, the Court cites paragraphs **[\*6]** from both parties' statements or only from Plaintiffs' counterstatement.

### B. Andrew Clarke

Because the Court finds that Plaintiff Clarke's claims are time-barred, the Court sets forth only those limited facts relevant to the timeliness of his claims. The Court does not get into the nature of Clarke's job duties, as it need not decide whether he was exempt from the FLSA's overtime requirements.

Andrew Clarke worked in JPM's IT department until his employment at JPM ended on June 11, 2007. (Def.'s Rule 56.1 Stmt. in Supp. of Clarke Summ. J. Mol., Apr. 14, 2009 ("Def.'s Clarke 56.1 Stmt."), P 7; Clarke 56.1 Cntrstmt. PP 3, 7.) Prior to August 1, 2005, Clarke was classified as overtime exempt. (See Def.'s Clarke 56.1 Stmt. P 2.)

It is undisputed that on August 1, 2005, Clarke was among many JPM employees who were reclassified as nonexempt. (See id.; Clarke 56.1 Cntrstmt. PP 98-101; Def.'s Resp. to Clarke 56.1 Cntrstmt., July 17, 2009, PP 98-101.) Clarke remained overtime eligible from that date until he voluntarily left JPM in June 2007. (See Clarke 56.1 Cntrstmt. P 3.) Nor can it be disputed that Clarke did, in fact, receive overtime from August 2005 until he left JPM. (See id. P 5; Aff. of **[\*7]** Debra Morway in Supp. of Def.'s Clarke Summ. J. Mot., Apr. 14, 2009, Ex. A (Dep. of Andrew Clarke, Feb. 13, 2009 ("Clarke Dep.")), 44:5-46:24, 63:13-24; Pls.' Mem. in Opp. to Def.'s Clarke Summ. J. Mot., June 30, 2009 ("Clarke Opp."), at 10 n.4.)

### C. Tapas Sarkar

The Rule 56.1 statements submitted in connection with the Sarkar Summary Judgment Motion rely predominantly on Sarkar's extensive deposition testimony. Sarkar's testimony clearly shows that his job duties place him within the FLSA's computer employee exemption.

Get a Document - by Citation - 159 Lab. Cas. (CCH) P 35,732
Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 40 of 102
Page 10 of 28

In a transparent attempt to avoid summary judgment, Sarkar submits a self-serving declaration that contradicts certain portions of his deposition, sworn to just *three months* after he was deposed. (See Decl. of Tapas Sarkar, May 13, 2009 ("Sarkar Decl.").) However, **HN1** "it is well-settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) (quoting Mack v. United States, 814 F.2d 120, 124-25 (2d Cir. 1987)); accord Cordell v. Verizon Comm'ns, Inc., 331 Fed. Appx. 56, 58 (2d Cir. 2009) ("[F] actual allegations that might **[*8]** otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiffs affidavit opposing summary judgment and that affidavit contradicts [his] own prior deposition testimony." (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)).

Further, Sarkar's Rule 56.1 Counterstatement, which relies heavily on his post-deposition declaration, attempts to manufacture disputes by citing various snippets of his testimony that, if taken out of context, could be said to support his position. (See Pls.' Resp. to Def.'s Sarkar 56.1 Stmt. & Pls.' Stmt. of Add'l Material Facts, May 14, 2009 ("Sarkar 56.1 Cntrstmt."),) However, the Court looks to the entirety of the Sarkar deposition testimony submitted by the parties in determining whether material facts are *genuinely* in dispute.

## 1. Sarkar's Position at JPM

Tapas Sarkar began working for JPM in December 2002. (Def.'s Sarkar 56.1 Stmt. P 62; Sarkar 56.1 Cntrstmt. P 62.) When he was hired, Sarkar understood that he would be paid a salary and would not be paid overtime. (Dep. of Tapas Sarkar, Feb. 11, 2009 ("Sarkar Dep."), 51:20-52:3.) ² Sarkar's annual compensation ranged from $ 78,850 **[*9]** in 2003 to $ 101,932 in 2007. (Id. 54:3-10, 55:17-22.) At all times while at JPM, Sarkar earned well more than $ 455 per week. (See id. 53:11-54:2.)

**FOOTNOTES**

**2** Pages from Sarkar's deposition transcript are attached as exhibits to various affidavits submitted in connection with the Sarkar Summary Judgment Motion. Throughout this opinion, the Court cites directly to the transcript itself.

Before being hired by JPM, Sarkar earned two technical certifications, as a Certified Novell Engineer ("CNE") and as a Microsoft Certified Systems Engineer ("MCSE"). (Sarkar 56.1 Cntrstmt. P 60.) The CNE certification enabled Sarkar to "understand" Novell's Netware, a network operating system. (See Sarkar Dep. 22:25-23:16.) To obtain his CNE, Sarkar attended a ten-month course, during which he had to pass approximately seven exams. (Id. 22:6-21, 23:25-24:13.) According to Novell's website, the CNE "has been recognized as the IT industry's leading certification for advanced networking and troubleshooting," and teaches its holder to "solve advanced company-wide support problems and high-level network problems." (See Aff. of Debra Morway in Supp. of Def.'s Sarkar Summ. J. Mot., Apr. 14, 2009 (Morway Sarkar Aff."), **[*10]** Ex. A-l.)

Sarkar is a member of JPM's Global Technology Infrastructure ("GTI"), which has at times been called Enterprise Technology Services ("ETS"). (See Def.'s Sarkar 56.1 Stmt. P 5; Sarkar 56.1 Cntrstmt. P 5.) GTI is part of JPM's IT department, and manages the file and print aspects of JPM's global computer network; GTI serves all of JPM's various LOBs. (See Sarkar Dep. 58:24-60:14,62:9-14.)

From the time he was hired until July 1, 2005, Sarkar worked as a Senior Technology Officer. (Morway Sarkar Aff. Ex. B (JPM Job Profile for Tapas Sarkar).) Sarkar then held the title of Distributed Computing Engineer II until May 1, 2007, when he became a Technology Operations

Analyst. (Id.) Each of those positions was classified as overtime exempt. (Sarkar Decl. P 2.) On January 1, 2008, Sarkar was one of hundreds of JPM employees reclassified as overtime eligible. (See id.; Decl. of Courtney Smith Goodrich, May 13, 2009 ("Goodrich Decl."), P 4.) On February 1, 2008, Sarkar was promoted to Vice President, which is an exempt position. (Sarkar Decl. P 2.) During this period, from 2003 to 2008, the nature of Sarkar's primary job duties remained essentially the same. (Id. PP 3-4; Sarkar Dep. 253:2-10.)

## 2.  [*11] Sarkar's Job Duties

The bulk of Sarkar's work at JPM has been on the computer; since at least 2005, "[a]lmost 100 percent" of his work has been on the computer. (Sarkar Dep. 69:10-70:24.) In 2007 and 2008, Sarkar worked on a Novell Services Group ("NSG") "SWAT Team" led by Jodi Shinney. (See Morway Sarkar Aff. Ex. D (Dep. of Jodi Shinney, Feb. 26, 2009 ("Shinney Dep.")), 35:2-22.) The SWAT Team had eight members, each of whom had different areas of expertise. (See id.) Sarkar worked to support the operation of JPM's Novell network with respect to file and print functionality and storage capacity. (See id.; Sarkar Dep. 61:11-62:14.) During his time at JPM, Sarkar's job duties have included: capacity management; Novell Distributed Print Services ("NDPS") remediation; resolution of escalated server-related issues; special projects; and the creation and updating of technical manuals.

### i. Capacity Management

Sarkar spent the majority of his time on capacity management. (Sarkar 56.1 Cntrstmt. P 76; Sarkar Dep. 163:20-22.) Capacity management refers to Sarkar's ensuring that users within his area of responsibility had sufficient capacity on Novell servers to store their electronic data. (Sarkar [*12] Dep. 78:6-10.) [3]

#### FOOTNOTES

3 A server is a shared device that routes information and acts as a communicator between different technologies on a network, enabling data, printers and applications to be shared across computers. (Morway Sarkar Aff. Ex. C (Decl. of Jodi Shinney, Mar. 30, 2009 ("Shinney Decl.")), P 4.)

Sarkar was responsible for capacity management in JPM's Northeast region, which includes the New York City area and Delaware. (Sarkar Dep. 73:14-17, 74:9-17.) Sarkar supported multiple LOBs within the Northeast region, but mainly JPM's Investment Bank (id. 78:11-23), which accounted for over $ 12 billion of JPM's revenue in 2008 (Morway Sarkar Aff. Ex. F (Decl. of Una Miller, Mar. 31, 2009)), P 2). Sarkar was responsible for about fifty to sixty physical servers and 1,500 virtual servers, affecting more than 10,000 users. (Sarkar Dep. 76:13-77:17.) [4] In connection with his capacity management work, Sarkar has identified the need to add data servers to JPM's infrastructure. (Def.'s Sarkar 56.1 Stmt. P 66; Sarkar 56.1 Cntrstmt. P 66.) If Sarkar did not do his job correctly, data would be lost, potentially causing financial loss to JPM. (See Def.'s Sarkar 56.1 Stmt. P 9; Sarkar 56.1 Cntrstmt. [*13] P 9.) Sarkar testified that he has "excellent" "[c]omputer skill[s] for storage-related work." (See Sarkar Dep. 203:25-204:17.) Many people at JPM considered Sarkar "the 'go-to' person for capacity management in the Northeast region." (Sarkar Decl. P 27.)

#### FOOTNOTES

4 A standalone server that individually houses resources is a "physical server." (See Morway Sarkar Aff. Ex. C (Shinney Decl.), P 4.) When physical servers exist in a cluster, however, they work together so that if one server goes down, the resources on the failed server migrate to the other, working servers in the cluster, which is called a "virtual server." (Id.) Servers are clustered so that all of the resources necessary to run a large computer network

can be provided. (Id.)

An important aspect of Sarkar's capacity management responsibilities was "put[ting] plans together to . . . remediate a lot of situations in the disk space area." (Sarkar Dep. 242:11-15.) [5] In a performance review, Sarkar's manager stated that "[Sarkar] has engineered improvements in a number of space shortage situations." (See Sarkar Dep. 242:2-25.) When creating a plan for disk space remediation, Sarkar considers the following factors: the space available on **[*14]** the current frame, the clusters that the frame was connected to, future frame growth, frame decommission, Symmetrix Remote Data Facility ("SRDF") needs, [6] and the viability of moving between frames. (Def.'s 56.1 Stmt. PP 72-73.)

**FOOTNOTES**

[5] When Novell servers appear in a cluster, an EMC frame houses storage on physical disks, and the frame is attached by cables to the cluster of servers. (See Morway Sarkar Aff. Ex. C (Shinney Decl.), P 4.) Chunks of storage from the EMC frame, called "volumes," are assigned to the server clusters. (Id.) These volumes, which are often referred to as virtual servers, house data for JPM's LOBs and are allocated based on the needs of the business. (Id.)

[6] SRDF is a data replication mechanism between two EMC frames that ensures changes in data are replicated to a disaster recovery copy of the data nearly instantaneously. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 190:19-24.)

For example, it is undisputed that in October 2007, Sarkar devised a disk space remediation plan for JPM data centers in New York City and Brooklyn. (Def.'s Sarkar 56.1 Stmt. P 16; Sarkar 56.1 Cntrstmt. P 16.) Sarkar attached the draft plan (contained in a series of spreadsheets) to an email dated **[*15]** October 10, 2007, which he sent to several JPM employees, including Jodi Shinney. (See Morway Sarkar Aff. Ex. A-6.) Sarkar's email states that implementing the plan, which he "put together to achieve some disk space remediation goals by the end of this year," was "not going to be straight forward and easy." (Id.) Sarkar then listed numerous technical issues relating to the plan that he anticipated encountering and/or that needed to be considered. (Id.; Sarkar Dep. 117:14-24.)

It is also undisputed that Sarkar developed remediation plans for JPM's LOBs. (Def.'s Sarkar 56.1 Stmt. P 69; Sarkar 56.1 Cntrstmt. P 69.) In response to an LOB's request for additional capacity, Sarkar would design a plan to meet its needs. (Sarkar Dep. 214:22-216:2.) In developing the plan, Sarkar would consult with the LOB--the client--about the LOB's requirements, and about the impact that implementing the plan would have on its business. (Id. 306:9-309:5.) Sarkar provided this sort of "impact analysis" to LOBs on a regular basis. (See id. 308:9-309:5.)

The capacity remediation plans provided to LOBs often involved data migration--i.e., moving data among volumes and server frames. (See id. 92:6-12 (explaining **[*16]** that another option for increasing storage capacity is to allocate more hardware resources to the user community).) Data can be migrated in several different ways, which have various benefits and risks. (See id. 94:4-97:8.) In connection with data migrations, Sarker would discuss numerous technical issues with a liaison at the LOB client, including: the number of login scripts at issue; the complexity of the migration; whether there are any hard-coded databases; the number of users that may be impacted by the migration; and the future capacity needs of the LOB. (Def.'s Sarkar 56.1 Stmt. P 71; Sarkar 56.1 Cntrstmt. P 71; Sarkar Dep. 97:21-98:10.)

**ii. NDPS Remediation**

Novell Distributed Print Services ("NDPS") is a component of the Novell network operating system that enables users to print to certain printers. Sarkar was responsible for NDPS printing for the Northeast region, and estimates that he spent about ten percent of his time on NDPS remediation. (Sarkar Dep. 163:23-164:2, 195:13-18.) Sarkar was considered a subject matter expert ("SME") in NDPS printing. (Def.'s Sarkar 56.1 Stmt. P 39; Sarkar 56.1 Cntrstmt. P 39.) Indeed, Sarkar's team members called him the NDPS "guru." (Def.'s **[*17]** Sarkar 56.1 Stmt. P 59; Sarkar 56.1 Cntrstmt. P 59.) Sarkar testified that he agreed with this assessment of his skills. (Sarkar Dep. 371:3-5.) Other members of Sarkar's team were considered SMEs in their particular areas of expertise. (Sarkar Decl. P 15.)

As part of his NDPS remediation work, Sarkar has drafted detailed plans regarding whether certain printers at JPM sites around the country could be moved off data servers onto EDG servers, or "boxes." (See Sarkar Dep. 218:19-222:2; Morway Sarkar Aff. Ex. D (Shinney Dep.), 157:8-24.) An EDG box is a dedicated server that directs printers. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 157:8-17.) Printer agents can be migrated from data servers to EDG servers in different ways, and Sarkar would suggest an approach to accomplish a particular migration. (See Sarkar Dep. 279:19-281:18.)

To develop these plans, Sarkar would analyze the printing infrastructure at a given site, determine whether it was causing problems, and then make a recommendation--to the LOB and to his manager--about what should be done. (See id. 218:19-222:2.) For example, Sarkar testified that he "did some work for Rochester," which had three servers and a user community **[*18]** of about 1,200 to 2,000, and was "having [a] problem with slowness." (Id. 220:16-21.) Sarkar "looked at that site" and, based on the size of its user community, recommended adding two servers. (Id. 220:22-221:14.) The LOB accepted Sarkar's suggestion, and two additional servers were implemented for that site. (Id. 221:6-14.)

In addition to responding to NDPS concerns at particular locations, Sarkar proactively developed plans to alleviate NDPS issues throughout the country. (See id. 221:15-23.) Sarkar "identif[ied] locations where NDPS should be moved to add servers," "establish[ed] plans to remove inactive printers from strategic trees" and transmitted ideas to the desktop team to create a "more healthy printing environment." (Id. 221:24-223:11.)

### iii. Escalation Work

Sarkar spent about seven or eight percent of his time responding to incidents that had been escalated to his attention. (See Sarkar Dep. 163:3-13.) An incident "ticket" is an electronic form that is filled out when a user or multiple users are having computer problems. (Id. 193:4-7.) An incident ticket typically originates with JPM's helpdesk, which attempts to resolve the issue. (Id. 193:10-194:4.) It is undisputed that **[*19]** Sarkar never worked on the helpdesk. (Def.'s Sarkar 56.1 Stmt. P 65.)

If the helpdesk cannot resolve the issue, it determines where to send the ticket, depending on the nature of the problem. (Sarkar Dep. 194:5-10.) Often, the helpdesk would escalate the issue to desktop support. (See id. 194:11-15.) If desktop support could not resolve the problem, it would be escalated to Sarkar's team within the NSG group. (Id. 194:16-19.) Sarkar admitted that his team was thus referred to as "third level support." (See id. 194:20-24.) Further, when a ticket was assigned to another member of Sarkar's team and he or she could not solve the problem, it was sometimes escalated to Sarkar. (Id. 194:25-195:16.) Tickets that were escalated from other team members to Sarkar typically concerned disk space remediation or NDPS printing. (Id. 195:7-11.) Thus, Sarkar effectively functioned as a fourth point of escalation for certain types of incidents.

Incident tickets are classified according to the severity of the situation, ranging from Priority 1 ("PI") to P3. (Id. 123:24-124:13.) A PI incident is the most serious. (Id. 124:11-13.) For example, an incident is designated PI if it involves "a business, technical, **[*20]** or facility outage where service must be restored within the specified time to repair or deadlines will be

missed," an issue that "results in non-compliance with Federal regulation," or one that "is causing cross-regional impact." (Morway Sarkar Aff. Ex. A-30 (JPM Priority and Severity Guidelines).) There are multiple levels of PI incidents, categorized based on the number of users affected and the amount of potential financial loss. (Id.)

It is undisputed that Sarkar regularly resolved PI issues during his employment at JPM. (Def.'s Sarkar 56.1 Stmt. P 20; Sarkar Dep. 226:2-21.) Indeed, Sarkar testified that he has "always been in the forefront of all critical issues in the Northeast region mostly in Atlas and in some cases in [the] Heritage [Novell network] environment." (Sarkar Dep. 161:9-17.) Sarkar explained that by "critical," he meant "P1, P2 situations." (Id. 161:18-21.) Sarkar also testified that his colleagues and clients sought him out when they needed help with difficult problems. (Id. 172:19-173:4.) While at JPM, Sarkar resolved issues that could have resulted in millions of dollars of losses for the business. (Def.'s Sarkar 56.1 Stmt. P 10.)

When Sarkar tackled escalated **[*21]** incident tickets, and when he dealt with capacity management, NDPS remediation and other issues, he would find the "root cause" of a problem and then figure out how to address it. (Sarkar Dep. 227:20-228:21.) Whenever possible, Sarkar tried to devise a solution that would prevent the issue from recurring. (Id. 229:3-10.) In performing his various duties, Sarkar encountered issues for which there was no documentation, no known solution, (Id. 424:14-18.) Sarkar testified that he was "creative" in performing his duties at JPM. (Def.'s Sarkar 56.1 Stmt. P 54; Sarkar 56.1 Cntrstmt. P 54.) Sarkar applied knowledge obtained from the engineering department, other team members, documentation and classes, as well as his own knowledge, skills and decision-making. (See id. 170:17-172:7, 424:14-425:3.)

In addition, it is undisputed that Sarkar proactively identified issues, thereby preventing potential PI and P2 situations. (Def.'s Sarkar 56.1 Stmt. P 33; Sarkar Dep. 175:7-24.) He has also identified areas for improvement in authentication performance and directory communications. (Def.'s Sarkar 56.1 Stmt. P 30.) For example, when his team was "getting a lot of PI tickets based on new workstation **[*22]** builds, and users [were] not able to log on to the network" at certain buildings, he determined that they "were not communicating to the nearest server" as a result of "authentication errors" in the site codes. (See Sarkar Dep. 139:21-140:10, 141:5-142:23.) Sarkar recommended a change to the specification that would route users to the nearest servers; it was accepted, and engineering corrected the site codes. (Id. 141:5-142:23.)

### iv. Special Projects

One of Sarkar's job duties was to work on "special projects" as they arose. (Def.'s Sarkar 56.1 Stmt. P 11; Sarkar 56.1 Cntrstmt. P 11; Sarkar Dep. 72:15-73:2, 165:17-21.) In 2006 and 2007, Sarkar spent about ten to twelve percent of his time on special projects, including the hardware or server refresh project, which involved the upgrade of Netware servers. (Sarkar Dep. 165:13-21, 231:3-10.) Sarkar identified servers most in need of refresh and determined the priority for their refresh by analyzing the age of the equipment, the criticality to the users and the load that the servers would be under. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 166:3-10.)

Sarkar was also involved in the backup migration project, an effort to ensure that all data **[*23]** is sufficiently backed up, so that it would be available if lost from its primary server. (Morway Sarkar Aff. Ex. C (Shinney Decl.). P 7.) As part of the project, JPM upgraded to a different version of NetBackup software--the product that JPM used to back up data in the Northeast region. (Morway Sarkar Aff. Ex. D (Shinney Dep.), 80:3-8.) Sarkar tested the new version of the software and, in doing so, identified storage issues with the new software that the storage team fixed. (See id. 80:19-81:7.)

### v. Manuals

In 2007, Sarkar drafted a troubleshooting guide for JPM's desktop support team, titled the NDPS Support & Troubleshooting Guide for Desktop Support Team. (Sarkar Dep. 348:23-349:6; Morway Sarkar Aff. Ex. A-25.) Sarkar's purpose in creating the documentation was to enable the desktop support team to resolve relatively straightforward NDPS issues so that they would only escalate more complicated issues--specifically, NDPS issues involving the server, since the desktop support team, unlike Sarkar's team, did not have access to the server. (See Sarkar Dep. 127:2-129:23.) In deciding what to include in the troubleshooting guide, Sarkar relied on materials from the engineering department, **[*24]** as well as his own training, knowledge and experience. (See id. 127:11-25, 352:14-25.)

It is undisputed that Sarkar also edited and updated another manual, called the NDPS Support & Troubleshooting Guide for Server Support Team, and that he is currently listed as the author of that manual. (Def.'s Sarkar 56.1 Stmt. P 27; Sarkar 56.1 Cntrstmt. P 27; Morway Sarkar Aff. Ex. A-26.) The purpose of this document was to guide the server support team in resolving NDPS issues without having to escalate them to Sarkar. (See Sarkar Dep. 349:20-350:3, 353:15-23.)

## DISCUSSION

### I. Standard of Review

*HN2* A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

*HN3* The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. **[*25]** Celotex v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." Anderson, 477 U.S. at 248.

*HN4* To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. Lightfoot v. Union Carbide Corp., 110 F. 3d 898, 907 (2d Cir. 1997).

### II. The Clarke Summary Judgment Motion

*HN5* The statute of limitations for an FLSA overtime claim is two **[*26]** years, except that the limitations period is three years for a claim arising out of a "willful" violation. 29 U.S.C. § 255 (a). The statute of limitations for an overtime claim under the NJWHL is also two years, with no exception for willful violations. See N.J.S.A. § 34:11-56a25.1; Genarie v. PRD Mgmt., Inc., No. 04 Civ. 2082, 2006 U.S. Dist. LEXIS 9705, at *61 (D.N.J. Feb. 17, 2006). A cause of action accrues at "each payday following an allegedly unlawful pay period." Lee v. ABC Carpet & Home, 236 F.R.D. 193, 199 (S.D.N.Y. 2006).

It is undisputed that Clarke was reclassified as overtime eligible and began receiving overtime in August 2005, and continued receiving overtime through the end of his employment at JPM. The Complaint in this case was not filed until March 7, 2008, more than two years after Clarke began receiving overtime.

Plaintiffs "concede that Clarke's individual New Jersey overtime claims are time-barred, because he did not file this action within New Jersey's two-year statute of limitations." (Clarke Opp. at 10 n.4.) Clarke also effectively concedes that his FLSA claim is likewise time-barred unless the three-year statute of limitations for "willful" violations applies--he **[\*27]** argues only that his FLSA claim is "timely for the period from March 7, 2005 (three years before filing the complaint) through the time he was reclassified in August 2005." (Id. at 10.) For the reasons set forth below, Clarke fails to raise any genuine issue about whether JPM's alleged FLSA violations were willful; thus, the ordinary two-year period applies, and Clarke's FLSA claim is time-barred.

In an attempt to somehow assert a timely claim, Clarke also argues--for the very first time-- that he has an overtime claim under *New York* law, which provides for a six-year statute of limitations. That argument is improper and rejected.

## A. Clarke's FLSA Claim Is Time-Barred

*HN6* An employer willfully violates the FLSA only if it "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). "Reckless disregard . . . involves actual knowledge of a legal requirement, and deliberate disregard of the risk that one is in violation." Damassia v. Duane Reade, Inc., No. 04 Civ. 8819, 2005 U.S. Dist. LEXIS 9768, at \*7 n.2 (S.D.N.Y. May 20, 2005) (Lynch, J.). A willful violation requires more than mere **[\*28]** negligence. See id. ("[P]laintiffs must prove more than that defendant 'should have known' it was violating the law."); El v. Potter, No. 01 Civ. 6125, 2004 U.S. Dist. LEXIS 24447, at \*15 (S.D.N.Y. Dec. 13, 2004) ("Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA."). Further, an employer does not willfully violate the FLSA even if it acted "unreasonably, but not recklessly, in determining its legal obligation." McLaughlin, 486 U.S. at 135 n.13; accord Reich v. Waldbaum, Inc., 52 F.3d 35, 39 (2d Cir. 1995). The employee bears the burden of proving willfulness. Young v. Cooper Cameron Corp., 586 F.3d 201, 207 (2d Cir. 2009); Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999).

In determining the meaning of the word "willful" in the FLSA statute of limitations, the McLaughlin Court looked to legislative history. The Court noted that in 1965, the Secretary of Labor had proposed expanding the coverage of the FLSA by replacing the two-year statute of limitations with a three-year period. McLaughlin, 486 U.S. at 132. Congress did not adopt that proposal; instead, in 1966, Congress **[\*29]** enacted "the 3-year exception for willful violations." Id. The Supreme Court concluded that, *HN7* "The fact that Congress did not simply extend the limitations period to three years, but instead adopted a two-tiered statute of limitations, makes it obvious that Congress intended to draw a significant distinction between ordinary violations and willful violations." Id.

Proof of willfulness requires a "factual showing" of an employer's knowing or reckless violation of the FLSA. See Saunders v. City of N.Y., 594 F. Supp. 2d 346, 358 (S.D.N.Y. 2008). An FLSA plaintiff seeking to invoke the three-year limitations period cannot survive a motion for summary judgment unless he "make[s] a competent demonstration that there [is a] trial worthy issue as to whether [the employer] 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'" See Lopez v. Corporacion Azucarera de P.R., 938 F.2d 1510, 1515-16 (1st Cir. 1991) (quoting McLaughlin, 486 U.S. at 133).

For example, in Gustafson v. Bell Atlantic Corp., 171 F. Supp. 2d 311 (S.D.N.Y. 2001), the

plaintiff-employee alleged that Bell Atlantic had "intentionally misclassified him as an independent contractor **[*30]** instead of an employee in order to deny him overtime pay." Id. at 316. Defendants moved for summary judgment on the FLSA claims that had accrued more than two years before the complaint was filed; plaintiff countered that the three-year statute of limitations should apply. See id. at 318, 322-23. Judge Conner concluded that "plaintiff [did] not offer sufficient evidence to carry his burden of proving a willful or reckless violation of the FLSA." Id. at 323. Plaintiff "only speculate[d] that [Bell Atlantic] willfully attempted to conceal plaintiff's eligibility for overtime pay," but there was "nothing in the record to support this allegation." Id. "Similarly, plaintiff offered no credible evidence to support his argument that defendants were reckless in failing to determine whether plaintiff was eligible for overtime pay under the FLSA." Id at 323-24. Judge Conner held that "[p]laintiff's FLSA claim is therefore governed by the two-year statute of limitations," and granted defendants' motion. See id. at 324.

In Yourman v. Dinkins, 865 F. Supp. 154 (S.D.N.Y. 1994), plaintiffs alleged that their New York City agency employers had willfully denied them overtime, when plaintiffs clearly **[*31]** did not qualify as salaried employees and thus were overtime eligible. See id. at 156-58. In determining whether to apply the three-year limitations period to plaintiffs' claims, Judge Preska held that, "To carry their burden of proof on the issue of knowledge, plaintiffs must show that defendants maintained their time and leave policies with full awareness that doing so rendered the classification of plaintiffs as FLSA-exempt improper." Id. at 159.

The Yourman plaintiffs argued that defendants must have been aware of their noncompliance because their policies were "so plainly inconsistent with regulatory requirements for salaried status." Id. However, even if the unlawfulness of defendants' policies was "obvious, that alone is not sufficient to establish defendants' willfulness." Id. at 160. The fact that defendants "lacked a reasonable basis" to believe that their policies complied with the FLSA "will not support a finding [of] willful[ness]." Id. Judge Preska acknowledged that defendants had acted negligently and even unreasonably; but, "in the absence of any evidence that defendants actually perceived the illegality of maintaining their . . . policies," the violations stemming from **[*32]** those policies could not be labeled as willful. Id. Thus, the two-year statute of limitations governed plaintiffs' claims. Id. at 166; see, e.g., Bowrin v. Catholic Guardian Soc'y, 417 F. Supp. 2d 449, 476 (S.D.N.Y. 2006) (finding that "[defendant's] violations of the overtime provisions of the FLSA do not rise to the level of willfulness," as "Plaintiffs have not presented evidence that [defendant] *knew* it was violating the FLSA," and defendant had at least "ma[d]e some effort to ascertain whether it was entitled to an exemption"); Potter, 2004 U.S. Dist. LEXIS 24447, at *40 (holding that "the two year statute of limitations is applicable to Plaintiffs' FLSA claims" because "[n]o genuine issue of material fact exist[ed] as to whether the defendant's conduct was willful").

Here, Plaintiff Clarke has not raised any genuine issue about whether JPM's alleged noncompliance with the FLSA was willful. Indeed, Clarke references only *one* fact in support of his contention that the three-year limitations period should apply: his reclassification in 2005 as overtime eligible.

It is undisputed that, as a normal practice, JPM periodically reviews the exempt status of its employees to ensure they **[*33]** are classified consistent with FLSA requirements. In summer 2005, after a firm-wide examination of its employees' exemption status, JPM reclassified several different job titles as overtime eligible. Clarke was one of the employees reclassified.

None of the documents cited by Clarke in connection with the reclassification suggests that JPM's failure to pay him overtime before August 2005 was a willful violation of the FLSA. (See Decl. of Adam T. Klein in Supp. of Pls.' Opp. to Def.'s Clarke Summ. J. Mot., June 30, 2009 ("Klein Clarke Decl."), Exs. A-C, F.) To the contrary, the internal JPM emails and memoranda cited by Clarke suggest that the reclassification was a good-faith effort to ensure that its classification of IT employees complied with the FLSA--and that the reclassification was likely a conservative measure adopted at a time when FLSA collective action overtime lawsuits were

becoming more and more common. Simply put, even viewed in the light most favorable to Clarke, the reclassification is not evidence that JPM's alleged violation of the FLSA was knowing or reckless. In fact, the documents do not even give rise to the inference that JPM acted negligently or unreasonably, **[*34]** and neither negligence nor unreasonableness constitutes willfulness for FLSA purposes. See McLaughlin, 486 U.S. at 135.

There is little case law touching upon whether an employer's reclassification of an employee can constitute evidence of willfulness. This is likely because the argument is rarely advanced. After all, FLSA **HN8⟱** collective action overtime suits are often *prompted* by a reclassification; if the mere fact of a reclassification were enough to trigger the exceptional three-year limitations period, it would cease to be an exception. That is clearly not what Congress intended when it passed the two-tiered statute of limitations in 1966. See id. at 132.

In one relevant decision from the Eastern District of Louisiana, the court held that "defendant's reclassification of plaintiff as an hourly employee and its payment of back overtime pay after [a] Department of Labor audit is not evidence that defendant willfully violated the FLSA." Gettridge v. Civic Ctr. Site Dev. Co., LLC, No. 01 Civ. 2434, 2002 U.S. Dist. LEXIS 2426, at *8 (E.D. La. Jan. 29, 2002). Here, JPM's reclassification of Clarke as overtime eligible similarly does not constitute evidence that JPM willfully violated the **[*35]** FLSA by classifying him as exempt in the first place.

Clarke presents no other evidence in support of his contention that the three-year limitations period should apply. Other than the four reclassification-related paragraphs in his thirty-five paragraph Rule 56.1 Statement of Additional Material Facts, not a single paragraph is directed to the issue of willfulness. Moreover, even the four paragraphs related to the reclassification are plainly intended to show that the reclassification is evidence that Clarke was, in fact, overtime *eligible--not* that JPM's conduct prior to reclassification was *willful*, in that it knowingly or recklessly was misclassifying him. Instead, Clarke's Rule 56.1 Counterstatement and his brief are devoted almost entirely to showing that Clarke's job duties place him outside the scope of the potentially applicable FLSA exemptions. But without a timely claim, that is all for nought.

Clarke cites two cases in support of his assertion that JPM's alleged FLSA violations were willful. Neither case is at all analogous to this one.

In Yang v. ABCL Corp., 427 F. Supp. 2d 327 (S.D.N.Y. 2005), the defendant, the owner of a jewelry store, "repeatedly stated that he knew that **[*36]** he was required to pay the overtime premium for all hours worked in excess of 40 per week." Id. at 331, 337. Yet, "Despite [defendant's] knowledge of the law's requirement that employees be paid an overtime premium," he refused to pay overtime to plaintiff, who worked weekends and extended hours nearly every day of the week. Id. at 336-37. Judge Sand found that "Such conduct defines a willful violation," and applied the three-year statute of limitations. Id. at 338.

The other case cited by Clarke. Chao v. Vidtape, Inc., 196 F. Supp. 2d 281 (E.D.N.Y. 2002), was an enforcement action brought by the Department of Labor ("DOL") against two related Long Island videotape companies and the three family members who ran them. See id. at 284. The defendants "admitted that they had knowledge of the minimum wage and overtime laws," and one of the defendants had held "a meeting and told his employees to lie [to DOL investigators] about their wages and hours worked." Id. at 295. Not surprisingly, the court concluded that defendants had willfully violated the FLSA.

Here, in stark contrast to Yang and Chao, the merits of Plaintiffs' FLSA claims turn on whether the nature of the specific job duties **[*37]** of certain employees in JPM's IT department render them overtime exempt. This is not a case, unlike Yang and Chao, where a small business owner is fully aware that he is required to pay overtime to his obviously eligible employees, and simply refuses to do so.

More generally, both Yang and Chao--like other cases in this Circuit that have found willfulness,

or at least a triable issue as to willfulness--demonstrate only that Clarke might have been able to invoke the three-year statute of limitations *if* he had presented evidence of similarly culpable conduct by JPM. See, e.g., Young, 586 F.3d at 203-04, 207-08 (affirming district court's finding of willfulness where employer had extensively analyzed the FLSA's overtime provisions and then intentionally "hir[ed] [plaintiff] into the exempt . . . position instead of the nonexempt . . . position in order to avoid paying him overtime, even though his responsibilities did not change based on the different titles"); Kaur v. Royal Arcadia Palace, Inc., 643 F. Supp. 2d 276, 294 (E.D.N.Y. 2007) (concluding that "[w]hether Defendants acted willfully in violating the FLSA [was] a question of fact for the jury" because "Plaintiffs adduced evidence **[*38]** that they had complained to Defendants that Plaintiffs had not received their wages").

Clarke has made no such factual showing here. He has not raised any genuine issue about whether JPM *willfully* violated the FLSA's overtime provisions. Thus, the two-year statute of limitations governs Clarke's FLSA claim, the claim is barred, and JPM is entitled to summary judgment. Cf. Damassia, 2005 U.S. Dist. LEXIS 9768, at *4 (noting that *HN9*⚓question of willfulness, absent genuinely disputed issues of fact, is properly decided on summary judgment).

## B. Clarke's Attempt to Assert a New York Claim Fails

In a last-ditch effort to assert a timely claim, Clarke, in a footnote in his opposition brief, argues for the first time that he falls within the putative *New York* Class represented by Plaintiff Sarkar. (Clarke Opp. at 10 n.4.) The Court rejects Clarke's purported New York claim on two grounds.

First, it is well established that *HN10*⚓a "party cannot contradict its own pleading with affidavits." Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 167 (2d Cir. 2003). "[T]he allegations in the [complaint] are 'judicial admissions' by which [plaintiff is] 'bound **[*39]** throughout the course of the proceeding.'" See id. (quoting Bellefonte Re Ins. Co. v. Argonaut Ins. Co., 757 F.2d 523, 528-29 (2d Cir. 1985) (holding that district court, on summary judgment motion, had "properly disregarded [plaintiff's] affidavits seeking to controvert its own pleading")); see also Soo Line R.R. v. St. Louis S.W. Ry., 125 F.3d 481, 483 (7th Cir. 1997) ("[J]udicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible.").

Here, the Complaint alleges that "Clarke was employed by Defendant in *New Jersey* from approximately 2000 until May 2007," and names Clarke as the representative of the putative New Jersey Class. (Compl. PP 9, 27-28 (emphasis added).) Plaintiff Sarkar represents the putative New York Class, whose members must have been "employed by Defendant in the State of *New York* within the last six (6) years." (Id. PP 29-30 (emphasis added).) Thus, Clarke pled himself out of the New York Class. Now, in his declaration submitted in opposition to summary judgment, Clarke claims that, "From roughly July, 2003 to January, 2004, [he] worked at one of [JPM's] facilities **[*40]** in Long Island, New York." (Decl. of Andrew Clarke, June 30, 2009, P 3.) The Court declines to consider that assertion, as it flatly contradicts what Clarke unequivocally alleged in his pleading.

Second, *HN11*⚓"Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" Beckman v, U,S, Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (quoting Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y. 1997)) (collecting cases).

Clarke does not argue that he pled a New York claim; instead, he inappropriately attempts to raise a New York claim for the first time in his brief in opposition to summary judgment. Allowing Clarke to assert a New York claim would unquestionably prejudice JPM, as it would be forced to litigate the nature of Clarke's pre-2005 job duties (as a result of the NYLL's six-year statute of limitations). Clarke's pre-2005 job responsibilities were not the subject of the fact

discovery that has been closed since March 2009.

For both of the reasons stated **[*41]** above, the Court rejects Clarke's eleventh-hour attempt to assert a New York claim. Because his New Jersey and FLSA claims are time-barred, the Court grants JPM's motion for summary judgment on the claims of Plaintiff Clarke.

### III. The Sarkar Summary Judgment Motion

Plaintiff Sarkar's claims are timely, but they fail for a different reason: Sarkar was exempt from FLSA and NYLL overtime requirements under the computer employee exemption.

### A. FLSA Statutory Framework

*HN12*ꦠUnder the FLSA, employees must be compensated for every hour worked over forty per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). However, the FLSA provides that certain categories of employees are exempt from its overtime requirements. JPM argues that Sarkar falls within one or more of the following exemptions: the "administrative" employee exemption, 29 U.S.C. § 213(a)(1), the "computer" employee exemption, 29 U.S.C. § 213(a)(17), the "combination" exemption, 29 C.F.R. § 541.708 and, for 2007 only, the "highly compensated" employee exemption, 29 C.F.R. § 541.601. (See Def.'s Sarkar Mem. at 1-2, 24.) ⁷

### FOOTNOTES

₇ Sarkar's NYLL claim is also subject to the FLSA exemptions **[*42]** in 29 U.S.C. § 213. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 *HN13*ꦠ(expressly providing that New York's overtime requirement is "subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938"); see also Topo v. Dhir, No. 01 Civ. 10881, 2004 U.S. Dist. LEXIS 4134, 2004 WL 527051, at *3 (S.D.N.Y. Mar. 16, 2004) ("There is general support for giving FLSA and New York Labor Law consistent interpretations."). Sarkar does not dispute that if he is exempt under the FLSA's administrative or computer employee exemptions, he is also exempt from the NYLL's overtime provisions.

*HN14*ꦠ"Because the FLSA is a remedial law, [courts] must narrowly construe its exemptions." Reiseck v. Universal Comm'ns of Miami, Inc., 591 F.3d 101, 104 (2d Cir. 2010) (citing Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S. Ct. 453, 4 L. Ed. 2d 393 (1960)). "The employer has the burden of proving that the employee clearly falls within the terms of the exemption." Young v. Cooper Cameron Corp., 586 F.3d 201, 204 (2d Cir. 2009).

*HN15*ꦠWhether an employee is exempt from FLSA overtime coverage is a "mixed question of law and fact." Downes v. J.P. Morgan Chase & Co., No. 03 Civ. 8991, 2007 U.S. Dist. LEXIS 36677, at *33 (S.D.N.Y. May 16, 2007) **[*43]** (Lynch, J.) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S. Ct. 1527, 89 L. Ed. 2d 739 (1986)). "The question of how the [employee] spent [his] working time . . . is a question of fact." Icicle Seafoods, 475 U.S. at 714. "The question whether [his] particular activities excluded [him] from the overtime benefits of the FLSA is a question of law . . . ." Id. Thus, "The ultimate question of a particular worker's exemption, based on factual findings as to [his] actual work activities, requires a conclusion of law." Downes, 2007 U.S. Dist. LEXIS 36677, at *33 (citing Freeman v. Nat'l Broadcasting Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996)).

### B. The Computer Employee Exemption

*HN16*ꦠUnder 29 U.S.C. § 213(a)(17), the FLSA exempts from its overtime requirements "any

employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty" is:

> (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, **[*44]** based on and related to user or system design specifications;

> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or

> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which requires the same level of skills, and who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $ 27.63 an hour.

29 U.S.C. § 213(a)(17).

*HN17* The term "primary duty" means the employee's "principal, main, major or most important duty." 29 C.F.R. § 541.700 (defining "primary duty" for purposes of executive, administrative, professional, computer and outside sales employee exemptions). **8** In determining an employee's primary duty, courts look to "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700. The amount of time an employee spends performing exempt work can be a "useful guide" in determining whether his primary duty consists of exempt work. Id. "[E]mployees **[*45]** who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." Id.

## FOOTNOTES

**8** Congress has never defined numerous terms--such as "primary duty"--used in the FLSA exemptions. With respect to the "executive, administrative, or professional" exemption of § 213(a)(1), Congress has directed the Secretary of Labor to define such terms through notice-and-comment rulemaking; regulations so issued carry the force of law and warrant deference unless arbitrary, capricious, or manifestly contrary to the purpose of the statute. See 29 U.S.C. § 213(a)(1); Freeman, 80 F.3d at 82 (citing Chevron v. Natural Res. Defense Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)). However, with respect to the "computer" exemption of § 213(a)(17), the DOL itself has acknowledged some ambiguity as to its rulemaking authority--the statutory text, in contrast to that of § 213(a)(1), does not specifically provide for such rulemaking. See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22,122, 22,159 (Apr. 23, 2004). Here, as both parties rely in their papers on the DOL regulations interpreting **[*46]** the FLSA exemptions, this Court takes such regulations as instructive authority, Cf. Downes, 2007 U.S. Dist. LEXIS 36677, at *35 n.9.

*HN18* The computer employee exemption applies to a "computer systems analyst, computer programmer, software engineer, *or other similarly skilled worker*." 29 U.S.C. § 213(a)(17) (emphasis added). Thus, an employee's job *duties*, not his job *title*, determine whether the exemption applies. 29 C.F.R. § 541.400 ("Because job titles vary widely and change quickly in the computer industry, job titles are not determinative of the applicability of [the computer employee] exemption."); 69 Fed. Reg. at 22,160 ("Where the prescribed duties tests are met,

the [computer] exemption may be applied regardless of the job title given to the particular position.").

In order to properly delineate the scope of the computer employee exemption, it is necessary to briefly consider its unique legislative and regulatory history. In 1990, Congress directed the DOL to issue regulations allowing certain computer services personnel to qualify as exempt professional employees under § 213(a)(1). See Pub. L. No. 101-583, § 2, 104 Stat. 2871 (1990); see also 69 Fed. Reg. at 22, 159-60 (describing  [*47] legislative and regulatory history of computer employee exemption). In 1991, the DOL implemented that legislation in 29 C.F.R. § 541, which contains the regulations that apply the § 213(a) exemptions. See 69 Fed. Reg. at 22,159.

However, in 1996, Congress revisited the issue and created a separate statutory exemption for computer employees, § 213(a)(17). See Small Business Job Protection Act of 1996, Pub. L. No. 104-188, § 2105, 110 Stat. 1755, 1929 (codified at 29 U.S.C. § 213(a)(17)). The new exemption contained "*most--but* not *all--of* the [DOL's] regulatory language" comprising the old computer employee exemption under § 213(a)(1). See 69 Fed. Reg. at 22,159.

*HN19* "[T]he exemption in Section 213(a)(17) broadened the coverage of computer services personnel from that included in the prior Section 213(a)(1) computer professional exemption and the 1991 DOL regulations in three significant ways." Bobadilla v. MDRC, No. 03 Civ. 9217, 2005 U.S. Dist. LEXIS 18140, at *19 n.5 (S.D.N.Y. Aug. 24, 2005). Perhaps most notably, "it eliminated the requirement that the employee's work require the exercise of independent judgment and discretion." Id. It also "eliminated any reference to educational requirements,"  [*48] and dispensed with the requirement that the employee must "have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge." Id. (internal quotations and citations omitted).

## C. Sarkar Qualifies as an Exempt Computer Employee

Plaintiff Sarkar falls squarely within the computer employee exemption. As shown by the facts set forth above, supra at Background III.C, Sarkar's "primary duty" consisted of a combination of the computer functions described in subparagraphs (A), (B) and (C) of § 213(a)(17).

Before being hired by JPM, Sarkar earned two technical certifications, as a CNE and MCSE. Sarkar attended a ten-month course and passed about seven exams to obtain his CNE, which enables its holders to "solve advanced company-wide support problems and high-level network problems." (See Morway Sarkar Aff. Ex. A-1.) While at JPM, Sarkar served as a Senior Technology Officer, Distributed Computing Engineer and Technology Operations Analyst, and spent almost all of his working time on the computer.

As part of his capacity management and NDPS remediation work, which accounted for the majority of his time, Sarkar consulted with users--JPM's  [*49] LOBs--to determine hardware, software or system functional specifications. Sarkar regularly consulted with LOBs about the impact that implementing a particular capacity remediation plan would have on the business. For example, in connection with data migrations, Sarkar consulted with the LOB client about numerous technical issues, including the number of login scripts at issue, whether there were any hard-coded databases, and the LOB's future capacity needs. When Sarkar drafted NDPS remediation plans regarding whether certain printers could be moved off data servers onto EDG boxes, Sarkar consulted with the LOB client about the printing infrastructure at the site in question.

As the employee responsible for capacity management in the Northeast region--about fifty to sixty physical servers and 1,500 virtual servers affecting more than 10,000 users--Sarkar analyzed computer systems based on and related to user or system specifications. For example, in developing disk space remediation plans, such as the plan he drafted for JPM's data centers in New York City and Brooklyn, Sarkar analyzed numerous factors, including the space available

on the current frame, the clusters that the frame **[*50]** was connected to, future frame growth, frame decommission, SRDF needs and the viability of moving between frames. Sarkar has also identified the need to add data servers to JPM's infrastructure.

When P1, P2 and other "difficult" and "critical" server issues were escalated to Sarkar, he analyzed the JPM system to identify the "root cause" of the problem, and then devised a solution. In addition, Sarkar proactively identified issues in the system, thereby preventing potential P1 and P2 situations. He has also identified areas for improvement in authentication performance and directory communications.

Sarkar's job duties also included testing software and products in a live environment and then giving feedback to the engineering department. For example, as part of his work on the backup migration project, Sarkar tested new versions of the NetBackup software, and discovered storage issues.

While at JPM, Sarkar drafted documentation for JPM's desktop support personnel, which was intended to enable the desktop support team to resolve relatively straightforward problems, so that only more complicated, server-related issues would be escalated to Sarkar. Sarkar also edited and updated another **[*51]** manual for the server support team, and is currently listed as the author of that document.

In sum, Sarkar's testimony and the other evidence before the Court show that Sarkar spent the majority of his time at JPM performing a combination of the functions specified in § 213(a)(17). Thus, he is exempt from the FLSA's overtime requirements.

One of the very few cases in this or any other district to squarely address the FLSA's computer employee exemption, Bobadilla v. MDRC, No. 03 Civ. 9217, 2005 U.S. Dist. LEXIS 18140 (S.D.N.Y. Aug. 24, 2005), is on point. In that case, as here, plaintiff Bobadilla alleged that his former employer, defendant MDRC, had violated the FLSA by failing to pay him overtime. Id. at * 1. MDRC moved for summary judgment, arguing that Bobadilla was exempt as a computer employee under § 213(a)(17), and as an administrative employee under § 213(a)(1). Id. Judge Koeltl granted MDRC's motion, finding that, "In view of all the evidence, Bobadilla performed highly-skilled work on MDRC computer systems and is an exempt computer employee." Id. at *29.

In reaching that conclusion, Judge Koeltl considered Bobadilla's technical certification. Bobadilla "held a certificate from **[*52]** by Cisco Systems . . . , which entitled him to designation as a Cisco Certified Network Associate ('CCNA')." Id. at *6. Referring to Cisco's website--just as JPM has referenced Novell's website with regard to Sarkar's CNE certification--Judge Koeltl noted that the CCNA equips its holder with "important knowledge and skills necessary to select, connect, configure, and troubleshoot the various CISCO networking devices." See id. at *7 n.3. Thus, Bobadilla "held a valuable Cisco CCNA credential that would allow him to develop computer systems based on user specifications." Id. at *22.

Bobadilla testified that he was a member of the networking team, and that he was referred to as a "Network Administrator." See id. at *7 n.2. As at JPM, MDRC's IT department also included lower-level helpdesk employees, See id. at *12. Bobadilla "was paid in excess of $ 75,000 per year, substantially more than the approximately $ 43,000 typically paid to Help Desk personnel." Id. at *22. Here. Sarkar's annual compensation ranged from $ 78,850 to $ 101,932, and it is undisputed that he, like Bobadilla, was not a member of the helpdesk.

Bobadilla's duties at MDRC included, inter alia, "Network Administration **[*53]** in the Novell . . . . environment"; the "analysis [of] existing network resources and determination [that] an underutilization existed"; and "resolving a problem with MDRC's [Virtual Private Network], which required the plaintiff to use trial and effort to mix and match various commands" and "a thorough understanding of the physical devices involved, their operating systems, and the logical protocols demanded by each." Id. at *24-27 (internal quotations and citations omitted).

Bobadilla was also involved in the introduction of new backup software, as well as a server upgrade project. See id. at *27-29. Thus, in Bobadilla, as here, "plaintiff's primary duties included a combination of the duties covered in 29 U.S.C. § 213(a)(17)." Id. at *22.

Critically, Judge Koeltl rejected Bobadilla's contention "that he spent most of his time performing Help Desk functions." Id. In other words, the court rejected precisely the tactic that Sarkar has employed here--denigrating his duties to make it appear as if he primarily performed lower-level, helpdesk functions. Judge Koeltl concluded, based on Bobadilla's own testimony and pre-litigation documents (including resumes and performance evaluations), **[*54]** that "Bobadilla was principally of value to MDRC because he had sophisticated knowledge of computing that went beyond that of a non-exempt Help Desk employee." Id. The Court reaches the same conclusion here--Sarkar, like Bobadilla, qualifies as an exempt computer employee under § 213(a)(17).

In opposition to JPM's motion, Sarkar strains to fit his job duties within the contours of authority applicable to lower-level technology personnel. As in Bobadilla, that attempt fails.

First, Sarkar cites 29 C.F.R. § 541.401, in which the DOL states that the computer exemption

> does not include employees engaged in the manufacture or repair of computer hardware and related equipment [or] whose work is highly dependent upon, or facilitated by, the use of computers and computer software programs (e.g., engineers, drafters and others skilled in computer-aided design software), but who are not primarily engaged in computer systems analysis and programming or other similarly skilled computer-related occupations.

Tapas Sarkar does not "manufacture" computer equipment, and he is not a repairman. Nor is he someone whose occupation is merely "dependent upon, or facilitated by, the use of computers." Instead, **[*55]** as established above, he was "primarily engaged" in the skilled, computer-related functions that render him exempt under § 213(a)(17). Thus, 29 C.F.R. § 541.401 is plainly inapplicable.

Sarkar also points to four DOL opinion letters from 1999, 2001 and 2006, each of which concluded that the employee described by the seeker of the opinion would not be exempt from the FLSA's overtime requirements. The Court finds these opinion letters wholly unpersuasive.

The most recent opinion letter concerned a "Help Desk Support Specialist." See DOL Wage & Hr. Op. Ltr., FLSA 2006-42, 2006 DOLWH LEXIS 56, *2, Oct. 26, 2006. It is undisputed that Sarkar did not work on JPM's helpdesk.

Similarly, the DOL opinion letter dated August 19, 1999 concerned "customer training consultants (CTCs)," who were "paid a salary of approximately $ 26,000 to $ 27,000," and whose duties consisted of training customers on computer software, modifying basic settings-- for example, "toolbars"--to meet customer needs, installing, debugging and troubleshooting, testing customers' modems, and conducting customer follow-up visits to ensure customer satisfaction. See 1999 DOLWH LEXIS 88, 1999 WL 1788144. This is hardly a description of Sarkar's job duties at JPM. Sarkar **[*56]** was responsible, inter alia, for ensuring that servers affecting more than 10,000 JPM users in the Northeast region had sufficient storage capacity, and spent much of his time developing disk space remediation plans for JPM's LOBs. He spent little of his time doing installation and when he was troubleshooting, he was analyzing critical, complex P1 and P2 issues that had been escalated by lower-level units in JPM's IT department.

The third DOL opinion letter, dated November 5, 1999, concerned an employee who "oversees other [IT] personnel; performs . . . installations, tuning [and] troubleshooting . . .; maintains assigned priorities and prepares status reports; schedules work pertaining to network problems

and software upgrades; assists the User Support Manager with training and mentoring of staff; and researches and assists the User Support Manager with network problem solving." 1999 DOLWH LEXIS 122, 1999 WL 33210907. Once again, this DOL opinion letter applies to lower-level, less skilled computer work than that performed by Sarkar.

The fourth DOL opinion letter, dated May 11, 2001, concluded that an employee whose primary duty "appears" to be "identify[ing] computer solutions to fit the need of a variety **[*57]** of local businesses," would not fall within the computer employee exemption. See 2001 DOLWH LEXIS 4, 2001 WL 1558967. Thus, this opinion letter, like the other three, does not apply to an employee with Sarkar's job duties. Further, the Court notes that the May 11, 2001 opinion letter contains little analysis, is "[b]ased on . . . limited information" and was issued "to assist [the seeker of the opinion] in writing a paper for class." Id.

In short, the four DOL opinion letters cited by Sarkar are inapposite. To the extent they provide even a modicum of support for Sarkar's position, they are unpersuasive. See Christensen v. Harris County, 529 U.S. 576, 587, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (holding that interpretations in opinion letters "do not warrant Chevron-style deference," and "are entitled to respect . . . but only to the extent that those interpretations have the power to persuade" (internal quotations and citation omitted)).

Finally, Sarkar points to two court of appeals decisions, Bohn v. Park City Group, Inc., 94 F.3d 1457 (10th Cir. 1996), and Martin v. Indiana Michigan Power Co., 381 F.3d 574 (6th Cir. 2004). In light of the absence of any Second Circuit authority on the scope of the computer employee exemption under § 213(a)(17), **[*58]** the Court feels compelled to address them.

In Bohn, the Tenth Circuit considered the *old* computer professional exemption under § 213(a)(1), *not* § 213(a)(17)'s new computer employee exemption. See 94 F.3d at 1461. As explained above, Congress broadened the scope of the exemption for computer employees when it passed § 213(a)(17). In reversing the district court's grant of summary judgment for the defendant-employer, the Bohn court expressly found factual issues concerning the level of plaintiff's education, "whether plaintiff's primary duty required theoretical and practical application of highly specialized knowledge" and whether his "work involve[d] consistent exercise of discretion and judgment." See id. at 1462-64 (internal quotations and citation omitted). Section 213(a)(17) eliminated all three of those requirements from the computer employee exemption. See Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *19 n.5. Further, the Bohn plaintiff was a "technical writer" who earned $ 47,000, Bohn, 94 F.3d at 1460; regardless of whether he would fall within the scope of § 213(a)(17)'s computer exemption, his job duties were not analogous to those of Sarkar. Thus, Bohn is inapposite on multiple **[*59]** levels.

Martin, too, was decided under the narrower computer professional exemption of § 213(a)(1). See 381 F.3d at 579. In any event, the plaintiff in Martin, unlike Sarkar, performed classic helpdesk functions--his primary duties consisted of "respond[ing] to . . . help desk tickets," "install[ing] software, such as Microsoft's Office 97, on individual workstations," "troubleshoot[ing] Windows 95 problems," "configuring desktops, checking cables [and] replacing parts." See id. at 577, 580; see also Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *30 n.8 (distinguishing the Martin plaintiff's duties as "closer to those of a Help Desk employee . . . rather than to Bobadilla's duties as a Network Administrator"). Thus, Martin, like Bohn, has no application here.

In the end, Sarkar's own testimony and the pre-litigation documents before the Court clearly establish that he falls within § 213(a)(17)'s computer employee exemption. Indeed, if Tapas Sarkar--who, by his own admission, was the NDPS "guru" and "the 'go-to' person for capacity management in the Northeast region"--does not qualify as a JPM computer employee, it is difficult to imagine who, other than, perhaps, a computer programmer, **[*60]** would.

### D. Sarkar Cannot Rely on His Reclassification

Sarkar argues that by reclassifying him as overtime eligible in 2008, JPM "has admitted that Mr. Sarkar was not exempt from overtime." (Pls.' Mem. in Opp. to Def.'s Sarkar Summ. J. Mot., May 14, 2009, at 10.) That argument fails.

It is undisputed that in January 2008, JPM reclassified more than 635 technology employees--including Sarkar--holding a wide array of job titles. (Goodrich Decl. P 4.) JPM states that, "in an environment in which its competitors and other employers saw an ever increasing number of class and collective action overtime lawsuits," it was "act[ing] conservatively by treating employees who were exempt from overtime under the law as eligible for overtime." (Def.'s Reply Br. in Supp. of Sarkar Summ. J. Mot., June 1, 2009, at 2 (internal citation omitted).) Pursuant to DOL regulations, an employer does not lose an exemption by paying overtime to an exempt employee. See 29 C.F.R. § 541.604(a).

The January 2008 reclassification is not materially relevant to the determination of whether Sarkar falls within the computer employee exemption. As noted above, a significant percentage of these FLSA overtime suits are triggered **[*61]** by such reclassifications--the mere fact that an employee was reclassified cannot establish an employer's liability for the period prior to the reclassification. Sarkar does not cite a single case suggesting otherwise.

Instead, *HN20* the exempt status of a given employee depends upon an analysis of the employee's *job duties*. See 29 C.F.R. § 541.2 ("The exempt or nonexempt status of any particular employee must be determined on the basis of whether the employee's salary and duties meet the requirements of the [exemption]."); Liger v. New Orleans Hornets NBA Ltd. P'ship, No. 05 Civ. 1969, 2008 U.S. Dist. LEXIS 9098, at *7 (E.D. La. Feb. 6, 2008) (finding that "evidence of the [defendant's] post-lawsuit compliance with the FLSA is not relevant to determining whether the [defendant] can claim the exemption during the period of time before the lawsuit was filed"); Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 221 (D. Conn. 2003) (holding, in denying plaintiff's motion for collective action certification, that "[t]he fact that Safeco decided to re-classify all Claims Representatives, including all Field Claims Representatives, does not provide the necessary common thread," and that "[t]he **[*62]** merits of [plaintiff's] claim will turn upon evidence relating to [his] day-to-day tasks, and not upon any Safeco company policy or decision"); Black v. Comdial Corp., No. 92 Civ. 81, 1994 U.S. Dist. LEXIS 2457, at *7-10 (W.D. Va. Feb. 15, 1994) (finding administrative exemption inapplicable to plaintiff based on analysis of his job duties, not because defendant had reclassified plaintiff's position as nonexempt after a DOL audit).

Here, as discussed above, Sarkar's job duties place him within the computer employee exemption. The mere fact of the January 2008 reclassification is not enough to raise a genuine issue regarding his exempt status.

In sum, the Court finds that JPM is entitled to summary judgment on the claims of Plaintiff Sarkar because he is in fact exempt under § 213(a)(17)'s computer employee exemption. Accordingly, the Court need not reach JPM's other asserted bases for exemption. See Bobadilla, 2005 U.S. Dist. LEXIS 18140, at *29-30 ("Because the plaintiff is an exempt computer employee under Section 213(a)(17), it is unnecessary to reach the defendant's additional argument that the plaintiff is an exempt administrative or professional employee under 29 U.S.C. § 213(a)(1).").

## E. [*63] Sarkar's Rule 56(f) Application

In a final attempt to stave off summary judgment, Sarkar submits a Rule 56(f) affidavit with his opposition papers, asking the Court to delay ruling on JPM's motion so that he can depose two of JPM's declarants and obtain additional "training and supervision documents." (Klein 56(f) Decl. P 27.) Sarkar's Rule 56(f) application is denied as procedurally improper and substantively meritless.

### 1. Sarkar's Rule 56(f) Application Is Procedurally Improper

*HN21* Under Rule 56(f), "If a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed. R. Civ. P. 56(f).

However, it is well established that Rule 56(f) "applies to summary judgment motions made before discovery is concluded." RSL Comm'ns PLC v. Bildirici, 649 F. Supp. 2d 184, 221 (S.D.N.Y. 2009) (quoting McAllister v. N.Y. City Police Dep't, 49 F. Supp. 2d 688, 696 n.5 (S.D.N.Y. 1999)); accord Espada v. Schneider, 522 F. Supp. 2d 544, 549 (S.D.N.Y. 2007) **[\*64]** (denying plaintiff's Rule 56(f) application because "[t]he relief that may be afforded under Rule 56(f) is not available when summary judgment motions are made after the close of discovery").

Here, as Sarkar acknowledges, fact discovery for the instant motions closed on January 15, 2009, and the period for depositions ended on February 27, 2009. (Klein 56(f) Decl. PP 8-9.) Magistrate Judge Freeman set these discovery deadlines with all parties knowing that JPM would be moving for summary judgment about a month after the end of depositions. (See Docket No. 32 (Order, Oct. 24, 2009).) Discovery was "targeted" for Plaintiffs' collective action certification motion, and for "Defendant's motion for summary judgment on the merits of Plaintiffs' individual claims." (See id.; Klein 56(f) Decl. P 6.) Now, four months after the close of fact discovery, and more than two months after the end of depositions, Sarkar seeks a reprieve under Rule 56(f). Such relief is not available to Sarkar at this late stage.

Further, Sarkar's Rule 56(f) application seeks discovery expressly denied by Magistrate Freeman. On April 6, 2009, more than a month after the close of discovery, Plaintiffs sent a letter to **[\*65]** Magistrate Freeman requesting that she compel additional discovery. (Klein 56(f) Decl. Ex. J.) On April 27, 2009, Magistrate Freeman held a hearing to resolve the dispute.

During that hearing, Magistrate Freeman repeatedly noted the dilatory nature of Plaintiffs' requests. (See, e.g., Aff. of Debra Morway in Supp. of Def.'s Reply to Pl. Sarkar's Rule 56(f) Aff., June 1, 2009 ("Morway 56(0 Aff."), Ex. C (Hr'g Tr., Apr. 27, 2009 ("4/27/09 Tr.")), at 8:8-9, 47:6-14, 96:12-19.) Nevertheless, Magistrate Freeman granted Plaintiffs additional electronic discovery relating to the training and supervision of Clarke and Sarkar, and directed the parties to agree on search terms and time limits. (See id. 56:9-57:14.) The parties reached an agreement on May 6, 2009 (see Morway 56(0 Aff. Ex. J (Joint Ltr. to Magistrate Freeman)), and JPM produced additional documents relating to Plaintiffs' training and supervision on May 12, 2009 (see id. Ex. K (JPM Cover Ltr. for Supplemental Production)).

With the exception of the additional electronic discovery discussed above, Magistrate Freeman denied Plaintiffs' requests at the April 27 hearing. (See 4/27/09 Tr. 99:9-10.) Magistrate Freeman instructed Plaintiffs **[\*66]** that to obtain any further discovery, they would have to provide her with specifics regarding the item requested, why it was necessary to oppose summary judgment, when it was requested, how JPM responded to the request and, if the request was late, the burden on JPM to produce it. (See id. 99:9-100:11.) On April 30, Plaintiffs again wrote Magistrate Freeman, requesting, inter alia, that she order the depositions of two of JPM's declarants (and coworkers of Sarkar), Suresh Kumar ("Kumar") and Peter MacDonald ("MacDonald"). (Klein 56(0 Decl. Ex. K.) On May 8, 2009, Magistrate Freeman denied Plaintiffs' request for those depositions. (Docket No. 54.)

Now, in his Rule 56(f) application, Sarkar again asks to depose Kumar and MacDonald. In other words, Sarkar seeks to relitigate a discovery issue already decided by Magistrate Freeman. The Court sees no reason to disturb Magistrate Freeman's decision, particularly in light of the fact that the Court has not relied at all on the declarations of Kumar or MacDonald in reaching today's decision.

At the April 27 hearing, Magistrate Freeman predicted that "Judge McMahon would [not] be likely to smile upon [a Rule 56(f) affidavit] because she would **[*67]** likely say where were you in the period Judge Freeman set." (4/27/09 Tr. 94:10-20.) That is exactly what this Court says now. Plaintiff Sarkar's Rule 56(f) application is denied.

## 2. Sarkar's Rule 56(f) Application Is Meritless

Even if Sarkar's Rule 56(f) application were procedurally proper, it is meritless. It is well established that a party resisting summary judgment on Rule 56(f) grounds "must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (internal quotations and citation omitted).

Sarkar fails to identify the facts he seeks or how they would create a genuine issue of material fact. Instead, he merely asks to depose Kumar and MacDonald "to test the meaning of their generalized statements in support of their employer's position," and to obtain additional "training and supervision documents" that "Plaintiffs believe will strongly support their opposition to **[*68]** summary judgment." (Klein 56(f) Decl. PP 22, 24.)

Moreover, as noted above, the Kumar and MacDonald declarations have played no part in the Court's decision to grant JPM's motion. The Court thus sees no reason to delay its decision so Sarkar can depose them.

As for training and supervision documents, they are relevant principally to the issue of whether Sarkar's work entailed "the exercise of discretion and independent judgment," a requirement for the *administrative* exemption of

Get a Document - by Citation - 2009 U.S. Dist. LEXIS 113208    Page 1 of 5

Case 5:08-cv-00823-NPM-ATB   Document 73   Filed 09/23/11   Page 59 of 102

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's*® | More | | History | Alerts |
|--------|----------------|-------------|------|--|---------|--------|

FOCUS™ Terms  Advanced...   **Get a Document**



View Tutorial

Service: **Get by LEXSEE®**
Citation: **2009 U.S. Dist. LEXIS 113208**

*2009 U.S. Dist. LEXIS 113208, \**

⚓ View Available Briefs and Other Documents Related to this Case

ALICIA HARRIS, Plaintiff, v. VECTOR MARKETING CORPORATION, Defendant.

No. C-08-5198 EMC,(Docket No. 83)

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

2009 U.S. Dist. LEXIS 113208

November 20, 2009, Decided
November 20, 2009, Filed

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part Harris v. Vector Mktg. Corp., 2010 U.S. Dist. LEXIS 5659 (N.D. Cal., Jan. 5, 2010)

**PRIOR HISTORY:** Harris v. Vector Mktg. Corp., 656 F. Supp. 2d 1128, 2009 U.S. Dist. LEXIS 80634 (N.D. Cal., 2009)

**CORE TERMS:** independent contractor, question of law, summary judgment, interlocutory appeal, genuine, materially, difference of opinion, legal question, issue of material fact, certification, termination, certify, immediate appeal, matter of law, common law, disputed facts, precise question, distinguishable, predicated, consultant, opposing, training, lawsuit

⚓**Available Briefs and Other Documents Related to this Case:**

U.S. District Court Motion(s)

**COUNSEL:  [\*1]** For Alicia Harris, Plaintiff: Craig Steven Hubble, LEAD ATTORNEY, Diversity Law Group, Los Angeles, CA; Daniel Hyo-Shik Chang ▾, Larry W Lee ▾, LEAD ATTORNEYS, Diversity Law Group, P.C., Los Angeles, CA; Sherry Jung, LEAD ATTORNEY, Law Office of Sherry Jung, Los Angeles, CA.

For Vector Marketing Corporation, Defendant: John H Lien ▾, John Peter Zaimes ▾✓, LEAD ATTORNEYS, Jordan Seungjin Yu ▾, Reed Smith LLP, Los Angeles, CA.

**JUDGES:** EDWARD M. CHEN ▾, United States Magistrate Judge.

**OPINION BY:** EDWARD M. CHEN ▾

OPINION

**ORDER DENYING DEFENDANT'S MOTION FOR CERTIFICATION OF ORDER DENYING SUMMARY JUDGMENT FOR INTERLOCUTORY APPEAL AND FOR STAY OF DISTRICT COURT PROCEEDINGS**

Plaintiff Alicia Harris has filed a class action lawsuit against Defendant Vector Marketing Corporation, alleging violation of federal and state employment laws. On 9/4/2009, the Court issued an order granting in part and denying in part Vector's motion for summary judgment. *See* Docket No. 71 (order). In the order, the Court concluded that there was a genuine dispute of material fact as to whether Ms. Harris was an employee rather than an independent contractor. Vector now seeks an interlocutory appeal with respect to that order.

**I. DISCUSSION**

Title 28 U.S.C. § 1292(b) **[*2]** provides as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such an order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).

As the language of the statute indicates, there are three factors that a trial court considers in determining whether certification of an interlocutory appeal is appropriate: (1) whether the moving party seeks to appeal an order involving a controlling question of law; (2) whether there is substantial ground for difference **[*3]** of opinion on that legal question; and (3) whether an immediate appeal on that legal question may materially advance the ultimate termination of the litigation.

A. Controlling Question of Law

Under 1292(b), the first consideration for a court in deciding whether to certify an interlocutory appeal is whether the order being challenged involves a controlling question of law. The Ninth Circuit has explained that "all that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). *Compare* Wright, *et al.* § 3930 (noting that "there is little doubt that a question is not controlling if the litigation would be conducted in the same way no matter how it were decided").

In the instant case, the order being challenges does involve -- as a formal matter -- a controlling question of law. The parties do not dispute that the issue of whether Ms. Harris is an employee or an independent contractor is a legal question, see, e.g., *Berger Transfer & Storage v. Central States Pension Fund*, 85 F.3d 1374, 1378 (8th Cir. 1996), **[*4]** and clearly the issue is controlling since each of her claims is predicated on her being an employees. *See* Docket No. 71 (Order at 2) (noting that "[e]ach of the claims asserted in Ms. Harris's complaint are predicated on her being an employee").

However, courts have repeatedly stated that § 1292(b) was not meant to apply to cases in which

Get a Document - by Citation - 2009 U.S. Dist. LEXIS 173208    Page 3 of 5

Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 61 of 102

the party opposing summary judgment had raised a genuine issue of material fact -- *i.e.*, that is not the kind of question of law that the statute is meant to cover. *See, e.g., Malbrough v. Crown Equip. Corp.*, 392 F.3d 135, 136 (5th Cir. 2004) (stating that "[t]he underlying issue of whether Malbrough has presented sufficient evidence to show a 'genuine issue ... [of] material fact,' and thus avoid summary judgment under Fed. R. Civ. P. 56(c), is not a question of law within the meaning of § 1292(b)"); *McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1259 (11th Cir. 2004) (stating that "[t]he antithesis of a proper § 1292(b) appeal is one that turns on whether there is a genuine issue of fact or whether the district court properly applied settled law to the facts or evidence of a particular case"); *Ahrenholz v. Board of Trustees*, 219 F.3d 674, 676 (7th Cir. 2000) **[*5]** (stating that "'question of law' as used in section 1292(b) has reference to a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than to the question whether the party opposing summary judgment had raised a genuine issue of material fact"); *S.B.L. by T.B. v. Evans*, 80 F.3d 307, 311 (8th Cir. 1996) (concluding that permission to appeal under § 1292(b) should not have been given because "there are a 'number of unresolved factual issues bearing on the framing and formulation of the legal questions'"); *Palandjian v. Pahlavi*, 782 F.2d 313, 313 (1st Cir. 1986) (noting that "the question of *whether* Massachusetts would recognize the principle of duress as tolling the statute would be a good example of a 'controlling question of law' [b]ut the question of the *extent* of such an exception is a classic example of what is not to be raised by intermediate appeals" because "[i]t resembles a 'sufficiency of the evidence' claim -- the kind of claim which an appellate court can better decide after the facts are fully developed") (emphasis added).

The instant case is one of those cases -- *i.e.*, the Court concluded that there were disputed facts **[*6]** about the existence and degree of each factor that should be considered in deciding whether a person is an employee or an independent contractor. Accordingly, certification under § 1292(b) is not appropriate. The case that Vector cites, *Hopkins v. Cornerstone America*, 545 F.3d 338 (5th Cir. 2008), to support its claim that it is proper to certify the issue of whether a person is an employee or independent contractor, *see* Mot. at 9-10, is distinguishable because, in that case, there were clearly no disputed facts. The precise question certified by the district court was: "'Whether, *under the undisputed facts*, Plaintiffs are employees of Defendants or independent contractors under the FLSA.'" *Id.* at 342 (emphasis added). *Compare also Estate of Escobedo v. City of Fort Wayne*, No. 1:05-CV-424-TS, 2008 U.S. Dist. LEXIS 79403, at *4-5 (N.D. Ind. Sept. 25, 2008) (concluding that "this appeal is close enough to being an 'abstract legal issue,' and will not require 'hunting through the record . . . to see whether there may be a genuine issue of material fact lurking there,' because the Plaintiff's arguments are based on legal interpretations of Fourth Amendment and due process rulings, not **[*7]** disputes over genuine issues of material fact").

B. Substantial Ground for Difference of Opinion

In the attempt to avoid the fact the challenged order does not involve a controlling question of law (for purposes of § 1292(b)), Vector argues that, even under Ms. Harris's version of the facts, she would still be an independent contractor as a matter of law. The Court, however, specifically held to the contrary in its order denying summary judgment, and Vector never moved for reconsideration of that order.

Even if the Court were to entertain Vector's argument on the merits, it would not be persuaded. As noted above, the second consideration for a court in deciding whether to certify an interlocutory appeal is whether there is a substantial ground for difference of opinion with respect to the legal question at issue. The rationale underlying this consideration is that, "[i]f the law is clear and there is no question that the district court's order is correct as a matter of law, there is no purpose in appealing the ruling." Moore's § 203.31[4]. Vector contends that there is a substantial ground for difference of opinion, citing cases in which a court deemed a plaintiff an independent contractor **[*8]** instead of an employee. The problem for Vector is that none of these cases is on point because they involve materially different facts.

In the instant case, the evidence -- viewed in the light most favorable to Ms. Harris -- reflects as follows: (1) she did not have the ability to set prices on the Cutco products; (2) she could be

Get a Document - by Citation - 2009 U.S. Dist. LEXIS 113205    Page 4 of 5

Case 5:08-cv-00023-NPM-ATB  Document 73  Filed 09/23/11  Page 62 of 102

paid not only on a commission basis but also on a "qualified sales presentation" basis (which could be analogized to payment on a piece rate basis); (3) she was required to report daily to her managers; (4) she was instructed to follow the training manual word-for-word; and (5) the three-day training was mandatory. None of the cases cited by Vector is, as a factual matter, on all fours with the instant case. *See, e.g., Aparacor, Inc. v. United States*, 556 F.2d 1004, 1006-18, 214 Ct. Cl. 130 (Ct. Cl. 1977); *Mary Kay, Inc. v. Woolf*, 146 S.W.3d 813 (Tex. Ct. App. 2004). The facts listed above are material, and Vector's counsel admitted that these facts (taken as true for purposes of summary judgment) present a unique case that is different from those cases which Vector cites. Therefore, the cases relied upon by Vector cannot be said to establish a substantial ground for difference **[*9]** of opinion with respect to the decision reached by the Court in the instant case.

The Court also notes that many of the cases cited by Vector apply non-California law and/or tax law [1] and that some of the cases are distinguishable on other grounds as well -- *e.g.*, because they did not address the precise question of whether or not a person was an employee instead of an independent contractor or because they applied a different test than the common law test for whether a person is an employee or an independent contractor. *See, e.g., Mary Kay, Inc. v. Department of Revenue*, 17 OTR 91, 2003 WL 21221859 (Or. Tax. Ct. 2003) (stating that it was a *stipulated fact* that "[c]onsultants are independent contractors"); *Graham v. Mary Kay, Inc*., 25 S.W.3d 749, 756 (Tex. Ct. App. 2000) (stating that, "[w]ithout a showing of affirmative action by Mary Kay which led plaintiff to believe its beauty consultants were its employees, Mary Kay not liable for the torts of its independent contractors"); *Mary Kay v. Isbell*, 338 Ark. 556, 558, 561, 999 S.W.2d 669 (1999) (simply noting that, "[a]s a consultant, Isbell was denominated an independent contractor" and that "Mary Kay [had] entered into a written agreement **[*10]** with Isbell so that Isbell, as an independent contractor, could use Mary Kay's trademark and name to sell its products as provided by their agreement"); *Sarah Coventry, Inc. v. Caldwell*, 243 Ga. 429, 431-32, 254 S.E.2d 375 (1979) (stating that since a Georgia statute "defines 'wages,' and does so without reference to the status of the parties (i.e., employer-employee versus independent contractor), the statutory definition of 'wages,' rather than common-law principles, must be used").

**FOOTNOTES**

1 *Cf*. Docket No. 49 (Matheson Decl., Ex. L) (IRS letter, dated 11/20/2008) (concluding that person working for Vector would not be considered an employee for federal employment tax purposes and that person would be considered instead as a direct seller under the IRS Code; adding, however, that the IRS Code "is not necessarily used in determining a worker's status for the purpose of worker's compensation, pension eligibility or wage and hour laws").

As this Court held, the facts and all inferences viewed therefrom in Ms. Harris's favor do not establish an independent contractor relationship. Vector has cited no California or federal case establishing that, based on these assumed facts, there is a substantial ground for difference **[*11]** on opinion on this point.

C. Materially Advance Ultimate Termination of Litigation

The final consideration for a court in determining whether to certify an interlocutory appeal is whether an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Ninth Circuit has indicated that this factor is satisfied when resolution of the legal question "may *appreciably* shorten the time, effort, or expense of conducting a lawsuit." *In re Cement Antitrust Litig.*, 673 F.2d at 1027 (emphasis added); Moore's § 203.31[3] (noting that "[courts] look for a 'controlling' question that has the potential of substantially accelerating disposition of the litigation"). As noted at the hearing, this Court intends to resolve the question of Ms. Harris's status as employee versus independent contractor on an expedited basis, possibly in the context of class certification which the Court may advance. Hence, the delay from an interlocutory appeal could well far exceed the time it takes to resolve

Case 5:08-cv-00823-NPM-ATB  Document 72  Filed 09/23/11  Page 63 of 102

this issue and possibly this case.

## II. CONCLUSION

For the foregoing reasons, the Court denies Vector's motion for certification.

This order disposes of Docket No. 83.

IT **[*12]** IS SO ORDERED.

Dated: November 20, 2009

/s/ Edward M. Chen ▾

EDWARD M. CHEN ▾

United States Magistrate Judge

|          |                                    |
|----------|------------------------------------|
| Service: | **Get by LEXSEE®**                 |
| Citation:| **2009 U.S. Dist. LEXIS 113208**   |
| View:    | Full                               |
| Date/Time:| Friday, September 23, 2011 - 7:31 PM EDT |

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

In          About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
            Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 14386    Page 1 of 12

Case 5:08-cv-00823-NPM-ATB   Document 73   Filed 09/23/11   Page 64 of 102

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's*® | More | | History | Alerts |
|---|---|---|---|---|---|---|

FOCUS™ Terms                          Advanced...   **Get a Document**                    View Tutorial

Service: **Get by LEXSEE®**
Citation: **2011 U.S. Dist. LEXIS 14386**

*2011 U.S. Dist. LEXIS 14386, \**

EWART LAWRENCE, individually and on behalf of all other persons similarly situated, Plaintiff, -against- ADDERLEY INDUSTRIES, INC. and CABLEVISION SYSTEMS CORPORATION, Defendants.

CV-09-2309 (SJF)(ETB)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2011 U.S. Dist. LEXIS 14386

February 11, 2011, Decided
February 11, 2011, Filed

**CORE TERMS:** technician's, contractor's, customer's, cable, summary judgment, quotation, putative, hire, citations omitted, installation, install, material fact, identification badge, quality control, genuine issue, specifications, genuine, assign, Labor Law, inter alia, economic reality, repair, window, hiring, work orders, nonmoving party, approve, hired, wear, appointment

**COUNSEL:** **[\*1]** For Ewart Lawrence, individually and on behalf of all other persons similarly situated, Plaintiff: Bradley Ian Berger ▾, LEAD ATTORNEY, Berger & Associates, New York, NY; Fran L. Rudich ▾, Jeffrey A. Klafter ▾, Seth R. Lesser ▾, LEAD ATTORNEYS, Klafter Olsen & Lesser LLP, Rye Brook, NY.

For Adderley Industries, Inc., Defendant: Elizabeth R. Gorman ▾, LEAD ATTORNEY, Milber Makris Plousadis & Seiden, LLP, Woodbury, NY; Manny A Frade ▾, Mastropietro & Associates LLC, New York, NY.

For Cablevision Systems Corporation, Defendant: Adam Samuel Wexler ▾, Morgan Lewis & Bockius LLP, New York, NY; Michael J. Puma ▾, Morgan, Lewis & Bockius, LLP, Philadelphia, PA.

**JUDGES:** SANDRA J. FEUERSTEIN ▾, United States District Judge.

**OPINION BY:** SANDRA J. FEUERSTEIN ▾

**OPINION**

**OPINION & ORDER**

FEUERSTEIN ▾, J.

On May 29, 2009, plaintiff Ewart Lawrence ("plaintiff") commenced this putative collective and class action, individually and on behalf of all other persons similarly situated, against defendants Adderley Industries, Inc. ("Adderley") and CSC Holdings LLC i/s/h Cablevision Systems Corporation ▾("Cablevision") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*, and the New York State Labor Law ("Labor Law") §§ 2 and 651.

Cablevision **[*2]** now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint against it. For the reasons stated herein, Cablevision's motion is granted.

I. Background

A. Factual Background [1]

**FOOTNOTES**

[1] The factual allegations are derived from the parties' Rule 56.1 Statements and the affidavits and exhibits submitted in support of, and in opposition to, Cablevision's motion. The facts are not in dispute, unless otherwise indicated.

1. Cablevision's Relationship with Adderley

Cablevision is a telecommunications, media and entertainment company that, *inter alia*, provides cable, internet and telephone services to customers in the New York area. (Def. 56.1 Stat., ¶1; Plf. 56.1 Stat., ¶ 1; Declaration of Thomas Monaghan [Monaghan Decl.], ¶ 2). Cablevision maintains that "[a] significant portion of the installation, service, repair and removal work for [its] telecommunications services is not performed by [its] own employees; rather [it] contracts with vendors ["contractors"]* * * to perform most of th[o]se services. The Contractors, in turn, hire and maintain their own workforce of cable installers/technicians * * * ["technicians"] to assist them in completing the **[*3]** work." (Def. 56.1 Stat., ¶ 4; Monaghan Decl., ¶ 5).

Adderley is a wholly-owned subsidiary of Advanced Communications, Inc. ("ACI"), (Def. 56.1 Stat., ¶ 13; Plf. 56.1 Stat., ¶ 13; Transcript of Deposition Testimony of Mike Lall [Lall Dep.], pp. 29-30), and is one (1) of six (6) contractors that perform installation, service, repair and removal work on Cablevision's cable, internet and telephone systems in the Bronx. (Def. 56.1 Stat., ¶ 7; Plf. 56.1 Stat., ¶ 7; Monaghan Decl., ¶ 8). Adderley is not a parent, subsidiary or affiliate of Cablevision, or of any of Cablevision's parents, subsidiaries or affiliates. (Def. 56.1 Stat., ¶ 8; Plf. 56.1 Stat., ¶ 8; Monaghan Decl., ¶ 9). Nor does Adderley have any ownership interest in Cablevision, or in any of Cablevision's parents, subsidiaries, or affiliates, or vice versa. (Def. 56.1 Stat., ¶ 9; Plf. 56.1 Stat., ¶ 9; Monaghan Decl., ¶ 10).

Cablevision's "Standard Installation and Services Agreement (Single Family Residences, Multiple Dwelling Units and Commercial Buildings)" ("SIS Agreement") with Adderley, dated December 1, 2006, as amended on January 15, 2007 and January 12, 2009, sets forth the terms under which Adderley provides technicians **[*4]** to install, service, repair and remove equipment for Cablevision's customers. (Def. 56.1 Stat., ¶¶ 10, 26; Plf. 56.1 Stat., ¶¶ 10, 26; Monaghan Decl., ¶¶ 11, 24; Lall Dep., pp. 141-2). Under the terms of the SIS Agreement, Adderley is required to perform work in accordance with Cablevision's procedures and specifications, (Monaghan Decl., ¶ 20; Lall Dep., pp. 186-7, 262-3, 277, 288), because a failure to complete work consistent with those specifications and procedures could create safety hazards for Adderley's technicians or Cablevision's customers, or lead to technical problems with

Cablevision's equipment, (Def. 56.1 Stat., ¶ 22; Plf. 56.1 Stat., ¶ 22; Monaghan Decl., ¶ 20). Adderley is required to provide ongoing training to its technicians and to certify that all of its employees have been trained in accordance with Cablevision's specifications. (Lall Dep., pp. 223-7, 284; see Monaghan Decl., ¶ 38 ("Cablevision provides information to Adderley's management about Cablevision's systems and new updates to the systems or Cablevision products so that Adderley can perform under the [SIS] Agreement. But it is then entirely up to Adderley to decide how to communicate that information **[\*5]** to its Technicians and to ensure that they are performing their duties appropriately.")). According to Cablevision, it does not train Adderley's technicians and does not determine which materials Adderley should use to train its technicians or how the training should be conducted. (Monaghan Decl., ¶¶ 37-8). Although Cablevision has the right to audit Adderley's training curriculum, it has never done so. (Lall Dep., p. 228).

Section 12(b) of he SIS Agreement provides, in relevant part, that Adderley "understands and agrees that Cablevision shall not, for any purpose, be deemed to be the employer of any Employee of [Adderley] * * *. [Adderley] further agrees that, other than reserving the right to request that [Adderley] remove its Employees from a Cablevision Project * * *, Cablevision has no authority to affect the terms or conditions of the employment of any of [Adderley's] Employees." (Def. 56.1 Stat., ¶ 34; Plf. 56.1 Stat., ¶ 34). However, Adderley is not permitted to hire any subcontractors. (Lall Dep., p. 262).

Although the SIS Agreement does not prohibit Adderley from providing cable, telephone or internet installation, service, repair, removal or other work for companies other **[\*6]** than Cablevision, Adderley's only client is Cablevision, (Def. 56.1 Stat., ¶ 11; Plf. 56.1 Stat., ¶ 11; Monaghan Decl., ¶ 12; Lall Dep., pp. 19-20, 60-1, 298-9, 307), and all of its revenue comes from Cablevision. (Lall Dep., pp. 261-2). Nonetheless, ACI, Adderley's parent company, does perform services for entities other than Cablevision. (Def. 56.1 Stat., ¶ 13; Plf. 56.1 Stat., ¶ 13).

Cablevision provides Adderley with work orders identifying the jobs to be completed and the "appointment windows" within which the work must be performed, but Adderley assigns particular technicians to the specific jobs and develops the routes for the technicians. (Lall Dep., pp. 121-2, 124, 151-2, 158; Monaghan Decl., ¶ 57). Cablevision requires Adderley's technicians to arrive at its customers' houses within the scheduled appointment window and prohibits Adderley from changing the appointment window. (Lall Dep., pp. 123, 159-60, 272). Nonetheless, Adderley is permitted to change which technician it assigns to perform the work within the scheduled appointment window. (Lall Dep., pp. 272-5; see Monaghan Decl., ¶ 56). Moreover, although Cablevision requires Adderley to provide it with a weekly "Workforce **[\*7]** Planner" identifying every technician who will perform work that week, Adderley determines the number of technicians it will assign to work. (Lall Dep., pp. 197-8, 296; see Monaghan Decl., ¶ 55).

Cablevision's work orders also inform Adderley what equipment its technicians need for each job. (Lall Dep., p. 231). Cablevision expects Adderley to complete all of the jobs given it on a particular day and tracks the jobs assigned to Adderley via its cable data system that records each technician's route and is updated as each job is completed. (Lall Dep., pp. 153-7). According to Lall, ACI's director of operations over Adderley, Adderley cannot "close a job" and move a technician to another job without Cablevision's approval, (Lall Dep., pp. 71-2, 167, 172-3), unless the job is a trouble call involving a problem with the customer's equipment, as opposed to a problem with Cablevision's service. (Lall Dep., p. 169). If an Adderley technician is unable to complete a job or to perform it properly, Adderley will "refer" the job to Cablevision for completion by one of its own technicians. (Id.) Upon completion of a job, Adderley's technician must have the customer sign a Cablevision acceptance **[\*8]** or acknowledgment form and collects payment from the customer for Cablevision, both of which the technician submits to Adderley for submission to Cablevision. (Lall Dep., pp. 238-9; Def. 56.1 Stat., ¶ 77; Plf. 56.1 Stat., ¶ 77; see Monaghan Decl., ¶ 58).

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 14586    Page 4 of 12

Case 5:08-cv-00823-NPM-ATB   Document 73   Filed 09/23/11   Page 67 of 102

Although Adderley does not need Cablevision's approval in order to perform work for Cablevision's customers other than what is contained in the work order, its technicians cannot perform any additional work without first obtaining a rate code change from Cablevision. (Monaghan Decl., ¶ 16; Lall Dep., pp. 127-8, 161, 286-8). For example, if a customer requests an additional cable box, modem or other equipment to be installed, Adderley's technician can perform that work without first obtaining Cablevision's approval, but the extra equipment would not be operable until the technician obtained a rate code from Cablevision. (Lall Dep., pp. 163-4, 175-6). Similarly, if a customer requests an upgrade in the services provided by Cablevision, i.e., the customer originally requested only cable services but decided once the technician was there that he or she also wanted internet services, Cablevision would have to be contacted in order to upgrade **[*9]** its work order "so that that rate code [could] be added so that extra piece of equipment would be recognized by the electronic equipment and then added and then turned on." (Lall Dep., pp. 164-6, 174).

Adderley does not need Cablevision's approval before hiring a technician, but it notifies Cablevision when it hires a technician so that Cablevision can issue the technician an identification badge identifying him or her as a Cablevision contractor. (Lall Dep., pp. 133, 149-51, 193-4, 259-60; Def. 56.1 Stat., ¶ 58; Plf. 56.1 Stat, ¶ 58; Monaghan Decl., ¶ 42). A technician cannot work on a Cablevision job without an identification badge. (Lall Dep., pp. 193-4, 200). Cablevision also maintains a list of approved workers, i.e., individuals authorized to install its equipment, and any individual not on that list cannot install Cablevision equipment. (Lall Dep., p. 198). According to Lall, any individual hired and trained by Adderley as a technician, and approved as capable of doing the job, will be issued an identification badge by Cablevision and will be added to its list of approved workers. (Lall Dep., pp. 199-200). Cablevision can direct Adderley not to assign an individual who was previously **[*10]** employed by one of its other contractors and had been disciplined or fired for bad performance to a Cablevision project, (Lall Dep., pp. 202-4, 300-1, 307; see Monaghan Decl., ¶ 70), and has removed technicians from its list of approved workers, (Lall Dep., p. 240), but Adderley would be permitted to employ that technician in a different capacity. (Monaghan Decl., ¶ 70).

Cablevision also requires Adderley to perform certain pre-hiring screenings, i.e. drug tests and criminal background checks, before hiring a technician, (Monaghan Decl., ¶¶ 32-3; Lall Dep., pp. 209-10), to protect the safety of Cablevision's customers, whose homes Adderley's technicians will be entering, and Cablevision's equipment, to which the technicians have access. (Def. 56.1 Stat, ¶ 42; Plf. 56.1 Stat., ¶ 42).

Cablevision monitors the quality of the work Adderley technicians provide to its customers, (Lall Dep., pp. 215-6), and performs quality control inspections of approximately five percent (5%) of the work performed by Adderley's technicians, (Def. 56.1 Stat., ¶ 23; Plf. 56.1 Stat., ¶ 23; Monaghan Decl., ¶¶ 19-21). Although Cablevision uses post-call surveys and "other metrics" to evaluate Adderley's performance **[*11]** of its obligations under the SIS Agreement and will contact Adderley regarding any complaints about Adderley's technicians from its customers, Cablevision cannot tell Adderley to fire a particular technician. (Monaghan Decl., ¶¶ 17, 30; Lall Dep., pp. 98-9, 191-3). Moreover, Cablevision does not discuss an individual technician's performance directly with that technician and does not have the authority to increase or decrease a technician's compensation, approve vacation or sick leave, discipline a technician or direct the performance of a technician. (Lall Dep., pp. 266-70, 289, 294; Def. 56.1 Stat., ¶¶ 69, 84; Plf. 56.1 Stat., ¶¶ 69, 84; Monaghan Decl., ¶¶ 22, 34-5, 52, 62-3, 67). Nor does Cablevision provide any benefits to any of Adderley's technicians. (Def. 56.1 Stat., ¶ 45; Plf. 56.1 Stat., ¶ 45; Monaghan Decl., ¶ 36).

Adderley's technicians are required to wear uniforms while working, but Cablevision does not provide those uniforms and is not required to approve those uniforms, except to ensure the uniform's quality, i.e., it is not ripped, etc. (Lall Dep., pp. 212-5; Def. 56.1 Stat., ¶ 65; Plf. 56.1 Stat., ¶ 65; Monaghan Decl., ¶ 48) Both the Cablevision and Adderley logos **[*12]** are on the uniform. (Lall Dep., pp. 213-4).

The vehicles Adderley's technicians use are either provided by Adderley or owned by a particular technician, but have to comply with standards established by Cablevision and display a Cablevision sign along with Adderley's name and address. (Lall Dep., pp. 218-22, 290-2; Def. 56.1 Stat., ¶¶ 60-1, 63-4; Plf. 56.1 Stat., ¶¶ 60-1, 63-4; Monaghan Decl., ¶¶ 44-6). In addition, although Adderley's technicians install and service Cablevision equipment, since Cablevision service will not work on another company's equipment, they use either their own tools or tools provided by Adderley to install that equipment. (Lall Dep., pp. 289-90; Def. 56.1 Stat., ¶¶ 66, 68; Plf. 56.1 Stat., ¶¶ 66, 68; Monaghan Decl., ¶¶ 49-51).

2. Plaintiff's Employment

Plaintiff worked as a technician for Adderley for approximately ten (10) months, from May 2009 until March 2009, (Def. 56.1 Stat., ¶ 30; Plf. 56.1 Stat., ¶ 30; Plf. Dep., pp. 52, 77, 202-3), and received training at Adderley in order to perform his duties. (Def. 56.1 Stat., ¶ 33; Plf. 56.1 Stat., ¶ 33; Plf. Dep., p. 106). Each morning plaintiff reported to Adderley's office in the Bronx, which is at a different **[*13]** location than Cablevision's offices, to pick up his work orders and equipment. (Def. 56.1 Stat., ¶¶ 52-3; Plf. 56.1 Stat, ¶¶ 52-3; Plf. Dep., pp. 80, 107, 116-9). Cablevision did not provide plaintiff with any tools, uniform or van; rather plaintiff used his own vehicle and either his own or Adderley's tools, and wore a uniform provided by Adderley. (Plf. Dep., pp. 213-5). At the end of each workday, plaintiff completed a "cover sheet," indicating the quantity of jobs he performed and his "tech number," and submitted it to an Adderley dispatcher at Adderley's office in the Bronx. (Plf. Dep., pp. 125-6). Plaintiff could only recall being on Cablevision's premises on two (2) occasions during his employment with Adderley for the purposes of attending a meeting at which the level of performance Cablevision expected from Adderley's technicians was discussed and obtaining his identification badge, respectively. (Def. 56.1 Stat., ¶¶ 54-6; Plf. 56.1 Stat., ¶¶ 54-6; Transcript of Deposition Testimony of Ewart Lawrence [Plf. Dep.], pp. 87, 90-2, 95-6). Plaintiff's paycheck said "Adderley" and he never received a paycheck from Cablevision. (Plf. Dep., pp. 207-8).

According to plaintiff, if a customer **[*14]** asked for whom he worked, he was instructed to say that he was a "representative" of Cablevision. (Plf. Dep., pp. 119-20, 226, 228-9). Plaintiff denied ever being instructed to identify himself as working for "Adderley, a Cablevision contractor." (Plf. Dep., pp. 119-20). Nonetheless, plaintiff was never instructed to say that he was employed by Cablevision either. (Plf. Dep., p. 229). According to Lall, Adderley's technicians are instructed to advise customers who ask that he or she is a contractor for Cablevision. (Lall Dep., pp. 133-4, 283).

Plaintiff's supervisor was Colin Lovelace ("Lovelace"), an employee of Adderley or ACL (Def. 56.1 Stat., ¶ 81; Plf. 56.1 Stat., ¶ 81; Plf. Dep., pp. 23-5, 170). Lovelace, in turn, reported to Lall, an employee of Adderley or ACL (Def. 56.1 Stat., ¶ 82; Plf. 56.1 Stat., ¶ 82; Plf. Dep., p. 25). Plaintiff complained to Lall and Lovelace about working overtime without pay, but never complained to Cablevision. (Plf. Dep., pp. 211-3). Cablevision did not provide plaintiff any employee benefits. (Plf. Dep., p. 213).

During his employment, plaintiff was repeatedly disciplined by Adderley without any knowledge or input by Cablevision. (Def. 56.1 Stat., **[*15]** ¶¶ 86, 94; Plf. 56.1 Stat., ¶¶ 86, 94; Plf. Dep., pp. 68-70, 102-3, 205; Monaghan Decl., ¶ 69). Adderley ultimately terminated plaintiff's employment without any participation or input by Cablevision. (Def. 56.1 Stat., ¶¶ 92-3; Plf. 56.1 Stat., ¶¶ 92-3; Plf. Dep., pp. 203-5; Monaghan Decl., ¶ 68). Subsequently, plaintiff obtained employment for Falcon, another Cablevision contractor, and performed services for Cablevision. (Plf. Dep., pp. 205-7, 221).

Plaintiff could not recall ever previously claiming on any employment application, loan application or other document that he was employed by Cablevision. (Def. 56.1 Stat., ¶ 36; Plf. 56.1 Stat., ¶ 36; Plf. Dep., pp. 39-46, 57-8, 64-6).

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 14386

Case 5:08-cv-00823-NRM-ATB   Document 73-6   Filed 09/23/11   Page 69 of 102   Page 6 of 12

## B. Procedural History

On May 29, 2009, plaintiff commenced this putative collective and class action, individually and on behalf of all other persons similarly situated, against Adderley and Cablevision alleging violations of the FLSA (first cause of action) and the New York State Labor Law (second cause of action).

Cablevision now moves pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint against it.

## II. Discussion

## A. Standard of Review

Summary judgment should **[*16]** not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (c). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine issue as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); see Ricci v. DeStefano, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving **[*17]** party, there is no genuine issue for trial." Ricci, 129 S.Ct, at 2677 (quoting Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Spinelli, 579 F.3d at 166 (internal quotations and citation omitted); see also Aulicino v. New York City Dept. of Homeless Services, 580 F.3d 73, 79 (2d Cir. 2009), to determine whether there is a genuine issue for trial. See Ricci, 129 S.Ct. at 2677. A genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)); see also United Transp. Union v. National R.R. Passenger Corp., 588 F.3d 805, 809 (2d Cir. 2009). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) **[*18]** (quotations and citation omitted), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id.; see also Spinelli, 579 F.3d at 166. Thus, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. Spinelli, 579 F.3d at 166 (internal quotations and citations omitted); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. "Joint Employer"

The FLSA broadly defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d). ² "[F]ederal

regulations and [Second Circuit] precedent recognize the possibility of joint employment for purposes of determining FLSA responsibilities." Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 141 (2d Cir. 2008) **[\*19]** (citing 29 C.F.R. § 791.2(a); Zheng v. Liberty Apparel Co. ("Zheng I"), 355 F.3d 61, 66 (2d Cir. 2003)).

## FOOTNOTES

2 Similar tests are applied to determine whether a party may be liable as an "employer" under both federal and state law. See, e.g. Gortat v. Capala Brothers, Inc., 257 F.R.D. 353, 367 n. 13 (E.D.N.Y. 2009); Velu v. Velocity Express, Inc., 666 F.Supp.2d 300, 306-7 (E.D.N.Y. 2009) ("Although slightly different that the FLSA inquiry, the standard for determining a worker's status as an employee or independent contractor under New York State Labor Law is similar, and accounts for some of the same factors). Accordingly, the following analysis applies to both plaintiff's federal and state law claims.

"[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' Goldberg v. Whitaker House Co-op., Inc., 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961) (internal quotation marks omitted), determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity' \* \* \*." Barfield, 537 F.3d at 141 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947)). **[\*20]** "As a result, [the Second Circuit] has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Id. at 141-2.

In assessing the "economic reality" of a particular employment situation, courts consider various factors "based on the factual challenges posed by particular cases." Barfield, 537 F.3d at 142. Initially, courts must "examine the degree of formal control exercised over a worker" by considering "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." Barfield, 537 F.3d at 142, 143 (quoting Carter v. Dutchess Community College, 735 F.2d 8, 12 (2d Cir. 1984)). Those four (4) factors are "useful largely in cases involving claims of joint employment," Zheng I, 355 F.3d at 67 (internal quotations and citation omitted), and "can be *sufficient* to establish employer status," although they are not "*necessary* to establish an employment relationship." Id. at 71 (emphasis in original).

A finding that a putative **[\*21]** joint employer does not exercise formal control over a worker does not end the inquiry however. See Zheng I, 355 F.3d at 69. Rather, the court must then "assess whether an entity that lacked formal control nevertheless exercised functional control over a worker" by considering "(1) whether [the putative employer]'s premises and equipment were used for the plaintiffs' work; (2) whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative employer]'s process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [putative employer] or (its) agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative employer]." Barfield, 537 F.3d at 143 (quoting Zheng I, 355 F.3d at 72). 3 "The court is also free to consider any other factors it deems relevant to its assessment of the economic realities." Zheng I, 355 F.3d at 71-2. In sum, there is "no rigid rule for the identification **[\*22]** of an FLSA employer." Barfield, 537 F.3d at 143. Rather, courts must consider "'a nonexclusive and overlapping set of factors' to ensure that the economic realities test \* \* \* is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." Id. (quoting Zheng I, 355 F.3d at 75-6).

## FOOTNOTES

3 Still other cases "distinguish between independent contractors and employees" by considering "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." Barfield, 537 F.3d at 142, 143 (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-9 (2d Cir. 1988)). These Brock factors, however, "do not bear directly on whether workers who are already employed by a primary employer are also employed by a second employer. Instead, they help courts determine if particular workers are independent of *all* employers." Zheng I, 355 F.3d at 67-8. Thus, under the circumstances **[*23]** of this case, where it is undisputed that plaintiff was employed by Adderley, a primary employer, the Brock factors are inapplicable.

Generally, "the question whether a defendant is a plaintiff's joint employer is a mixed question of law and fact. Such questions involve the application of a legal standard to a particular set of facts." Zheng v. Liberty Apparel Co.. Inc. ("Zheng II"), 617 F.3d 182, 185 (2d Cir. 2010) (internal quotations, alterations and citation omitted). "Mixed questions of law and fact are especially well-suited for jury determination. . . ." Id. at 185-6 (internal quotations, brackets and citations omitted). Nonetheless, summary judgment is appropriate where application of the relevant factors to the facts of the case, viewed in the light most favorable to the plaintiff, compels the legal conclusion that the plaintiff was not an employee of a putative joint employer. See Zheng I, 355 F.3d at 76-7 [4].

## FOOTNOTES

4 Following the remand ordered in Zheng I, the district court denied the defendants' motion for summary judgment finding genuine disputes of material fact with respect to three (3) of the factors identified by the Second Circuit in Zheng I and the case proceeded to trial **[*24]** and jury verdict. Zheng II involved the defendants' appeal following the jury verdict on the issue, *inter alia*, of whether the district court improperly allowed the jury to determine the "ultimate legal question" of whether they were the plaintiffs' joint employer. Thus, the procedural posture of Zheng II is distinguishable from this case.

## 1. Formal Control

Cablevision did not exercise sufficient formal control over plaintiff, or Adderley's other technicians, to be deemed their joint employer under the FLSA. Based upon the evidence in the record, there is no genuine dispute as to a material fact that Cablevision did not: (1) have the power to hire and fire plaintiff or Adderley's other technicians; (2) supervise and control plaintiff's, or the other technicians', work schedules or conditions of employment; (3) determine the rate and method of plaintiff's or the other technicians' compensation; or (4) maintain employment records on plaintiff or the other technicians.

The requirement that Adderley's technicians meet Cablevision's installation specifications "is entirely consistent with the standard role of a contractor who is hired to perform highly technical duties. It is in the nature **[*25]** of a contract that the contractor [Adderley] promises to deliver the performance bargained for by the client [Cablevision]. * * * [R]equiring a contractor [Adderley] to meet the client's [Cablevision's] technical specifications is not the type of control' which bestows 'employee' status on the contractor [Adderley]." Herman v. Mid-Atlantic Installation Services, Inc., 164 F.Supp.2d 667, 672 (D. Md. 2000), aff'd sub nom Chao v. Mid-Atlantic Installation Services, Inc., 16 Fed. Appx. 104 (4th Cir. 2001).

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 14586    Page 9 of 12

Case 5:08-cv-00823-NPM-ATB    Document 73    Filed 09/23/11    Page 72 of 102

Nor does the requirement that Adderley's technicians wear uniforms and identification badges identifying themselves as being associated with Cablevision render them employees of Cablevision. See, e.g. Herman, 164 F.Supp.2d at 673. The requirement to wear such identifying materials "does not affect the economic reality of the relationship [between Adderley and Cablevision], * * * but merely allows consumers to be assured of [the technicians'] *bona fides*." Id.

Cablevision's drug testing and background-check policy also does not indicate an employee/employer relationship. Rather, "[i]t is only good business sense for [Cablevision] to attempt to insure that [the technicians sent to its customers' **[*26]** homes] are fit to [enter those homes]." Herman, 164 F.Supp.2d at 673.

Moreover, Cablevision's assignments of specific "windows" within which its customers must be serviced "stem[s] from the nature of the business and the need to provide reliable service and convenience to the consumers, not [from] the nature of the relationship between [Adderley] and [Cablevision] * * * [and] [does not] dictate a conclusion that [Adderley's technicians] are [Cablevision's] employees." Herman, 164 F.Supp.2d at 674.

A similar case seeking overtime wage payments under the FLSA was filed by cable technicians against a cable television provider, Comcast Corporation ("Comcast"), in the United States District Court for the District of Maryland entitled Jacobson v. Comcast Corp., 740 F. Supp. 2d 683, 2010 U.S. Dist. LEXIS 102834, 2010 WL 3769120 (D. Md. 2010). The following facts in Jacobson are substantially similar to the facts in this case: Comcast contracts with other companies ("the contractors") to hire technicians to perform installation of its equipment in a customer's home; the contractors perform all, or the vast majority of their work, for Comcast; the technicians are issued identification numbers and badges by Comcast; **[*27]** all of the equipment installed in the customers' homes belong to Comcast, but the contractors and their technicians own the tools and equipment needed to install that equipment; Comcast requires all prospective technicians to pass criminal background checks and drug screening tests before working on behalf of Comcast; the contracts between Comcast and the contractors require performance in accordance with Comcast's specifications and procedures; Comcast directs technicians to specific work sites and details the time frames in which jobs must be completed; Comcast utilizes a program permitting it to exercise real time monitoring of a technician's work to determine where they are, how long they are on site and what equipment they are utilizing and retains records of technicians' arrival and departure times; Comcast has the authority to "deauthorize" a specific technician, i.e., to strip the technician of his or her status as an "authorized contractor," thereby prohibiting that technician from performing any work on behalf of Comcast and effectively terminating that technician because the contractors only perform work for Comcast; and Comcast does not pay the technicians directly, instead **[*28]** it pays the contractors for each service completed by their technicians. 2010 U.S. Dist. LEXIS 102834, [WL] at * 1-2. Moreover, in Jacobson, unlike the present case, Comcast was required to approve all prospective technicians prior to their hiring by the contractors and occasionally contacted technicians directly to assign them to particular jobs. 2010 U.S. Dist. LEXIS 102834, [WL] at * 1, * 2. To the contrary, Cablevision is not required to approve prospective technicians before Adderley hires them and there is no evidence in the record that Cablevision ever contacted plaintiff, or any other technician, directly in order to assign then to a particular job.

The District Court in Jacobson found, *inter alia*, that although Comcast "unquestionably plays a role in hiring and firing technicians[,] * * * [i]t is only in the context of quality control * * * that Comcast exercises power over the hiring or firing of technicians."    F.Supp.2d    , 2010 U.S. Dist. LEXIS 102834, 2010 WL 3769120, at * 4. Specifically, the court found, in relevant part, that:

> "[Contractors] are free to hire anyone they choose to hire, provided that the applicants do not have a criminal record or fail a drug test. Likewise, a []
> [Contractor] has full authority to maintain the employment of the technicians,
> **[*29]** provided that a technician meets Comcast's quality performance standards,

and to fire any technician that it believes should be fired, even if the technician meets Comcast's quality control standards."

2010 U.S. Dist. LEXIS 102834, [WL] at * 4.

In addition, the Jacobson court found that although Comcast "maintains specific standards to which the [Contractors] and technicians must adhere, and regularly monitors the technicians to ensure that their performance satisfies Comcast's expectations[,] * * * Comcast is not responsible for the day-to-day management of the technicians."   F.Supp.2d   , 2010 U.S. Dist. LEXIS 102834, 2010 WL 3769120, at * 5. Specifically, the court found that Comcast "has no role in developing the [Contractors] human resources policies and does not dictate the technicians' working conditions, or determine the conditions upon which the technicians would receive payment. Th[o]se determinations are made by the [Contractors]." Id. The court further found significant:

> "that the control Comcast does exercise is in part designed to protect Comcast customers. * * * Technicians enter the residences of Comcast customers to perform installations. * * * Comcast's quality control procedures ultimately stem from the nature of their business  **[*30]** and the need to provide reliable service to their customers, not the nature of the relationship between the technicians and Comcast. While Comcast's supervision and control may appear substantial in degree, it is qualitatively different from the control exercised by employers over employees."

2010 U.S. Dist. LEXIS 102834, [WL] at * 6. Similarly, the court found that Comcast's retention of records regarding, *inter alia*, the technicians' arrival and departure times, employment status and history, criminal background and drug testing results "is only an extension of Comcast's control procedures. * * * The information reflected in th[o]se records is used to ensure that Comcast receives the services for which it is entitled, and that the individuals fulfilling them are authorized to do so." Id.

Furthermore, the Jacobson court rejected the plaintiffs' claim that Comcast had control over their wages because it payed the contractors on a per service basis and the contractors, in turn, paid their technicians on a per service basis. 2010 U.S. Dist. LEXIS 102834, [WL] at * 6. Instead, the court found that:

> "Comcast's involvement in the pay structure of the [Contractors] is typical of any client/independent contractor relationship. Comcast does not issue the  **[*31]** technicians' pay checks, pay stubs, or W-2s, nor do the technicians submit pay records or timesheets to Comcast. * * * To find that th[e] arrangement [to pay contractors on a per service basis] places Comcast in control of [the technicians'] wages would dramatically expand the FLSA to subsume traditional independent contractor relationships. * * * The [Contractors], not Comcast, determine whether to pay their employees on a per service or salary basis, and at what rate."

Id.

The facts of this case are virtually indistinguishable from those presented in Jacobson and I find the district court's reasoning in that case to be persuasive. Accordingly, there is no genuine issue for trial regarding Cablevision's lack of formal control over Adderley's technicians.

2. Functional Control

Plaintiff and Adderley's other technicians do not work on Cablevision's premises and although they install and service Cablevision's equipment, they use their own or Adderley's tools to do so and do not "use," i.e., avail themselves of, Cablevision's equipment to accomplish the

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 14586    Page 11 of 12

Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 74 of 102

installation and service. Moreover, although Cablevision performs quality control inspections and reviews of the work performed by Adderley's **[\*32]** technicians, it does not exercise any significant degree of supervision over plaintiff's or any particular technician's work. In addition, Adderley controls plaintiff's and its other technicians' work assignments and work schedule; Cablevision does not provide plaintiff or Adderley's other technicians with a uniform that they must wear; Cablevision's identification badges and vehicle signage clearly indicate that the technicians were employed by Adderley, a contractor of Cablevision; and Cablevision does not provide plaintiff, or Adderley's other technicians, with any type of employee benefits. Furthermore, plaintiff and Adderley's other technicians only perform work for Cablevision pursuant to the SIS Agreement, i.e., to the extent Adderley (or another contractor with whom they are employed) is hired to do so, and Adderley's business could "shift as a unit" from Cablevision to another cable media provider. In addition, although plaintiff and Adderley's other technicians perform discrete jobs that are integral to Cablevision's services, the degree of skill required to perform those jobs weighs against a finding of employer status. See, e.g. Chao, 16 Fed. Appx. at 107 (finding that **[\*33]** the degree of skill required to install and repair cable equipment weighed against a finding of employee status); Freund v. Hi-Tech Satellite, Inc., 185 Fed. Appx. 782, 784 (11th Cir. 2006) (accord). The only relevant factor weighing in favor of a joint employment relationship is the fact that Adderley, although not its parent company ACI, works exclusively for Cablevision, albeit by its own choice.

In determining that there was no triable issue of fact with respect to whether Comcast was a joint employer of the plaintiffs, the Jacobson court considered the following similar factors: (1) that Comcast does not provide technicians with uniforms, vehicles or tools, with the exception of a "star key" needed to unlock Comcast's boxes, and each contractor has its own premises out of which their technicians' work; (2) that although the contractors work primarily or exclusively for Comcast, "the absence of a single client base is not a proxy for joint employment because it is perfectly consistent with a legitimate subcontracting relationship," 2010 U.S. Dist. LEXIS 102834, [WL] at \* 7 (internal quotations and citation omitted); see also Zheng I, 355 F.3d at 72 ("Although \* \* \* the absence of a broad client base is \* \* \* **[\*34]** [not] a perfect proxy for joint employment (because [it] [is] \* \* \* perfectly consistent with a legitimate subcontracting relationship), the factfinder can use th[is] readily verifiable fact[] as a starting point in uncovering the economic realities of a business relationship."); and (3) that "the technicians only work for Comcast to the extent their [Contractor] is hired to do so," Jacobson, 2010 U.S. Dist. LEXIS 102834, 2010 WL 3769120, at \* 7.

As noted above, the undisputed or uncontroverted facts of this case are virtually indistinguishable from the facts presented in Jacobson and I find the Jacobson court's well-reasoned findings and conclusions to be persuasive. Accordingly, I conclude that Cablevision is not the joint employer of plaintiff or Adderley's other technicians within the meaning of both the FLSA and the New York Labor Law. See also Santelices v. Cable Wiring, Inc., 147 F.Supp.2d 1313, 1326-8 (S.D. Fla. 2001) (finding that the cable company was not a joint employer of a contractor's technician where it exercised only minimal oversight of the technician's performance to ensure quality control and there was no evidence, *inter alia*, that the cable company checked the technician's work on a daily basis, **[\*35]** gave work commands or otherwise intervened in the performance of the technician's duties). Therefore, Cablevision's motion for summary judgment is granted and the complaint is dismissed in its entirety as against Cablevision.

III. Conclusion

For the reasons stated herein, Cablevision's motion for summary judgment is granted and the complaint is dismissed with prejudice as against Cablevision. The remaining parties are directed to appear with authority or with persons with authority to settle this matter in my courtroom located at 1010 Federal Plaza, Central Islip, New York, 11722, on **March 4, 2011 at 11:00 a.m**. for a pretrial conference.

SO ORDERED.

SANDRA J. FEUERSTEIN ▾

United States District Judge

Dated: February 11, 2011

Central Islip, N.Y.

Service:  **Get by LEXSEE®**
Citation: **2011 U.S. Dist. LEXIS 14386**
View: Full
Date/Time: Friday, September 23, 2011 - 7:30 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

In

About LexisNexis   | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright ©  2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - By Citation - 2011 U.S. Dist. LEXIS 27613

Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 76 of 102

Page 1 of 8

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's®* | More | | History | Alerts |

**FOCUS™** Terms            Advanced...   **Get a Document**            View Tutorial

Service: **Get by LEXSEE®**
Citation: **2011 U.S. Dist. LEXIS 27613**

*2011 U.S. Dist. LEXIS 27613, \**

HILDA L. SOLIS, Plaintiff, -vs- SECURITY CREDIT SYSTEMS, INC., et al., Defendant.

08-CV-267-JTC

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

2011 U.S. Dist. LEXIS 27613

March 15, 2011, Decided
March 17, 2011, Filed

**CORE TERMS:** overtime, collector, summary judgment, overtime compensation, de minimis, compensable, genuine, weekly, unpaid, minutes, record-keeping, recording, times, time clock, compensated, scheduled, payroll, spent, periods of time, hours worked, issues of material fact, reasonable inferences, aggregate, recorded, regular, meal, accurately, matter of law, regular rate, initial burden

**COUNSEL:**  [\*1]  For Elaine L. Chao, Secretary of Labor, United States Department of Labor, Plaintiff: Chaya Mayim Mandelbaum ▾, Gregory F. Jacob, Patricia M. Rodenhausen ▾, LEAD ATTORNEYS, Darren J. Cohen ▾, Elena S. Goldstein, Susan Beth Jacobs ▾, U.S. Department of Labor, Office of the Solicitor, New York, NY.

For Security Credit Systems, Inc., Angelo J. Travale, Jr., Individually, Defendants: James N. Schmit ▾✔, LEAD ATTORNEY, Jaeckle Fleischmann & Mugel LLP, Buffalo, NY.

**JUDGES:** JOHN T. CURTIN ▾, United States District Judge.

**OPINION BY:** JOHN T. CURTIN ▾

**OPINION**

By order of Chief United States District Judge William M. Skretny dated November 5, 2010 (Item 46), this matter has been reassigned to the undersigned for all further proceedings.

The complaint in this action was filed on April 2, 2008, by plaintiff Elaine Chao [1] as Secretary of the United States Department of Labor ("DOL"), against Security Credit Systems, Inc. ("Security Credit") and its owner Angelo J. Travale, Jr., seeking injunctive relief and damages on behalf of Security Credit employees pursuant to various provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* Plaintiff claims that, during the three-year

period preceding the filing of the complaint, defendants **[*2]** "willfully and repeatedly" violated the overtime compensation and record-keeping requirements of the FLSA and its implementing regulations (Item 1, ¶¶ VII-IX).

### FOOTNOTES

, 1 On February 24, 2009, Hilda L. Solis replaced Elaine Chao as Secretary of Labor, and is therefore automatically substituted as the plaintiff herein pursuant to Rule 25(d) of Federal Rules of Civil Procedure.

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that, after discovery, plaintiff has come forward with no credible evidence to support the claims alleged. For the reasons that follow, defendants' motion is denied.

### BACKGROUND

The facts incorporated in this background section are derived from the parties' statements submitted in accordance with Rule 56.1 of the Local Rules of Civil Procedure for the Western District of New York (Item 38-5; Item 43-2), and accompanying affidavits and exhibits.

Security Credit is a collection agency located in Buffalo, New York, engaged in the business of undertaking collections of overdue accounts on behalf of various clients, which include retail corporations, financial institutions, medical facilities, community colleges, and **[*3]** universities. Security Credit employs "collectors," whose job duties include contacting debtors to try to negotiate repayment of debts owed to Security Credit's clients. Collectors generally are assigned a weekly schedule that runs from 8:00 a.m. to 4:30 p.m. on most days, and from 10:00 a.m. to 7:00 p.m. one or two days per week, for a total of 40 hours each week. They are required to perform all of their job duties on Security Credit's telephone and computer system (Item 38-5, ¶¶ 1-9, 23).

Collectors use a "hand scan" time clock to record the times they begin and end their work, as well as their break time and meal time. When working from 8:00 a.m. to 4:30 p.m., collectors receive two paid fifteen-minute breaks and one unpaid thirty-minute meal period. When working the 10:00 a.m. to 7:00 p.m. shift, collectors receive two paid fifteen-minute breaks, one thirty-minute unpaid lunch break, and one thirty-minute unpaid dinner break. The time clock generates electronic reports of the time recorded by collectors, referred to as "Archived Time Reports" (*id.* at ¶¶ 10-12).

According to Security Credit's written policies:

ACCURATELY RECORDING TIME WORKED IS THE RESPONSIBILITY OF EVERY EMPLOYEE.

TIME **[*4]** WORKED IS ALL THE TIME ACTUALLY SPENT ON THE JOB PERFORMING ASSIGNED DUTIES.

If an employee punches in [e]arly or punches out late, without prior approval of a supervisor, the time recorded is defaulted to an 8-hour workday. . . .

Overtime work must always be approved before it [is] performed. Item 44-4, Exs. A ("Weekly Work Hours" policy), C ("Timekeeping and Use of Time Clock" policy). During the three-year period relevant to the claims in this action, no collector has requested approval for overtime,

nor has Security Credit requested that any collector work overtime (*see* Item 38-3, Ex. F, at 90; Ex. E, at 160).

In March 2007, DOL Investigator Martin Murray initiated an investigation in response to a complaint regarding Security Credit's compliance with the FLSA's requirement that employers pay employees one and one-half times their regular rate of pay for hours worked in excess of forty hours per week. Mr. Murray interviewed several employees, reviewed company documents, and examined the Archived Time Reports and payroll records of a sample of collectors for a single two-week pay period in March 2007. Based on the information he received, Mr. Murray concluded that Security Credit collectors **[*5]** frequently worked more than forty hours in a week, but were not compensated at one and one-half times their regular rate of pay for that time, as required by the statute (Item 38-5, ¶¶ 33-36). Mr. Murray calculated that, on average, each collector who was paid for seventy-six hours of work or more during a two-week pay period was due one hundred minutes of overtime pay, which totaled in the aggregate over $50,000 for the period from April 2005 through October 2009 (*id.* at ¶¶ 43-44; *see also* Item 44-14, ¶ 11).

Following review of Mr. Murray's investigation, the DOL commenced this action alleging that, since April 2005, Security Credit has failed to compensate employees for overtime worked, in violation of FLSA Sections 7 and 15(a)(2), and has failed to make, keep and preserve adequate and accurate records of employees' wages, hours, and terms and conditions of employment, in violation of FLSA Sections 11(c) and 15(a)(5) (*see generally* Item 1). Attached to the complaint as Exhibit A is a list of 116 former and current Security Credit employees who the DOL claims are entitled to unpaid overtime compensation. By order entered April 2, 2010, plaintiff was granted leave to amend Exhibit A **[*6]** to include on the list an additional 83 current and former employees revealed during discovery who are alleged to be entitled to overtime compensation as well (*see* Item 36).

Defendants have now moved for summary judgment dismissing the complaint in its entirety. Defendants contend that the "overtime" hours reported by Mr. Murray as a result of his limited comparison of Archived Time Reports for a small number of employees with payroll records for a single pay period actually reflects only minor discrepancies between time clock records and actual hours worked, not compensable "overtime" under the FLSA and DOL regulations. Defendants also contend that plaintiff's record-keeping claim must fail because, as recognized by the regulations, these minor reporting discrepancies are unavoidable when an employer uses a time clock to record employees' work hours, and therefore cannot be considered to be violations of the FLSA.

## DISCUSSION

### I. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is **[*7]** material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Hamilton Bank, N.A. v. Kookmin Bank*, 245 F.3d 82, 89 (2d Cir. 2001).

In reaching a summary judgment determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 574 (2d Cir. 2005). The moving party bears the initial burden of establishing that there are no genuine issues of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). That burden may be satisfied by pointing out the absence of evidence to support the non-movant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once this initial showing

is made, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *Anderson*, 477 U.S. at 256; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996). Mere conclusory allegations are insufficient and  **[\*8]** "[t]here must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts . . .'" to defeat a motion for summary judgment. *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)), *cert. denied*, 500 U.S. 928, 111 S. Ct. 2041, 114 L. Ed. 2d 125 (1991).

The trial court's function at the summary judgment stage "is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Services, Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Keystone Manufacturing Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 549 (W.D.N.Y. 2005). "In examining the record it must be kept in mind that only by reference to the substantive law can it be determined whether a disputed fact is material to the resolution of the dispute." *Gallo*, 22 F.3d at 1224 (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988)). In this case, the substantive  **[\*9]** law is the FLSA.

## II. Fair Labor Standards Act

### A. Overtime

The DOL's claim that Security Credit failed to pay overtime compensation invokes Section 207 (a)(1) of the FLSA, which provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The FLSA's overtime provisions "were designed to remedy the 'evil of overwork' by ensuring workers were adequately compensated for long hours, as well as by applying financial pressure on employers to reduce overtime." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008) (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577-78, 62 S. Ct. 1216, 86 L. Ed. 1682 (1942)). To accomplish these goals, "the Supreme Court consistently has interpreted the Act liberally and afforded its protections exceptionally broad coverage." *Id.* (citing cases).

Although the courts have not precisely defined the elements of a claim for failure to pay overtime compensation under 29 U.S.C. § 207(a), the Second Circuit has held that the  **[\*10]** plaintiff (in this case, the Secretary of Labor bringing suit on behalf of affected Security Credit employees) has the initial burden to "produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated and produce sufficient evidence to show the amount and extent of that work 'as a matter of just and reasonable inference.'" *Reich v. Southern New England TelecommunicationsCorp.*, 121 F.3d 58, 67 (2d Cir. 1997) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946)). As explained by the Second Circuit, in meeting this initial burden under *Mt. Clemens*, "the Secretary need not present testimony from each underpaid employee; rather, it is well-established that the Secretary may present the testimony of a representative sample of employees as part of [her] proof of the *prima facie* case under the FLSA." *Southern New England*, 121 F.3d at 67. Upon making this showing, described in the case law as "minimal," *see, e.g., Secretary of Labor v. DeSisto*, 929 F.2d 789, 793 (1st Cir. 1991), the burden shifts to the employer:

> to come forward with evidence of the precise amount of work performed or with evidence to negative  **[\*11]** the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate.

Get a Document - by Citation - 2011 U.S. Dist. LEXIS 127613    Page 5 of 8

Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 80 of 102

*Mt. Clemens*, 328 U.S. at 687-88.

In this regard, while the term "employ" is defined in the FLSA as "to suffer or permit to work," 29 U.S.C. § 203(g), the statute does not contain a definition of "work." However:

> The broad meaning that has emerged from Supreme Court cases describes work as exertion or loss of an employee's time that is (1) controlled or required by an employer, (2) pursued necessarily and primarily for the employer's benefit, and (3) if performed outside the scheduled work time, an integral and indispensable part of the employee's principal activities.

*Gotham Registry*, 514 F.3d at 285 (citing *Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598, 64 S. Ct. 698, 88 L. Ed. 949 (1944)); *Armour & Co. v. Wantock*, 323 U.S. 126, 133, 65 S. Ct. 165, 89 L. Ed. 118 (1944) ; *Steiner v. Mitchell*, 350 U.S. 247, 252-53, 76 S. Ct. 330, 100 L. Ed. 267 (1956)); *see also Holzapfel v. Town of Newburgh, N.Y.*, 145 F.3d 516, 521 (2d Cir.) (question whether employee is entitled to overtime pay is a mixed question of law and fact; court determines **[*12]** as a matter of law whether employee's activities could potentially constitute "work," and jury decides as a question of fact (1) how much of employee's time spent with employer fell within court's definition of "work" and would be compensable, and (2) how much of that time was spent with the employer's actual or constructive knowledge), *cert. denied*, 525 U.S. 1055, 119 S. Ct. 619, 142 L. Ed. 2d 558 (1998).

Upon review of the entire record presented thus far, the court finds the evidence proffered by the Secretary sufficient to make a *prima facie* showing that Security Credit employees have performed activities outside their scheduled work time, and for which they were not compensated, which could potentially be considered an integral and indispensable part of the employees' principal activities "as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. For example, several employees testified at their depositions that they performed work-related activities before their shifts began or during the time allotted for breaks and meals, including reading through client files; reviewing "promise sheets" and "hot sheets;" checking and responding to voice mail and other messages; reviewing faxes, letters, and **[*13]** other documents related to accounts; planning their calls to clients; and returning calls or initiating client contact when phones were available. *See, e.g.*, Item 43-3, Ex. G, at 11-12, 16-17 (Garrett King); Ex. H, at 11-12 (Michael Frank); Ex. I, at 16-18, 22 (Linda Fazio).

Defendants contend that all of this alleged "overtime work" occurred either a few minutes before employees began their day, a few minutes after the employees ended their day, or at the very end of a break or meal period, and "is so negligible as to be *de minimis* and therefore not compensable under the FLSA." *Reich v. New York City Transit Authority*, 45 F.3d 646, 652 (2d Cir. 1995). Under the *de minimis* doctrine, first articulated in *Anderson v. Mt. Clemens Pottery*, employers may disregard otherwise compensable work for purposes of the FLSA's overtime requirements "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours . . . . It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Mt. Clemens*, 328 U.S. at 692. The Second Circuit considers three factors in determining whether otherwise **[*14]** compensable time should be considered *de minimis*: (1) the practical administrative difficulty of recording additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis. *Singh v. City of New York*, 524 F.3d 361, 370-71 (2d Cir. 2008); *see also New York City Transit Authority*, 45 F.3d at 652 (citing *Lindow v. United States*, 738 F.2d 1057, 1062-63 (9th Cir. 1984)).

Defendants rely on the holding in *Lindow*, in which the Ninth Circuit applied the *de minimis* doctrine to a claim for overtime compensation under the FLSA in a case of first impression. The circuit court affirmed the district court's determination after trial that seven to eight minutes spent each day by Army Corps of Engineer employees, reading a log book and exchanging information with other employees prior to the start of their work shift, was *de minimis* and therefore not compensable. Noting that "most courts have found daily periods of 10 minutes *de*

*minimis,* even though otherwise compensable . . . ," *Lindow*, 738 F.2d at 1062 (citing cases), the *Lindow* court focused on "the **[*15]** practical administrative difficulty of recording small amounts of time for payroll purposes" *Id.* (citing 29 C.F.R. § 785.47). ² Based upon the proof at trial, which showed a wide variance in the amount of pre-shift time spent on compensable activities (as opposed to social activities like engaging in conversation and drinking coffee), and notwithstanding the substantial size of the aggregate claim, the court found that the time for which the employees sought overtime compensation was *de minimis* "because of the administrative difficulty of recording the time and the irregularity of the additional pre-shift work." *Id.* at 1064.

## FOOTNOTES

**2** This regulation states:

> In recording working time under the Act, insubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are *de minimis.* This rule applies only where there are uncertain and indefinite periods of time involved of a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not arbitrarily **[*16]** fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47 (citations omitted).

In contrast, in this case it is not disputed that Security Credit's "hand scan" procedure provides a relatively precise method for generating Archived Time Reports, at least arguably minimizing the practical administrative difficulty of recording the time collectors spend at work before and after their shifts and during allotted break times. Indeed, *Lindow* itself holds that employers "must compensate employees for even small amounts of daily time unless that time is so minuscule that it cannot, as an administrative matter, be recorded for payroll purposes." *Lindow*, 738 F.2d at 1062-63. In addition, the Secretary relies on the deposition testimony of former and current employees, as well as the Archived Time Reports themselves, as evidence from which a reasonable inference can be drawn that the activities at issue are primarily pursued for the employer's benefit, occur on a fairly regular basis, and are engaged in by a significant number of **[*17]** collectors giving rise to an aggregate claim for unpaid overtime compensation of substantial size.

Based upon the record presented, and considering the admonition to afford the FLSA's overtime requirements "exceptionally broad coverage" in recognition of the statute's "remedial and humanitarian goals," *Gotham Registry*, 514 F.3d at 285, the court finds that the Secretary has made a sufficient *prima facie* showing that Security Credit employees have performed activities that could potentially constitute overtime work for which they were improperly compensated under Section 207(a) of the FLSA, and that genuine issues of material fact exist regarding the determination whether that work activity was so negligible as to be considered *de minimis.* Accordingly, defendants are not entitled to summary judgment dismissing plaintiff's claim for unpaid overtime compensation.

## B. Record-Keeping

In addition to the claim for unpaid overtime, the Secretary also alleges that defendants violated the FLSA's record-keeping requirements, set forth at Section 211(c) as follows:

> Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records **[\*18]** of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder.

29 U.S.C. § 211(c). The Department of Labor regulations further require employers to preserve, for three years, records of the (1) total daily and weekly hours employees work; (2) employees' regular hourly rates of pay for each week that overtime is worked; (3) total daily or weekly straight time earnings and (4) total weekly premium pay for overtime hours. *See* 29 C.F.R. §§ 516.2-516.5. Although a violation of these requirements "does not result in a penalty *per se*, . . . an employer's failure to produce evidence of the hours an employee worked and wages paid may result in the court having to approximate damages." *Genarie v. PRD Management, Inc.*, 2006 U.S. Dist. LEXIS 9705, 2006 WL 436733, at \*15 (D.N.J. Feb. 17, 2006) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. at 687-88); *see also Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991) **[\*19]** ("In the absence of adequate employer records of employees' wages and hours, as required by the FLSA, the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow the employee or the Secretary to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred.").

Security Credit contends that the Archived Time Reports generated by the "hand scan" time clock, and the promulgation of policies instructing all collectors to accurately record their time at work, are sufficient as a matter of law to meet the FLSA's record-keeping requirements. The Secretary responds that while the Archived Time Reports provide a record of the times collectors clock in and clock out, defendants' records do not provide any basis for aggregating this data to accurately reflect the total daily or weekly hours worked. Instead, defendants calculate collectors' total hours merely by reference to their formal schedule of forty hours per week.

Based on its review of the submissions on file, the court finds that the Secretary has prevailed on this argument as well. Simply put, **[\*20]** the same evidence found sufficient to raise genuine issues of material fact regarding collectors' uncompensated "overtime" activities must likewise be deemed sufficient to raise a genuine issue as to whether the Archived Time Reports accurately reflect collectors' total daily and weekly hours worked. Whether this evidence is also sufficient to satisfy the burden-shifting and damage calculation standards articulated by the Supreme Court in *Mt. Clemens* is a question best left for the trier of fact.

Accordingly, defendants are not entitled to summary judgment dismissing plaintiff's claim for violation of the FLSA's record-keeping requirements.

**CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment (Item 38) is denied in its entirety.

A telephone conference with the court is scheduled for Wednesday, March 30, 2011, at 2:00 p.m. to discuss a schedule for further proceedings. The court will initiate the call.

So ordered.

Dated: 3/15, 2011

/s/ John T. Curtin

JOHN T. CURTIN ▾

United States District Judge

Service: **Get by LEXSEE®**
Citation: **2011 U.S. Dist. LEXIS 27613**
View: Full
Date/Time: Friday, September 23, 2011 - 7:31 PM EDT

In

About LexisNexis   | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright ©  2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 109656

Case 5:08-cv-00823-NPM-ATB   Document 72   Filed 09/23/11   Page 84 of 102

Page 1 of 7

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's®* | More | | History | Alerts |

**FOCUS™** Terms     Advanced...    **Get a Document**    View Tutorial

Service: **Get by LEXSEE®**
Citation: **2008 U.S. Dist. LEXIS 109656**

*2008 U.S. Dist. LEXIS 109656, ***

LOUIS THIBAULT, JR. VERSUS BELLSOUTH TELECOMMUNICATIONS, INC. ET AL.

CIVIL ACTION NO: 07-0200 SECTION: "S" (2)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

2008 U.S. Dist. LEXIS 109656

November 10, 2008, Decided
November 10, 2008, Filed

**SUBSEQUENT HISTORY:** Partial summary judgment denied by, Summary judgment granted by Thibault v. BellSouth Telecomms., Inc., 2009 U.S. Dist. LEXIS 17282 (E.D. La., Mar. 6, 2009)

**PRIOR HISTORY:** Thibault v. BellSouth Telcoms., Inc., 2008 U.S. Dist. LEXIS 91945 (E.D. La., Oct. 30, 2008)

**CORE TERMS:** splicer, summary judgment, yard, independent contractor, time sheet, supervisor, motor home, genuine issue, splicing, overtime, arrived, bucket, matter of law, hours per week, moving party, entitled to judgment, contractor, initiative, skill, temporary, van, telecommunication, partial, filled, contract claim, issues of material fact, employee status, material fact, produce evidence, degree of control

**COUNSEL:** [*1] For Louis Thibault, Jr., Plaintiff: Clement Francis Perschall, Jr. ▾, LEAD ATTORNEY, Clement F. Perschall, Jr., Attorney at Law, Metairie, LA; Arthur John O'Keefe, Arthur J. O'Keefe, Attorney at Law, Lake Charles, LA.

For BellSouth Telecommunications, Inc., Directional Road Boring, Inc., Defendants: Wade P. Webster ▾✔, LEAD ATTORNEY, Fowler Rodriguez (New Orleans), New Orleans, LA.

For Robert J. Parker, doing business as, Parker Communications, Defendant: Christine S. Goldberg ▾, LEAD ATTORNEY, The Kullman Firm (Baton Rouge), Baton Rouge, LA; Melissa M. Mulkey ▾, The Shaw Group, Inc., Baton Rouge, LA; Timothy W. Lindsay, Vasilios Manthos ▾, The Kullman Firm (New Orleans), New Orleans, LA.

For Parker Communications, Inc., Parker Communications, L.L.C., Parker Communications, Inc., Directional Road Boring, Inc., Parker Communications, L.L.C., Defendants: Christine S. Goldberg ▾, LEAD ATTORNEY, The Kullman Firm (Baton Rouge), Baton Rouge, LA; Melissa M. Mulkey ▾, The Shaw Group, Inc., Baton Rouge, LA; Vasilios Manthos ▾, The Kullman Firm (New Orleans), New Orleans, LA.

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 109656    Page 2 of 7

Case 5:08-cv-00823-NPM-ATB   Document 79-5   Filed 09/23/11   Page 85 of 102

For Robert W. Parker, Defendant: Christine S. Goldberg ▾, LEAD ATTORNEY, The Kullman Firm (Baton Rouge), Baton Rouge, LA; Vasilios Manthos ▾, **[*2]** The Kullman Firm (New Orleans), New Orleans, LA.

For Parker Communications, Inc., Cross Claimant: Christine S. Goldberg ▾, LEAD ATTORNEY, The Kullman Firm (Baton Rouge), Baton Rouge, LA; Melissa M. Mulkey ▾, The Shaw Group, Inc., Baton Rouge, LA; Vasilios Manthos ▾, The Kullman Firm (New Orleans), New Orleans, LA.

For Directional Road Boring, Inc., Cross Defendant: Wade P. Webster ▾📧, LEAD ATTORNEY, Fowler Rodriguez (New Orleans), New Orleans, LA.

For Robert J. Parker, doing business as, Parker Communications, Cross Claimant: Christine S. Goldberg ▾, LEAD ATTORNEY, The Kullman Firm (Baton Rouge), Baton Rouge, LA; Melissa M. Mulkey ▾, The Shaw Group, Inc., Baton Rouge, LA; Timothy W. Lindsay, Vasilios Manthos ▾, The Kullman Firm (New Orleans), New Orleans, LA.

**JUDGES:** MARY ANN VIAL LEMMON ▾, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** MARY ANN VIAL LEMMON ▾

**OPINION**

**ORDER AND REASONS**

**IT IS HEREBY ORDERED** that Louis Thibault, Jr.'s motion for partial summary judgment is **DENIED**. (Document # 118.)

**IT IS FURTHER ORDERED** that BellSouth Telecommunications, Inc.'s ▾ motion for summary judgment is **GRANTED**. (Document # 119.)

**IT IS FURTHER ORDERED** that Directional Road Boring, Inc.'s motion for summary judgment is **GRANTED**. (Document # 122.)

**IT IS FURTHER [*3] ORDERED** that the motion for summary judgment of Robert J. Parker d/b/a Parker Communications, Parker Communications, Inc., Parker Communications, LLC, and Robert W. Parker is **GRANTED**. (Document # 123.)

**IT IS FURTHER ORDERED** that, as they pertain to the motions for summary judgment, Louis Thibault, Jr.'s motion to exclude and strike income tax returns is **DENIED**, and the motion to exclude the report of James L. White, CPA and Bernard & Franks, a Corporation of Certified Public Accountants, is **GRANTED**. (Document # 117.) **1**

**FOOTNOTES**

**1** The court need not address the motion to strike as it pertains to the documents and testimony at trial.

**I. BACKGROUND**

Louis Thibault, Jr. was hired as a "splicer" by Robert J. Parker d/b/a Parker Communications (Parker) to repair telecommunication wiring damaged as a result of Hurricane Katrina. Thibault was advised that he would receive supplies and work under the supervision of Directional Road Boring, Inc. (Directional) and BellSouth Telecommunications, Inc. ▾ (BellSouth ▾). Thibault

reported to the BellSouth construction yard on Airline Drive in Jefferson Parish on October 3, 2005.

Thibault alleges that the offer of employment included six months of work at $ 68 per hour **[*4]** for 84 hours per week and the furnishing of a paid location for a motor home. Thibault was required to complete a daily time sheet and return it to Directional at the end of each day to be signed by supervisors from Directional and BellSouth. Thibault was paid weekly by Parker. On January 8, 2006, Thibault was discharged. His last pay check did not include overtime or payment for the time remaining on the expected six months of employment.

After making a demand for the amount allegedly due, Thibault filed a petition for damages in the 24th Judicial District Court for the Parish of Jefferson, State of Louisiana, against BellSouth, Parker, [2] and Directional, alleging violations of the Fair Labor Standards Act (FLSA), 29 U.S.C § 216, state-law breach of contract, and failure to pay wages under La. Rev. Stat. 23:631-32. BellSouth removed the case to federal court with the consent of Parker and Directional, asserting federal question jurisdiction under § 216. The court denied Thibault's motion to remand.

### FOOTNOTES

[2] The plaintiff sued Parker d/b/a Parker Communications in his individual capacity on December 7, 2006. Parker Communications was incorporated in South Carolina on January 30, 2006 and is **[*5]** now known as Parker Communications, Inc. Robert Parker, the president of Parker Communications, Inc., consented to the removal to federal court individually and on behalf of Parker Communications.

Thibault filed a motion *in limine* to exclude and strike his income tax returns; a motion in *limine* to exclude the testimony of James L. White CPA and Bernard & Franks, a corporation of certified public accountants; and a motion for partial summary judgment on the issue of overtime pay. BellSouth, Directional, and Parker filed motions for summary judgment on grounds that Thibault is not an employee, but an independent contractor; he is not covered by the provisions of the Louisiana Wage Payment Act; and there was no contractual guarantee regarding the term of the splicing work.

## II. DISCUSSION

### A. Legal standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there **[*6]** is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### B. FLSA

Thibault contends that he is entitled to overtime compensation for hours worked in excess of 40

hours per week, pursuant to the FLSA, 29 U.S.C. § 207. The defendants contend that Thibault is an independent contractor, not an employee, and therefore not covered by the FLSA.

"The definition of employee under the FLSA is particularly broad." Hopkins v. Cornerstone America, 545 F.3d 338, 2008 WL 4542491 *2 (5th Cir. 2008). To determine if a worker is an employee, the court **[*7]** focuses on "whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." Id. The court focuses on five non-exhaustive factors: "(1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." Id. No factor is determinative, and each is applied to gauge the economic dependence of the alleged employee. Id.

The material facts are essentially undisputed. The parties present the following facts in support of the factors to determine Thibault's employment status.

## 1. Control

The contract splicers reported to a special yard on Airline Drive to receive their instructions, and the BellSouth ⌄employees reported to Duncan yard in Kenner. Chris Floyd, a BellSouth ⌄first-level supervisor, received his instructions for the next day's work each afternoon at BellSouth's ⌄ Duncan yard. The instructions were distributed to a ten-man crew **[*8]** by Directional supervisors, Dave DeSanto and Mike Allen. Parker's supervisor, Dan Keener, initially met the contract splicers and confirmed that they would work 84 hours per week at $ 68 per hour, but Parker exercised no control over how assignments were made. BellSouth ⌄and Directional provided verbal instructions and blueprints regarding the particular daily assignment. BellSouth ⌄and Directional supervisors checked to see if the contract splicers were present on the job, but they did not check the splicers' work.

The contract splicers attended a daily safety meeting, then selected the materials needed for the day from the yard. The contract splicers, as well as the BellSouth ⌄employees, worked a twelve-hour day, which was dictated by the BellSouth ⌄employees' union contract. They returned to their respective yards at 7:00 p.m. and filled out time sheets. The BellSouth ⌄ employees entered the information into a computer, and the contract employees presented hand-written time sheets to Floyd for his signature. Parker's representative collected the time sheets, and Parker issued payment based on the number of hours reflected on the time sheets.

## 2. Investment

In September 2005, Parker contacted **[*9]** Bill Peek to perform contract work in the New Orleans area. The contract splicers were required to provide their own tools, equipment, and a bucket truck to perform the work. Peek spoke to Thibault about the opportunity, and Thibault decided to go to New Orleans, even though he had never worked as a splicer. Thibault borrowed some of the tools from Peek and purchased safety equipment and additional tools for $ 400. He also obtained the use of a bucket van in exchange for fixing the vehicle. Thibault drove his motor home, in which he would live while in New Orleans, and towed the bucket van. Thibault arrived in New Orleans on October 3, 2005. For the first two weeks, Thibault parked his motor home in a lot east of the yard. Thereafter, he paid $ 750 per month to park at a trailer park.

## 3. Worker's opportunity for profit and loss

Thibault's compensation and number of hours worked on this job were determined by the various contracts among BellSouth, ⌄Parker, and Directional. Thibault, however, controlled his expenses in order to maximize his profit. The opportunity for profit depended on each splicer's interest in seeking work with various companies throughout the country.

#### 4. [*10] Skill and initiative

Splicing work requires specialized skill. Thibault relied on Peek to train him on-the-job and solicited advice from other members of his crew. Thibault's initiative on the job was limited to the task before him.

#### 5. Permanency

The splicing work performed after Hurricane Katrina was temporary, and none of the contract splicers worked exclusively for the defendants. The nature of splicers' work in the industry is to move from project to project and from company to company as opportunities arise. This was Thibault's first experience as a contract splicer, and he did not intend to remain in the field for more than seven or eight months. He owned a company, K & L Sales, and intended to return to Delaware to run his business full time. When Thibault was laid off as a contract splicer, Directional offered him a job as a splicer, and he declined. After leaving New Orleans, Thibault returned to his business in Delaware and has not performed work as a splicer since then.

#### 6. Other factors

When Thibault arrived on the job, he filled out W-9 and I-9 forms and completed a "Subcontractor Information Sheet." On the W-9 form, Thibault listed his business name as K & L Sales. Thibault [*11] received checks in his own name until November 7, 2005, when he requested that Parker make his checks payable to his company, K & L Sales.

As in most employee-status cases, there are facts weighing in favor of employee status and independent contractor status. See Carrell v. Sunland Construction, Inc., 998 F.2d 330, 334 (5th Cir. 1993). Weighing in favor of employee status are the facts that the defendants dictated Thibault's schedule, his hourly rate, and the number of hours he worked. The remaining factors, however, weigh in favor of independent-contractor status. Thibault worked as a splicer only on this one occasion, and expressed no intent or understanding that the position was permanent. Thibault could have moved from project to project performing work as a splicer for other companies as the opportunity arose if he wanted to. However, he returned to his business in Delaware. Additionally, he requested that Parker pay his company for the hours that he worked as a splicer. In his deposition, Thibault described the specialized work he performed involving large phone cables with as many as 7,400 wires going in and out of terminals. Although Thibault was not a trained splicer when he [*12] arrived in New Orleans, he worked closely with Peek, who introduced him to the job and provided him with the necessary training. The defendants provided supervisors to check that the splicers were working in their assigned areas and to collect their time sheets and forward them to Parker. However, the manner in which the splicers performed their work was not supervised. As a requirement for the position, Thibault arrived with the equipment, tools, and bucket van, albeit mostly borrowed, to perform the job. BellSouth provided these items for its own employees, but not for contract splicers.

Accordingly, Thibault's status as a splicer is consistent with that of an independent-contractor. Because Thibault is in business for himself, not economically dependent upon the defendants, he does not meet the definition of employee under the FLSA. Thibault's motion for partial summary is denied, and the defendants' motions for summary judgment are granted.

#### C. Breach of contract

Thibault contends that the defendants breached the contract by which they guaranteed him six months of work and the furnishing of a paid location for his motor home. He seeks wages due for the 12 weeks remaining under the [*13] employment contract and three months of rent to park his motor home. The defendants argue that there is no evidence that Parker, Directional or BellSouth guaranteed that the splicing work would be available for any set term or that they would pay Thibault's expenses.

"A contract is formed by the consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La. Civ. Code. art 1927. The party asserting a contract has the burden of proving the existence of the contract. See J. Caldarera & Co., Inc. v. Louisiana Stadium Dist., 750 So.2d 284, 288 (La. Ct. App. 1999).

To support his claim, Thibault points to the one-year, service agreement between BellSouth and Directional, the subcontract agreement between Parker and Directional incorporating the same terms as the service agreement, Chris Floyd's employment as construction manager at the Kenner yard for at least nine months, Peek's testimony that there was at least six months of work on the telephone cables, Ron Baker's work as a **[*14]** splicer out of the Kenner yard for three months longer than Thibault, and an e-mail advising that the hourly rate would be reduced effective May 1, 2006, and projecting four or five months of additional work.

This circumstantial evidence does not specifically address Thibault's contention that he was hired for a fixed term of six months or promised a paid location for his motor home. Robert Parker testified that it is commonly known that storm work is temporary, and there is no guarantee how long it will last. Further, shortly after Thibault was terminated from the job obtained through Parker, Directional offered him employment. Thibault declined the offer and returned to Delaware.

Thibault has not met his burden of putting forth evidence to show a genuine issue for trial on the breach of contract claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986) (The burden is on the non-movant to produce evidence of the existence of a genuine issue for trial.). Accordingly, there are no disputed issues of material fact, and the defendants are entitled to judgment as a matter of law on the breach of contract claim.

**D. Louisiana Wage Payment Statutes, La. Rev. Stat. 23:631 *et seq*.**

Thibault **[*15]** seeks penalties and attorney's fees under the Louisiana Wage Payment Statutes for failure to pay him overtime and wages for the time remaining under his employment contract. ³ The defendants contend that the Louisiana Wage Payment Statutes, like the FLSA, are designed to protect employees, not independent contractors.

**FOOTNOTES**

3 Louisiana Revised Statute 23:631 states as follows:

> A. (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, or on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

In order for an employer to be liable for penalty wages, the employer must have been motivated by bad faith in failing to pay wages or must be found to have acted in an arbitrary or unreasonable manner. See La. Rev. Stat. 23:632; Bartlett v. Doctor's Hosp. of Tioga, Inc., 415 So.2d 635 (La. Ct. App. 1982).

The application of La. Rev. Stat. 23:631 *et seq.* to the present case depends on whether Thibault is an employee or an independent **[*16]** contractor. Glover v. Diving Serv. Int'l, Inc., 577 So.2d 1103, 1106 (La. Ct. App. 1991). "Whether an individual is an employee or an independent contractor . . . depends primarily on the degree of control that the principal retains in the contract over the employee's work." Reynolds v. Paulson, 871 So.2d 1215, 1218 (La. Ct. App. 2004). Moreover, "where there is no withholding of taxes or Social Security deductions, then the relationship is that of a principal-independent contractor, and not that of an employer-employee." Knapp v. The Management Company, 476 So.2d 567, 569 (La. Ct. App. 1985).

As discussed above, BellSouth contracted with Directional to perform the splicing operations, and Directional contracted with Parker to hire the splicers. On October 5, 2005, Thibault filled out Parker's "Subcontractor Information" form and a W-9, "Request for Taxpayer Identification Number and Certification." Thibault then directed Parker to change the name on his checks to K & L Sales, Inc. and provided the federal tax identification number for the company. For the years 2005 and 2006, Parker filed Forms 1099-MISC indicating "Nonemployee compensation." No federal or state income tax was withheld. **[*17]** For 2005 and 2006, K & L Sales, Inc. issued Form W-2 Wage and Tax Statements, indicating that K & L Sales, Inc. paid Thibault wages and withheld income and social security taxes.

The lack of salary withholdings by Parker indicates that Thibault was an independent contractor rather than an employee. See Reynolds v. Paulson, 871 So.2d at 1222. Moreover, the factors discussed above concerning the control over the performance of the job, the investment in tools, and the temporary nature of the job support Thibault's status as an independent contractor. As an independent contractor, he is not entitled to the protections of the Louisiana Wage Payment Statutes.

Because there are no genuine issues of material fact underlying the business relationship between the defendants and Thibault, the defendants are entitled to judgment as a matter of law on Thibault's claim under the Louisiana Wage Payment Statutes.

New Orleans, Louisiana, this 10th day of November, 2008.

/s/ Mary Ann Vial Lemmon

**MARY ANN VIAL LEMMON**

**UNITED STATES DISTRICT JUDGE**

Service:  **Get by LEXSEE®**
Citation:  **2008 U.S. Dist. LEXIS 109656**
View:  Full
Date/Time:  Friday, September 23, 2011 - 7:31 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available
- Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

In          About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Switch Client | Preferences | Help | Sign Out

| Search | Get a Document | *Shepard's*® | More | | History | Alerts |

**FOCUS™** Terms     Advanced...   **Get a Document**     View Tutorial

Service: **Get by LEXSEE®**
Citation: **2006 U.S. Dist. LEXIS 96963**

*2006 U.S. Dist. LEXIS 96963, \**

Jonah West, individually, and on behalf of all others similarly situated, Plaintiffs, vs. Border Foods, Inc., d/b/a Pizza Hut, Inc., and Sky Ventures, LLC, Defendants.

Civ. No. 05-2525 (DWF/RLE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

2006 U.S. Dist. LEXIS 96963

June 12, 2006, Decided

**SUBSEQUENT HISTORY:** Adopted by, Motion denied by, Motion denied by, As moot West v. Border Foods, Inc., 2006 U.S. Dist. LEXIS 46506 (D. Minn., July 10, 2006)

**CORE TERMS:** manager, certification, restaurant, overtime, conditional, judicial notice, clock, similarly situated, collective action, off-the-clock, hours per week, timekeeping, notice, moot, factual basis, recommend, discovery, putative, hours worked, colorable, hearsay, store managers, required to work, deposition, informal, overtime pay, modified, hourly, time records, overtime compensation

**COUNSEL: [\*1]** For Jonah West, individually and on behalf of others similarly situated, Plaintiff: Donald H Nichols ▾ �️, LEAD ATTORNEY, Nichols Kaster & Anderson, Minneapolis, MN; Jill M Novak ▾, LEAD ATTORNEY, Fair Isaac Corporation, St Paul, MN; Michele R Fisher ▾, LEAD ATTORNEY, Nichols Kaster & Anderson, PLLP, Minneapolis, MN; Paul J Lukas ▾ �️, LEAD ATTORNEY, Nichols Kaster & Anderson, Mpls, MN; Rachhana T Srey ▾, LEAD ATTORNEY, Nichols Kaster & Anderson, PLLP, Mpls, MN; Sarah M Fleegel ▾, LEAD ATTORNEY, Nichols Kaster & Anderson, PLLP, Minneapolis, MN.

For Border Foods, Inc., doing business as Pizza Hut, Inc., Defendant: Brent A Lorentz ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN; David P Pearson ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN; Laura A Pfeiffer ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN; William A McNab ▾, Winthrop & Weinstine, PA, Mpls, MN.

For Sky Ventures, LLC, Defendant: Brent A Lorentz ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN; David P Pearson ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN; William A McNab ▾, LEAD ATTORNEY, Winthrop & Weinstine, PA, Mpls, MN.

**JUDGES:** Raymond L. Erickson ▾, CHIEF U.S. MAGISTRATE JUDGE.

**OPINION BY:** RAYMOND L. ERICKSON ▾

**OPINION**

REPORT AND RECOMMENDATION

I. Introduction

This **[*2]** matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel, and the Defendant's Informal Motion to Stay Consideration of the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel. A Hearing on the Motions was conducted on April 18, 2006, at which time, the Plaintiffs appeared by Donald H. Nichols, and Michelle R. Fisher, Esqs., and the Defendants appeared by David P. Pearson, Julie M. Engbloom, and William A. McNab, Esqs.

For reasons which follow, we recommend that the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel be denied, and that the Defendants' informal Motion to Stay consideration of the Motion be denied, as moot. We also recommend that the Defendants' Motion to Strike be denied, as moot. [1]

**FOOTNOTES**

[1] While the Plaintiffs' Motion was under advisement, the Defendants filed a Motion to Strike certain averments that were made in the Plaintiffs' Interrogatory Answers which were submitted in support of the Plaintiffs' Motion for Conditional **[*3]** Certification, Judicial Notice, and to Compel. The Plaintiffs have not, as of yet, responded to the Defendants' Motion to Strike, and no Hearing was conducted on that Motion. Nevertheless, our recommended disposition of the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel, would appear to render the Defendants' Motion moot, and accordingly, we recommend that the Motion be denied.

II. Factual Background

The Plaintiff Jonah West ("West") commenced this action on behalf of himself, and others similarly situated, alleging that the Defendants violated the Fair Labor Standard Act ("FLSA"), Title 29 U.S.C. §§ 201-219, when they failed to pay him for his overtime hours. Specifically, West, who is a former shift manager at the Pizza Hut restaurants in Maplewood, and in Woodbury, Minnesota, alleges that he and other similarly situated employees worked as shift managers at the Pizza Hut restaurants that were owned and operated by the Defendants, and that he, and other similarly situated employees, worked in excess of forty (40) hours per week, without receiving full overtime compensation. Amended Complaint, at PP6 and 7.

At the time that the Plaintiffs' Motion was **[*4]** filed, ten (10) persons, in addition to West, had "opted-in" to the suit. Affidavit of Michele Fisher ("Fisher Aff."), at P3. Of those persons, six (6) were determined by the Plaintiffs not be similarly situated, and either have withdrawn from the case, or have been asked to do so by the Plaintiffs. Id. The remaining five (5) Plaintiffs include: West; Erin Allram ("Allram"), who worked as a shift manager at the Defendants' Pizza Hut restaurant in Cottage Grove, Minnesota; Marshaire Cross ("Cross"), who worked at the Defendants' Pizza Hut restaurants in Apple Valley, Minnesota, and in St. Paul, Minnesota; Joseph Starks ("Starks"), who worked as a shift manager in the Defendants' Pizza Hut restaurant in New Brighton, Minnesota; and Stacy Dondelinger ("Dondelinger"), who worked as a shift manager in the Defendants' Pizza Hut restaurant in Columbia Heights, Minnesota. [2]

## FOOTNOTES

2 Since the Plaintiffs' Motion was filed, two (2) other persons -- Nakia Johnson, and Mike Sittler -- have filed Notices of Consent, in which they expressed their willingness to join as Plaintiffs to the action. See, Docket No. 37. However, no information has been provided with respect to those persons, such as which restaurants **[*5]** they worked at, or the precise nature of their claims against the Defendants.

By their Motion, the Plaintiffs now seek conditional certification to proceed collectively, pursuant to Title 29 U.S.C. §216(b). The Plaintiffs also seek to provide judicial notice of the action to all of the shift managers who have not joined in the action, and who are employed by the Defendants at their Pizza Hut, and "combo" restaurants. 3 In order to effectuate the notice, the Plaintiffs have also requested that the Defendants be compelled to answer Request No. 1, of their First Set of Requests for the Production of Documents, which requests the following information:

> A list, in electronic and importable format, of all persons employed by Defendants as shift managers at any of Defendants' Pizza Hut locations from September of 2002 to present, including their name, address, telephone number, dates of employment as a shift manager, location of employment, employee number, and social security number.

Given this factual backdrop, we proceed to the parties' Motions.

## FOOTNOTES

3 The Plaintiffs' request to include, within the putative class, shift managers at "combo" restaurants is apparently a reference to restaurants which **[*6]** contain a Pizza Hut facility, in addition to another facility, such as a Taco Bell restaurant. Notably, the deposition testimony of Fred Burmer, who is the Vice President of Operations for the Defendant Sky Ventures, LLC ("Sky Ventures"), reflects that Sky Ventures owns and operates one facility that contains both a Taco Bell, and a Pizza Hut restaurant, and that the employees of Taco Bell, at that location, are -- like each of the Plaintiffs -- paid by Sky Ventures. Fisher Aff., Exh. 15, at pp. 30-31.

III. Discussion

"The FLSA allows employees to bring a collective action 'for and in behalf of * * * themselves and other employees similarly situated.'" Frank v. Gold'n Plump Poultry Inc., 2005 U.S. Dist. LEXIS 20441, 2005 WL 2240336 at *2 (D. Minn., September 14, 2005), quoting Title 29 U.S.C. §216(b). However, "[u]nlike class actions under Rule 23, '[n]o employee shall be a party to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.'" Smith v. Heartland Automotive Services, Inc., 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005), quoting Title 29 U.S.C. § 216(b). The process by which putative plaintiffs, in a FLSA collective **[*7]** action, are joined, is commonly referred to as the "opt-in" process, and Courts may facilitate that process by authorizing the named Plaintiffs in a FLSA action to transmit a notice to potential class members. Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989). However, "[t]hat power is to be exercised * * * only in 'appropriate cases,' and remains within the discretion of the district court." Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 266 (D. Minn. 1991) ("Severtson I").

"The fundamental inquiry in determining whether a collective action under [Section] 216(b) is

appropriate is whether or not the plaintiffs are 'similarly situated.'" Smith v. Heartland Automotive Services, Inc., 404 F. Supp. 2d 1144, 1149-50 (D. Minn. 2005). "Unfortunately, [Section] 216(b) does not define the term 'similarly situated,' and there is little circuit law on the subject." Thiessen v. GE Capital Corp., 267 F.3d 1095, 1102 (10th Cir. 2001). In this District, like many other jurisdictions, the determination of whether plaintiffs are "similarly situated," is made by using a two-step process, which has recently been described as follows:

> At the initial stage, the court determines **[*8]** whether the class should be conditionally certified for notification and discovery purposes. [Kalish v. High Tech Institute, Inc., 2005 U.S. Dist. LEXIS 8238, 2005 WL 1073645 at *1 (D. Minn., April 22, 2005)]. At this conditional certification stage, the plaintiffs need only come forward with evidence establishing a colorable basis for their claim that the putative class members were together the victims of a single decision, policy, or plan. See, 2005 U.S. Dist. LEXIS 8238, [WL] at *2; Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 267 (D. Minn. 1991) (Severtson I). That is, the plaintiffs must show that there is some factual basis beyond the mere averments in their complaint for the class allegations. Severtson I, 137 F.R.D. at 267; Severtson v. Phillips Beverage Co., 141 F.R.D. 276, 278-79 (D. Minn. 1992) (Severtson II). At the second stage -- which comes after discovery is completed -- the court uses a stricter standard for determining whether the putative class members are similarly situated and reconsiders whether the trial should proceed collectively or if it should be severed. Kalish, 2005 U.S. Dist. LEXIS 8238, 2005 WL 1073645 at * 1. At the second stage, the court conducts a fact intensive inquiry of several factors, including: (1) the extent and consequence **[*9]** of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. See, Thiessen, 267 F.3d at 1102-03.

Frank v. Gold'n Plump Poultry, Inc., supra, 2005 U.S. Dist. LEXIS 20441, [WL] at *2; see, Smith v. Heartland Automotive Services, Inc., supra at 1149-50; Kalish v. High Tech Institute, Inc., 2005 U.S. Dist. LEXIS 8238, 2005 WL 1073645 at *2-3 (D. Minn., April 22, 2005); see also Thiessen v. General Electric Capital Corp., supra at 1102-03; Koren v. SUPERVALU, Inc., 2003 U.S. Dist. LEXIS 4104, 2003 WL 1572002 at * 15-16 (D. Minn., May 14, 2003).

Here, the parties have engaged in some discovery, such as the exchange of Interrogatories and Document Requests, and have taken the depositions of Barry Zelickson, Frank Burmer, and Julie Pung ("Pung"), who are each officers of the Defendant Sky Ventures, LLC ("Sky Ventures"), pursuant to Rule 30(b)(6), Federal Rules of Civil Procedure. However, the discovery process has not been completed and, as such, we analyze the Plaintiff's Motion under the initial stage of review.

At this stage, the Plaintiffs need only show that there is a "colorable basis" for their collective action, see, **[*10]** Smith v. Heartland Automotive Services, Inc., supra at 1149, and that factual similarities or differences among the putative Plaintiffs are such that the case may be properly managed as a collective action. See, Ray v. Motel 6 Operating Limited Partnership, 1996 U.S. Dist. LEXIS 22564, 1996 WL 938231 at *4 (D. Minn., March 18, 1996); see also, Severtson v. Phillips Beverage Co., supra at 266 ("As a matter of sound case management, a court should, before [authorizing a notice], make a preliminary inquiry as to whether a manageable class exists."); see, e.g., Diaz v. Electronics Boutique of America, 2005 U.S. Dist. LEXIS 30382, 2005 WL 2654270 at *5 (W.D. N.Y., October 17, 2005); England v. New Century Financial Corp., 370 F. Supp. 2d 504, 509 (M.D. La. 2005).

"A colorable basis means that plaintiff must come forward with something more than the mere averments in its complaint in support of its claim." Severtson v. Phillips Beverage Co., 141 F.R.D. 276, 278-79 (D. Minn. 1992) ("Severtson II"). This analysis "does not require th[e] court to make any findings of fact with respect to contradictory evidence presented by the parties nor does th[e] court need to make any credibility determinations with respect to the evidence

presented." Id. However, **[*11]** "some identifiable facts or legal nexus must bind the claims so that hearing the cases together promotes judicial efficiency." Barron v. Henry County School System, 242 F. Supp.2d 1096, 1103 (M.D. Ala. 2003), citing Sheffield v. Orius Corp., 211 F.R.D. 411, 416 (D. Or. 2002).

The Plaintiffs urge that conditional certification is proper because West, and each of the other "opt-in" Plaintiffs, are or were shift managers at Pizza Hut restaurants that were owned and operated by the Defendants; that each was classified as a "non-exempt employee" for the purposes of overtime eligibility; that each used the same computer system to track their time; that each was subject to the same corporate hierarchy; and that, pursuant to the practice of the Defendants, each was deprived of overtime pay.

As factual support for their Motion, the Plaintiffs have presented the Interrogatory Answers of West, Starks, Dondelinger, Allram, and Cross. See, Fisher Aff., at Exh. 17. As is pertinent to the present Motion, each of those persons was asked to "[d]escribe in detail all facts supporting, refuting or concerning your complaint that Defendants failed to pay you overtime compensation for all hours worked in **[*12]** excess of forty (40) hours per week," and to describe his or her responsibilities for recording work hours in the Defendants' Automated Timekeeping system. Id.

In response to the Interrogatory concerning the factual basis for his claim, West avers, as follows:

> Defendant maintained a practice of requiring its hourly employees to work hours "off the clock." For example, Plaintiff's district managers, Jerry Wickery and Doug Pricket, told Plaintiff's manager Glenn Rowley that hours worked over forty hours per week were to be "off the clock." Mr. Rowley then conveyed that information to Plaintiff. Sometimes Mr. Rowley allowed a few hours of overtime pay to be recorded and paid. Plaintiff is also aware that this practice was occurring at other locations, including but not limited to the Maplewood, Cottage Grover, Stillwater, and Woodbury restaurants.

Id.

West further elaborates that he was responsible for clocking in and out daily; that he was instructed by Glenn Rowley, who was his manager, to delete hours for certain employees, who had worked in excess of forty (40) hours per week; and that he had worked approximately three (3) hours of overtime per week. In response to a Second Set of Interrogatories, **[*13]** West explained that his awareness of similar conduct at other stores was predicated on his knowledge that Jerry Wickery ("Wickery") was a district manager for several of the Defendants' restaurants, and West's experiences working at restaurants that had been managed by Wickery. Additionally, West reports that a shift manager at the Defendants' restaurant in Stillwater, Minnesota, who he identified as Corinna, had informed him that she had been required to work off the clock without overtime compensation.

Id.

Similarly, Starks describes the factual basis for his claim, as follows:

> Plaintiff worked on average 50 hours per week. Plaintiff was not fully compensated for his overtime hours worked because his restaurant managers, Ronda Gordmaker and Tony Martin, required him to work off the clock in order to keep labor costs as low as possible. At weekly performance meetings, his managers regularly stressed that they need to keep labor costs down. This resulted in shift managers being forced to work longer hours. Plaintiffs managers at times, told him to clock out before his shift was over and then paid him cash for staying the extra hours. In addition, Plaintiff's managers modified his hours **[*14]** worked in the timekeeping system. Finally, sometimes Plaintiff's managers clocked him into the timekeeping

system but did not do so immediately upon him beginning his shift.

Id.

Starks further avers that he was required to enter his time into the Automated Timekeeping System, and that, on occasion, he modified his time in the system. Id.

Dondelinger's Interrogatory Answers contain the following description of the factual basis for her claim:

> Plaintiff worked on average 42 hours per week. Plaintiff was not paid accurately for her overtime hours worked because the restaurant manager, Jennifer Bauer, recorded her hours inaccurately in the computer system. In addition, there were instances where Plaintiff's manager asked her to work off the clock and told her she would pay her cash out of the cash register if she worked a few extra overtime hours. She worked this overtime once or twice a month. Plaintiff believes that it was either the regional or district manager directing her boss to make her work overtime hours.

Id.

Additionally, Dondelinger avers that she was required to enter her time into the Automated Timekeeping System; that she modified her time on several occasions with her manager's [*15] approval; and that she was allowed to modify her time when she forgot to punch in or out at the beginning or end of a shift. Id.

According to Allram's Interrogatory Answers, the factual basis for her claim can be described, as follows:

> Plaintiff worked on average 47 hours per week. Plaintiff was required by her manager to work off the clock a few times per month. It was Plaintiff's understanding that Pizza Hut only allowed her manager to pay the hourly employees for a specified number of hours per month. If Plaintiff or the other hourly employees' overtime hours exceeded the hours allocated to the manager, he would inform them that he would not pay them for those hours and required that they work off the clock. Plaintiff is not aware if anyone altered her records to further deny her pay for hours worked.

Id.

Allram further attests that she was required to enter her time in the Automated Timekeeping System, and that she did not make any modifications to the work hours that were entered into the system. Id.

Cross answered the Defendants' Interrogatory concerning the factual basis for her FLSA claim, as follows:

> Plaintiff worked on average 52 hours per week. As a matter of corporate policy, [*16] Plaintiff's managers were required to meet a quota every month. Therefore, they were required to reduce the number of overtime hours because her managers, Bruce and Neil, modified her time records in the timekeeping system. She is not sure how often this occurred, but once the Plaintiff realized it was occurring (her co-workers, Jamie and Sabrina Baucou, were complaining about it happening to them also), she noticed that for approximately a three month period her hours listed on her pay statements were less than the total hours worked.

Id.

Cross further attested that she was allowed to modify her time records in the Automated Timekeeping System if she forgot to punch in or out at the beginning or end of a shift. Id.

In addition to those Interrogatory Answers, the Plaintiffs submitted an anonymous letter, which was addressed to Pung, who is the Senior Human Resources Generalist for the Defendants, in which the author describes instances in which a number of the Defendants' employees at the Defendants' Hillcrest Pizza Hut restaurant in Maplewood, Minnesota, including West, were either required to work off-the-clock, or were denied overtime pay. Id. at Exh. 18. The Plaintiffs have also **[*17]** directed our attention to the deposition testimony of Pung, which reflects that an employee of the Defendants, at a Pizza Hut restaurant in either Brainerd or Baxter, Minnesota, had complained that a manager had adjusted his end times for when he finished his shifts. See, Id. Exh. 16, at p. 34.

The Defendants have challenged the admissibility of several of averments that have been presented by the Plaintiffs in support of their Motion. There is presently a split in the pertinent authority as to whether the Court may properly consider inadmissible hearsay in the context of a Motion for Conditional Certification. Compare, Harrison v. McDonald's Corp., 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005) ("[O]nly admissible evidence maybe considered in connection with a [Section] 216(b) motion."), citing Richards v. Computer Sciences Corp., 2004 U.S. Dist. LEXIS 19637, 2004 WL 2211691 at * 1 (D.Conn., September 28, 2004), and McElmurry v. US Bank National Association, 2004 U.S. Dist. LEXIS 15233, 2004 WL 1675925 at * 10 (D. Or., July 27, 2004); Clark v. Dollar General Corp., 2001 U.S. Dist. LEXIS 25976, 2001 WL 878887 at *2 (M.D. Tenn., May 23, 2001), with White v. MPW Industrial Services, Inc., 236 F.R.D. 363, 2006 WL 752554 at *4-5 (W.D. Tenn., 2006) (finding that hearsay **[*18]** evidence may properly be considered in the context of a Motion for Conditional Certification). The parties do not address this split in authority, and our independent research does not disclose any case law from this District, or from any Circuit Court of Appeals, which has addressed the propriety of considering hearsay evidence in the context of a Motion for Conditional Certification.

The resolution of this split in authority is not material to our Recommendation and, as such, we will assume, without deciding, that hearsay evidence may be considered in the context of a Motion for Conditional Certification. That being said, even under the more permissive line of authority, the averments made in support of a Motion for Conditional Certification must be based on personal knowledge, see, White v. MPW Industrial Services, Inc., 236 F.R.D. 363, supra at *5, and "unsupported assertions of widespread violations are not sufficient to meet the Plaintiff's burden." See, Freeman v. Wal-Mart Stores, Inc., 256 F. Supp. 2d 941 (W.D. Ark. 2003), citing Haynes v. Singer Co., Inc., 696 F.2d 884, 887 (11th Cir. 1983); H&R Block, Ltd. v. Housden, 186 F.R.D. 399, 400 (E.D. Tex. 1999).

Eliminating those averments which **[*19]** are not based on personal knowledge, as well as those which are merely conclusory, the Plaintiffs' submissions establish that six (6) shift managers, who were employed by the same corporate entity, and who operated under the same timekeeping system, were required to work off-the-clock by their individual store managers. [4] Sky Ventures purportedly owns approximately eighty (80) Pizza Hut restaurants, and it employs approximately three (3) shift managers, and one (1) restaurant general manager, at each location. **Affidavit of Julie** Pung ("Pung Aff."), at P2-3. As such, the Plaintiffs' showing demonstrates that six (6) of the potential class of approximately 240 shift managers, who are employed at Pizza Hut restaurants owned by the Defendants -- 2.5 per cent of the potential class -- were allegedly required by their store managers to work off-the-clock. Such a limited sampling of employees does not support the Plaintiffs' assertion of widespread violations resulting from a common policy or plan. See, e.g., Harrison v. McDonald's Corp., supra at 870-71 (averments from two (2) employees who claimed FLSA violations, out of a potential class of 300, were insufficient to allow for conditional **[*20]** certification); Flores v. Lifeway Foods, Inc., 289 F. Supp. 2d 1042, 1046 (N. D. Ill. 2003) (evidence that demonstrated an employer's payment practices with respect to two (2) employees out of fifty (50) did not

amount to "even a 'modest factual showing' of a common policy or plan.").

## FOOTNOTES

4 Of course, if we were to accede to the view that "only admissible evidence may be considered in connection with a [Section] 216(b) motion," see, Harrison v. McDonald's Corp., 411 F. Supp. 2d 862, 865-66 (S.D. Ohio 2005), we would necessarily disregard West's averments that a shift manager at the Defendants' restaurant in Stillwater, Minnesota, who he identified as Corrina, told him that she had been required to work off-the-clock, as such an averment is plainly hearsay.

The Defendants have also presented evidence which refutes the Plaintiffs' assertion that a centralized policy required shift managers to work off the clock. Specifically, the Defendants have submitted training materials which require employees to clock themselves in before they start work, and to clock themselves out when their shift is over. Pung Aff., Exh. B, at SV000349. The Defendants have also submitted their Basic Management Training [*21] Program for Pizza Hut restaurants, which contains a memorandum entitled "Policy Bulletin 501." Id. at Exh. A. According to that policy, managers employed at the Defendants' Pizza Hut restaurants are prohibited from punishing an employee by cutting hours that were actually worked, or by asking, letting, or making employees work after they clock out. Similarly, the manager on duty is also prohibited from improving shift labor by directing anyone not to clock in for a scheduled shift; by refusing to pay overtime that an employee earned; by moving overtime from one week to the next; by asking or requiring anyone to work off the clock; or by reducing actual hours worked in the company records. Id. Exh. B., at SV000349-50. The Defendants further note that their Management Operations Manual requires that hourly employees be paid time and a half for overtime. Id. at Exh. C.

Since this case is at the initial stage of the certification inquiry, we need not make any factual determinations. However, neither the remedial purposes of the FLSA, nor the interests of judicial economy, would be advanced if we were to overlook facts which generally suggest that a collective action is improper. See, Basco v. Wal-Mart Stores, Inc., 2004 U.S. Dist. LEXIS 12441, 2004 WL 1497709 at *5 (E.D. La., July 2, 2004) [*22] ("To create a collective action class, including the cost associated with that when a Court is convinced that there is insufficient support for the same prior to certification would be an exercise in futility and wasted resources for all parties involved."); see, e.g., Ray v. Motel 6 Operating Limited Partnership, supra, 2004 U.S. Dist. LEXIS 12441, [WL] at *4. The plaintiffs, in Ray, who were assistant managers at the defendant's motels, sought to proceed collectively in their claim that the defendant had denied them overtime payments in violation of the FLSA. Specifically, the plaintiffs alleged that the defendants told assistant managers that the job would require overtime, but that they could not record more than forty (40) hours per week. In support of their requested certification, the plaintiffs submitted a number of affidavits concerning the defendant's alleged "plan" to deny them overtime payments.

In addressing the propriety of the conditional certification and notice, the Court recognized that the "[d]etermination of class status at the notice stage is often liberally authorized since the court has minimal evidence for analyzing the class." Id. However, the Court determined that, given the extensive facts [*23] before it, there was no need for discovery in order to determine whether certification was proper, and it ultimately found that the plaintiffs had failed to satisfy their burden that they were similarly situated for the purposes of the FLSA. In so finding, the Court recognized that each of the plaintiff's who had "opted in" to the action were employed in the same position, pursuant to a similar management plan, as members of a management team which consisted of a manager and an assistant manager; that each of the plaintiffs were employed by the same corporate entity; and that the plaintiffs each alleged a common illegal plan to deprive them of overtime pay.

However, the Court also noted the individualized nature of the plaintiffs' claims, as the plaintiffs worked at a minimum of thirty-nine (39) different properties, located in twenty (20) different States; the properties where the plaintiffs worked varied widely as to the number of rooms and budgets; and the amount of overtime hours varied among plaintiffs. The Court also observed as follows:

> Moreover, the illegal overtime plan alleged by the Plaintiffs in the present action is not necessarily carried out through central management. **[*24]** First official written policy dictates that overtime will be paid in compliance with the FLSA. Second, if an illegal scheme exists at all, it is implemented on a decentralized level. Specifically, the approval of overtime is controlled by area supervisors. Further, in that Plaintiffs also allege that budget plans demonstrate a need for improper overtime, it is notable that the budgetary plans differ according to region and property. The evidence does not indicate that all the Plaintiffs sustained injury from one unlawful policy.

1996 U.S. Dist. LEXIS 22564, [WL] at *4.

Under similar circumstances, Courts from other jurisdictions have determined that where an "off-the-clock" claim requires significant individual considerations, it may be inappropriate for conditional certification. See, Diaz v. Electronics Boutique of America, supra, 2005 U.S. Dist. LEXIS 30382, [WL] at *5 (denying Motion for Conditional Certification upon the finding that the plaintiff's "allegations -- viz., that he worked "off-the-clock" without compensation and that his timesheets were altered to delete overtime hours worked -- are too individualized to warrant collective action treatment."), citing Lawrence v. City of Philadelphia, 2004 U.S. Dist. LEXIS 8445, 2004 WL 945139 at *2 (E.D. Pa., April 29, 2004) **[*25]** (denying Motion for class certification where "off-the-clock" claim did not involve regularly scheduled hours that were worked by all members of the class, because "[t]he circumstances of those individual claims potentially vary too widely to conclude that * * * the Plaintiffs are similarly situated."); England v. New Century Financial Corp., supra at 509 (finding conditional certification improper in a case where an "off-the-clock" claim involved a multitude of different managers at different locations, and where liability at one store location would not necessarily require a finding of liability at another location); Basco v. Wal-Mart Stores, Inc., supra, 2004 U.S. Dist. LEXIS 12441, [WL] at *7.

In Basco v. Wal-Mart Stores, Inc., supra, 2004 U.S. Dist. LEXIS 12441, [WL] at *7, the plaintiffs alleged "wide- spread occurrence of off-the-clock-work and unpaid overtime" at the defendant's stores in Louisiana. In support for their allegations, the plaintiffs presented testimony from a former store manager that six (6) persons worked off-the-clock at his store, and that he had previously been instructed to delete overtime hours from employees' time records. The plaintiffs also presented testimony from five (5) of the defendant's employees who claimed that **[*26]** they had worked more than forty (40) hours without receiving overtime compensation. 2004 U.S. Dist. LEXIS 12441, [WL] at *6.

In response to the plaintiffs' submissions, the defendants presented evidence that the plaintiffs were, individually, responsible for punching themselves in and out, and that the defendant's official policy required payment for all working time. 2004 U.S. Dist. LEXIS 12441, [WL] at *7. As such, the defendants urged that "any deviations for [sic] that policy occurs on a manager-by-manager basis and associate-by-associate basis involving particular circumstances and anecdotal testimony." Id.

When presented with this information, the Court determined that certification was improper, reasoning as follows:

> Simply put, plaintiffs seek to make a corporate policy to keep employee wage costs low sufficient proof to justify the creation of a class of all Wal-Mart employees that have not been properly paid overtime in the last three years. It is obvious from the

discovery presented that this "policy" and its effects are neither homogeneous nor lend themselves to collective inquiry. The effects of the policy as alleged are anecdotal, that is to say particularized. Plaintiffs' own witnesses demonstrate that the "policy" was not even **[*27]** uniformly or systematically implemented at any given store. While it is true that this "lesser" standard should not preclude certification, and "similarly situated" does not mean identically situated, plaintiffs have failed in their burden of proof to demonstrate identifiable facts or legal nexus that binds the claims so that hearing the cases together promotes judicial efficiency. For this reason the Court would deny the Motion to Certify Collective Action.

2004 U.S. Dist. LEXIS 12441, [WL] at *7. [5]

The circumstances here are analogous to those which were present in Ray and Basco, in that the Plaintiffs were employed at different store locations, where different individual restaurant managers allegedly used varying means to deprive the Plaintiffs of proper compensation for his or her overtime hours. Furthermore, the nature of the asserted violation differ among the Plaintiffs; the number of uncompensated overtime hours that are being claimed range from two (2) to twelve hours (12) hours weekly, Fisher Aff. at Exh. 17; and, like both Ray and Basco, the alleged violations are contrary to the Defendants' official written policy, which precludes store managers from requiring employees to work off-the-clock, and requires **[*28]** payment of time and one-half for all overtime hours worked.

### FOOTNOTES

[5] While the Court, in Basco, analyzed the plaintiffs' Motion for Class Certification under both the first and second stage of the two-step analysis, we have limited our discussion of that case to its analysis under the initial, less stringent standard.

The burden on the Plaintiffs to establish that their case is "appropriate" for conditional certification and judicial notice "is not a difficult one." Severtson II, supra at 279. However, before subjecting an employer to the burdens of a collective action, the plaintiffs must establish a colorable basis for their claim that a manageable class of "similarly situated" plaintiffs exist. Severtson I, supra at 267. Considering the individualized nature of the alleged violations, along with the absence of evidence to support the Plaintiffs' conclusory assertion of widespread violations, we find that the Plaintiffs have failed to demonstrate even a colorable basis that they were the victim of some common policy or plan, or that a manageable class exists, which would render a collective action appropriate. Therefore, we recommend that the Plaintiff's Motion for Conditional Certification, **[*29]** Judicial Notice, and to Compel be denied at this time. [6]

### FOOTNOTES

[6] As noted, the Plaintiff's Motion to Compel seeks to require the Defendants to provide them with a list of all persons that were employed by the Defendants as shift managers at their Pizza Hut restaurants from September of 2002, until the present, and contact information for those individuals. The purpose of the requested information is to facilitate notice to potential putative plaintiffs. Since, we find that the Plaintiffs' claims are inappropriate for collective action, and notice, it necessarily follows that the information being sought is no longer pertinent to the Plaintiffs' claims. Furthermore, given our recommended disposition of the Plaintiffs' Motion to for Conditional Certification, Judicial Notice, and to Compel, we recommend that the Defendants' informal Motion to Stay consideration of that Motion be denied, as moot.

During the time that the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to

Compel, was under advisement, the Defendants filed a Motion to Strike certain portions of the Plaintiffs' Interrogatories Answers that were submitted in support of the Plaintiffs' Motion for Conditional **[\*30]** Certification, Judicial Notice, and to Compel. The Defendants' Motion was predicated on depositions of the Plaintiffs, which commenced after the Hearing on the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel, and which the Defendants contend contain testimony that is contradictory to the information that was conveyed in the Plaintiffs' Interrogatory Answers. Since we have concluded that the Plaintiffs' Interrogatory Answers, as they were presented, fail to provide a basis for conditional certification, we further recommend that the Defendants' Motion to Strike be denied, as moot.

NOW, THEREFORE, It is --

RECOMMENDED:

1. That the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel [Docket No. 29] be denied.

2. That the Defendants' informal Motion to Stay Consideration of the Plaintiffs' Motion for Conditional Certification, Judicial Notice, and to Compel [Docket No. 34] be denied, as moot.

3. That the Defendants' Motion to Strike Interrogatory Answers [Docket No. 57] be denied, as moot.

Dated: June 12, 2006

/s/ Raymond L. Erickson

Raymond L. Erickson

CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, **[\*31]** D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than June 29, 2006,** a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 29, 2006,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.

Service: **Get by LEXSEE®**
Citation: **2006 U.S. Dist. LEXIS 96963**
View: Full
Date/Time: Friday, September 23, 2011 - 7:32 PM EDT

\* Signal Legend:
- Warning: Negative treatment is indicated
- Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
- Citing Refs. With Analysis Available

**I** -  Citation information available

* Click on any *Shepard's* signal to *Shepardize*® that case.

In

About LexisNexis  | Privacy Policy   | Terms & Conditions   | Contact Us
Copyright © 2011 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.